RAOUL D. KENNEDY (STATE BAR NO. 40892)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Embarcadero Center, Suite 3800
San Francisco, California 94111
Telephone: (415) 984-6400
Facsimile: (415) 984-2698
Email: Raoul.Kennedy@skadden.com

JAMES R. CARROLL (*PRO HAC VICE*)
DAVID S. CLANCY (*PRO HAC VICE*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Beacon Street, 31st Floor
Boston, Massachusetts 02108
Telephone: (617) 573-4800
Facsimile: (617) 573-4822
Email: James.Carroll@skadden.com
Email: David.Clancy@skadden.com

Attorneys for Defendant
Conseco Life Insurance Company

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE CONSECO LIFE INSURANCE COMPANY LIFETREND INSURANCE SALES AND MARKETING LITIGATION | ) CASE NO.: M:10-CV-02124-SI<br>)<br>) ALL CASES<br>)<br>)<br>) **CONSECO LIFE'S OPPOSITION**<br>) **TO PLAINTIFFS' JOINT MOTION FOR**<br>) **CLASS CERTIFICATION AND**<br>) **MEMORANDUM OF POINTS**<br>) **AND AUTHORITIES IN SUPPORT**<br>) **THEREOF**<br>)<br>)<br>) Date:   June 4, 2010<br>) Time:   9:00 a.m.<br>) Place:   Courtroom 10<br>) Judge: The Honorable Susan Illston<br>)<br>) **PUBLICLY-FILED VERSION**<br>)<br>)<br>) |

**OPPOSITION OF**
**DEFENDANT CONSECO LIFE INSURANCE COMPANY**

Defendant Conseco Life Insurance Company respectfully submits this opposition to plaintiffs' joint motion for class certification filed on March 11, 2010.  This opposition is based on the accompanying Memorandum of Points and Authorities, the Declaration of Frank S. Scuglik, the Declaration of David S. Clancy, the Declaration and Supplemental Declaration of Michael C. Keeley, Ph.D., and all exhibits and attachments thereto.

DATED:  April 22, 2010                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


By: _____/s/ Raoul D. Kennedy_____
                Raoul D. Kennedy

Attorneys for
DEFENDANT CONSECO LIFE INSURANCE
COMPANY

# TABLE OF CONTENTS

Page

STATEMENT OF ISSUES TO BE DECIDED ................................................................1

INTRODUCTION AND BRIEF STATEMENT OF FACTS ..........................................1

PLAINTIFFS' ALLEGATIONS AND MOTION FOR CLASS CERTIFICATION.......................4

ARGUMENT ...................................................................................................................7

I.      THE COURT SHOULD EXERCISE ITS DISCRETION TO DENY THE
        MOTION ON THE BASIS THAT IT IS PREMATURE .....................................8

II.     THE COURT SHOULD DENY THE MOTION ON THE BASIS THAT
        PLAINTIFFS HAVE NOT SUBMITTED A WORKABLE TRIAL PLAN, NOR
        HAVE THEY SUBMITTED AN ADEQUATE ANALYSIS OF STATE LAW.............10

III.    PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THOSE OF THE CLASS, NOR
        ARE PLAINTIFFS ADEQUATE CLASS REPRESENTATIVES, BECAUSE
        THEY PRESS A DIFFERENT THEORY THAN THE PURPORTED "CLASS"
        CLAIM AND LACK BASIC KNOWLEDGE ABOUT THE LITIGATION .................12

        A.      Plaintiffs' Claims Are Not Typical Of The Class ....................................12

        B.      Plaintiffs Are Inadequate Class Representatives ...................................14

IV.     INDIVIDUALIZED ANALYSIS WILL BE REQUIRED TO RESOLVE
        PLAINTIFFS' THEORIES, DEFEATING THE COMMONALITY,
        PREDOMINANCE AND SUPERIORITY REQUIREMENTS .......................................15

        A.      Individualized Analysis Would Be Required  To Resolve The Merits Of
                Each Of The Three Theories At Issue.......................................................17

        B.      Similarly, Individualized Analysis Will Be Required To Resolve Statute Of
                Limitations Defenses ...............................................................................26

        C.      Both The Fact Of And The Amount Of Damages Would Need To Be
                Determined On An Individualized Basis As Well....................................29

        D.      For These And Related Reasons, Other Fed. R. Civ. P. 23(b)(3) Factors For
                Consideration Weigh Against Class Certification ...................................30

        E.      Contrary To Plaintiffs' Suggestion, Conseco Has Never Endorsed The
                Certification Of A Class............................................................................31

V.      THE MULTIPLE FLAWS IN PLAINTIFFS' CASE  FOR CLASS
        CERTIFICATION ARE EXACERBATED BY THE FACT THAT MANY
        PROPOSED CLASS MEMBERS HAVE ALREADY SURRENDERED THEIR
        POLICIES ............................................................................................................32

VI.     PLAINTIFFS DO NOT SATISFY FED. R. CIV. P. 23(B)(2) EITHER ..........................33

        A.      Plaintiffs Do Not Satisfy The Prerequisites Of Rule 23(a)....................34

i

B.    The Monetary Relief Sought By Plaintiffs Is Not Incidental ...............................34

C.    The Putative Class Is Lacking In Cohesiveness .....................................................36

VII.   PLAINTIFFS' REQUEST FOR A CALIFORNIA-ONLY CLASS ALSO FAILS ..........37

A.    The Class Representatives Are Atypical Because They Did Not Rely Upon The Allegedly Misleading Component Of The Annual Statement........................37

B.    In Addition, This California-Only Theory -- Like Plaintiff's Nationwide Theories -- Would Also Require Plaintiff-By-Plaintiff Adjudication .................38

VIII.  THE ALLEGATIONS ABOUT FEES ARE PART AND PARCEL OF THE OVERALL CASE, WHICH SHOULD NOT BE CERTIFIED, AND PLAINTIFFS HAVE NOT MADE ANY PROPOSAL AT ALL -- MUCH LESS A WORKABLE ONE -- TO *SEPARATELY* CERTIFY THOSE ALLEGATIONS.....................................40

A.    Plaintiffs' Assertions About The Fees Are Wrong...................................................40

B.    Plaintiffs' Fee Challenge Is Bound Up In A Broader Case Which Cannot Be Certified For The Reasons Already Shown; Plaintiffs Have Not Proposed, Much Less Justified, Some Separate Certification Of The Fee Challenge...........41

CONCLUSION .......................................................................................................................44

Appendix A .................................................................................................................... A-1

Appendix B .................................................................................................................... B-1

Appendix C .................................................................................................................... C-1

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page(s)**

Abbott Labs., Inc. v. Gen. Elec. Capital,
    765 So. 2d 737 (Fla. Dist. Ct. App. 2000) ............................................................28

Adams v. Kan. City Life Ins. Co.,
    192 F.R.D. 274 (W.D Mo. 2000)...........................................................22, 23, 24

Apr. Enters., Inc. v. KTTV,
    147 Cal. App. 3d 805 (Cal. App. 2d. 1983) .........................................................28

Arnold v. United Artists Theatre Circuit, Inc.,
    158 F.R.D. 439 (N.D. Cal. 1994)..........................................................................13

Blackwell v. Skywest Airlines, Inc.,
    245 F.R.D. 453 (S.D. Cal. 2007) .............................................................................8

Bowers v. Jefferson Pilot Fin. Ins. Co.,
    219 F.R.D. 578 (E.D. Mich. 2004) ........................................................................23

Bracamonte v. Adler,
    Civ. No. 03-01821-SI, 2004 WL 1146624 (N.D. Cal. May 7, 2004) ...................36

Cartwright v. Viking Indus. Inc.,
    Civ. No. 2:07-02159-FCD-EFB, 2009 WL 2982887 (E.D. Cal. Sept. 14,
    2009) .....................................................................................................................11

Castano v. Am. Tobacco Co.,
    84 F.3d 734 (5th Cir. 1996) ....................................................................................9

Cohn v. Mass. Mut. Life Ins. Co.,
    189 F.R.D. 209 (D. Conn. 1999)................................................................16, 17, 21

In re Conseco Life Ins. Co. Cost of Ins. Litig.,
    Civ. No. ML 04-1610-AHM (Mcx), 2005 WL 5678790 (C.D. Cal. Apr. 27, 2005).............39

In re Conseco Life Ins. Co. Cost of Ins. Litig.,
    Civ. No. ML 04-1610-AHM (Mcx), 2005 WL 5678842 (C.D. Cal. Apr. 26, 2005).......33, 35

Doninger v. Pacific Nw. Bell, Inc.,
    564 F.2d 1304 (9th Cir. 1977) ..............................................................................11

Edwards v. The First Am. Corp.,
    251 F.R.D. 454 (C.D. Cal. 2008) ..........................................................................16

Endres v. Wells Fargo Bank,
    Civ. No. 06-7019-PJH, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008) ...................39

Forrand v. Fed. Express Corp.,
    Civ. No. 08-1360-DSF (PJWx), 2009 WL 648966 (C.D. Cal. Feb. 18, 2009).......................8

Gabriella v. Wells Fargo Fin., Inc.,
    Civ. No. 06-4347-SI, 2008 WL 3200190 (N.D. Cal. Aug. 4, 2008)....................16

iii

Gartin v. S&M Nutec, LLC,
      245 F.R.D. 429 (C.D. Cal. 2007) ..................................................................13

Gen. Tel. Co. of Sw. v. Falcon,
      457 U.S. 147 (1982)..........................................................................................8

Gilman v. John Hancock Variable Life Ins. Co.,
      Civ. No. 02-00051-AB, 2003 WL 23191098 (Fla. Cir. Ct. Oct. 20, 2003) ...............24, 35, 36

Gregurek v. United of Omaha Life Ins. Co.,
      Civ. No. 05-6067-GHK (FMOx), 2009 WL 4723137 (C.D. Cal. Nov. 10, 2009)...........27, 28

Grosman, M.D. v. Lederman, M.D., P.C.,
      Civ. No. 100544/2007, 2009 WL 4927156 (N.Y. Sup. Ct. Dec. 21, 2009).........................11

Hanlon v. Chrysler Corp.,
      150 F.3d 1011 (9th Cir. 1998) ........................................................................16

Hodgers-Durgin v. De La Vina,
199 F.3d 1037 (9th Cir. 1999..........................................................................43

Hood v. Hartford Life and Accident Insurance Co.,
      Civ. No. S-07-1634-FCD/EFB, 2008 WL 5101584 (E.D. Cal. Dec. 2, 2008) ....................23

Howard v. Gap, Inc.,
      Civ. No. 06-06773-WHA, 2009 WL 3571984 (N.D. Cal. Oct. 29, 2009)................20, 30, 38

Jackson v. Se. Pa. Transp. Auth.,
      260 F.R.D. 168 (E.D. Pa. Aug. 31, 2009).........................................................33

Kirkham v. Am. Lib. Life Ins. Co.,
      717 So. 2d 1226 (La. Ct. App. 1998)...............................................................21

Klay v. Humana, Inc.,
      382 F.3d 1241 (11th Cir. 2004) .....................................................................16

Lanzarone v. Guardsmark Holdings, Inc.,
      Civ. No. 06-1136-RPLAX, 2006 WL 4393465 (C.D. Cal. Sept. 7, 2006) ...........................34

Legge v. Nextel Commc'ns , Inc.,
      Civ. No. 02-8676DSF(VNKX), 2004 WL 5235587 (C.D. Cal. Jun. 25, 2004) ........30, 41, 42

Lewallen v. Medtronic USA, Inc.,
      Civ. No. 01-20395-RMW, 2002 WL 31300899 (N.D. Cal. Aug. 28, 2002) .......................36

Mahfood v. QVC,
      Civ. No. SACV 06-0659-AG(ANx), 2008 WL 5381088 (C.D. Cal. Sept. 22, 2008) .....35, 38

Mann v. GTE Mobilnet of Birmingham Inc.,
      730 So. 2d 150 (Ala. 1999).............................................................................22

Mass. Mut. Life Ins. Co. v. Super. Ct. of San Diego County,
      97 Cal. App. 4th 1282 (2002) ........................................................................39

iv

<u>Mentis v. Delaware Am. Life Ins. Co.</u>,
Civ. No. 98C-12-023WTQ, 2000 WL 973299 (Del. Super. Ct. May 30, 2000) .............20, 21

<u>Mortimore v. FDIC</u>,
197 F.R.D. 432 (W.D. Wash. 2000) ........................................................................................24

<u>In re Paxil Litig.</u>,
212 F.R.D. 539 (C.D. Cal. 2003) .....................................................................................10, 11

<u>Phillips v. Klassen</u>,
502 F.2d 362 (D.C. Cir. 1974) ...............................................................................................43

<u>In re Quarterdeck Office Sys. Inc. Sec. Litig.</u>,
Civ. No. 92-3970-DWW(GHKx),
1993 WL 623310 (C.D. Cal. Sept. 30, 1993) .........................................................................14

<u>Quezada v. Loan Ctr. of Cal.</u>,
Civ. No. 2:08-00177-WBS KJM, 2009 WL 5113506 (E.D. Cal. Dec. 18, 2009) ...........37, 39

<u>Rodriguez v. Gates</u>,
Civ. No. 99-13190-GAF (AJWX), 2002 WL 1162675 (C.D. Cal. May 30, 2002) ...13, 14, 31

<u>Servicios de Almacen Fiscal Zona Franca Y Mandatos S.A. v. Ryder Int'l, Inc.</u>,
Civ. No. 06-22774-HUCK/SIMONTON,
2007 WL 628133 (S.D. Fla. Feb. 26, 2007) .....................................................................28, 29

<u>Solomon v. Massachusetts Mut. Life Ins. Co.</u>,
47 Pa. D. & C.4th 36 (Ct. Com. Pl. 2000) .............................................................................21

<u>Suever v. Connell</u>,
Civ. No. 03-00156-RS, 2007 WL 3151964 (N.D. Cal. Oct. 26, 2007) ...............................9, 10

<u>Sweet v. Pfizer</u>,
232 F.R.D. 360 (C.D. Cal. 2005) ......................................................................................12, 36

<u>Textana, Inc. v. Klabzuba Oil & Gas</u>,
222 P.3d 580 (Mont. 2010) .....................................................................................................11

<u>Umsted v. Intelect Commc'ns., Inc.</u>,
Civ. No. A. 3:99-CV-2604, 2003 WL 79750 (N.D. Tex. Jan. 7, 2003)..................................15

<u>Vasquez v. Super. Ct. of San Joaquin County</u>,
4 Cal. 3d 800 (1971) ...............................................................................................................39

<u>Vega v. T-Mobile USA, Inc.</u>,
564 F.3d 1256 (11th Cir. 2009) ........................................................................................20, 38

<u>Walsh v. Ford Motor Co.</u>,
807 F.2d 1000 (D.C. Cir. 1986) ..............................................................................................12

<u>Welling v. Alexy</u>,
155 F.R.D. 654 (N.D. Cal. 1994) ............................................................................................15

<u>Westways World Travel, Inc. v. AMR Corp.</u>,
218 F.R.D. 223 (C.D. Cal. 2003) ............................................................................................36

v

Yokoyama v. Midland Nat. Life Ins. Co.,
    594 F.3d 1087 (9th Cir. 2010) ..................................................................30

Yue v. Conseco Life Ins. Co.,
    2:08-cv-01506 (C.D. Cal Dec 12, 2009)............................................35, 36

Zinser v. Accufix Research Inst., Inc.,
    253 F.3d 1180 (9th Cir. 2001) ......................................................10, 12, 30

**STATUTES AND RULES**

28 U.S.C. § 1407(a) ...............................................................................................31

Cal. Bus. & Prof. Code § 17200 ...........................................................................39

Cal. Civ. Proc. Code § 337(1)................................................................................28

Cal. Civ. Proc. Code § 339(1)................................................................................28

Fed. R. Civ. P. 23 ..............................................................................................passim

Fla. Stat. Ann. § 95.031(1).....................................................................................29

Fla. Stat. Ann. § 95.11(2)(b) ..................................................................................28

Ky. Rev. Stat. Ann. § 413.090(2) ..........................................................................28

Ohio Rev. Code Ann. § 2305.06.............................................................................28

vi

## STATEMENT OF ISSUES TO BE DECIDED

Plaintiffs in the <u>Brady</u> and <u>McFarland</u> actions[1] ("Plaintiffs"), which have been consolidated in this MDL, have jointly moved this Court for certification of a nationwide class and a California-only subclass ("Motion").  The issue before the Court is whether certification of those two separate classes should be granted.  For the reasons set forth herein, Defendant Conseco Life Insurance Company ("Conseco" or the "Company") respectfully submits that certification is not appropriate, and that the Motion should be denied.

## INTRODUCTION AND BRIEF STATEMENT OF FACTS

This lawsuit relates to certain "Lifetrend" life insurance policies originally issued by Massachusetts General Life Insurance Company and Philadelphia Life Insurance Company, and now administered by Conseco.  The policies at issue are Lifetrend 3 and Lifetrend 4 policies, which were offered for sale in the 1980s and into the 1990s.  They were sold by independent agents, not by employees of Conseco or its predecessors.  (Declaration of Frank S. Scuglik ("Scuglik Decl."), first filed on January 29, 2010 in the <u>Brady</u> matter and filed again herewith, at ¶ 3.[2]  For discussion of the factual background, also see the Declaration and Supplemental Declaration of Michael C. Keeley, Ph.D., Senior Vice-President of Cornerstone Research in Menlo Park, California ("Keeley Decl." and "Suppl. Keeley Decl."), Ex. 1.[3])

These policies have an "accumulation account."  (<u>See, e.g.</u>, Life Insurance Policy for Cedric Brady ("Brady Policy"), Ex. 2, at 8.)  The "ANNUAL PREMIUM" is deposited into this account, and a guaranteed minimum interest rate is applied to it.  (Brady Policy at 3, 8.)  On a discretionary

---

[1]    <u>Brady v. Conseco Life Ins. Co.</u>, No. 3:08-CV-05746-SI (N.D. Cal.) and <u>McFarland v. Conseco Life Ins. Co.</u>, No. 3:09-CV-00598 (M.D. Fla.).

[2]    Lifetrend 3 and Lifetrend 4 policies were issued in "series": the 1987 series, the 1993 series, and the 1995 series.  There were different policy forms for Massachusetts General and Philadelphia Life, and for each of the three series.  All of the <u>Brady</u> plaintiffs had Lifetrend 4 1987 series policies issued by Massachusetts General.  (Scuglik Decl. at ¶ 5.)  Additionally, Plaintiff McFarland had two Lifetrend 4 policies:  a 1987 series policy and a 1993 series policy issued by Philadelphia Life.

[3]    Unless otherwise indicated, exhibits are attached to the Declaration of David S. Clancy, filed herewith.

1  basis, the Company can apply a greater interest rate than the minimum in one or more years,

2  depending on its own investment experience.  (Id.)  To the extent the Company is imposing one or

3  more contractually-permitted fees, those fees are deducted from the accumulation account,

4  meaning that the size of this account is influenced over time based upon the deduction of fees (if

5  any), and the accumulation of interest (at a fluctuating rate).  (Scuglik Decl. at ¶ 6.)

6       The policies provide for a stated premium to be paid each year.  (Brady Policy, at 3.)  But

7  there is an exception:  under the policy's Optional Premium Payment provision ("OPP"), the

8  policyholder may choose to cease paying premium after the fifth year of ownership, as long as then,

9  and thereafter, the value of the fluctuating accumulation account is equal to or greater than the sum

10 of three stated values.  (Brady Policy at 9.)  Those values are (1) the Guaranteed Cash Value,

11 which increases over time and is shown in the policy (Brady Policy at 4, 9); (2) the surrender

12 charge, which decreases over time and is also shown in the policy (Brady Policy at 5, 9); and (3)

13 the amount of any outstanding loan.  (Brady Policy at 7-8.)  Where the accumulation account value

14 is below the sum of these values, the policy is informally referred to as "underfunded," or "in

15 shortfall."  (Scuglik Decl., at ¶ 8; see also Brady Policy at 10.)

16      Putting aside factors 2 and 3 -- the ultimately-disappearing surrender charge and the loan,

17 which is optional -- the essential idea of OPP is that it allows the policyholder to remain in a non-

18 premium paying status as long as he or she remains above the policy's stated guaranteed cash value;

19 i.e., as long as the policy is not "underfunded."  That said, a policyholder in that situation may

20 choose to pay additional premium, in order to benefit from the interest that accrues on the

21 accumulation account.[4]

22      During the 1990s and 2000s, many policyholders entered OPP mode, but, over time, their

23 policies became underfunded.  (Scuglik Decl. at ¶ 9.)  That is true of the named Plaintiffs here.

24 This happened for different reasons that depended on the policyholder.  For example, Brady took a

25

26

---

27     [4]    See, e.g., Brady Policy, at 9:  after the fifth policy anniversary the policyholder

28 "may elect . . . to pay: an amount which is less than the premium then due on the policy." (emphasis added.)

OPPOSITION TO MOTION FOR CLASS CERTIFICATION         CASE NO.: M:10-CV-02124-SI

1    significant loan from his policy, which he still has not paid back.  (See Ex. 3, Brady's 2008 annual

2    statement, showing an approximately $38,000 loan.)

3         Each policyholder was sent an annual benefit statement showing the value of his or her

4    accumulation account.  (Scuglik Decl. at ¶ 8 and Ex. 17 thereto (sample statement); see also

5    Section IV.B.)

6         In late 2008, Conseco sent a letter to certain Lifetrend 3 and 4 policyholders stating, inter

7    alia, that their policies were underfunded, and that Conseco would be imposing certain

8    contractually-permitted fees on a going-forward basis (the "October 2008 letter").  (Scuglik Decl.

9    at ¶ 10, and Ex. 19 thereto.)  The letter established a set of policies and procedures for addressing

10   this underfunding.  However, shortly thereafter, Conseco informed policyholders that they should

11   disregard the October 2008 letter and all subsequent letters, in light of ongoing conversations with

12   regulators.  (Scuglik Decl. at ¶ 11, and Ex. 20 thereto.)  Those discussions are presently continuing.

13   (Scuglik Decl. at ¶ 11.)   A settlement in principle has been reached, but the particular terms of the

14   written settlement agreement are under negotiation.

15         Absent that suspension (a hypothetical which Plaintiffs incorrectly treat as the present-day

16   reality), the situation would have been as follows:

        (i)     Contrary to Plaintiffs' assertions of a demand for immediate payment of substantial lump-sum premium, a policyholder would have been permitted to pay no further premium at all, and his policy would have remained in force -- with death benefit fully available -- until the accumulation account value was no longer able to support the monthly fees (see below for a description of these fees).  In that scenario, how long a policy would remain in force would have depended on the person.  In Brady's case, for example, the October 2008 letter projected his policy remaining in force for eleven years with current assumptions, if he had chosen to pay no additional premium whatsoever.  (See Ex. 4, at CLIC 0002515; see also Keeley Decl. at ¶ 27.))  Further, under the October 2008 letter, the policyholder could always avoid that future lapse by making, beforehand, a modest premium payment sufficient to cover the next year's fees.  (This "enhanced continuation of insurance" arrangement was a significant new benefit to policyholders.  Under the policy itself, absent eligibility for OPP, a failure to pay required annual premium meant the policy would be placed in a "continuation of insurance" status under which the policyholder was not permitted to make further premium payments, exposing the policyholder to the possibility of a policy lapse that he or she could not control.  (Brady Policy at 9.)  Also, in that situation, a surrender charge would have immediately been subtracted from the accumulation account.  (Brady Policy, at 9.)  Under the October 2008 letter, those limitations were removed.  (Scuglik Decl. at ¶ 12.))

3

(ii)     As to fees, two fees would have been imposed on a going-forward basis: a "cost of insurance" fee, and an "expense" fee.[5]  Conseco had made the discretionary decision not to charge these fees for many years in many cases (benefiting policyholders), but the policies expressly permit both fees to be charged, within certain parameters (for example, there is a monthly $5 maximum charge for the expense fee for the Lifetrend IV 1987 series (the policy common to the Brady plaintiffs), and a contractually-specified maximum rate for calculation of the cost of insurance fee).  (See Brady Policy at 5, 10-11.)  Neither fee would have exceeded those parameters.  (Scuglik Decl. at ¶ 12.)

Consequently, there is no basis for Plaintiffs' frequent assertions that their policies are at risk of cancellation absent a prompt, substantial payment:  the October 7, 2008 letter did not create that situation,[6] and in any event that letter has been suspended.  Nor is there any basis for Plaintiffs' assertions that there is something contractually improper about the fees that were proposed in the October 2008 letter.  More broadly, Plaintiffs' assertion of harm is undeveloped, and, on its face, difficult to understand.  Plaintiffs have had free insurance for many years, and under the October 2008 letter their insurance coverage would have continued, for as long as their accumulation account covered certain contractually-permitted fees.  Further, as explained in the Keeley Declaration, under the October 2008 letter "Conseco offered proposed class members a valuable new option to make additional contributions to their accumulation accounts, which will earn tax-deferred interest at rates substantially above current market rates."  (Keeley Decl. at ¶ 16.)

## PLAINTIFFS' ALLEGATIONS AND MOTION FOR CLASS CERTIFICATION

The Plaintiffs themselves, when asked for their grievances, testified that they expected to make only five premium payments, and the October 2008 letter purportedly demanded unexpected additional premium payments.  (See, e.g., Deposition of Cedric T. Brady ("Brady Dep."), Ex. 5, at 68:21-70:8.)  Plaintiffs make this claim even though the policies contain no five-payment guarantee, nor does any other document.

In an effort to obtain class certification, Plaintiffs' counsel appear to press two different theories:

---

[5]     There is also a "per unit" expense fee that Plaintiffs do not appear to be challenging.

[6]     See Deposition of Frank Scuglik ("Scuglik Dep."), previously filed under seal as Ex. 14 to Plaintiffs' Motion, at 152:20-153:20 ███████████████████████████

4

(a)   The Complaint and the Amended Complaint in <u>Brady</u> and the Complaint in <u>McFarland</u> appear to allege that the policies became underfunded years ago, and that, as soon as they became underfunded, Defendants were obligated to so notify policyholders (i.e., the October 2008 notice was belated).  (<u>See, e.g.</u>, <u>Brady</u> Am. Compl. at ¶¶ 78-85; <u>McFarland</u> Compl. at ¶¶ 25-29.)[7]

(b)   Plaintiffs' motion for class certification, however, argues that the policies are not underfunded at all, and that Conseco is misapplying the OPP formula described above.  (<u>See, e.g.</u>, Motion at 13-14.)  Again, that formula checks whether the accumulation account value is greater than a "floor" which is the sum of guaranteed cash value, surrender charge, and any indebtedness.  Usually the most significant portion of that "floor" is the guaranteed cash value, which, as shown on an initial page of each Lifetrend 3 and 4 policy, increases each year; <u>e.g.</u>, in Mr. Brady's 20th year (2007), it was $135,879.  (Brady Policy, at 4.)  Plaintiffs incorrectly contend that, once a policyholder is in OPP status, the guaranteed cash value for use in this formula is actually <u>zero</u>, meaning, practically, that a policy would <u>never</u> be underfunded absent significant indebtedness.  This reading of the policy is illogical.  (See Suppl. Keeley Decl. at 2-3.)[8]

Theory (b) should not be deemed to "replace" Theory (a).  If Theory (b) were to fail, Theory (a) would surely be the fallback.  That is, upon a finding that Conseco properly applied the OPP formula in finding underfunding, Plaintiffs would argue that they were <u>still</u> wronged, because notice of underfunding was sent belatedly.

In the complaints and in their class certification motion, Plaintiffs also claim that the fees described in the (suspended) October 2008 letter are not permitted by the policy.  As shown above, and as addressed further in Section VIII of this brief, Plaintiffs are wrong, and Conseco views this

---

[7]   Policyholders were able to track their underfunding status, because they received annual benefit statements accurately showing the value of their accumulation account.  That said, as Mr. Scuglik explained in his deposition, ████████████████████████████████

████████████████████████████████████████████████████  (Scuglik Dep. at 155:6-159:3.)

[8]   Plaintiffs support this argument by pointing to a statement on the guaranteed cash value page of the policy that "THIS TABLE PRESUMES THAT THE INSURED PAYS THE FULL ANNUAL PREMIUM SHOWN ON THE PRECEDING PAGE EACH YEAR" (Brady Policy at 4), and to a statement in certain annual benefit statements that "The surrender value of your policy on [date] is the greater of the cash value of [amount] or the guaranteed cash value of $0.00."  (<u>See, e.g.</u>, Ex. 6 at CLIC 0004784.)  Plaintiffs misconstrue both statements, which convey that if an insured on OPP were to <u>surrender</u> his or her coverage, he or she would not be entitled to receive the guaranteed cash value shown in the policy's table of guaranteed cash values -- <u>not</u> that the figure shown there is irrelevant to the periodic determination of underfunding.

5

1 | as, at best, a tag-along aspect of Plaintiffs' case that should not be the subject of a nationwide

2 | class,[9] and which Plaintiffs are free to pursue on an individual basis.

3 |     As established herein, Plaintiffs' Motion should be denied for multiple reasons:

4 |     1.    The Motion is premature.  Plaintiffs purport to challenge certain actions announced

5 | in a 2008 letter that is suspended, and subject to revision in connection with the administrative

6 | settlement negotiations.  In this situation, which involves a "wrong" that has not happened,

7 | Plaintiffs cannot plausibly claim to satisfy their burden of proving -- subject to "rigorous analysis"

8 | -- that, on examination of the law <u>and facts</u>, certification of a class is appropriate.  <u>See</u> Section I

9 | herein.

10 |     2.    Plaintiffs' motion is unsupported by either a workable trial plan or an analysis of

11 | variation in relevant state law.  As shown herein, this case implicates the heterogeneous breach of

12 | contract law of <u>48</u> states.  Plaintiffs' superficial submissions in this regard are insufficient.  <u>See</u>

13 | Section II herein.

14 |     3.    The named plaintiffs are starkly atypical, because they press a theory -- violation of

15 | a purported 5-premium "promise" -- that is wholly different than the theories pressed by their

16 | counsel on behalf of the class.  <u>See</u> Section III herein.

17 |     4.    The commonality, predominance, and superiority requirements are not met, because

18 | as to all of the theories being pressed here, plaintiff-by-plaintiff adjudication would be necessary,

19 | as to the merits of the theories, as to application of statute of limitations defenses, and as to

20 | determination of damages.  The named Plaintiffs claim that they expected their premium-payment

21 | obligation to "vanish" in five years, based upon inherently idiosyncratic alleged representations and

22 | understandings.  (The policy makes no such guarantee, nor does any document.)  Over and over

23 | again, courts have rejected class-certification on so-called "vanishing premium" allegations, for the

24 | straightforward reason that -- as is the case here -- person-by-person adjudication would be

25 | necessary to resolve what each insured saw, was told and claimed to believe concerning premium

26 | duration.  As to the theory that Conseco's underfunding calculation is incorrect, Cedric Brady sent

27 | 

28 |     [9]    Plaintiffs' putative nationwide class consists of 9,550 policyholders who received the October 2008 letter and were underfunded at the time.

OPPOSITION TO MOTION FOR CLASS CERTIFICATION          CASE NO.: M:10-CV-02124-SI

1   a letter to Conseco in 1992 evidencing an understanding of that calculation that is <u>consistent</u> with

2   Conseco's.  Similarly, as to the alternate theory that notice of underfunding was belated, the impact

3   if any of that alleged belated notice on each policyholder would require individualized analysis, for

4   the reasons explained in detail in the accompanying Keeley Declaration.  The resulting

5   manageability problems are exacerbated by material variation in state law concerning such matters

6   as admissibility of extrinsic evidence to prove a breach of contract claim.  <u>See</u> Section IV herein.

7       5.      All of these problems are exacerbated by the fact that many proposed class members

8   (approximately 21% of them) surrendered their policies after receiving the October 2008 letter,

9   making them uniquely situated as to claims and damages.  <u>See</u> Section V herein.

10      6.      Plaintiffs' tag-along request for certification of a Rule 23(b)(2) injunctive-relief only

11  class is inappropriate in this case, where it is clear -- including from the prayer for relief itself --

12  that monetary damages are not "incidental."  <u>See</u> Section VI herein.

13      7.      Plaintiffs' request for a California-only class on claims of, <u>inter alia</u>, fraud, fails for

14  multiple reasons, including lack of typicality and predominance.  This proposed class is premised

15  on the theory that policyholders were misled by text that appeared in only <u>some</u> annual statements,

16  and without Plaintiff-specific inquiry, it would be impossible to determine if any policyholder read,

17  much less relied on, that text.  <u>See</u> Section VII herein.  As it happens, none of the representative

18  plaintiffs did so, and assuming that <u>all</u> policyholders did so is therefore improper.

19      8.      Finally, Plaintiffs' challenge to the fees that were described in the now-suspended

20  October 2008 letter is uncertifiable on a class basis for the same reasons.  It is part-and-parcel of a

21  case that, for all of those reasons, is unsuitable for class certification, and Plaintiffs have not even

22  proposed -- much less justified factually and legally -- any <u>separate</u> certification of the fee

23  challenge.  <u>See</u> Section VIII herein.  Moreover, as explained in the Keeley Declaration,

24  individualized issues exist in this area, as well.

25                              **ARGUMENT**

26      Rule 23 of the Federal Rules of Civil Procedure contains a two-step process for class

27  certification.  First, would-be class representatives must show that each of the four separate

28  requirements of Rule 23(a) -- numerosity, commonality, typicality, and adequacy of representation

7

1   -- has been met.  (Fed. R. Civ. P. 23(a).)  If plaintiffs do so, then plaintiffs still must show that at

2   least one of the three requirements of Fed. R. Civ. P. 23(b) is met.  Plaintiffs seek to satisfy two of

3   those additional requirements here:

        (i)    Rule 23(b)(3).  "Questions of law or fact common to class members
4              predominate over any questions affecting only individual members, and . . .
5              a class action is superior to other available methods for fairly and efficiently
               adjudicating the controversy."  (Fed. R. Civ. P. 23(b)(3).)  This inquiry is
6              "more rigorous" than the threshold commonality inquiry, and "the Court,
               therefore, must balance concerns regarding the litigation of issues common
7              to the class as a whole with questions affecting individual class members."
               Blackwell v. Skywest Airlines, Inc., 245 F.R.D. 453, 467 (S.D. Cal. 2007).[10]
8
        (ii)   Rule 23(b)(2).  "The party opposing the class has acted or refused to act on
9              grounds that apply generally to the class, so that final injunctive relief or
               corresponding declaratory relief is appropriate respecting the class as a
10             whole."  (Fed. R. Civ. P. 23(b)(2).)

11          Plaintiffs bear the burden of proving that each of these requirements is satisfied, and courts

12  must engage in a "rigorous analysis" of whether plaintiffs have done so.  Gen. Tel. Co. of Sw. v.

13  Falcon, 457 U.S. 147, 161 (1982); see also, e.g., Forrand v. Fed. Express Corp., Civ. No. 08-1360-

14  DSF (PJWx), 2009 WL 648966, at *1 (C.D. Cal. Feb. 18, 2009) ("before certifying a class, the trial

15  court must conduct a 'rigorous analysis' to determine whether the party seeking class certification

16  has met the [Rule 23] prerequisites.")

17          As explained herein, Plaintiffs do not and cannot satisfy their burden on their Motion, for

18  multiple reasons.

19  I.      THE COURT SHOULD EXERCISE ITS DISCRETION TO
            DENY THE MOTION ON THE BASIS THAT IT IS PREMATURE
20          As shown above, the October 2008 letter triggered the Plaintiffs' lawsuit, but the challenged

21  matters concerning premium payments and fees announced in that letter are in a state of suspension,

22  pending ongoing communications with regulators.  (A settlement is currently being documented in

23  continuing discussions between Conseco and the regulators.  If a final settlement is consummated,

24

25

26          [10]     The findings pertinent to this inquiry include:  "(A) the class members' interests in
27  individually controlling the prosecution or defense of separate actions; (B) the extent and nature of
    any litigation concerning the controversy already begun by or against class members; (C) the
28  desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D)
    the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).

OPPOSITION TO MOTION FOR CLASS CERTIFICATION            CASE NO.: M:10-CV-02124-SI

1   Conseco will seek leave to file a supplemental brief addressing the impact on Plaintiffs' class

2   certification motion.)

3          In this unusual setting -- a matter that asserts a vague complaint about a <u>suspended</u> action

4   that is under active negotiation -- the movant cannot plausibly claim satisfaction of the multiple

5   Rule 23 class certification prerequisites.  The "rigorous" application of legal standards to the facts

6   and theories of this matter is plainly not possible, and the Court should exercise its discretion to

7   deny class certification.  Fed. R. Civ. P. 23(c)(1)(A) requires the Court to determine class

8   certification at an "early <u>practicable</u> time" (emphasis added), and, before certifying a class, the

9   Court "must understand the claims, defenses, relevant facts, and applicable substantive law in order

10  to make  meaningful determination of class certification issues." <u>Castano v. Am. Tobacco Co.</u>, 84

11  F.3d 734, 744 (5th Cir. 1996) (emphasis added.)[11]

12         In <u>Castano</u>, the Court reversed certification of a class in part because the tort claim asserted

13  was "immature" (i.e., its nature and elements had not been tested and developed in multiple cases),

14  and therefore the necessary predominance analysis was "abstract," and certification "risk[ed]

15  decertification after considerable resources [were] expended."  <u>Id.</u> at 749.  The situation here is

16  logically analogous.  While plaintiffs' <u>cause of action</u> is not immature, the factual situation is

17  highly unsettled, meaning that -- just as in <u>Castano</u> -- the requisite analysis is inherently abstract,

18  and prudence dictates that the Court exercise its broad discretion against certification of a class.

19  <u>See also</u> <u>Suever v. Connell</u>, Civ. No. 03-00156-RS, 2007 WL 3151964, at *5 (N.D. Cal. 2007)

20  (denying class certification in light of pending motion for reconsideration on a substantive issue,

21  the result of which would impact the class certification analysis; here, the situation is significantly

22  more unsettled, because the very action that Plaintiffs challenge is suspended and under regulatory

23  review); <u>see also</u> Keeley Decl. at ¶ 12 (finding lack of injury to recipients of October 2008 letter

24  because aspects relating to shortfall premium payments and fees are suspended).

25

26         [11]    Further, "district courts have broad discretion" on class certification motions,
27  "because the district court is in the best position to consider the most fair and efficient procedure
    for conducting any given litigation."  <u>Cartwright v. Viking Indus. Inc.</u>, 2009 WL 2982887, at *3
28  (E.D. Cal. Sept. 14, 2009), quoting <u>Doninger v. Pacific Nw. Bell, Inc.</u>, 564 F.2d 1304, 1309 (9th
    Cir. 1977).

OPPOSITION TO MOTION FOR CLASS CERTIFICATION                    CASE NO.: M:10-CV-02124-SI

1

**II.    THE COURT SHOULD DENY THE MOTION
ON THE BASIS THAT PLAINTIFFS HAVE NOT
SUBMITTED A WORKABLE TRIAL PLAN, NOR HAVE
THEY SUBMITTED AN ADEQUATE ANALYSIS OF STATE LAW**

2

3

Plaintiffs have failed to submit a workable trial plan, which, among other things, should

4

have analyzed and proposed a plan for addressing variations in relevant state law.  Such a plan is of

5

particular importance in this matter, where: (a) the case challenges an action that is suspended

6

while under regulatory review; for that reason, (b) the theory of alleged "wrong" is unclear and

7

inconsistent; (c) Plaintiffs are also unclear about the damages (or other relief) they seek; and (d)

8

Plaintiffs seek certification of a nationwide class, which would require the jury to consider the

9

breach of contract law of 48 states.[12]  Instead, the Plaintiffs glossed over these critical issues, and

10

proposed simply to try this matter "in a single phase with a single set of jury instructions," having

11

(wrongly) concluded that "there are no material variations in applicable state law."  (Motion at 26.)

12

In a case of this nature, a trial plan permits the Court to understand the plaintiffs' theories

13

and proposal for trying those theories, to meaningfully evaluate satisfaction of the multiple Rule 23

14

prerequisites, including whether a certified class would be manageable.  Absent such a plan,

15

certification should be denied.  "At least in the Ninth Circuit, the presentation of a preliminary,

16

unworkable trial plan, does not suffice for class certification."   In re Paxil Litig., 212 F.R.D. 539,

17

548 (C.D. Cal. 2003) (denying nationwide class certification in product liability suit where -- on

18

reply -- plaintiffs submitted a trial plan insufficiently addressing how to resolve individualized

19

factual issues, and variances in state law), citing Zinser v. Accufix Research Inst., Inc., 253 F.3d

20

1180, 1190 (9th Cir. 2001) (upholding denial of class certification where "there was no manageable

21

trial plan adequate to deal with individualized issues and variances in state law.")

22

The absence of this required showing is significant in this case.  As shown below, even now

23

-- with the alleged "wrong" wholly speculative -- it is apparent that this case is rife with

24

individualized factual issues.  For example, as explained below, the record includes a letter sent by

25

26

---

27

[12]    Plaintiffs seek a nationwide class on their claim for breach of contract and
declaratory judgment.  (The dramatic narrowing of the fourteen-count Brady complaint is itself a
concession about the unmanageability of this proposed class action.)  That class would cover the 48
states in which proposed class members reside.

28

| OPPOSITION TO MOTION FOR CLASS CERTIFICATION | CASE NO.: M:10-CV-02124-SI |

1   Mr. Brady to Conseco in 1992 which shows that his understanding of the method of OPP

2   calculation was the same as Conseco's.  Plaintiffs neither recognize such individualized factual

3   issues, nor propose a plan for addressing them -- they instead ignore them, and propose to shift the

4   burden squarely onto the Court:  in the face of the varying laws of 48 states, they blithely suggest

5   that if "evidence is admissible as to some purposes but not others, the Court can so instruct the

6   jury." (Motion at 26.)

7          The same is true of legal variation.  Contrary to Plaintiffs' superficial analysis, the relevant

8   contract law varies substantially from state to state, as shown in Appendix A to this brief.  For

9   example, there is substantial variation on the important and always-challenging question of what

10  evidence is admissible on a breach of contract claim, i.e., to what extent can "extrinsic" evidence --

11  such as Brady's 1992 letter -- be admitted.  Plaintiffs also seek punitive damages, but the law of

12  punitive damages also varies state to state, also as shown in Appendix A.[13]  Plaintiffs make no

13  effort at all to address this important issue.  The court in <u>Paxil</u> noted that one significant flaw in the

14  trial plan presented by plaintiffs there was that "[t]he description does not even begin to lay out the

15  specific elements required to prove certain causes of actions." 212 F.R.D. at 546.  Here, similarly,

16  Plaintiffs make no attempt to chart the choice of law variations across the 48 states whose laws will

17  inform the legal analysis -- they simply declare (again, wrongly) that there are no material

18  variations.  (Motion at 26.)

19

20

21     [13]       Punitive damages are generally not available on a claim of breach of contract.
22  However, that is not <u>uniformly</u> true, and Plaintiffs have not formally disclaimed their punitive
    damages claim.  Indeed, Plaintiffs are pursuing their fraud claim on behalf of themselves and other
23  <u>California</u> policyholders meaning they may intend to use that claim, and related findings, as a basis
    for a request for punitive damages in the other states.  Conseco believes that any such effort would
24  be wholly baseless, but, at this stage, it must be considered in analyzing satisfaction of Rule 23.
    <u>See, e.g.</u>, <u>Grosman, M.D.V. v. Lederman, M.D., P.C.</u>, 25 Misc. 3d 1245(A), 2009 WL 4927156, at
25  *4 (N.Y. Sup. Ct. Dec. 21, 2009) (table) (punitive damages recoverable in a breach of contract case
    where, <u>inter alia</u>, "the breach of contract is first actionable as an independent tort for which
26  compensatory damages are ordinarily available, and is sufficiently egregious to warrant the
    additional imposition of exemplary damages.") (internal citation and quotes omitted); <u>Textana, Inc.</u>
27  <u>v. Klabzuba Oil & Gas</u>, 222 P.3d 580, 595 (Mont. 2009) (a Montana statute permits punitive
    damages on a breach of contract claim "where the claimant proves by clear and convincing
28  evidence that the defendant is guilty of actual fraud or actual malice outside the contract context.")
    (internal citation and quotes omitted).

11

As now-Justice Ruth Bader Ginsburg once stated, "[n]ationwide class action movants must credibly demonstrate, through an 'extensive analysis' of state law variances, that class certification does not present insuperable obstacles."  Walsh v. Ford Motor Co., 807 F.2d 1000, 1016-17 (D.C. Cir. 1986, cert denied, 482 U.S. 915 (1987).  In the circumstances of this case, Plaintiffs' failure to submit a workable trial plan forms a compelling basis for denial of class certification, both independently, and in conjunction with the matters addressed below.  "The Ninth Circuit has clearly stated that plaintiffs seeking certification of a nationwide class in which numerous state laws may apply bear the burden of demonstrating a trial plan."  Sweet v. Pfizer, 232 F.R.D. 360, 370-71 (C.D. Cal. 2005) (denying class certification where "Plaintiffs failed to satisfy this key requirement of a motion for class certification," and failed to give the Court "guidance regarding the orderly manner in which to apply all the varying states' laws.") (emphasis added), quoting Zinser v. Accufix Res. Inst., Inc., 253 F.3d 1180 (9th Cir. 2001).

**III.   PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THOSE OF THE CLASS, NOR ARE PLAINTIFFS ADEQUATE CLASS REPRESENTATIVES, BECAUSE THEY PRESS A DIFFERENT THEORY THAN THE PURPORTED "CLASS" CLAIM AND LACK BASIC KNOWLEDGE ABOUT THE LITIGATION**

**A.     Plaintiffs' Claims Are Not Typical Of The Class**

The typicality requirement is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (Fed. R. Civ. P. 23(a)(3).)  The adequacy requirement is that "the representative parties will fairly and adequately protect the interests of the class." (Fed. R. Civ. P. 23(a)(4).)  Those requirements are not satisfied in this case, because the representative plaintiffs press a theory that is different than the theory of the purported class.

As explained in the background section of this brief, (a) the motion for class certification articulates a theory that the policies are not underfunded, because Conseco's determination of underfunding rests on an incorrect interpretation of the formula in the policies' OPP provision, and (b) the complaints articulate an alternative theory that Conseco sent policyholders a belated notice of underfunding.  These lawyer-crafted theories are apparently those on which Plaintiffs' counsel seek class certification.

1    But those are not the theories of the Plaintiffs themselves.  Stated generally, the plaintiffs,

2  deposed under oath in their role as class representatives, complained about violation of a purported

3  promise that the policies would require only five annual premium payments.[14]  That is a very

4  different theory; also, it is subject to unique defenses -- for example, the utter absence of any such

5  guarantee in the relevant policy documents.

6    Consequently, class certification should be denied for failure to satisfy Fed. R. Civ. P.

7  23(a)'s typicality requirement.  In Gartin v. S&M Nutec, LLC, 245 F.R.D. 429 (C.D. Cal. 2007),

8  for example, the plaintiff sued a manufacturer of dog treats, claiming that the product had caused

9  physical harm.  However, plaintiff's focus was to recover damages for existing injury, "while other

10  class members will seek costs for monitoring" for potential latent health problems.  Id. at 435.

11  Further, plaintiff's claims were "subject to particular defenses"; for both reasons, the Court

12  concluded that "litigation of the action is likely to be overwhelmed by addressing her individual

13  claims," such that her claims were not typical.  Id.  The same is true here, where an effort to litigate

14  a "class claim" about miscalculation of a policy formula will necessarily be overwhelmed by the

15  named representatives' discrete claims about misrepresentation at point of sale.  See also Rodriguez

16  v. Gates, Civ. No. 99-13190-GAF (AJWX), 2002 WL 1162675 (C.D. Cal. May 30, 2002) (named

17  plaintiff was atypical where his theory of liability was narrower than the theory or theories that

18  could be presented by the class).[15]

19

20

21

_____

22    [14]    See Brady Dep. at 68:1-69:3; Deposition of Dr. Hisaji Sakai ("H. Sakai Dep."), Ex.
23  7 , at 15:10-16:3; Deposition of Jean Sakai ("J. Sakai Dep."), Ex. 8, at 15:24-16:5; Deposition of Dr.
    Marion Hovden ("M. Hovden Dep."), Ex. 9, at 38:6-39:11; Deposition of Dr. Charles Hovden ("C.
24  Hovden Dep."), Ex. 10, at 25:22-26:8; Deposition of Dr. John McNamara ("McNamara Dep."), Ex.
    11, at 31:22-32:4; Deposition of Dr. Eugene Kreps ("Kreps Dep."), Ex. 12, at 43:10-17; Deposition
25  of Bill McFarland ("McFarland Dep."), Ex. 13, at 43:22-44:9.

26    [15]    Arnold v. United Artists Theatre Circuit, Inc., 158 F.R.D. 439 (N.D. Cal. 1994),
    cited by Plaintiffs with regard to commonality and typicality, was a very different case.  As to
27  commonality, plaintiffs sought the injunctive relief of modifications to movie theaters, and the only
    damages they sought were a statutorily-specified $250.  Id. at 449.  As to typicality, it was
28  expressly determined that plaintiffs did not -- as here -- pursue a claim different than the proposed
    class claim.  Id. at 450.

**B.**    **Plaintiffs Are Inadequate Class Representatives**

For the same reasons that their claims are not typical, Plaintiffs fail the adequacy requirement. Where named representatives pursue an atypical claim, and/or are subject to unique defenses (as here), they are not adequate representatives. In <u>In re Quarterdeck Office Sys. Inc. Sec.</u> <u>Litig.</u>, Civ. No. 92-3970-DWW(GHKx), 1993 WL 623310 (C.D. Cal. Sept. 30, 1993), for example, the Court found that plaintiffs' claim to have standing to pursue the lawsuit was "speculative," "indicat[ing] that their claims are atypical <u>and that they are unable to represent the class</u> <u>adequately</u>," because they were exposed to a "unique defense which would absorb a considerable amount of plaintiffs' time and would divert attention from the other claims." <u>Id.</u> at *3. <u>See also</u> <u>Rodriguez</u>, Civ. No. 99-13190-GAF (AJWX), 2002 WL 1162675, at *8 (C.D. Cal. 2002) ("Rodriguez would not be an adequate representative of the proposed class because his claims are atypical of the class").

In finding the named plaintiffs inadequate, the Court in <u>Quarterdeck</u> also relied upon "discrepancies between plaintiffs' understanding of their claims and the way they are articulated in the complaint." <u>Id.</u> at *5. As shown, there is a fundamental discrepancy of that nature here. In addition, the Court in <u>Quarterdeck</u> gave weight to the named plaintiffs' lack of involvement in the prosecution of the case; <u>e.g.</u>, that "the named plaintiffs [were] not familiar with the changes in the various amended complaints filed on behalf of the class." <u>Id.</u> at *6. Here, the named plaintiffs are similarly uninvolved. For example:

- Beyond hiring his lawyer, Dr. Sakai has "done nothing" in connection with his role as a class representative. (H. Sakai Dep. at 18:19-23.)

- His wife, Mrs. Sakai, had no understanding of the lawsuit at all prior to sitting through her husband's deposition. (J. Sakai Dep. at 11:13-11:18.)

- Mr. Brady similarly admitted that "I haven't done any work in connection with prosecuting this lawsuit." (Brady Dep. at 59:17-21.)

- Dr. Marion Hovden only read the complaint for the first time two days before her deposition and met her lawyer the week before the deposition, and besides going "over all the letters I had from Conseco," had done nothing else in connection with the lawsuit. (M. Hovden Dep. at 22:11-22:19; 24:10-12; 26:10-19.)

- Likewise, Dr. Charles Hovden met his lawyer for the first time only days before his deposition and generally had little or no knowledge or recall of any facts relating to his policy. (C. Hovden Dep. at 9:12-24.)

- Dr. McNamara did not read the complaint before it was filed, had never seen Plaintiffs' motion for class certification and didn't know any of the other plaintiffs. (McNamara Dep. at 115:6-12; 116:14-18; 130:25-131:11.)

- Mr. McFarland had "no idea" what kind of class he wants to represent, had only a vague understanding that his attorneys sought to amend the definition of the putative class and had no understanding of what the amended class definition would be. (McFarland Dep. at 45:24-25; 56:5-13.)

- Perhaps most alarmingly, Dr. Kreps could not recall reading the complaint at all, did not "have a good understanding" of the class, did not know what claims the class would be pursuing, had never heard of the Gilbert law firm (lead counsel in this litigation) and had met one other lawyer working on the case only once, and, other than "faxing documents" and appearing for his deposition, admitted to doing nothing else in connection with the lawsuit. (Kreps Dep. at 59:9-61:25; 63:11-25; 65:22-24.)

In <u>Umsted v. Intelect Commc'ns., Inc.</u>, Civ. No. A. 3:99-CV-2604, 2003 WL 79750 (N.D. Tex. Jan. 7, 2003), the court denied class certification where the proposed representatives "could not identify the names of attorneys" who represented them, "exhibited a regrettably poor understanding of [their] fiduciary role[s] and responsibilities" to the purported class, had met with lead counsel only on the morning of the deposition, did not know the names of the other lead plaintiffs and former lead plaintiffs, and had seen the much earlier-filed amended complaint only "reasonably recently." <u>Id.</u> at *2. A similar result, due to similar facts, is appropriate here. <u>See also</u> <u>Welling v. Alexy</u>, 155 F.R.D. 654 (N.D. Cal. 1994) (proposed representative was inadequate where he, among other things, stated that his only role in filing the case was to call a lawyer and tell him he "ha[d] a case for him"; was unaware his lawyers had filed an amended complaint and otherwise ceded control of the case to his lawyers).

## IV.   INDIVIDUALIZED ANALYSIS WILL BE REQUIRED TO RESOLVE PLAINTIFFS' THEORIES, DEFEATING THE COMMONALITY, PREDOMINANCE AND SUPERIORITY REQUIREMENTS

The threshold commonality requirement is that "there are questions of law or fact common to the class" (Fed. R. Civ. P. 23(a)(2)); even where that baseline requirement is met, the plaintiff must satisfy a "more rigorous" requirement that "questions of law or fact common to class

15

1  members predominate over any questions affecting only individual members, and that a class

2  action is superior to other available methods for fairly and efficiently adjudicating the controversy."

3  (Fed. R. Civ. P. 23(b)(3).)  In this case, these important requirements are not satisfied, because

4  resolving plaintiffs' claims would require individualized adjudication for each class member.

5  When that is true, courts -- in varying contexts -- deny class certification for lack of commonality,

6  predominance, and/or superiority.

7       For example, in Edwards v. The First Am. Corp., 251 F.R.D. 454 (C.D. Cal. 2008),

8  plaintiffs sought a class action challenging, as violative of the Real Estate Settlement Procedures

9  Act (RESPA), a title agency's referral of her to its own subsidiary for title insurance.  The Court

10  quoted Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004) for the proposition that

11  "[w]here, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of

12  individualized proof or argue a number of individualized legal points to establish most or all of the

13  elements of their individual claims, such claims are not suitable for class certification under Rule

14  23(b)(3)." Id. at 458.  The Court denied class certification on that basis, observing that, to

15  determine whether a class member was "referred" to the subsidiary (an element of the RESPA

16  claim) would "involve direct and cross-examination of each class member." Id.

17       Similarly, in Gabriella v. Wells Fargo Fin., Inc., Civ. No. 06-4347-SI, 2008 WL 3200190,

18  at *3 (N.D. Cal. Aug. 4, 2008), the Court denied class certification in a case alleging

19  noncompliance with California meal-and-rest-period requirements, because under California law a

20  relevant issue is why meal or rest periods are missed, and individualized inquiry would be needed

21  to resolve that issue.

22       As shown below, just as in Edwards and Gabriella, this case cannot be resolved without

23  adjudication specific to each class member.[16]  That is true with respect to each of the three

24  inconsistent theories presented in this matter, which Conseco addresses separately below.

25

26      [16]     For the proposition that the commonality requirement here is satisfied, Plaintiffs cite

27  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  But that case is unavailing because
   it evaluated a proposed class settlement, not an opposed class certification motion.  See Cohn v.

28  Mass. Mut. Life Ins. Co., 189 F.R.D. 209, 218 n.36 (D. Conn. 1999) (cases approving settlement
   classes do not support the certification of contested classes because "when a district court is

16

**A.    Individualized Analysis Would Be Required
To Resolve The Merits Of Each Of The Three Theories At Issue**

**1.    The "Vanishing Premium" Theory;
i.e., That Plaintiffs Expected To Pay Only Five Premiums**

In deposition, proposed class representatives claimed that they expected to pay only five premiums, and that their complaint is the Company's purported demand, now, for additional premium.[17]

The policy itself contains no support for any belief in a five-premium arrangement.  In fact, it contradicts any such understanding:  it states that the specified premium is "ANNUAL" (see, e.g., Brady Policy at 3), and the OPP provision makes clear that continued nonpayment of premium extends on whether the accumulation account value remains above, among other things, the always-increasing guaranteed cash value.  (See, e.g., Brady Policy at 9.)  Further, Plaintiffs have not pointed to any other "common" document that supports their asserted belief.  Nor is there any allegation of a sales "script" for oral communications, and Conseco does not have -- and has never had -- its own sales force (all agents are independent, and may sell insurance for multiple companies).  (Scuglik Decl. at ¶ 3.)[18]

Consequently, resolving this claim would inherently require inquiry and analysis specific to each class member.  The depositions of the named representatives confirm that, in this regard, each individual's case is materially different.  For example:

---

confronted with a request for settlement-only class certification, it 'need not inquire whether the case, if tried, would present intractable management problems . . . .'").

[17]    As explained in the background section, the October 2008 letter in fact did not demand immediate payment of additional premium, and that letter has been suspended.

[18]    For the various Lifetrend 3 and 4 "series," Conseco has produced corresponding "for agent use only" product information.  That information further undermines Plaintiffs' 5-payment guarantee claim and their request for class certification.  For example, the guide for most of the named plaintiffs' policies -- i.e., the Massachusetts General Lifetrend 4 1987 series -- states in pertinent part that "the insured has the option after the payment of 5 year's premium of 'vanishing' or limiting premium payments, thereby creating a 'paid-up' policy based on *current interest, mortality, and expense assumptions*."  In contrast, the guide for one of Mr. McFarland's policies (a Philadelphia Life Lifetrend 4 1993 series) states that "Premiums are payable for life."  There is great variation in these guides, not all of which address the same issues.  See relevant excerpts attached as Appendix B; Scuglik Decl. at ¶ 4 and accompanying exhibits.

17

**Mr. Brady.** Mr. Brady, a former licensed life insurance agent and financial planner per his insurance application, testified that the basis of his action is Conseco's violation of his understanding that his policy would be fully paid up after five annual premium payments. (Brady Dep. at 68:1-69:3.) He testified that he understood that "you could elect to pay no more premiums after the fifth premium and that the policy would carry itself." (Id. at 68.) Mr. Brady's claim is weak, and -- more importantly on this motion -- unique:

- Brady's belief was not based on any sales literature. (Id. at 68.) Nor was it based on any oral representations relating to his particular policy (indeed, Brady does not recall ever speaking with anyone about his policy before purchasing it); instead, it was based on his general memory of statements made while he was in attendance at "seminars" (Id. at 65:7-15; 68:1-14.) The seminars were conducted by a particular California insurance agency -- his employer Xelan -- which was never part of Conseco. (Scuglik Decl. at ¶ 3.)

- Brady received but doesn't recall reading his policy (Brady Dep. at 71:24-72:4), which contained no five-year guarantee, and indeed contained an OPP provision making clear that continuation of non-paying status depended on the relationship between different variables. And Brady received but does not recall whether he read a point of sale illustration, which stated, in part, "IMPORTANT NOTICE: The projected results of your insurance program may change drastically with variations in interest rates, mortality rates, risk charges, expense factors, and the frequency, timing and amount of your premium payments." (Brady Dep. at 73:17-73:24.)

**Dr. Sakai.** Dr. Sakai also testified that the basis of his action is a supposed five-year guarantee (H. Sakai Dep. at 13:17-23, 15:10-16:3), but the facts and circumstances of his claim in this regard are very different from Mr. Brady's. Dr. Sakai claims to have relied on the handwritten words "new Xelan five pay" on "the application for one of the policies" (H. Sakai Dep. at 15-16.) Further, Dr. Sakai was markedly unclear about whether his agent, David Neubauer, ever addressed this topic with him, much less guaranteed him a five-payment arrangement:

- "A. A vanishing premium is a vanishing premium, and if the insurance company is well managed there should be no problem in providing a vanishing premium policy which would live up to its contract. Q. That is how Mr. Neubauer explained it to you? A. No. I don't recall what he said about it." (H. Sakai Depo. at 45:11-45:16 (emphasis added).)

Unlike Mr. Brady, Dr. Sakai was represented by a life insurance agent (Neubauer), but Dr. Sakai failed to ask him any questions, even though he though he "trusted" him, and thought the policy (which he "scanned") was "legalese." (Id. at 42:18-43:12.) Also unlike Mr. Brady, Dr.

OPPOSITION TO MOTION FOR CLASS CERTIFICATION    CASE NO.: M:10-CV-02124-SI

1  Sakai claims not to have received the point-of-sale illustration with its "IMPORTANT NOTICE"

2  (which addresses potential "drastic" variations).

3  **Mrs. Sakai.** Mrs. Sakai is also unique. She too believes the lawsuit is about a five-

4  payment guarantee, but only because, "last week," her husband told her that. (J. Sakai Dep. at

5  16:3-17:11.) She had no understanding of that alleged premium arrangement at the time the policy

6  was purchased. (Id. at 17:12-18:3.) And, as a general matter, her lawsuit will need to overcome

7  the fact that, simply put, she read nothing and remembers nothing (see, e.g., id. at 20:15-22:1) -- a

8  situation very different than Mr. Brady and Mr. Sakai.

9  **Dr. Marion Hovden.** The basis of Dr. Marion Hovden's claim is her belief that "once we

10  paid and paid up everything, it was paid in full." (M. Hovden Dep. At 13:14-14:7.) This

11  understanding allegedly came from her insurance agent, Larry Winsten, who (according to her)

12  told her that that she would not have to pay any more than five annual premium payments. (Id. at

13  38-39; 57-58.) Later in her testimony, though, Dr. Hovden acknowledged that she was told she

14  might have to make additional payments, even though that situation was "very, very, very

15  unlikely." (Id. at 60:19-60:21.) That understanding is different from other plaintiffs who testified

16  that they never expected to pay any additional monies. (Kreps. Dep. 125:21-25.)

17  **Dr. McNamara.** Dr. McNamara testified that he expected to pay only five premiums, but

18  he was unable to provide any basis for that belief. He testified that it could not have come from the

19  policy, because he never read it, and that he simply did not know where it came from: "Q. That

20  came from Mr. Neubauer, that understanding? A. I'm not sure. I'm not sure whether -- I'm just not

21  sure from a conversation that long ago." (McNamara Dep. at 49:6-49:9.)

22  **Mr. McFarland.** In contrast, Mr. McFarland was quite clear that his agent, Lonnie Poole,

23  informed him that the policy would "be paid up in five years" and that "from there forward, you

24  don't really have any problem." In fact, Mr. Poole recommended that Mr. McFarland purchase his

25  life insurance policy because of the five-payment guarantee. (McFarland Dep. at 64:22-65:10;

26  70:13-19.)

27  In short, it is self-evident that each of the Plaintiffs has a case that is materially different,

28  and that would need to be tried separately. Plainly, then, a class of nearly 10,000 individuals

19

1  should not be certified, and courts have routinely denied to certify classes under similar

2  circumstances.  <u>Vega v. T-Mobile USA</u>, 564 F.3d 1256 (11th Cir. 2009) (reversing certification of

3  class) is instructive on this point.  A former sales employee brought a purported class action

4  seeking certain commissions.  There was no common written contract, though, and so resolving

5  entitlement to commissions would "depend on such individualized facts and circumstances as when

6  a given employee was hired, what the employee was told (and agreed to) with respect to

7  compensation rules and procedures at the time of hiring . . . "  <u>Id.</u> at 1272.  Here, analogously, the

8  named plaintiffs seek to enforce a varying alleged oral promise that is not reflected in any of the

9  contracts at issue.  <u>See also</u> <u>Howard v. Gap, Inc.</u>, Civ. No. 06-06773-WHA, 2009 WL 3571984, at

10  *6 n.2 (N.D. Cal. Oct. 29, 2009) (in case challenging a purported store policy requiring employees

11  to purchase store clothing, denying class certification on predominance grounds where there was

12  no "standardized written pitch that managers were supposed to give [about the policy]," and there

13  were "individual variations in the supposed recollections of oral statements allegedly made").

14        Further, despite plaintiffs' counsel's attempts to cast it in a different light, this matter is

15  unavoidably similar to "vanishing premium" cases that courts have deemed unsuitable for class

16  treatment.  For example, in <u>Mentis v. Del. Am. Life Ins. Co.</u>, Civ. No. 98C-12-023WTQ, 2000 WL

17  973299 (Del. Super. Ct. May 30, 2000), the plaintiff moved for certification of his breach of

18  contract and consumer fraud claims based on a purported unfulfilled promise to some

19  policyholders that the interest and dividends on their life insurance policies would eventually pay

20  for future premiums (i.e., that the policies would eventually become self-funded and the premiums

21  would "vanish").  The court, however, recognized that there was no indication that such

22  representations were a result of standardized marketing or sales procedures provided by the

23  defendant insurance company, and that therefore individual inquiry would be required to

24  understand what representations were made, and to whom (indeed, the plaintiff himself testified

25  that there were no such representations made to him).  <u>Id.</u> at *5.  The court concluded that this "fact

26  intensive analysis" was better suited to individual treatment.  <u>Id.</u> at *7.

27

28

OPPOSITION TO MOTION FOR CLASS CERTIFICATION                    CASE NO.: M:10-CV-02124-SI

Here too, the agents selling Conseco policies used no standard sales scripts[19] -- and there is no five-payment guarantee promised in the insurance policies -- meaning that individual inquiry would be required to understand the basis for any plaintiff's belief on this point. For the reasons recognized by the court in <u>Mentis</u>, class certification here would be inappropriate. <u>See also</u> <u>Cohn</u>, 189 F.R.D at 215 (in vanishing premium case, denying class certification because, in part, the nature of oral representations at the time of sale would be essential to the adjudication of plaintiffs' breach of contract claim); <u>Solomon v. Mass. Mut. Life Ins. Co.</u>, 47 Pa. D. & C.4th 36, 55-56 (Ct. Com. Pl. 2000) (certification denied on theory that plaintiffs' vanishing premium contract claims were not suitable for class treatment because individual issues predominated; adjudication would require consideration of circumstances surrounding the issuance of each policy, including oral and written misrepresentations, illustrations shown to prospective class members and extra-contractual discussions); <u>Kirkham v. Am. Lib. Life Ins. Co.</u>, 717 So. 2d 1226, 1229-30 (La. Ct. App. 1998) (reversing grant of class certification in vanishing premium case; whether plaintiffs relied on representations of three separate sales agents and ignored the unambiguous written provisions of an insurance contract is an individual inquiry that defeats class certification).

2.      **The Theory That Conseco's Underfunding Analysis Is Incorrect**

As detailed above, Plaintiffs' counsel -- departing from their own clients' claims -- theorize that Conseco is improperly applying the OPP formula, which checks whether the accumulation account value is greater than the sum of guaranteed cash value, outstanding indebtedness, and surrender charge. Again, Plaintiffs erroneously claim that the guaranteed cash value for purposes of this analysis is $0, rather than the figure prominently set forth in the policy itself.[20]

---

[19]      Conseco served subpoenas on three selling agents who sold the Plaintiffs their insurance policies, and intended to depose them and include their testimony in this opposition. However, Plaintiffs' counsel refused to make themselves available prior to the due date of this filing. Conseco intends to depose the agents soon, and will request leave to file a short sur-reply to present their expected relevant testimony to the Court.

[20]      In addition, this theory, if successful, would tend to result in longer, less costly coverage for an insured (because it lowers the underfunding threshold), but it implicitly abandons any claim to the policy's illustrated guaranteed cash values -- even though those values are demanded in the Complaint, which stresses the different theory that Conseco sent belated notice of underfunding (addressed in the next section). As explained in the Supplemental Keeley Declaration, proposed class members would have different interests, and resulting preferences,

21

On this issue -- the use of guaranteed cash value to determine underfunding -- the policy is unambiguous. The OPP provision calls for an over-time comparison of the accumulation account value with the sum of "the then guaranteed cash value," "the then applicable surrender charge," and "any indebtedness." (See, e.g., Brady Policy at 10) (emphasis added.) Obviously this calls for comparison (in part) to the guaranteed cash values shown in the policies; otherwise, that portion of the text would have no meaning. This reading of the policy is also consistent with common sense (the essential concept of OPP is to track whether the policy is above or below the guaranteed cash values), and with illustrations sent to policyholders.[21] Further, the Plaintiffs themselves do not claim any contrary expectation. Mr. Brady, for example, testified that he had no understanding of the OPP provision at all, because his understanding of the policy was limited to his belief that it would require only five annual payments. (Brady Dep. at 119-20.)

Plaintiffs' counsel will likely argue that the policy is unambiguously in their favor. That is unsupported by their own clients' testimony, and in any event, it would be inappropriate to premise a class certification ruling on that unlitigated conclusion. See, e.g., Mann v. GTE Mobilnet, 730 So.2d 150, 153 (Ala. 1999) (in deciding class motion, court may not accept plaintiffs' characterization of contract; at best (for plaintiff), contract is ambiguous).

Plaintiffs seem to demand adjudication of whether the policy is ambiguous, and, if that determination were reached (over Conseco's objection), adjudication to resolve that ambiguity would be needed. This would require plaintiff-specific adjudication. See Adams v. Kansas City Life Ins. Co., 192 F.R.D 274, 281 (W.D Mo. 2000) (denying class certification because, in part,

---

with respect to which of these different theories is pressed in this lawsuit. For example, the theory addressed in this section would tend to be more attractive to a class member whose particular facts and preferences make him or her more interested in coverage, than in funding; if the opposite is true, the theory addressed in the next section (i.e., that notices of underfunding were belated) might be more attractive. (See Suppl. Keeley Decl., at ¶¶ 27-28.)

[21]     See, e.g, illustration prepared for H. Sakai on Feb. 11, 2003: "This provision permits you to limit or even discontinue your direct premium payments. Should the reduced premium payment at some point in time cause the policy's current cash surrender charges to decrease below the policy's guaranteed cash values, which are based on payment of the full premium each year, you have the option at that time to maintain your guaranteed values by paying additional premiums as may be required." (Ex. 14, at 4.) This language does not square with Plaintiffs' theory that the underfunding is to be calculated without reference to the guaranteed cash value figures in the policy.

22

extrinsic evidence of the parties' understandings of an important, but ambiguous, contract provision rendered plaintiffs' contract claim unsusceptible to class treatment).  For example:

- Again, the theory, in essence, is that the underfunding analysis should take no account of the table of guaranteed values in the policy.  However, Mr. Brady himself sent a letter articulating the opposite view:  though he denies writing the letter, it suggests that he understood that, for purposes of determining underfunding, the Company would consider the guaranteed cash value shown on the policy data page.  The letter states, in pertinent part:

  > "I would like to elect the option of premium payment by the vanishing premium method for the above policy, effective with the premium due date above.  I understand that if the actual cash value drops below the table of guarantee value, a special premium due notice will generate to advise that additional premium is due."

(Ex. 15) (emphasis added.)

- As another example, Dr. Sakai received a 2003 "re-proposal" illustration, which clearly explained how the shortfall calculation is performed, and the role of guaranteed cash value in that calculation.  (See supra, n. 21.)  Dr. Sakai stated that he received and read this illustration.  (H. Sakai Dep. at 75:14-76:7.)

- A re-proposal illustration with the same language was prepared for Dr. McNamara (Ex. 16).  Unlike Dr. Sakai, he did not recall receiving it, but he testified that he would have sent the illustration to his agent and had a discussion about it with him; the illustration was dated around the time that Dr. McNamara was contemplating a loan from his policy.  (McNamara Dep. at 99:1-100:6.)

Plaintiffs may claim that evidence such as this would be inadmissible.  But it was their burden to establish that, not just as to California, but as to each of the other 47 states at issue, and they did not do so.  In fact, state law varies on whether and the extent to which extrinsic evidence is considered in litigating the threshold question of whether an insurance policy is ambiguous, and state law also varies on the proper use of extrinsic evidence if an insurance policy is found to be ambiguous.  See Appendix A.  Plaintiffs' superficial submission on the law variation simply ignores these issues; it establishes only the irrelevant point that the list of elements of a breach of contract claim (e.g., breach, damage) is roughly similar state-by-state.  But the nature of those elements, and how they are proven, varies.

The thousands of mini-trials that Plaintiffs' breach-of-contract theory threatens would need to be conducted under the law of 48 different states.  In Bowers v. Jefferson Pilot, 219 F.R.D. 578 (E.D. Mich. 2004), the Court denied nationwide class certification in part because

23

> [w]ith respect to the use of extrinsic evidence, not only does the
> Court have to deal with the variations in state law regarding its use,
> i.e., when extrinsic evidence may be admitted and the type of
> extrinsic evidence that may be used, but as a preliminary step, the
> Court must determine in each instance exactly what the law is in each
> state with respect to the use of extrinsic evidence . . . the Court
> believes that an in-depth review of each state's laws (particularly for
> those states where the parties disagree as to what the law is) would
> be required before the Court could determine how to correctly use
> the extrinsic evidence.

Id. at 584.  See also Gilman v. John Hancock, 3 WL 23191098, at *11 (Fla. Cir. Cit. 2003)

(denying class certification in part because "variations between the 50 states' laws governing the

admission of extrinsic evidence to resolve putative class members' breach of contract claims also

preclude a finding of predominance . . . [c]ourts throughout the country take different, conflicting

approaches to the use of extrinsic evidence when a contractual ambiguity is claimed," and detailing

the "complicating nuances"); Adams, 192 F.R.D at 281 (denying Missouri statewide class because,

upon a finding of "some degree of ambiguity," Missouri law requires "recourse . . . to evidence of

relationship of the parties, the circumstances surrounding execution of contract, subject matter of

contract, acts of parties in relation to contract, and any other external circumstances which would

cast light on the intent of the parties.") (emphasis added).[22] (Id. at 275.)

### 3.   The Theory That, If The Policies Are Underfunded, Then The Premium Notice Was Belated

As previously explained, Plaintiffs' counsel also press the alternative contention that, if the

policies are in shortfall, Conseco was required to immediately notify policyholders of that, so that

policyholders could decide (a) whether to re-commence payment of annual premium, or (b) to

instead go into the policy's "continuation of insurance" status, under which, inter alia, (i) the

policy's surrender charge would have been subtracted from the accumulation account, and (ii) no

further premiums could have been paid, meaning that, depending on what fees were subtracted

---

[22]     Plaintiffs declare that "contract law is essentially the same in all fifty states on the issues that are relevant here," and cite Mortimore v. FDIC, 197 F.R.D. 432 (W.D. Wash. 2000) (Motion at 22-23.)  But Mortimore involved a single theory (improper calculation of interest rates), as to which the decision discloses no material state law variations, e.g., the court does not address any argument by defendants concerning the existence of extrinsic evidence, or legal variation relevant thereto.

24

1    over time, the policy was exposed to the possibility of a lapse over which the policyholder had no

2    control.  (Brady Am. Compl. ¶¶ 64-68; McFarland Compl. ¶¶ 40-50.)

3        However, as shown in the Keeley Declaration and the Supplemental Keeley Declaration,

4    individualized analysis would be necessary to determine the impact on each policyholder of the

5    non-occurrence of this event.  (Keeley Decl., at Section VIII; Suppl. Keeley Decl., at Sections III

6    and IV.)[23]

7        For example, if this event had occurred, and if a policyholder chose not to pay additional

8    premium, he or she would have entered into the "continuation of insurance" status.  Some such

9    policyholders (particularly those with substantial loans) are better off today, because, in that

10    hypothetical scenario, they would have experienced a policy lapse, whereas, today, they have an in-

11    force policy with a substantial accumulation value.  (Keeley Decl., at ¶ 35.)  Other such

12    policyholders (particularly those without substantial loans) would not have lost their coverage or

13    riders, and so they are in the same position today as they otherwise would have been with respect

14    to insurance coverage, except that they have higher accumulation values (because they avoided the

15    subtraction of surrender-charge) and have retained all their benefits.  (Id. at ¶ 37.)

16        Some policyholders might have chosen to make additional premium payments, rather than

17    enter into "continuation of insurance" status.  Whether those policyholders are worse or better off

18    today requires individualized inquiry into such matters as what they instead did with the money

19    that they would otherwise have invested in premiums.  (Id. at ¶ 38.)  These matters are addressed in

20    detail in the Keeley Declaration at Section VIII, and in the Supplemental Keeley Declaration at

21    Sections III and IV.  On this theory as well, therefore, plaintiff-by-plaintiff analysis would be

22    necessary, and certification of a class is inappropriate.

23

24

---

25      [23]    In California, the state of residence of most of the named plaintiffs, "'[a] cause of action for breach of contract requires proof of the following elements: (1) existence of the contract;

26    (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." Hood v. Hartford Life and Accident Insurance Co., Civ. No.

27    S-07-1634-FCD/EFB, 2008 WL 5101584, *7 (E.D. Cal. Dec. 2, 2008) (emphasis added, citations omitted).  Yet even Plaintiffs' choice of law "analysis" (assuming, arguendo, that it is correct)

28    recognizes that a number of the 48 states at issue do not require this fundamental element.  (See entries for, e.g., Idaho, Maryland, North Carolina and Vermont in Exhibit 30 to Plaintiffs' Motion.)

OPPOSITION TO MOTION FOR CLASS CERTIFICATION        CASE NO.: M:10-CV-02124-SI

**B.    Similarly, Individualized Analysis Will Be
       Required To Resolve Statute Of Limitations Defenses**

Individualized inquiry will also be necessary as to Conseco's statute of limitations defenses.

For example, as to Plaintiffs' theory that Conseco's underfunding analysis is incorrect, significant

limitations issues exist that would require plaintiff-specific analysis to resolve:

- Mr. Brady himself sent a letter to Conseco stating an understanding of the OPP
  calculation that is consistent with Conseco's method of calculation, i.e., comparing
  accumulation account to "the table of guarantee value." (Ex. 15) (emphasis added).
  He sent this letter in 1992.  He claims not to have written it, but even crediting that
  testimony, it is inescapable that in 1992 he was presented with and signed a
  document describing OPP calculation in a manner his counsel now claim is
  contractually incorrect. (Brady Dep. at 90:12-95:10; Ex. 15.)  Dr. Marion Hovden
  and Dr. Charles Hovden sent letters in 1994 similar to the one sent by Mr. Brady in
  1992. (Exs. 17 and 18.)

- Dr. Sakai did not send any such letter, but in 1989 -- 21 years ago -- he received an
  illustration containing the "IMPORTANT NOTICE" concerning potential "drastic"
  changes in his insurance program, and he testified that he was so surprised that he
  "did not believe it." (H. Sakai Dep. at 114:23-115:7; Ex. 19.)  Further, in 2003, he
  received the previously-described "re-proposal" illustration describing the OPP
  calculation in a manner Plaintiffs now claim is contractually incorrect. (H. Sakai
  Dep. at 79:15; Ex. 14.)  These documents have particular significance as to Dr.
  Sakai because, as a general matter, he was unusually attentive:  during his
  deposition he produced a cash-value log that he himself maintained over the years,
  based on annual statements from Conseco. (H. Sakai Dep. at 53:13-54:12.)

Similarly, as to Plaintiffs' alternate theory that Conseco belatedly sent a premium notice,

limitations issues could not be resolved on a classwide basis.  Plaintiffs assert that if the policies

were in shortfall years ago (which they were), Plaintiffs expected to receive, and should have

received, a premium-due notice as soon as their accounts became underfunded.  Even if Conseco

was contractually required to so inform the Plaintiffs (which Conseco disputes), each proposed

class member is subject to a statute of limitations defense, the relevant facts for which vary by class

member.  The following mix of factors will vary person-by-person:

  (i)    Letters from Conseco confirming entry into OPP status stated that no
       premium notice would be sent until the accumulation account was
       essentially exhausted -- contrary to Plaintiffs' contention that Conseco was
       contractually required to send those notices as soon as the policy became
       underfunded.  (See, e.g., Ex. 21.)

  (ii)   Annual benefit statements clearly showed the current accumulation account
       value, permitting the insured to see whether the policy was then underfunded.

26

Plaintiffs' counsel, in a deposition of a Conseco witness, referred to this as "fairly simple arithmetic,"[24] and it is:  in essence, the policyholder need only have checked to see if his or her current accumulation account value (on each annual statement) was in fact greater than any outstanding loan (shown on the annual statement) plus the guaranteed cash value and surrender charge (both shown in the policy itself).

(iii)   As did the Sakais and Dr. McNamara, a policyholder could request "re-proposal" illustrations, which also showed the current accumulation account value -- and, in addition, showed the duration to policy lapse, assuming no more premium payments.

Depending on the policyholder, the existence of this mix of factors can constitute a strong and unique limitations defense.  For example:

- Mr. Brady regularly received annual statements (unlike, for example, Mrs. Sakai), and cursory review of those statements would have shown him that his policy was underfunded.  For example, his 1994 annual statement showed an accumulation account value of approximately $43,000.  (Ex. 22.)  Was this greater than the amount of any loan plus the guaranteed cash value and surrender charge?  Plainly not.  Alone, the outstanding loan (approx. $31,000; Ex. 22 at 2) plus the guaranteed cash value (approx. $31,000; Ex. 2 at 4) far exceeded the accumulation account value.  This notice of underfunding was in 1994 -- fifteen years before Brady filed suit.

- As to Dr. Sakai, his annual statements also permitted him to see that his policy was underfunded, and, in his case, Conseco would be entitled to point out that Dr. Sakai carefully reviewed his annual statements -- he even kept a log summarizing them.  (H. Sakai Dep. 67:21-70:18.)  Conseco would also present, in support of a statute of limitations defense, the 2003 re-proposal illustration which was so pessimistic that Dr. Sakai's reaction was "disbelief."  (H. Sakai Dep. at 79:11; Ex. 14.)

- As to Dr. McNamara, he too testified that he generally reviewed his annual statements when he received them. (McNamara Dep. at 83:11-14.)  Indeed, Dr. McNamara would make particular note of the accumulated value on each statement to conduct an end-of-year financial review of his finances; during this process, he would also contact Conseco to obtain the cash value of his policy.  (Id. at 94:16-17.)  Dr. McNamara also testified that he would periodically review with his agent correspondence received from Conseco. (Id. at 99:13-23.)

In light of these facts, certification of a class is inappropriate.  In Gregurek v. United of Omaha Life Ins. Co., Civ. No. 05-6067-GHK (FMOX), 2009 WL 4723137 (C.D. Cal. Nov. 10, 2009), for example, plaintiff alleged (as here) that the insurance company's calculation of a "cost of insurance" charge was contractually incorrect.  After class certification, the company introduced

---

[24] Scuglik Dep. at 168:10-13.

OPPOSITION TO MOTION FOR CLASS CERTIFICATION                    CASE NO.: M:10-CV-02124-SI

1    evidence that, in some instances, agents explained the insurance company's calculation method to

2    policyholders -- meaning that, upon such explanation, a policyholder would be on notice of the

3    alleged breach. Id. at *6-7. The Court noted that "[i]n California, the discovery rule postpones the

4    accrual of a breach of contract claim until the plaintiff knew or should have known of the breach,"

5    such that sales presentations in which there was explanation of the challenged charge "presented

6    the possibility of an inquiry notice defense against the discovery rule." Id. at *7 (citing Apr.

7    Enters., Inc. v. KTTV, 147 Cal.App.3d 805, 832 (1983).) The Court concluded that the statute of

8    limitations issue "will require individualized findings specific to each class member, and is not

9    amenable to collective resolution." Gregurek, 2009 WL 4723137, at *8. The same analysis is

10    applicable here.

11       These matters are complicated substantially by Plaintiffs' request for a nationwide class.

12    Breach-of-contract statute-of-limitations periods vary widely state by state. For example, in

13    California limitations period for breach of contract is two years (if an oral contract; Cal. Civ. Proc.

14    Code § 339(1)), or four years (if a written contract; Cal. Civ. Proc. Code § 337(1)). In contrast, the

15    limitations period for breach-of-contract in Florida is five years. (Fla. Stat. Ann. § 95.11(2)(b).)

16    (Limitations periods for breach of contract vary widely: from two years (for breach of oral contract

17    in California) to 15 years in Kentucky (Ky. Rev. Stat. Ann. § 413.090(2)) and Ohio (Ohio Rev.

18    Code Ann. § 2305.06).)

19       There is also variation in the rules concerning the point at which the limitations period is

20    triggered. For example, in California, the limitations period is triggered by discovery of the alleged

21    breach. See Gregurek, 2009 WL 4723137, at *8 ("in California the discovery rule postpones the

22    accrual of a breach of contract claim until the plaintiff knew or should have known of the breach")

23    (citation omitted). In contrast, in Florida, the limitations period "commences once the last element

24    for breach of contract occurs, not when a plaintiff discovers the breach." Servicios de Almacen

25    Fiscal Zona Franca Y Mandatos S.A. v. Ryder Int'l, Inc., Civ. No. 06-22774-HUCK/SIMONTON,

26    2007 WL 628133, at *3 (S.D. Fla. Feb. 26, 2007) (emphasis added) (citing Abbott Labs., Inc. v.

27    Gen. Elec. Capital, 765 So. 2d 737, 740 (Fla. Dist. Ct. App. 2000) ("the legislature did not intend to

28    provide a discovery rule in section 95.11(2)(b), Florida Statutes (1981) . . . [t]o conclude otherwise

28

1  would require us to write into section 95.11(2)(b), Florida Statutes, a discovery rule when the

2  legislature has not") (emphasis added); see also Fla. Stat. Ann. § 95.031(1) ("A cause of action

3  accrues when the last element constituting the cause of action occurs.").

### C.   Both The Fact Of And The Amount Of Damages Would Need To Be Determined On An Individualized Basis As Well

Apparently in an effort to avoid individualized merits and damages issues, the class

certification brief focuses on the request for a determination that the policies are not underfunded at

all because Conseco is improperly applying the OPP formula.  But if that theory fails at trial or on

summary judgment, Plaintiffs will necessarily press their complaints' assertion that there was

belated notice of underfunding (which is properly viewed as an alternative claim, like negligent

misrepresentation in a case that also alleges fraud).

If Plaintiffs were to prevail on that theory, extensive, individualized inquiry would be

needed to assess whether each plaintiff suffered resulting harm at all, and, if so, how and to what

extent.  Simply put, there would be no way to assess any plaintiff's damages -- or whether a

plaintiff was entitled to damages -- without probing inquiry concerning his or her particular facts

and circumstances.  This point is addressed in more detail in the accompanying Keeley Declaration

(see, e.g., Section VIII thereof).

Relatedly, the complaints assert that if Conseco had provided policyholders with timely

notice, they would have been able to explore obtaining additional insurance.  (Compl. ¶ 84; Am.

Compl. ¶ 83.)  This "deprivation of opportunity" damages theory is highly individualized.  For

example, Dr. Sakai (84 years old) testified that since at least 2003 he has been unable to obtain

insurance for health reasons.  (H. Sakai Dep. at 100:1-4.)  By contrast, Dr. McNamara (59 years

old) testified that he is a healthy tri-athlete, and freely admitted that he is perfectly able to obtain

additional insurance now.  (McNamara Dep. at 113:14-19; 131:17-22.)  This issue is addressed in

more detail in the Supplemental Keeley Declaration (see ¶¶ 19-21.)

The complaints also assert that Conseco's actions have affected the policyholders' ability to

purchase or afford alternate insurance.  (Brady Compl. ¶ 5 and Am. Compl. ¶ 83; McFarland

Compl. ¶ 29.)  This too is not susceptible to classwide proof.  Though Plaintiffs have barred inquiry

29

1   into their personal financial situations, it is self-evident that the 9,550 proposed class members are

2   differently situated with respect to the question of affordability, and this would require person-by-

3   person inquiry.

4         Conseco recognizes that the Ninth Circuit recently ruled that the need for individualized

5   damages determinations generally is not an independent basis for denial of class certification (a

6   conclusion Conseco questions, given Conseco's right to have a single jury resolve all issues).  See

7   Yokoyama v. Midland Nat. Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir. 2010).  However, the

8   existence of this problem at least contributes to denial of class certification.  See, e.g., Zinser v.

9   Accufix, 253 F.3d 1180, 1189 (9th Cir. 2001) ("to determine causation and damages for each of the

10   three claims asserted here, it is inescapable that many triable individualized issues may be

11   presented") (emphasis added); Howard v. Gap, Inc., Civ. No. 06-06773-WHA, 2009 WL 3571984,

12   at *6 n.2 (N.D. Cal. Oct. 29, 2009) (denying class certification on predominance grounds in part

13   due to the need for individualized damages inquiries).[25]

14      **D.**    **For These And Related Reasons, Other Fed. R. Civ. P.**
                **23(b)(3) Factors For Consideration Weigh Against Class Certification**

15         As noted previously, Fed. R. Civ. P. 23(b)(3) identifies certain exemplar factors to consider

16   in assessing predominance and superiority.  A particularly important one is "the likely difficulties

17   in managing a class action."  For all the reasons already set forth, that factor weighs heavily against

18   a finding of predominance.   The same is true of the factor that weighs "the interest of members of

19   the class in individually controlling the prosecution or defense of separate actions."  Here, Plaintiffs

20   themselves refer to the underfunding amounts as "substantial" (Brady Am. Compl. at ¶ 5), so this is

21   not a case exclusively involving (for example) a small fee that could not be economically pursued

22

23

24

25       [25]     Plaintiffs may seek to informally limit or clarify their damages theories on reply (or at oral argument), but a belated, informal effort of that nature should be unavailing.  In Legge v.

26   Nextel Communications, Inc., 2004 WL 5235587, at *7-8 (C.D. Cal. Jun. 25, 2004), Plaintiffs' counsel claimed at oral argument that all class members would seek only sum-certain statutory

27   damages.  The Court nonetheless denied class certification in part because the individualized nature of consequential and punitive damages, which were requested in the Complaint and which were

28   theoretically available on the statutory claims at issue, "raise[d] questions concerning both commonality and the adequacy of the class representation."  Id. at *8.

1    on an individual basis.  See Rodriguez v. Gates, Civ. No. 99-13190-GAF (AJWX) May 30, 2002

2    WL 1162675, at *12 (C.D. Cal. May 30, 2002).

3    **E.      Contrary To Plaintiffs' Suggestion,**
     **Conseco Has Never Endorsed The Certification Of A Class**

4
     Contrary to Plaintiffs' strained assertions (Motion at 23-24), Conseco obviously did not

5    concede the appropriateness of a class in its briefing to the MDL Panel.  Indeed, in that briefing,

6    Conseco stated explicitly that "Conseco will vigorously oppose class certification in each and every

7    instance."  (See Brady Docket No. 75-1, at 7.)  Plaintiffs do not acknowledge this statement in their

8    briefing to this Court.

9        In fact, Conseco made the very different point -- with which the Panel agreed -- that the

10   three related actions should be consolidated because all of them asserted the same essential

11   "wrong" (i.e., the administrative error, and the October 2008 letter), and two of them sought

12   certification of a nationwide class.  (See, e.g., id. at 1-2.)  That is a far cry from conceding the

13   appropriateness of class certification.

14       The standard for creation of an MDL requires actions "involving one or more common

15   issues of fact . . . " (28 U.S.C. § 1407(a)), and Conseco indeed did assert that this standard was

16   satisfied -- on the basis of the broad factual and procedural commonalities just addressed.  But that

17   is of course not equivalent to conceding that each of the multiple Rule 23 prerequisites (e.g.,

18   predominance) is met; otherwise, a defendant could never move for MDL treatment of competing

19   class action cases, and yet, as Conseco showed in its briefing, defendants do so successfully all the

20   time.  Plaintiffs' argument, if accepted, would obviate the need for a contested class certification

21   motion in any proceeding where a defendant sought an MDL -- a nonsensical result that, to

22   Conseco's knowledge, has never been endorsed by a court.

23       Put differently, whether three actions share some high-level factual allegations and legal

24   claims in the aggregate does not correlate to whether thousands of individuals are similarly situated.

25   During the MDL proceedings, Conseco argued that the lawsuits were similar because they

26   challenged the legality of Conseco's October 2008 letters to policyholders.  But that does not bear

27   upon the propriety of class certification, and as discussed herein, there are simply too many stark

28

OPPOSITION TO MOTION FOR CLASS CERTIFICATION                    CASE NO.: M:10-CV-02124-SI

1  and dispositive differences among <u>individuals</u> -- the Brady plaintiffs, Mr. McFarland and the

2  thousands of other class members -- to sweep away the individual inquiry necessary to resolve their

3  complaints.

4  **V.    THE MULTIPLE FLAWS IN PLAINTIFFS' CASE**
   **FOR CLASS CERTIFICATION ARE EXACERBATED**
5  **BY THE FACT THAT MANY PROPOSED CLASS**
   **MEMBERS HAVE ALREADY SURRENDERED THEIR POLICIES**
6
        Named representative Eugene Kreps surrendered his policy after receiving the October
7
   2008 letter. (Kreps. Dep. at 103:21-25.)  So did approximately 21% of proposed class members.
8
   (Scuglik Decl. at ¶ 13.)  Though Plaintiffs do not recognize it, such individuals are effectively
9
   pursuing an entirely different claim than the other proposed class members, who still maintain their
10
   policies.  Though the nature of the surrenderees' claim is not developed by Plaintiffs, that group
11
   cannot seek monetary and non-monetary relief for whatever action(s) Conseco ultimately takes
12
   after the regulatory proceedings conclude, because they no longer have a Conseco policy.
13
   Presumably, then, they would seek damages for being allegedly "forced" to abandon their policy by
14
   the October 2008 letter.
15
        To the extent the surrenderees attempt to encompass within that claim the theories already
16
   addressed (e.g., that there was a 5-payment "promise"), their case for class certification is flawed
17
   for all of the above-stated reasons.  Their case is crippled by a host of additional individualized
18
   issues.  As an initial matter, it would be necessary to adjudicate <u>why</u> any given surrenderee actually
19
   terminated coverage, in order to ensure that the termination in fact related to the October 2008
20
   letter.  If so, the policyholder would still be subject to individualized defenses.  For example, did
21
   the policyholder surrender <u>after</u> the October 2008 letter was suspended?  If so, why, and how could
22
   a suspended letter constitute a breach of contract justifying policy termination and consequent
23
   damages?  Did he or she receive and sign one of the acknowledgements Conseco distributed?  (<u>See</u>
24
   Scuglik Decl. at ¶ 14.)  Regardless of when the policyholder surrendered, what aspect of the
25
   October 2008 letter caused him or her to surrender?  If the policyholder claims that he or she
26
   terminated because the letter demanded a substantial immediate premium payment to maintain
27

28

OPPOSITION TO MOTION FOR CLASS CERTIFICATION                    CASE NO.: M:10-CV-02124-SI

1  coverage (a common refrain), then Conseco would be entitled to litigate the defense that the

2  policyholder either did not read the letter, did not fully read the letter, or misread the letter.

3    Even if a policyholder were able to prove liability on this strained theory, the damages

4  determination would also be individualized.  Though Plaintiffs have not articulated a damages

5  theory for surrenderees, it would seemingly prominently involve consequential damages, e.g., costs

6  associated with obtaining alternate coverage, or compensating their inability to obtain alternate

7  coverage.  Such matters would inherently require policyholder-specific adjudication.

8    Plaintiffs only superficially address this issue, even though identifying it and overcoming it

9  was their burden.  They cite In re Conseco Life Ins. Co. Cost of Ins. Litig., Civ. No. ML 04-1610-

10  AHM (Mex), 2005 WL 5678842 (C.D. Cal. Apr. 26, 2005), but that case challenged a narrow issue:

11  Conseco's elimination in 2003/2004 of a so-called "R Factor" in determination of the cost of

12  insurance rate, which allegedly had the effect of increasing that rate.  The Court certified a Fed. R.

13  Civ. P. 23(b)(2) class only (rendering predominance, superiority and manageability considerations

14  irrelevant), finding that the primary issue was whether that elimination was contractually permitted,

15  and that, if so, "damages [presumably mechanically-calculable recoupment of overcharges] would

16  flow directly from that finding." Id. at *8.  In that different context, the Court was untroubled by

17  the fact that some class members had surrendered their policies already, presumably because of the

18  ease of calculating any pre-surrender overcharges.  Here, predominance, superiority and

19  manageability considerations matter greatly, and, as shown, surrenderees' claims implicate a host

20  of complex, individualized liability and damages issues.

21  **VI.**  **PLAINTIFFS DO NOT SATISFY FED. R. CIV. P. 23(B)(2) EITHER**

22    Buried at the end of Plaintiffs' motion is a three-paragraph request for class certification

23  under Fed. R. Civ. P. 23(b)(2), a provision which was designed "specifically for civil rights cases

24  seeking broad declaratory or injunctive relief for a numerous and often unascertainable or

25  amorphous class of persons." Jackson v. Se Pa. Transp. Auth., 260 F.R.D. 168, 193-94 (E.D. Pa.

26  Aug. 31, 2009).  This request too is inappropriate and should be denied.

27

28

OPPOSITION TO MOTION FOR CLASS CERTIFICATION        CASE NO.: M:10-CV-02124-SI

### A.   Plaintiffs Do Not Satisfy The Prerequisites Of Rule 23(a)

Class certification is proper under this provision only where the four threshold class certification requirements -- numerosity, commonality, typicality, and adequacy -- are already satisfied.  See Fed. R. Civ. P. 23(a) (establishing these four "prerequisites" to any class action); Fed. R. Civ. P. 23(b) ("A class action may be maintained if Rule 23(a) is satisfied and if the class falls into one of the additional categories specified in 23(b), including 23(b)(2).") (emphasis added). For the reasons set forth already, Plaintiffs have not satisfied these requirements.

### B.   The Monetary Relief Sought By Plaintiffs Is Not Incidental

It is settled law in the Ninth Circuit, and elsewhere, that a case falls within Fed. R. Civ. P. 23(b)(2) only where any claim for monetary damages is "incidental"; otherwise, the important and generally-applicable predominance and superiority considerations would be swallowed by 23(b)(2). Here, the claim for monetary damages is plainly not "incidental."

As an initial matter, approximately 21% of class members have surrendered their policies. (Scuglik Decl. at ¶ 13.)  These individuals lack standing to seek injunctive relief, and they are therefore inherently limited to monetary damages -- a circumstance in which Rule 23(b)(2) clearly does not apply.  In Lanzarone v. Guardsmark, Civ. No. 06-1136-RPLAX, 2006 WL 4393465, at *3 (C.D. Cal. Sept. 7, 2006), for example, a case involving alleged wage-and-hour violations, the court denied 23(b)(2) certification because the plaintiff was a former employee, and therefore could not show a "credible threat that he [would] suffer the alleged harm again" in order to seek an injunction.

This is otherwise not a case in which the claim for monetary damages is merely "incidental."  The Brady Amended Complaint's "Prayer for Relief" requests the following categories of monetary damages:  "compensatory damages," "actual damages," "a refund of all moneys acquired by Conseco by means of its unlawful conduct," "treble damages," "punitive damages," "attorneys' fees," "interest" and "the costs of this suit."  Of the sixteen paragraphs in the Prayer for Relief, fully nine of them request money damages (and of the remaining seven, many are boilerplate requests to "[c]ertify the Class," "[e]nter a judgment" for plaintiffs and award "other relief").  (Brady Am. Compl.; see also Appendix C.)

34

Further, the preamble of the Brady Amended Complaint demands that Conseco "restore the value of Plaintiffs' accumulation accounts to the levels at which they would be properly funded," and Plaintiffs themselves allege the following underfunding amounts, which they characterize as "substantial":

| | |
|---|---|
| Eugene Kreps | $346,133.77 |
| John McNamara | $187,262.23 |
| Marion Hovden | $101,160.55 |
| Charles Hovden | $80,243.64 |
| Cedric Brady | $93,619.56 |
| Hisaji Sakai | $23,339.66 |
| Jean Sakai | $66,044.47 |

(Am. Compl. ¶ 87) (emphasis added).

Similarly, the McFarland complaint contains a "Prayer For Relief" seeking "compensatory damages," "punitive damages," "interest," "attorneys' fees," "litigation expenses" and "costs." (McFarland Compl. at pp. 12-13.)

In light of these facts, Rule 23(b)(2) is inapplicable because money damages are not "incidental." For example, in Mahfood v. QVC, Civ. No. SACV 06-0659-AG(ANx)5, 2008 WL 5381088 (C.D. Cal. Sept. 22, 2008), the plaintiff challenged allegedly misleading pricing advertisements by television retail company QVC. The Court rejected her request for a 23(b)(2) class, notwithstanding her assertion that her "primary intent" was to "seek a change in QVC's ongoing comparative pricing business practices, which is effectuated by declaratory or injunctive relief." Id. at *11. The Court noted that "her prayer for relief… repeatedly requests actual damages, rescission, restitution, and even disgorgement of profits," and that cases certifying 23(b)(2) cases often "involved discriminatory actions or civil rights violations impacting a certain class of persons." Id.[26] See also Gilman, Civ. No. 02-00051-AB, 2003 WL 23191098, at *6

_____

[26] Here too, Plaintiffs cite In re Conseco Life Ins. Co. Cost of Ins. Litig., 2005 WL 5678842 (C.D. Cal. Apr. 26, 2005). Again, though, that case challenged a narrow issue: Conseco Life's elimination in 2003/2004 of a so-called "R Factor" in determination of the cost of insurance rate, which allegedly had the effect of increasing that rate. The Court found that the primary issue was whether that elimination was contractually permitted, and that, if so, "damages [presumably mechanically-calculable recoupment of overcharges] would flow directly from that finding." Id. at *8. This case is far more complex, and -- as the Amended Complaint reflects -- the monetary damages issue (which includes a demand for compensatory and punitive damages) is more prominent and complex. Yue v. Conseco Life Ins. Co., Civ. No. 2:08-01506-AMH (C.D. Cal. Dec. 12, 2009), Ex. 25, is similarly distinguishable. It exclusively involved a challenge to certain fee

35

1  (certification denied because plaintiff sought damages that were not merely incidental to his claim

2  for injunctive relief, as made clear by the complaint's prayer for relief).

3        C.       **The Putative Class Is Lacking In Cohesiveness**

4        To be certified under Rule 23(b)(2), class claims must be "cohesive."  In other words,

5  "[e]ven though the rule does not contain a predominance and superiority requirement, the requisite

6  cohesiveness is lacking where individual issues predominate."  Lewallen v. Medtronic USA, Inc.,

7  Civ. No. 01-20395-RMW, 2002 WL 31300899, at *3 (N.D. Cal. Aug. 28, 2002) (denying

8  certification for proposed Rule 23(b)(2) class because individual issues predominated over

9  common issues); see also Sweet v. Pfizer, 232 F.RD. 360, 374 (C.D. Cal. 2005) (a "class under

10  Rule 23(b)(2) must not be overrun with individual issues").

11        In Sweet, the court considered plaintiffs' alternate request for certification under Rule

12  23(b)(2) in addition to their request for certification under Rule 23(b)(3).  Yet, having already

13  determined that individual issues precluded certification under Rule 23(b)(3), the Court recognized

14  that certification under Rule 23(b)(2) was also inappropriate:  "[h]ere, because the predominance of

15  individual issues barred certification under Rule 23(b)(3), certification under Rule 23(b)(2) is

16  similarly barred."  Id. at 374.

17        The situation here is no different.  Plaintiffs' request for certification under Rule 23(b)(3)

18  should be denied for all the reasons set forth herein, and particularly because individual issues

19  predominate over common issues.  Moreover, as the court in Sweet held, those individual issues

20  are fatal to certification under Rule 23(b)(2) as well.  232 F.R.D. at 374.  The proposed injunctive

21  class lacks the requisite "cohesiveness" and should be denied.

22

23

24

25  increases, the primary relief sought was injunctive (cessation of the fees), and the only damages
    sought were "repayment of any unlawful overcharges" (Id. at 8) -- but the fees were not going to be
26  imposed in the first place for many years.  (Id. at 9.)  Plaintiffs' other cases are also distinguishable.
    See Bracamonte v. Adler, Civ. No. 03-01821-S1, 2004 WL 1146624, at *4 (N.D. Cal. May 7, 2004)
27  (Defendant does not appear to have argued that damages were not "incidental"); Westways World
    Travel, Inc. v. AMR Corp., 218 F.R.D. 223, 241-42 (C.D. Cal. 2003) (damages claim deemed to be
28  "incidental," which is not the case here).

**VII.    PLAINTIFFS' REQUEST FOR A CALIFORNIA-ONLY CLASS ALSO FAILS**

For California policyholders, Plaintiffs seek state-wide certification on additional causes of action -- including fraud[27] -- on a discrete additional theory:  that Conseco's annual benefit statements were misleading.  According to Plaintiffs, those annual statements represented that the guaranteed cash value was "$0," even though Conseco believes that the guaranteed cash value was the greater amount shown on the policy data page.  (Motion at 10-11, 15, 24-25.)

**A.    The Class Representatives Are Atypical Because They Did Not Rely Upon The Allegedly Misleading Component Of The Annual Statement**

A proposed class action should fail on typicality grounds where the class representatives challenge an alleged misrepresentation upon which they did not themselves rely.  In <u>Quezada v. Loan Center of California, Inc.</u>, Civ. No. 2:08-00177 WBS KJM, 2009 WL 5113506, at *3-4 (E.D. Cal. Dec. 18, 2009), for example, the court denied class certification on typicality grounds where the class representative did not read the challenged loan documents at issue but instead had them explained to her.  That is the situation here:  none of the seven proposed class representatives relied upon the allegedly incorrect portion of the annual benefit statements (which appeared in only some of them; compare, e.g., Brady's 1998 annual statement (which does not contain the challenged $0 reference) (Ex. 23) to Brady's 1999 annual statement (which does contain the challenged $0 reference) (Ex. 24).)

- Mrs. Sakai simply never read any of her annual statements, (J. Sakai Dep. at 18:18-18:23) and so she cannot claim to have relied to her detriment on them.

- Dr. Charles Hovden could not remember whether he ever received or read annual statements about his policy, so he too cannot claim to have relied to his detriment on them.  (C. Hovden Dep. at 26-27:11.)

- Dr. Sakai testified that, generally, he claims an entitlement to his policy's guaranteed cash values.  (H. Sakai Dep. at 70.)  But when presented with the challenged aspect of his 2000 annual statement -- the reference to guaranteed cash value as $0 -- Dr. Sakai testified that he "probably" read it, but that he does not "remember" if he had any reaction to it.  (<u>Id.</u> at 66:19-67:4.)

- Unlike Dr. Sakai, Mr. Brady did not rely upon or expect his policy's guaranteed cash values; he testified:  "I've never looked at these values.  I've never thought about

_____

[27]    Fraud, negligent misrepresentation, promissory estoppel, breach of duty of good faith and fair dealing.  (Motion at 1.)

37

these values." (Brady Dep. at 134:9.) Not surprisingly, therefore, he simply did not notice the challenged aspect of his annual statements. (Id. at 115:10.)

- Dr. McNamara testified that even though he generally reviewed his annual statements when he received them, he did not have any recollection of reading the challenged statement about guaranteed cash value. (McNamara Dep. at 81:1-82:20.)

- Dr. Kreps claimed to have read the allegedly incorrect portion of his annual benefit statement numerous times, but "cannot figure out what it says" and didn't recall asking anyone about the meaning of the statement. (Kreps Dep. at 112:23-115:5) When asked if he ever understood what it meant, he acknowledged "not really." (Id. at 114.)

- Dr. Marion Hovden testified that she reviewed her annual statements when she received them. (M. Hovden Dep. at 52:4-52:8.) Yet, when asked whether she saw the challenged statement about guaranteed cash value, she responded "I doubt it." (Id. at 83:8.)

**B.      In Addition, This California-Only Theory -- Like Plaintiff's Nationwide Theories -- Would Also Require Plaintiff-By-Plaintiff Adjudication**

Just like Plaintiffs' other theories, this California-only theory would require adjudication of issues that are unique to each class member, centering on such matters as:

- Did the policyholder receive and read an annual benefit statement that contained one of the $0 references? (Again, not all annual statements did.)

- If the policyholder received and read one of those annual statements, did the policyholder notice the $0 reference itself?

- Did the policyholder rely to his or her detriment on that reference? (How a plaintiff would do so is not spelled out in the class certification brief, even hypothetically.)

As already shown, where liability depends on whether each proposed class member was exposed to non-uniform representations, class certification is inappropriate for failure to satisfy the commonality, predominance, and superiority requirements. See Vega, 564 F.3d at 1272 (no class certification because resolving entitlement to commissions would "depend on such individualized facts and circumstances as when a given employee was hired, what the employee was told (and agreed to) with respect to compensation rules and procedures at the time of hiring . . . "); Howard, 2009 WL 3571984 at *6 n.2 (no class certification because there were "individual variations in the supposed recollections of oral statements allegedly made"); Mahfood v. QVC, 2008 WL 5381088 at *4-5 (denying class certification on breach of contract and other claims in case against television shopping network because resolution of the claim would require adjudication of each purchaser's

38

1  unique facts, as "consumers hear or see different representations during QVC's television

2  programming and on QVC's website").

3        This rule applies with special force where the theory is based upon a claim of fraud (as

4  here), because then the inherently-individualized issue of reliance is an integral part of the claim.

5  In Quezada v. Loan Center of California, Inc., Civ. No. 2:08-00177-WBS-KJM, 2009 WL 5113506,

6  at *8-9 (E.D. Cal. Dec. 18, 2009), for example, the Court denied class certification in a fraud case

7  alleging that the lender did not disclose that the original "teaser" rate was unlikely to persist,

8  because, although "the loan documents . . . were similar," "whether class members relied upon the

9  loan documents in question will be a critical issue in this action," and "[t]he class members likely

10  had different conversations with their mortgage brokers," and "read the loan documents to different

11  degrees."  Similarly here, there is no way to know whether a policyholder even received and read

12  an annual statement containing the challenged text, much less relied upon it to his or her detriment,

13  without individualized adjudication.  Cf. Endres v. Wells Fargo Bank, Civ. No. 06-7019-PJH, 2008

14  WL 344204, at *12 (N.D. Cal. Feb. 6, 2008) (denying class certification in part because resolution

15  of nondisclosure claims would depend on "whether and when a particular class member heard or

16  read the alleged misrepresentations").

17        For these reasons, the California-only class fails not just on typicality grounds, but also on

18  commonality, predominance and superiority grounds.[28]

19  _____

20     [28]   In this area, Plaintiffs cite Mass. Mutual Life Ins. Co. v. Super. Ct. of San Diego
County, 97 Cal. App. 4th 1282, 1293 (2002) and Vasquez v. Super. Ct. of San Joaquin County, 4

21  Cal. 3d 800 (1971).  Those cases bear no similarity to this one.  In Vasquez, as Plaintiffs
themselves recognize, "salespersons recited to consumers a standard statement about a product that

22  contained misrepresentations."  (Opp. at 25.)  Mass. Mutual involved a common "failure to
disclose" (id. at 1293-94), and there was "nothing in the record" indicating that the allegedly

23  nondisclosed information was communicated to anyone at all.  Id. at 1295.  Here, Plaintiffs rely
upon an alleged affirmative representation which -- as shown -- they themselves did not even read

24  and/or rely on.

25     Plaintiffs also cite "In re Conseco II," a companion to the previously-addressed
Conseco decision in which the Court certified a California statewide class.  The Court did so on

26  two claims not at issue here:  insurance bad faith and Cal. Bus. & Prof. Code § 17200.  In re
Conseco Life Ins. Co. Cost of Ins. Litig., Civ. No. 04-1610-AHM (Mex) 2005 WL 5678790, at

27  *1 (C. D. Cal. Apr. 27, 2005).  The Court denied class certification on the fraud claim -- which
Plaintiffs are pursuing -- on the basis that, as here, individualized issues would predominate.  Id. at

28  3-4.  And, as noted, that case presented a narrower and more straightforward claim than does this
case.  (It challenged only a fee increase.)

**VIII.   THE ALLEGATIONS ABOUT FEES**
**AND PARCEL OF THE OVERALL CASE,**
**WHICH SHOULD NOT BE CERTIFIED, AND PLAINTIFFS**
**HAVE NOT MADE ANY PROPOSAL AT ALL -- MUCH LESS A**
**WORKABLE ONE -- TO *SEPARATELY* CERTIFY THOSE ALLEGATIONS**

The fee increases that were proposed in the October 2008 letter are among the issues under discussion with the regulators. As such, Conseco may be presenting to the Court an agreement with the regulators addressing those fees. Until such time, Conseco makes the following points concerning Plaintiffs' request for certification in this area:

**A.   Plaintiffs' Assertions About The Fees Are Wrong**

Though the Court is not to resolve the merits at the class certification stage, Plaintiffs make various assertions concerning the fee changes that were proposed in the now-suspended October 2008 letter. Those assertions are factually incorrect.

First, the policies permit a monthly $5.00 expense fee, and -- though on many relevant policies Conseco opted not to charge that fee for many years -- the October 2008 letter stated that it would be imposed on a going-forward basis. Plaintiffs assert various purported "real" reasons for this decision, e.g., Conseco's investments had historically performed poorly, and that Conseco had made a poor business decision in relieving policyholders of these fees for many years. (Motion, at 12-13.) But Plaintiffs ignore the fundamental point: the policy *explicitly* provides for a monthly $5.00 expense charge. (See, e.g., Brady Policy at 5.)

Second, the policies provide for a cost-of-insurance fee, and the maximum "rate" for calculation of this fee is set forth in the policy. (See, e.g., Brady Policy at 9-10.) ███████ ███████████████████████████████████████████████████ (Scuglik Dep., at 102:18-21), but as reflected in the now-suspended October 2008 letter, Conseco had decided to re-impose the fee, calculating it using increased rates (which rates would have been different for different classes of policyholders).

Plaintiffs appear to contend that this proposal was contractually barred because there had been no decline in mortality experience, and because it was for the improper purpose of "recouping" prior investment losses. Both contentions are wrong. As to the first contention, the policy states maximum cost-of-insurance rates that are based on a 1980 mortality table (Brady

40

1  Policy at 10), but nowhere does the policy state that if Conseco exercises its discretion to <u>benefit</u>

2  policyholders by charging a <u>lower</u> rate (or no fee at all), it thereafter cannot alter that decision

3  absent a decline in mortality experience.  Instead it gives the Company broad discretion to adjust

4  this fee, stating, <u>inter alia</u>, that "[t]he company reserves the right to adjust for the monthly cost of

5  insurance being charged on any policy anniversary by increasing or decreasing the rates for the

6  monthly cost of insurance under this plan by giving written notice to all insureds not less than

7  ninety days prior to the date of such change." (Brady Policy at 9-10.)  Conseco's October 2008

8  announcement was therefore entirely proper, regardless of current data on mortality experience.

9         As to the contention that Conseco intends to use a cost-of-insurance increase to recoup prior

10  investment losses, there is no basis for that claim.  Conseco actuary Keith Turner explained,

11

12

13

14                                                                      (Deposition of Keith

15  Turner ("Turner Dep.), previously filed under seal as Ex. 13 to Plaintiffs' Motion, at 44:3-8, 67:23-

16  70:6, 153:12-154:17, 163:8-165:4, 167:16-172:19) (emphasis added).)

17

18

19        (<u>Id.</u> at 242:5-6.)  Unsurprisingly, Plaintiffs did not follow up with Mr. Turner.

20  **B.    Plaintiffs' Fee Challenge Is Bound Up In A Broader Case Which**
   **Cannot Be Certified For The Reasons Already Shown; Plaintiffs Have Not**
21  <u>**Proposed, Much Less Justified, Some Separate Certification Of The Fee Challenge**</u>

22         In any event, Plaintiffs' premature fee challenge is part of a broader case which, for all the

23  reasons already shown, cannot be certified under Fed. R. Civ. P. 23(b)(2) or 23(b)(3).  For example,

24  in <u>Legge v. Nextel Communic'ns, Inc.</u>, Civ. No. 02-8676 DSF (VNKX), 2004 WL 5235587, at *7-

25  8 (C.D. Cal. June 25, 2004), plaintiffs claimed that Nextel violated certain statutes in failing to

26  inform phone-service applicants of certain facts concerning adverse credit reports.  The named

27  plaintiffs' interactions with Nextel occurred prior to 2003, when Nextel changed its procedures in

28  an effort to remedy the issues.  <u>Id.</u> at *8.  Plaintiffs' motion "ma[de] no distinction" between

                                            41

1  individuals who interacted with Nextel before April 2003 (such as the named plaintiff herself), and

2  those who interacted with Nextel after April 2003.  Id.  Upon a finding that the case was generally

3  unsuitable for certification, the Court denied certification, "declin[ing] to speculate whether it

4  would be appropriate to create one or more post-April 2003 subclasses."  Id.  The same analysis is

5  appropriate here:  Plaintiffs have made no effort to separate the fee challenge from their overall

6  case, which challenge is part-and-parcel of a case that is unsuitable for class certification.

7  Even if Plaintiffs now propose separating the fee challenge from the remainder of the case,

8  that effort would be belated.  It would also raise difficult issues concerning the premature nature of

9  the claim, the nature and content of class notice, the nature of any opt-out rights, and fairness to the

10  proposed class members, who could find themselves fully bound by a judgment that resolved only

11  a peripheral sliver of their originally-asserted claim.  Legge is instructive on this issue as well.  At

12  oral argument, departing from statements in their court papers and from the testimony of the named

13  plaintiffs themselves, Plaintiffs' counsel stated that class members would seek only certain

14  statutorily-specified damages ($9 per violation).  2004 WL 5235587, at *6.  Plaintiffs' counsel also

15  stated that, if the Court were nonetheless concerned about individualized issues, the Court could

16  certify a class for the purpose of determining liability only.  Id. at *8.  As to the possibility of a

17  liability-only class, the Court "decline[d] to fashion such a class without Defendants having been

18  provided an opportunity to brief the issue."  Id. at *8.  Further, the Court addressed multiple

19  concerns occasioned by Plaintiffs' counsel's efforts to narrow their case in order to obtain class

20  certification, including the possibility that a favorable class judgment would unfairly limit the relief

21  that individual class members could have pursued.  Id. at *11.

22  Multiple additional factors support such judicial restraint:

23  First, the fee challenge is premature because the fee increases have been suspended.

24  Second, the Plaintiffs' complaints about the fees are substantively without merit.  Legge,

25  2004 WL 5235587, at *13 (denying class certification; "admitted disadvantage" to class members

26  of a class certification denial "should be balanced against Nextel's credible argument that the Class

27  Members have not actually been damaged, and . . . Class Action treatment would lead to an

28  inequitable and absurd result").

42

1    Third, certifying a class in this area, as in the others, would lead the Court and the parties

2    into a host of complex individualized issues.  Presumably Plaintiffs would seek a permanent

3    injunction against the challenged proposed fees, but such relief cannot issue absent a showing of

4    irreparable harm.  See Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1042 (9th Cir. 1999) (a

5    court may not exercise jurisdiction over a suit for equitable relief unless the plaintiff demonstrates

6    a likelihood of imminent and irreparable injury).  That showing cannot be made here on a

7    categorical, class wide basis.  Some policyholders have surrendered their policies, and will never

8    pay any increased fees; others would benefit from, and prefer, the set of proposals contained in the

9    October 2008 letter, which integrate the fee proposals with a variety of corresponding benefits,

10   including the previously-described "enhanced continuation of insurance" status.  (Keeley Decl., at ¶

11   40.)  This fundamental divergence of interests would also create conflict within the class, yet

12   another factor weighing against class certification.  See Phillips v. Klassen, 502 F.2d 362, 366-67

13   (D.C. Cir. 1974) (affirming denial of class certification because, in part, retired post office

14   employees contesting premature retirement on grounds of coercion had interests that conflicted

15   with those retirees who were happy with early retirement).

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR CLASS CERTIFICATION                    CASE NO.: M:10-CV-02124-SI

1

## CONCLUSION

2        For all the foregoing reasons, Conseco respectfully requests that the Court deny Plaintiffs'

3    joint motion for class certification in its entirety.

4    Dated:  April 22, 2010                                    Respectfully submitted,

5

6                                                    _____/s/ Raoul D. Kennedy_____
                                                     RAOUL D. KENNEDY (State Bar No. 40892)
7                                                    Skadden, Arps, Slate, Meagher & Flom LLP
                                                     Four Embarcadero Center, Suite 3800
8                                                    San Francisco, California 94111
                                                     Telephone: (415) 984-6400
9                                                    Facsimile: (415) 984-2698
                                                     Email: Raoul.Kennedy@skadden.com
10

11                                                   JAMES R. CARROLL (*Pro Hac Vice*)
                                                     DAVID S. CLANCY (*Pro Hac Vice*)
12                                                   Skadden, Arps, Slate, Meagher & Flom LLP
                                                     One Beacon Street, 31st Floor
13                                                   Boston, Massachusetts 02108
                                                     Telephone: (617) 573-4800
14                                                   Facsimile: (617) 573-4822
                                                     Email: James.Carroll@skadden.com
15                                                   Email: David.Clancy@skadden.com

16
                                                     Attorneys for Defendant
17                                                   Conseco Life Insurance Company

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR CLASS CERTIFICATION                    CASE NO.: M:10-CV-02124-SI

## Appendix A

## VARIATIONS IN THE RELEVANT ASPECTS OF
## APPLICABLE CONTRACT LAW FROM STATE TO STATE

**Breach**: State law differs as to the required standard of proof for breach of contract. For example:

- Some states have adopted a broad definition of "breach," encompassing any "failure to perform."[1]

- Some states apply a stricter standard of breach, requiring proof of a "substantial" (as opposed to trivial) breach of a contract.[2]

- Other states require that a plaintiff demonstrate a "material" breach.[3]

**Causation**: The states also have adopted different definitions of causation. For example:

- Some states define causation as a breach which was a cause "in fact" of the damage.[4]

---

[1]     See, e.g., Metro. Transfer Station, Inc. v. Design Structures, Inc., 328 N.W.2d 532, 537-38 (Iowa Ct. App. 1982) ("[N]onperformance of a duty under [a] contract is a breach, unless performance is excused."); Strodtman v. Integrity Builders, Inc., 668 N.E.2d 279, 282 (Ind. Ct. App. 1996) ("A party breaches a contract either by placing itself in a position where it is unable to perform its contractual obligations, or by failing to perform all of its contractual obligations."); WFND, LLC v. Fargo Marc, LLC, 730 N.W.2d 841, 848 (N.D. 2007) ("A breach of a contract is the nonperformance of a contractual duty when it is due."); Missouri Approved Jury Instructions, Civil § 26.06 (instructing the jury that it can find a breach where the "defendant failed to perform his agreement").

[2]     See, e.g., Massachusetts Jury Instructions, Civil § 2.12(a) ("[A] failure to perform a contractual obligation must be substantial rather than a minor or technical failure to constitute a breach."); Pennsylvania Suggested Standard Civil Jury Instructions § 15.06 (Civ) ("If you find that the nonperformance was immaterial, and thus the contract was substantially performed, you must also find that a breach of the contract has not occurred.").

[3]     See, e.g., Seckinger-Lee Co. v. Allstate Ins. Co., 32 F. Supp. 2d 1348, 1357 (N.D. Ga. 1998) (applying Georgia law to a claim for breach of insurance contract and stating that "[t]he essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom") (citation omitted); Abbott Labs., Inc. v. Gen. Elec. Capital, 765 So. 2d 737, 740 (Fla. Dist. Ct. App. 2000) ("The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages.").

[4]     See, e.g., Nw. Indep. Forest Mfrs. v. Dep't of Labor and Indus., 899 P.2d 6, 9 (Wash. Ct. App. 1995) (holding that "to establish causation" the plaintiff must show that the defendant's alleged breach "was a cause in fact of [plaintiff]'s alleged damages"); Rockford Mut. Ins. Co. v.

A-1

- Other states define causation as harm that "arose naturally" from the breach, or was foreseeable by the parties.[5]

- California courts employ a "substantial factor" test to define causation.[6]

- In some states causation is not a formal element of a claim for breach of contract.[7]

**Contract Interpretation/Extrinsic Evidence**: California takes a liberal approach to the admission of extrinsic evidence. Extrinsic evidence must be considered by courts in California when the words used in a contract are disputed. <u>Wolf v. Superior Court</u>, 8 Cal. Rptr. 3d 649, 655 (Cal. Ct. App. 2004) (observing that "it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face"). Other states are not in accord with California. In fact, state law on this issue varies widely.[8] For example:

---

<u>Pirtle</u>, 911 N.E.2d 60, 67 (Ind. Ct. App. 2009) ("The party seeking damages must prove by a preponderance of the evidence that the breach was the cause in fact of its loss.").

[5]    <u>See, e.g.</u>, <u>Lansing Pavilion, L.L.C. v. Eastwood, L.L.C.</u>, No. 265970, 2006 WL 2271348, at *2 (Mich. Ct. App. Aug. 8, 2006) (holding that the plaintiff must prove that the harm alleged "arose naturally" from the "alleged breaches, or can <u>reasonably</u> be said to have been in the contemplation of the parties at the time their contract was made") (emphasis in original) (citations omitted).

[6]    <u>See</u> <u>Linden Partners v. Wilshire Linden Assocs.</u>, 62 Cal. App. 4th 508, 530 (1998) ("A cause of injury, damage, loss or harm is something that is a substantial factor in bringing about an injury, damage, loss or harm.") (quotation marks and citation omitted).

[7]    <u>See, e.g.</u>, <u>MBNA Am. Bank v. Goodman</u>, 140 P.3d 589, 591 (Utah Ct. App. 2006) ("The elements of a breach of contract claim are '(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.'") (citation omitted).

[8]    <u>See</u> <u>Ritti v. U-Haul Intern., Inc.</u>, Civ. A. No. 05-4182, 2006 WL 1117878, at *14 (E.D. Pa. Apr. 26, 2006) (denying class certification of a breach of contract claim in part because the application of multiple states' parol evidence rules would preclude predominance); <u>Bowers v. Jefferson Pilot Fin. Ins. Co.</u>, 219 F.R.D. 578, 583-84 (E.D. Mich. 2004) ("With respect to the use of extrinsic evidence, not only does the Court have to deal with the variations in state law regarding its use, i.e., when extrinsic evidence may be admitted and the type of extrinsic evidence that may be used, but as a preliminary step, the Court must determine in each instance, exactly what the law is in each state with respect to the use of extrinsic evidence. While the Court's brief review of state law suggests variations as set forth above, the Court believes that an in-depth review of each state's laws (particularly for those states where the parties disagree as to what the law is) would be required before the Court could determine how to correctly use the extrinsic evidence. This alone contributes to the management difficulties of this case.").

A-2

1       •    Some states permit extrinsic evidence without any apparent limitations.[9]

2       •    Some states permit extrinsic evidence whether or not the contract has first been
3               deemed ambiguous.[10]

4       •    Other states permit extrinsic evidence only if the contract has first been deemed
              ambiguous.[11]

5

6      The states' description of the types of extrinsic evidence that may be considered also
7 varies:[12]

8

---

9       [9]      See, e.g., Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 808 P.2d 919, 921-22 (Nev.
10 1991) (stating that "the better approach is for the courts to examine the circumstances surrounding the
parties' agreement in order to determine the true mutual intentions of the parties") (footnote omitted);
11 R. Zoppo Co. v. City of Dover, 475 A.2d 12, 15 (N.H. 1984) ("Because interpreting a contract is, by
necessity, fact-oriented, we will consider the situation of the parties at the time of their agreement.");
12 Smith v. Melson, Inc., 659 P.2d 1264, 1267 (Ariz. 1983) ("When interpreting an agreement, the court
may always consider the surrounding circumstances.").

13       [10]      Sawyer v. Arum, 690 F.2d 590, 593 (6th Cir. 1982) ("[E]xtrinsic or parol evidence
14 may be admitted in Michigan to establish the existence of, and to ultimately resolve, a
contract ambiguity."); Alyeska Pipeline Serv. Co. v. O'Kelley, 645 P.2d 767, 771 n.l (Alaska 1982)
15 (holding, as a matter of first impression, that "a court in this jurisdiction may initially turn to extrinsic
evidence in construing a contract" without making a preliminary finding that the contract is ambiguous);
16 Main St. Landing, L.L.C. v. Lake St. Assoc., Inc., 892 A.2d 931, 935 (Vt. 2006) ("The court may
consider limited extrinsic evidence of circumstances surrounding the making of the agreement in
17 determining whether the writing is ambiguous.") (internal quotations and citation omitted).

18       [11]      Student Loan Guar. Found. of Ark., Inc. v. Barnes, Quinn, Flake & Anderson, Inc.,
19 806 S.W.2d 628, 631 (Ark. Ct. App. 1991) (reversing trial court decision admitting extrinsic
evidence of parties' prior negotiations because contract was not ambiguous); Eason Publ'ns, Inc. v.
20 Monson, 294 S.E.2d 585, 586 (Ga. Ct. App. 1982) (holding that the court may consider
surrounding circumstances after concluding that lease agreement was ambiguous); Perron v. Hale,
21 701 P.2d 198, 201 (Idaho 1985) (admitting extrinsic evidence only after determination that earnest
money agreement on its face was ambiguous); Bunke, Inc. v. Johnson, 666 P.2d 1234, 1240 (Mont.
22 1983) ("Where the contract is clear and unequivocal on its face, we will not consider parol
evidence to modify its terms."); Emergency Assocs. of Tampa, P.A. v. Sassano, D.O., 664 So. 2d
23 1000, 1002 (Fla. Dist. Ct. App. 1995) ("[B]efore a trial court can consider [ ] extrinsic evidence in
interpreting a contract, the words used must be unclear such that an ambiguity exists on the face of
24 the contract."); Birmingham Steel Erectors v. Haynes, 816 So. 2d 494, 497 (Ala. Civ. App. 2001)
("[W]here a contract or a judgment is unambiguous, the terms of that contract or judgment control,
25 and parol evidence is not admissible to contradict, vary, add to, or subtract from those terms.");
Olander v. State Farm Mut. Auto. Ins. Co., 317 F.3d 807, 819 (8th Cir. 2003) ("Under North
26 Dakota law, [extrinsic] evidence is not admissible to vary the terms of an unambiguous written
contract.").

27       [12]      See Bowers, 219 F.R.D. at 583 ("There appears to be a significant variation in the
laws of the states with respect to the use of extrinsic evidence (including the types of extrinsic
28 evidence that may be used) to determine whether, as a matter of law, the contract language is
ambiguous.") (emphasis added) (citation omitted).

A-3

- For example, in Missouri, courts take a liberal view on admitting extrinsic evidence.[13]

- But not all states take such a view.  Others permit only a limited use of extrinsic evidence, and their state-by-state standards vary.  For example:

  - In Washington, courts will admit extrinsic evidence only to determine the meaning of the words used in a contract, not to divine the intent of the parties.[14]

  - In Delaware, courts only admit extrinsic evidence that was contemporaneous with the execution of the contract.[15]

  - In New York, courts admit extrinsic evidence of the parties' dealings throughout the life of the contract.[16]

- As a general matter, states' articulation of the standard for admission of extrinsic evidence is unique and varied.  Consider, for example, Kentucky, which instructs that courts may use extrinsic evidence not to determine "what the parties mean to say, but rather what the parties mean by what they said."[17]

---

[13]   Adams v. Kan. City Life Ins. Co., 192 F.R.D 274, 281 (W.D. Mo. 2000) (denying Missouri statewide class because, after finding that the parties' contract was ambiguous, Missouri law required the court to consider "evidence of the relationship of the parties, the circumstances surrounding execution of the contract, subject matter of the contract, acts of the parties in relation to the contract, and any other external circumstances which would cast light on the intent of the parties") (citations omitted).

[14]   Chew v. Lord, 181 P.3d 25, 30 n.3 (Wash. Ct. App. 2008) ("[E]xtrinsic evidence is relevant only to determine the meaning of specific words and terms used, not to show an intention independent of the instrument.") (citations omitted).

[15]   Monsanto Co. v. Aetna Cas. and Sur. Co., 1993 WL 542402, at *7 (Del. Super. Ct. Dec. 9, 1993) (holding that under Missouri law "when extrinsic evidence is allowed to explain ambiguous terms, the evidence must be contemporaneous in nature") (emphasis in original) (citation omitted).

[16]   N.Y. State Law Officers Union v. Andreucci, 433 F.3d 320, 332 (2d Cir. 2006) (applying New York law) ("In determining the meaning of the language at issue, the jury may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract.") (citations omitted).

[17]   See, e.g., Jaglowicz v. Tex. Life Ins. Co., No. 3:06-CV-95-H, 2006 WL 3759599, at *2 (W.D. Ky. Dec. 15, 2006) ("Courts should endeavor to determine not what the parties mean to say, but rather what the parties mean by what they said.  The Kentucky Supreme Court has instructed that courts should consider 'the subject matter of the contract, the situation of the parties and the conditions under which the contract was written.'  As types of extrinsic evidence, courts may also consider the circumstances surrounding execution of the contract, the objects to be accomplished, and the conduct of the parties.") (internal citations omitted) (emphasis in original).

A-4

1    As these examples illustrate, each state has its own standards in this area, and its own body

2 of case law applying them.

3    **Punitive Damages:**  Punitive damages are generally not available on a claim of breach of

4 contract.  However, that is not uniformly true,[18] and Plaintiffs have not formally disclaimed their

5 punitive damages claim.  Indeed, Plaintiffs are pursuing their fraud claim on behalf of themselves

6 and other California policyholders, meaning they may intend to use that claim, and related findings,

7 as a basis for a request for punitive damages in the other states.  State law concerning punitive

8 damages is highly varied.  For example:

9    • Some states award punitive damages only when the defendant acted with a
10      heightened degree of culpability (e.g., "actual fraud or actual malice,"[19] "reckless
         indifference,"[20] "outrageous conduct"[21] or "vindictiveness and a wholly wanton
11      disregard"[22]).

12    • Other states do not allow recovery of punitive damages except as specifically
13      authorized by statute.[23]

14    _____

15    [18]   See Tartaro v. Allstate Indem. Co., 56 A.D.3d 758, 758-59 (N.Y. App. Div. 2008)
16 (punitive damages are recoverable in a breach of contract case when "the breach of contract is first
    actionable as an independent tort for which compensatory damages are ordinarily available, and is
    sufficiently egregious to warrant the additional imposition of exemplary damages"); Textana, Inc. v.
17 Klabzuba Oil & Gas, 222 P.3d 580, 590 (Mont. 2010) (noting that a Montana statute permits
    punitive damages on a breach of contract claim "where the claimant proves by clear and
18 convincing evidence that the defendant is guilty of actual fraud or actual malice outside the
    contract context") (internal citation and quotes omitted); Monahan v. GMAC Mortgage Corp., 893
19 A.2d 298, 315-16 (Vt. 2005) ("Punitive damages are generally not available in breach of contract
    actions.  We recognize an exception to this general rule for cases in which the breach has the
20 character of a willful and wanton or fraudulent tort.") (internal citation omitted).

21    [19]   Mont. Code Ann. § 27-1-221(1) ("[R]easonable punitive damages may be awarded
    when the defendant has been found guilty of actual fraud or actual malice.").
22

23    [20]   Alyeska, 645 P.2d at 774 (punitive damages are recoverable in Alaska when the
    defendant's conduct can be characterized as "reckless indifference to the interests of another").

24    [21]   Idaho Code § 6-1604(l) (punitive damages are recoverable where defendant's
25 conduct is "oppressive, fraudulent, malicious or outrageous").

26    [22]   Pittsburgh Live, Inc. v. Servov, 615 A.2d 438, 442 (Pa. Super. Ct. 1992) (punitive
    damages are awarded in a fraud action in Pennsylvania only where the defendant's conduct
27 demonstrates "malice, vindictiveness and a wholly wanton disregard of the rights of others").

28    [23]   See, e.g., Int'l Harvester Credit Corp. v. Seale, 518 So. 2d 1039, 1041 (La. 1988)
    ("Under Louisiana law, punitive or other 'penalty' damages are not allowable unless expressly

A-5

- • One state entirely prohibits punitive damages as being in contravention of its state constitution.[24]

- • Among the states that allow for the recovery of punitive damages, the burden of proof varies. Several states expressly require proof of the required conduct by way of clear and convincing evidence,[25] while other states adhere to the preponderance standard[26] and one state requires proof beyond a reasonable doubt.[27]

---

authorized by statute.") (citations omitted); <u>Santana v. Registrars of Voters</u>, 502 N.E.2d 132, 135 (Mass. 1986) ("Punitive or exemplary damages are not allowed in Massachusetts except under statutory authority.").

[24]    <u>See</u> <u>State ex rel. Cherry v. Burns</u>, 602 N.W.2d 477, 484 (Neb. 1999) (recognizing that the Nebraska Constitution prohibits an award of punitive damages for state causes of action).

[25]    <u>See, e.g.,</u> <u>Chizmar v. Mackie, M.D.,</u> 896 P.2d 196, 210 (Alaska 1995); <u>Masaki v. Gen. Motors Corp.,</u> 780 P.2d 566, 575 (Haw. 1989); <u>Kleinschmidt v. Morrow,</u> 642 A.2d 161, 165 (Me. 1994); <u>Owens-Illinois, Inc. v. Zenobia,</u> 601 A.2d 633, 657 (Md. 1992); Minn. Stat. § 549.20.1(a); Mont. Code Ann. § 27-1-221(5); Nev. Rev. Stat. § 42.005(1); Ohio Rev. Code Ann. § 2315.21(D)(4); S.C. Code Ann. § 15-33-135.

[26]    <u>See, e.g.,</u> <u>Transp. Ins. Co. v. Moriel,</u> 879 S.W.2d 10, 31-32 (Tex. 1994).

[27]    <u>See</u> Colo. Rev. Stat. § 13-25-127(2).

# Appendix B

## LIFETREND 3 & 4 POLICIES:  PRODUCT INFORMATION
## TEXT CONCERNING DURATION OF PREMIUM PAYMENTS

| Series | Issued By Massachusetts *General* Life | Issued By Philadelphia Life |
|---|---|---|
| 1987 | Form NP-WL-86 (Lifetrend III)<br><br>Relevant text from product information:<br><br>"Premiums:  Premiums are fixed and may be paid continuously, however, the insured has the option after the payment of 5 year's premiums of "vanishing" or limiting premium payments, thereby creating a "paid-up" policy based on *current interest, mortality and expense assumptions.*"  (Ex. 2 to Scuglik Decl.) | Form LA 0078 (Lifetrend III)<br><br>Relevant text from product information:<br><br>"LIFETREND is an *interest-sensitive* permanent whole life insurance policy.  Unlike many other forms of interest-sensitive life insurance, Lifetrend's initial premium can never be increased.  The direct payment of premiums can, however, be reduced or even discontinued after five policy years.  If you elect to reduce or totally eliminate your out-of-pocket costs after five years, those policy expenses necessary to keep your contract in force are automatically deducted from your policy's cash value account.  A summary of the status of your policy's account values is provided annually."  (Ex. 4 to Scuglik Decl.) |
|  | Form NP-END-86 (Lifetrend IV)<br><br>Relevant text from product information:<br><br>"Premiums:  Premiums are fixed and may be paid continuously, however, the insured has the option after the payment of 5 year's premiums of "vanishing" or limiting premium payments, thereby creating a "paid-up" policy based on *current interest, mortality and expense assumptions.*"  (Ex. 6 to Scuglik Decl.) | Form LA 0080 (Lifetrend IV)<br><br>Relevant text from product information:<br><br>"LIFETREND is an *interest-sensitive* permanent whole life insurance policy.  Unlike many other forms of interest-sensitive life insurance, Lifetrend's initial premium can never be increased.  The direct payment of premiums can, however, be reduced or even discontinued after five policy years.  If you elect to reduce or totally eliminate your out-of-pocket costs after five years, those policy expenses necessary to keep your contract in force are automatically deducted from your policy's cash value account.  A summary of the status of your policy's account values is provided annually."  (Ex. 4 to Scuglik Decl.) |

| | | |
|---|---|---|
| 1993 | Form NP-WL-92 (Lifetrend IV)<br><br>Relevant text from product information:<br><br>None (Ex. 9 to Scuglik Decl.) | Form NP-WL-92 (Lifetrend IV)<br><br>Relevant text from product information:<br><br>"Premiums are payable for life.  After the fifth policy year, however, the policyowner may elect to pay less than the specified premium in accordance with the terms of the Optional Premium Payment Provision.<br><br>This provision allows the payment of a premium less than that due on the policy, provided that after the payment of the reduced premium, the value of the accumulation account exceeds the sum of 1) the guaranteed cash value, plus 2) the applicable surrender charge, plus 3) any debt." (Ex. 11 to Scuglik Decl.) |
| 1995 | Form NP-WL-94 (Lifetrend IV)<br><br>Relevant text from product information:<br><br>"Premiums are payable for life.  After the fifth policy year, however, the policyowner may elect to pay less than the specified premium in accordance with the terms of the Optional Premium Payment Provision. This provision allows the payment of a premium less than that due on the policy, provided that after the payment of the reduced premium, the value of the accumulation account exceeds the sum of 1) the guaranteed cash value, plus 2) the applicable surrender charge, plus 3) any debt." (Ex. 13 to Scuglik Decl.) | Form NP-WL-94 (Lifetrend IV)<br><br>Relevant text from product information:<br><br>"Premiums are payable for life.  After the fifth policy year, however, the policyowner may elect to pay less than the specified premium in accordance with the terms of the Optional Premium Payment Provision.<br><br>This provision allows the payment of a premium less than that due on the policy, provided that after the payment of the reduced premium, the value of the accumulation account exceeds the sum of 1) the guaranteed cash value, plus 2) the applicable surrender charge, plus 3) any debt." (Ex. 15 to Scuglik Decl.) |

B-2

## Appendix C

## Brady Plaintiffs' Prayer for Relief (emphasis added)

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court:

I.     Certify the Class as defined in this Complaint;

II.    Order Conseco to notify each and every Member of the Class of the pendency of the claims in this action in order to give such persons an opportunity to seek relief;

III.   Enjoin Conseco from engaging in conduct that violates the Conseco Life Policies and the California Legal Remedies Act;

IV.    Enter a judgment in favor of Plaintiffs and the Class on all Counts;

V.     Declare the Plaintiffs' and Class' Rights under the Policies;

VI.    **Award compensatory damages to Plaintiffs and the Class;**

VII.   **Award Plaintiffs and the Class actual damages under applicable law;**

VIII.  **Award Plaintiffs and the Class a refund of all moneys Conseco acquired by means of its unlawful conduct;**

IX.    **Award Plaintiffs and the Class treble damages under applicable law;**

X.     **Award Plaintiffs and the Class punitive damages under applicable law;**

XI.    **Create a common fund comprised of all damages to Class Members;**

XII.   Impose a constructive trust on the value of Plaintiff and Class Members' accumulation accounts and policy proceeds;

XIII.  **Award Class counsel attorneys' fees pursuant to applicable law and the Common Fund Doctrine;**

XIV.   **Award Plaintiffs and the Class interest as prescribed by law;**

XV.    **Award Plaintiffs and the Class the costs of this suit**; and

XVI.   Award Plaintiffs and the Class such other relief as this Court may deem to be just, proper, and equitable.

(Brady Am. Compl. at p. 49-50).