David J. Millstein (CSB #87878)
MILLSTEIN & ASSOCIATES
100 The Embarcadero Suite 200
San Francisco, California 94105
Telephone:      (415) 348-0348
Facsimile:      (415) 348-0336
E-mail:dmillstein@millstein-law.com
Scott D. Gilbert (Admitted *pro hac vice*)
Stephen A. Weisbrod (Admitted *pro hac vice*)
August J. Matteis Jr. (Admitted *pro hac vice*)
Kathleen Hale (Admitted *pro hac vice*)
GILBERT LLP
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
Telephone:      (202) 772-2200
Facsimile:      (202) 772-3333
Email: gilberts@gotofirm.com
Email: weisbrods@gotofirm.com
Email: matteisa@gotofirm.com
Email: halek@gotofirm.com

Other Plaintiffs' Counsel Appear on Signature Page

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
NORTHERN DIVISION

|  |  |
|---|---|
| **IN RE CONSECO LIFE INSURANCE CO. LIFE TREND INSURANCE MARKETING AND SALES PRACTICE LITIGATION** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**Case No. M:10-cv-02124-SI**

**[REDACTED]**

**PLAINTIFFS' AMENDED JOINT MOTION FOR CLASS CERTIFICATION**

**Date:  August 6, 2010**
**Time:  3:00 p.m.**
**Judge: Hon. Susan Illston**

**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**

**TO CONSECO LIFE INSURANCE COMPANY AND ITS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT**, the Plaintiffs[1] respectfully submit this

Amended Joint Motion for Class Certification (the "Motion") and the accompanying proposed

order.  The Court has not scheduled a hearing on this Motion; however, the Court has scheduled a

conference, at which this motion may be addressed, to be held on August 6, 2010 3:00 p.m. in

Courtroom 10 of the United States District Court for the Northern District of California.  In the

Motion, Plaintiffs ask the Court to certify: (1) a national class for breach of contract and

declaratory judgment; and (2) a California state class for breach of the duty of good faith and fair

dealing, fraud, and negligent misrepresentation.  This Motion is based on the memorandum set

forth below, certain previously filed memoranda filed in these proceedings by Plaintiffs, the

accompanying declaration of Stephen A. Weisbrod (the "Weisbrod Declaration"), and such other

written or oral argument as may be presented before the Motion is under submission with the

Court.

---

[1] Plaintiffs filing this motion are Cedric Brady, Charles Hovden, Marion Hovden, Eugene Kreps, John McNamara, and Hisaji Sakai each of whom is a plaintiff in *Brady v. Conseco Inc.*, No. 3:08-cv-5746 (N.D. Cal.), and Bill W. McFarland, who is the plaintiff in *McFarland v. Conseco Life Ins. Co.*, No. 3:09-cv-598 (M.D. Fla.).  Jean Sakai is a plaintiff in *Brady v. Conseco* but is not seeking to serve as a class representative.

JOINT MOTION FOR CLASS CERTIFICATION                    M:10-cv-02124-SI

# **TABLE OF CONTENTS**

Page

Table of Contents ............................................................................................................. i

Table of Authorities ...................................................................................................... iii

I.     Statement Concerning Scope of Briefing ............................................................. 1

II.    Relief Requested ................................................................................................. 2

III.   Introduction ....................................................................................................... 3

IV.   Background ........................................................................................................ 5

      A.     All of the Policies Provide Investment and Insurance Benefits. ........................... 5

      B.     All of the Policies Contain the Optional Premium Payment Provision................. 7

      C.     All of the Policies Restrict Conseco's Right to Impose "Expense Charges" and "Cost of Insurance" Deductions. ................................................................. 10

      D.    Policyholders Lose Certain Benefits if They Fail to Make Required Premium Payments. ..................................................................................... 11

      E.     Policyholders Do Not Share in Conseco's Profits and Conseco Cannot Seek to Recover Its Losses from Policyholders. ................................................ 13

      F.     The October 2008 Letter................................................................................ 14

      G.    The Regulatory Settlement .......................................................................... 16

            1.     The Limited Scope of the Regulatory Investigation ................................. 16

            2.     The "Corrective Action Plan" .................................................................. 17

            3.     Conseco's Planned Solicitation of Releases. ............................................ 21

            4.     Preservation of Private Actions, Including Class Actions. ....................... 22

            5.     Conseco's Rights to Deal Separately with Individuals Who Sue it. ......... 23

      H.    Plaintiffs' Allegations ................................................................................ 23

V.    Argument ........................................................................................................ 24

      A.     Despite the Regulatory Settlement, Conseco is Continuing to Breach the LifeTrend 3 and 4 Policies.......................................................................... 24

      B.     The Regulatory Settlement Can Proceed Alongside a Class Action. .................. 25

            1.     The Regulatory Settlement Expressly Preserves Private Claims and Remedies, Including Class Action Remedies. .......................................... 26

i

|  |  | 2. | Certifying a Class Will Not Prevent Absent Class Members from Taking Advantage of the Regulatory Settlement If They Wish to Do So. ........................................................................................... 27 |

| | C. | | The Regulatory Settlement Is Irrelevant to the Certification Analysis Under Rule 23(b)(2). ..................................................... 27 |

| | D. | | The Regulatory Settlement Does Not Materially Alter the Certification Analysis Under Rule 23(b)(3). ................................................. 28 |

|  |  | 1. | The Regulatory Settlement Does Not Adjudicate the Controversies at Issue Here. ............................................................... 29 |

|  |  | 2. | The Insurance Commissioners Lacked Authority to Bring the Same Type of Claims that Plaintiffs Are Asserting. ............................. 31 |

|  |  | 3. | The Regulatory Settlement Is Not a Superior Method of Resolving Individual Claims. ................................................. 33 |

|  |  | 4. | *Kamm* and *Brown* are Easily Distinguished. ................................. 33 |

| | E. | | State Insurance Regulators Are Not the Final Arbiters of Insurance Contract Disputes. ................................................ 36 |

| VI. | | | Conclusion .............................................................................. 37 |

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

**Cases**

4

*Brown v. Blue Cross & Blue Shield of Michigan, Inc.,*
   167 F.R.D. 40 (E.D. Mich. 1996), .................................................... 34, 36

5

*Caro v. Proctor & Gamble Co.,*
   18 Cal. App. 4th 644 (4th Dist. 1993)................................................... 36

6

7

*County of Stanislaus v. Pacific Gas & Elec. Co.,*
   1994 WL 706711 (E.D. Cal. Aug. 25, 1994) ......................................... 32

8

*Dukes v. Wal-Mart Stores, Inc.,*
   603 F.3d 571 (9th Cir. 2010)......................................................... 28, 37

9

10

*In re Conseco Life Ins. Co. Cost of Ins. Litig.,*
   2005 WL 5678842 (C.D. Cal. Apr. 26, 2005) ........................................ 19

11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
   No. M 02-1486, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ................... 27

12

13

*In re Lorazepam & Clorazepate Antitrust Litigation,*
   202 F.R.D. 12 (D.D.C. 2001).......................................................... 33

14

*In re WorldCom, Inc. Sec. Litig.,*
   219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................... 26

15

16

*Kamm v. California City Development Co.,*
   509 F.2d 205 (9th Cir. 1975)..................................................... *passim*

17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)..................................................................... 26

18

19

*White v. E-Loan, Inc.,*
   No. C 05-02080, 2006 WL 2411420 (N.D. Cal. Aug. 18, 2006)............... 32

20

**Statutes**

21

22

28 U.S.C. § 1407 ............................................................................. 14

23

Cal. Ins. Code §§ 790.035, 790.03 ...................................................... 32

24

**Rules**

25

Fed. R. Civ. P. 23 ..................................................................... *passim*

26

27

28

## I.      STATEMENT CONCERNING SCOPE OF BRIEFING

Plaintiffs filed their Joint Motion for Class Certification (the "Original Joint Motion") on March 11, 2010.  In the Original Joint Motion, Plaintiffs asked the Court to certify national and California classes of  individuals who own or owned "LifeTrend 3" and "LifeTrend 4" insurance policies (the "Policies") issued by Conseco Life Insurance Company ("Conseco").[2]  As originally formulated, Plaintiffs' proposed class definitions encompassed policyholders who were sent a form letter by Conseco in October 2008 concerning the alleged "under-funding" of their accounts, Conseco's demand for so-called shortfall payments to make up for the alleged under-funding, and Conseco's plans to impose new annual premiums, increased expense charges, and increased cost-of-insurance deductions (the "October 2008 Letter").  *See* Joint Mot. for Class Certification 1-5, ECF No. 15; *see also* Ex. 1, October 2008 Form Letter to Charles Hovden.  After Plaintiffs filed their Original Joint Motion, Conseco and the majority of the state insurance regulators in the United States entered into a settlement agreement concerning Conseco's administration of the Policies (the "Regulatory Settlement").  *See* Weisbrod Decl. Ex. 2.[3]  The administrative procedures set forth in the Regulatory Settlement differ from and supersede those in the October 2008 Letter in many respects, and Conseco now intends to follow the procedures outlined in the Regulatory Settlement, not the October 2008 Letter, in administering the Policies.

On July 2, 2010 – two days after the Regulatory Settlement became effective – the Court held a hearing on Plaintiffs' Original Joint Motion.  *See* Ex. 3, Class Certification Hr'g Tr. (July 2, 2010).  As undersigned counsel acknowledged during the hearing, some adjustment to the class definitions set forth in the Original Joint Motion was needed because Conseco had changed some of its plans in accordance with the Regulatory Settlement and the October 2008 letter was no longer the operative document.  At the conclusion of the hearing, in light of the need to adjust

---

[2] The Policies were in fact written and sold by two of Conseco's corporate predecessors, Massachusetts General Life Insurance Company and Philadelphia Life Insurance Company.  For simplicity, we refer to them herein as "Conseco," which is how they are now known.

[3] Plaintiffs have separately filed a Declaration of Stephen A. Weisbrod in support of their Amended Joint Motion for Class Certification.  All exhibits cited herein are the exhibits attached to the Declaration.

1

JOINT MOTION FOR CLASS CERTIFICATION                                    M:10-cv-02124-SI

the class definitions as well as various arguments made by counsel for Plaintiffs and Conseco, the Court directed Plaintiffs' counsel to file a new class certification motion reflecting Plaintiffs' revised class definitions. *Id.* at 33-34. The Court further directed counsel not to re-brief all of the issues addressed in the briefing on the Original Joint Motion but instead to focus on the issues relating to the Regulatory Settlement. *Id.* Plaintiffs are submitting this Amended Joint Motion in accordance with those directions.

Plaintiffs hereby incorporate by reference their prior submissions concerning the Original Joint Motion. The briefs previously submitted in connection with the Original Joint Motion are:

> Plaintiffs' Joint Motion for Class Certification ("Original Joint Motion"), ECF No. 15.

> Conseco Life's Opposition to Plaintiffs' Joint Motion for Class Certification and Memorandum of Points and Authorities in Support Thereof, ECF No. 25.

> Plaintiffs' Joint Reply Brief in Support of Their Motion for Class Certification, ECF No. 37.

> Conseco Life's Memorandum of Points and Authorities Accompanying the Filing of the Regulatory Settlement Agreement, ECF No. 58.

> Conseco Life's Supplemental Submission Concerning Agent Depositions and Plaintiffs' "Vanish" Theory, ECF No. 59.

> Plaintiffs' Response to Conseco Life's Supplemental Submission Concerning Agent Depositions, ECF No. 61.

> Plaintiffs' Joint Memorandum Concerning Effect of Regulatory Settlement Agreement on Pending Motion for Class Certification, ECF No. 63.

> Conseco Life's Reply in Further Support of its Submissions Concerning the Regulatory Settlement and Recent Agent Deposition Testimony, ECF No. 68.

## II.    RELIEF REQUESTED

Pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), Plaintiffs respectfully request that this Court (1) certify a national class on Plaintiffs' claims for breach of contract and declaratory judgment; and (2) certify a California class on Plaintiffs' claims for breach of good faith and fair dealing, fraud, and negligent misrepresentation.

2

For the proposed national class, Plaintiffs seek to represent all persons in the United States who (1) own or owned a Conseco LifeTrend 3 or 4 Policy, and (2) have received since October 2008, or in the future may receive, pursuant to a settlement with state insurance regulators or otherwise, any of the following: (a) notice that an annual premium is due, notwithstanding such person's prior invocation of the Policy's Optional Premium Payment Provision ("OPP Provision"); (b) notice of increased expense charges under the Policy; or (c) notice of increased cost-of-insurance deductions under the Policy.  For the proposed California class, Plaintiffs Cedric Brady, Charles Hovden, Marion Hovden, Eugene Kreps, John McNamara, and Hisaji Sakai (collectively, the "Brady Plaintiffs" or "California Plaintiffs") seek to represent a class of California residents who satisfy those conditions.

## III.   INTRODUCTION

This is a quintessential case for class certification under Rule 23 of the Federal Rules of Civil Procedure.  The decision by state insurance regulators to resolve their differences with Conseco does not change that.  The possibility that some policyholders may accept optional benefits under the Regulatory Settlement does not change that.  The Regulatory Settlement and Plaintiffs' proposed class action can peacefully coexist.

In October 2008, years after all potential class members purchased their Policies, Conseco announced that it planned to implement uniform and systematic changes in the way it administers the Policies.  The most shocking news in Conseco's October 2008 announcement was that the company was going to start demanding so-called "shortfall payments" equal to several years' worth of annual premiums.  According to Conseco, those annual premiums should have been paid by policyholders in prior years but had not been charged previously due to an alleged "administrative error."  Conseco's announcement also disclosed changes that garnered less attention but still would cost policyholders many millions of dollars if implemented.  The announced changes included a new method for calculating premium payment obligations, increased "expense charges," and increased deductions for "cost of insurance."  In Plaintiffs' view, all of these announced changes violated the plain terms of the Policies.

3

On December 19, 2008, in response to demands from various state regulators, Conseco issued another letter to policyholders that "suspended" its request for shortfall payments, its plans to recalculate premium obligations, and its plans to increase expense charges and cost-of-insurance deductions. Conseco spent the next year and a half negotiating with the state regulators. Unfortunately, Plaintiffs were excluded from the negotiation process. Conseco steadfastly refused to share with Plaintiffs any information about what was being discussed with the regulators. And Conseco invoked the confidentiality stipulation in this case as a basis for barring Plaintiffs from sharing with the regulators most of the key information that they obtained through discovery. Until last month's Regulatory Settlement was announced publicly, Plaintiffs did not know precisely how Conseco intended to administer the Policies.

Now that the Regulatory Settlement has been unveiled, it is evident that Conseco still intends to commit many of the most egregious contractual breaches announced by the company in October 2008. Conseco's Regulatory Settlement confirms that, unless it is enjoined from doing so, the company will take systematic actions over the coming months and years that will have an enormous negative impact on LifeTrend policyholders. In violation of numerous Policy terms, Conseco is going to reduce the value of both the death benefit and investment account features of the Policies. The Regulatory Settlement does contain some positive terms for policyholders – most notably, Conseco no longer plans to demand one-time shortfall payments – but policyholders nevertheless stand to lose tens of millions of dollars (perhaps even hundreds of millions of dollars) as a result of Conseco's improper premium calculations, expense charges, and cost-of-insurance deductions. The Regulatory Settlement includes a settlement pool as well as options for modifying the Policies, but those benefits are small compared to the enormous damages that Plaintiffs and other putative class members will incur unless Conseco is ordered to comply with the terms of its Policies.

Yet Conseco argues that the Regulatory Settlement is a "superior method" for resolving Plaintiffs' claims, and that Plaintiffs' request for class certification should be denied on that basis. Conseco is incorrect for numerous reasons.

JOINT MOTION FOR CLASS CERTIFICATION                    M:10-cv-02124-SI

*First*, despite the Regulatory Settlement, Conseco is continuing to breach the LifeTrend 3 and 4 Policies, to the enormous detriment of policyholders.

*Second*, the Regulatory Settlement (and the "Corrective Action Plan" embodied within it) can proceed alongside a class action without doing any harm to the settlement or the policyholders.

*Third*, the Regulatory Settlement is irrelevant to the certification analysis under Rule 23(b)(2) because the test under Rule 23(b)(2) is whether "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," and Rule 23(b)(2) does not depend on a finding that the proposed class action would be a "superior method" for resolving the controversy.

*Fourth*, the Regulatory Settlement does not materially alter the certification analysis under Rule 23(b)(3) because the regulators did not adjudicate the controversies at issue here, the policyholders are entitled to vastly more relief than they can receive under the Regulatory Settlement, and forcing policyholders to choose between litigating their claims individually or capitulating to Conseco's contractual breaches would be unfair and result in extreme judicial inefficiencies.

*Finally*, state insurance regulators are not the final arbiters of insurance contract disputes. The Regulatory Settlement is a settlement among potential litigants, not an adjudication by a court of law.  Neither Plaintiffs nor this Court are constrained by the fact that the state regulators have chosen not to pursue particular claims against Conseco.

## IV.     BACKGROUND

This discussion will focus on facts underlying Plaintiffs' claims against Conseco and the impact of the Regulatory Settlement on those claims.

### A.     All of the Policies Provide Investment and Insurance Benefits.

Every LifeTrend Policy provides two main types of benefits: investment income and payment of insurance proceeds upon the death of the insured.  For any particular policyholder, the value of the investment and potential death benefit will depend on how much money is in the

5

policyholder's "accumulation account."  *See* Ex. 4, LifeTrend Policy of Eugene Kreps ("Kreps Policy") at BRD 0114.[4]  Each account is funded initially with premium payments made by the policyholder and then, over time, with interest payments paid by Conseco.  *Id.*  The interest rate varies, but the Policies guarantee that the interest rate will never fall below 4.5 percent.  *Id.*

The Policies also provide that the policyholder "may obtain a loan at any time" while the Policy is in force.  *Id.* at BRD 0113.  If the policyholder borrows money from the account, then the policyholder is charged interest.  *Id.*

A policyholder may surrender a Policy for cash at any time and receive the value of the accumulation account, less a "Surrender Charge" specified in the Policy and less the amount of any indebtedness.  *Id.* at BRD 0115.

The Policy's "Death Benefit Provision" includes a section labeled "Proceeds."  It provides that, if the insured dies, Conseco will pay the greater of (a) the sum insured (as shown on each policyholder's Policy schedule) or (b) the amount in the accumulation account multiplied by a factor corresponding to the insured's age at death (as shown on the same schedule), less any indebtedness and "any premium due and unpaid if the insured dies during the grace period." *Id*. at BRD 0113.  In other words, if Conseco notifies a policyholder that he or she owes an annual premium and the policyholder fails to pay it, then the "Proceeds" are reduced by the amount of the unpaid premium.  (As discussed below, the Regulatory Settlement changed some Policy provisions bearing on what happens in this situation but did not change the definition of "Proceeds.")

Each Policy also contains a "Table of Guaranteed Policy Values" (the "Table").  *Id.* at BRD 0110.  For example, in 1991, Mr. Brady's Policy had a guaranteed value of $11,359, and in 1992, it had a guaranteed value of $18,090.  Ex. 5, LifeTrend Policy of Cedric Brady ("Brady Policy") at BRD 0007.  The Table contains important qualifying language: "This table presumes that the insured pays the full annual premium shown on the preceding page each year."  *Id.* at

---

[4] As noted, all of the policy forms contain essentially the same relevant provisions.  Unless otherwise stated, Plaintiffs will cite only to the policy of Eugene Kreps, which is policy form NP-END-86, when referencing the policy provisions.

JOINT MOTION FOR CLASS CERTIFICATION                                    M:10-cv-02124-SI

BRD 0007.  Under this clear and express language, if the policyholder does not pay the premium in any year, then the guaranteed cash values set forth in the Table no longer apply and thus are zero.  (All policyholders who availed themselves of the OPP Provision for more than one year received similar annual statements stating, correctly, that the then-guaranteed cash value for their accounts was zero dollars; these annual statements are central to Plaintiffs' request for certification of a California class.  *See, e.g.*, Ex. 6, Annual Statement of Eugene Kreps at BRD 0106; Ex. 7, Annual Statement of John McNamara at BRD 0172; Ex. 8, Annual Statement of Hisaji Sakai at BRD 0215.)[5]

Thus, if a policyholder stops paying annual premiums, then the policyholder still is entitled to receive the cash value of the accumulation account (less the Surrender Charge and any indebtedness), but Conseco no longer guarantees what that amount will be.  To be clear, after a nonpayment of premium, the *actual* cash-out value does not become zero.  Rather, Conseco is required to calculate the cash-out value based on a formula that incorporates the actual content of the account, without regard to the "guaranteed" values listed in the Table.  Although Policyholders who stop paying premiums and later cash out their accounts are entitled to receive an amount that corresponds to the actual value of their accounts, they take the risk that the cash-out amount may be less than the minimum guaranteed value listed in the Table.

**B.     All of the Policies Contain the Optional Premium Payment Provision.**

Under the Policies' "Optional Premium Payment" or "OPP" provision, policyholders can stop paying premiums after five years without losing Policy benefits if certain conditions are met. Ex. 4, Kreps Policy at BRD 0115.  As of October 2008, over 9,550 LifeTrend 3 and 4 policyholders had exercised this option, which was described to policyholders – and is still referred to internally by Conseco – as the "vanishing premium" option.  *See* Ex. 9, LifeTrend

---

[5] Conseco claims the language in the Table and the annual statements means "that if an insured on OPP were to *surrender* his or her coverage, he or she would not be entitled to receive the guaranteed cash value shown in the policy's table of guaranteed cash values – *not* that the figure shown there is irrelevant to the periodic determination of underfunding."  Conseco's Opp. to Pls.' M. for Class Certification at 5 n.8.  However, Conseco cannot selectively choose when the Table will apply.  The Policy language accompanying the Table is clear and contains no qualifying language that would limit its application to the surrendering of Policies.  *See* Ex. 5 to Joint Motion, Brady Policy at BRD 0007.

JOINT MOTION FOR CLASS CERTIFICATION                                    M:10-cv-02124-SI

Consumer Guide at CLIC 3532; ███████████████████████████████

Conseco's internal computer databases still refer to all policyholders that have elected not to pay

premiums pursuant to the OPP Provision as having "vanishing" or "vanished" premiums. ████

████████    The OPP Provision allows policyholders to stop paying premiums after five years as

long as they satisfy the OPP eligibility formula specified in the Policies. Ex. 4, Kreps Policy at

BRD 0115.  The OPP Provision provides that the value of the accumulation account must exceed

the sum of "the then guaranteed cash value; plus the then applicable surrender charge; and any

indebtedness." *Id.*

The meanings of the terms in the OPP eligibility formula are found in the Policies.  For

example, the "then guaranteed cash value" is the amount described in the Policy's Guaranteed

Policy Values section. *Id.* at BRD 0115.  As noted above, that section unambiguously establishes

guaranteed values for each policy year if the policyholder has paid annual premiums through that

year, but the section further provides, again unambiguously, that there is no guaranteed value –

i.e., the guaranteed value is zero – if the policyholder ceased paying premiums. ████████████

█████████████████████████████████

Another term in the OPP formula is the "then applicable surrender charge," which is the

amount specified in the Policies' Surrender Charges tables. Ex. 4, Kreps Policy at BRD 0111.

For Mr. Brady, the Surrender Charge started at $12,463 and slowly declined, dropping all the way

to zero in the twentieth year and thereafter. Ex. 5, Brady Policy at BRD 0008.  Finally,

indebtedness is defined to include the amounts borrowed plus interest incurred on the loans. Ex.

4, Kreps Policy at BRD 0113.

Conseco claims to have applied the OPP formula when it arrived at the shortfall amounts

listed in the October 2008 Letters, but discovery in this matter has revealed that the shortfall

amounts demanded by Conseco were improperly calculated in precisely the same way for all

policyholders.  Now, despite the Regulatory Settlement, Conseco is continuing to misapply the

OPP formula, with the result that Conseco will soon send out annual premium notices to

thousands of policyholders who owe no premium at all. (Conseco denies that it is misapplying

JOINT MOTION FOR CLASS CERTIFICATION                    M:10-cv-02124-SI

the formula but does not deny that it is going to send out new annual premium notices based on the company's OPP calculations.)

As shown in the table below, the values set forth in the Guaranteed Policy Values table should be used in applying the OPP eligibility calculation only for the first year in which the policyholder seeks OPP status.  This is because that year is the only one in which the policyholder has paid each year's full annual premium.  ████████████████████  After the first year of OPP status, the policyholder has not paid the premium "each year" and the guaranteed value is zero.  ████████  As noted above, Conseco's own documents confirm that for many years Conseco adhered to the policy's plain meaning in regard to guaranteed cash value.  Prior to October 2008, all of the Plaintiffs whose policies were on OPP status received annual statements stating that their guaranteed cash value was zero.  *See*, *e.g.*, Ex. 12, Annual Statement of Cedric Brady at BRD 0063, Ex. 6, Annual Statement of Eugene Kreps at BRD 0106; Ex. 7, Annual Statement of John McNamara, BRD 0172; Ex. 8, Annual Statement of Hisaji Sakai at BRD 0215.

For most policyholders, incorporating the no-longer-applicable Table values into the OPP calculation will make it appear as if the account is underfunded when it really is not.  And that, in turn, will result in the issuance of a new, improper annual premium bill.

Conseco has argued in its defense that the reference to the guaranteed cash value in the OPP formula would be rendered "meaningless" if the guaranteed cash value becomes zero whenever a policyholder misses an annual premium payment.  Conseco's argument is simply wrong: the guaranteed cash value in the Table is used when determining whether a policyholder can enter the OPP in the first instance, but the value in the Table is not used thereafter.  To illustrate this point, consider the values for Plaintiff Marion Hovden over seven years of her policy and how using the guaranteed cash value in the table impacted her ability to elect OPP status:

9

| Policy Year[6] | Annual Premium Paid | **Item A** Accumulation Account Value[7] | **Item B** Guaranteed Cash Value | **Item C** Surrender Charge | **Item D** Debt | OPP Eligibility |
|---|---|---|---|---|---|---|
| 1. (1989-90) | $19,895 | $5,360.58 | $0 | $24,831 | $0 | Too Early |
| 2. (1990-91) | $19,895 | $13,574.79 | $0 | $24,831 | $0 | Too Early |
| 3. (1991-92) | $19,895 | $53,703.22 | $12,000 | $24,831 | $0 | Too Early |
| 4. (1992-93) | $19,895 | $74,460.48 | $24,500 | $24,831 | $0 | Too Early |
| 5. (1993-94) | $19,895 | $75,896.58 | **$37,500** | $24,831 | $0 | **A > B + C + D = Eligible for OPP at end of policy year** |
| 6. (1994-95) | $0 | $76,655.13 | $0 -Table listed value of $50,500 inapplicable | $24,831 | $0 | A > B + C + D = Still eligible for OPP at end of policy year |

For Mrs. Hovden to enter the OPP for the first time in early 1994, Conseco had to determine whether the value of her accumulation account exceeded the then guaranteed cash value plus the surrender charge and any indebtedness.  When she elected the OPP, the guaranteed cash value of $37,500 that was listed in the Table applied because she had paid the annual premium every year up to that point.  After 1994, the OPP formula still applied to determine whether she remained eligible for the OPP, but the guaranteed cash value used in the OPP formula was zero because she had ceased paying premiums in 1994.

**C.     All of the Policies Restrict Conseco's Right to Impose "Expense Charges" and "Cost of Insurance" Deductions.**

Conseco is permitted under the Policies to make two types of "Monthly Deduction[s]" from the policyholders' accounts: "expense charges" and "cost of insurance."  Ex. 4, Kreps Policy at BRD 0115.  After the second Policy year, the Policies cap expense charges at $5.00 per month.

---

[6] Marion Hovden's policy incepted on February 15, 1989.  Ex. 13, M. Hovden Policy at CLIC 4105.

[7] The accumulation account values are derived from the Values History Tables produced by Conseco.  Ex. 14, M. Hovden Values at CLIC 4133-4148.  The accumulation account value is for February for each policy year.  The premium values, guaranteed cash value, and surrender charge are derived from Marion Hovden's policy.  Ex. 13, M. Hovden Policy at CLIC 4105-4107.

JOINT MOTION FOR CLASS CERTIFICATION                         M:10-cv-02124-SI

*Id*. at BRD 0111.  The cost of insurance charge also is limited, with maximum deductions varying depending on the age and sex of the insured, as set forth more fully in a table entitled "Guaranteed Maximum Monthly Mortality Charge: Table of (Monthly) Cost of Insurance Rates" (the "Mortality Charge/Cost of Insurance Table").  *Id*. at BRD 0116.  The Mortality Charge/Cost of Insurance Table is printed in the Policy and includes the following legend: "The above rates are based upon the Commissioner's 1980 Standard Mortality Table."  *Id*.

> ### D.     Policyholders Lose Certain Benefits if They Fail to Make Required Premium Payments.

Being charged a premium and failing to pay it is not the same as never being charged a premium in the first place.  If a premium is not paid before the end of the Policy's sixty-one day grace period, *id*. at BRD 0112, then the Policy will be in "default" and the Policy's rules for winding down the coverage – described in a section entitled "Non-Forfeiture Provision" – will be triggered, *id*. at BRD 0115, with adverse consequences for the policyholder.

The Non-Forfeiture Provision was modified by the Regulatory Settlement.  The modifications apply to all Policies, including those belonging to policyholders who elect not to participate in the Regulatory Settlement's optional benefits.  While the modifications were significant, and inure to the benefit of policyholders, they do not alter the fact that if a policyholder fails to pay an annual premium that Conseco alleges is due, Conseco will cease providing certain benefits under the Policy.

If a policyholder fails to pay a premium and the grace period expires then the premium is in "default."  *Id*. at BRD 0115.  Once a policyholder defaults by failing to pay an annual premium, the policyholder can choose between a "cash" option and a "continuation of insurance" option.  *Id*.  The default results in "termination" of the Policy, except for "continuation of insurance," if elected.  *Id*.  While it may sound oxymoronic for a Policy to be "terminated" at the same time that coverage is "continued," that outcome sounds more plausible if one keeps in mind that a Policy in good standing confers two distinct benefits – investment proceeds and insurance proceeds in the event of the insured's death.  After a default, the investment benefit of the Policy apparently ends and Conseco stops paying interest.  The policyholder may either take the cash out

JOINT MOTION FOR CLASS CERTIFICATION                                    M:10-cv-02124-SI

of the accumulation account or, if he or she prefers, keep the cash in the account while retaining the Policy's death benefit, with the proceeds of the death benefit reduced in the amount of the missed premium.

Choosing the cash option means that the insured will get the "net cash value" of the account as of the "premium due date." *Id.* Conseco has six months to pay this amount, with the clock ticking only after the request for cash is received. *Id.* The request can be received anywhere from sixty-one days to sixty-one days plus three months after the premium due date. *Id.* Therefore, if the policyholder elects to cash out after missing a premium, Conseco will hold onto the policyholder's money, without paying interest, for eight to eleven months.

Choosing "continuation of insurance" has new implications as a result of the Regulatory Settlement. Under the new Policy language, "continuation of insurance" means that "insurance coverage will be continued in an amount equal to the proceeds of [the] policy." Ex. 15, Regulatory Settlement Ex. B, CLIC 7663. "Insurance shall continue until the net cash value is insufficient to cover the monthly deduction." *Id.* As noted above, the Policy's "proceeds" are reduced by the amount of the missed premium. Apparently, because the Policy is "terminated" except for its insurance coverage component, the insured will not earn interest on the account in this situation.

The adverse consequences of missing a premium payment are easily seen when one looks at the entire "Guaranteed Values" section of the Non-Forfeiture Clause. (The key language is shown in **bold**, with the new language shown in *italics*.)

> **GUARANTEED VALUES**
>
> **Any premiums not paid before the end of the grace period will result in the premium being in default as of the premium due date. Except for Option B below, default will result in the termination of this policy.** If this policy has a net cash value, as applicable, **one of the options listed below may be elected by written request to the Company** no later than three (3) months after the premium due date. If no election is made within the election period, the automatic option will be Option B. The guaranteed policy values for these options are shown in the Table of Guaranteed Policy Values on a Policy Data Page.

JOINT MOTION FOR CLASS CERTIFICATION                    M:10-cv-02124-SI

(A)     Cash

**This Option shall consist of the net cash value which will be the same as at the premium due date of this policy.  The Company may defer paying the net cash value for not more than six (6) months after this option request is received.**

(B)     **Continuation of Insurance**

*In the event any premiums, other than the premiums for supplemental benefits provided by any attached riders, are not paid before the end of the grace period,* ***insurance coverage under this policy will be continued in an amount equal to the proceeds of this policy****, including any attached riders.  When this happens, your policy will be in a "period of continued insurance".* ***Insurance shall continue until the net cash value is insufficient to cover the monthly deduction.****  In no event will the insurance be continued for a term less than that which the net cash value on the due date of the unpaid premium would purchase when applied as a net single premium.*

*During a period of continued insurance, you can pay premiums to extend insurance coverage under this policy.  Such premium amounts can not exceed the original schedule premium, unless approved by the Company.*

*The period of continued insurance cannot extend beyond an insured's age 100.  If the insured is living at age 100, the net cash value remaining will be refunded at that time to the owner.*

*When you first enter a period of continued insurance, the TABLE OF GUARANTEED POLICY VALUES shown on the Policy Data Page or Policy Schedule will no longer be applicable.*

*The insurance provided under Option B may be surrendered at any time for its net cash value as of the surrender date.*

Ex. 4, Kreps' Policy at BRD0115; Regulatory Settlement at Ex. B.

**E.      Policyholders Do Not Share in Conseco's Profits and Conseco Cannot Seek to Recover Its Losses from Policyholders.**

Conseco is a stock insurance company, not a mutual insurance company.  ██████

████████████████   As such, Conseco is entitled to keep any profits it generates instead of

distributing them to policyholders, and, as such, Conseco must absorb any losses it incurs as a

result of poor business decisions or unsuccessful investment strategies.  ████████████████

These principles are reflected in the Policies' Non-Participating Provision, which states that the

Policy "will not share in any of the Company's profits or surplus."  Ex. 4, Kreps Policy at BRD

0119.  All but one of the Policy forms also state that "[a]ny premium or factor changes are

13

determined and redetermined prospectively," and that the insurer "will not recoup prior losses, if any, by means of premium or factor changes," *see, e.g.*, *id.* The Non-Participating Provision means that Policyholders share neither in Conseco's profits nor its losses. ███████████████

███████████

### F.    The October 2008 Letter

In October 2008, Conseco sent the October 2008 Letter to all of the potential class members stating that Conseco was making major changes in its administration of the Policies. Conseco sent the October 2008 Letter to 9,550 policyholders, including 2,392 persons in California. Ex. 1, Oct. 2008 Letter; *see also* Conseco Life Insurance Co.'s Notice of Filing of Motion to Transfer Pursuant to 28 U.S.C. § 1407 with the Judicial Panel on Multidistrict Litigation, Ex. A, at 5, *Brady v. Conseco, Inc.*, No. 3:08-CV-05746-SI (N.D. Cal. Oct. 15, 2009), ECF No. 75.

According to the October 2008 Letter, policyholders had not been informed previously that, "[d]ue to administrative issues," their Policies were "Under Funded" and additional premiums were required. Ex. 1, Oct. 2008 Letter at BRD 0078. The letter explained that, to rectify the alleged under funding caused by policyholders' not paying premiums when they allegedly should have been paid, each policyholder would have to pay a "shortfall" amount. *Id.* In some cases, these amounts totaled hundreds of thousands of dollars. Ex. 16, Nov. 3, 2008, Letter to Eugene Kreps. Significant premiums also would be due in the future. Ex. 1, Oct. 2008 Letter at BRD 0078.

Conseco did not disclose its method for calculating the alleged shortfall amounts. Plaintiffs subsequently learned that, ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████

Conseco also informed policyholders that the company was going to take the maximum monthly Expense Charge deduction and substantially increase the monthly cost of insurance deduction. Ex. 1, Oct. 2008 Letter at BRD 0077-78. For one plaintiff, this would bring the

14

1   annual deductions to over $29,100.  Ex. 1, October 7, 2008 Letter to Eugene Kreps.[8]  Once again,

2   however, Conseco concealed its methods for calculating the rate changes.  █████████████

3   ████████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████

5   █████████████████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████████████████████

7   █████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████

9   ██████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████████

11   ████████████████████████████

12           █████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████████████████

19   █████████████████████████████████████████████████████████████████████████

20   █████████████████

21         ██████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23

24

25

26   ————————————————

27   [8] Conseco may argue that the Cost of Insurance deductions under the Regulatory Settlement will be lower than they
     would have been under the October 2008 Letter.  However, Conseco has not responded to Plaintiffs' requests for the

28   new numbers applicable under the Regulatory Settlement.  Plaintiffs have no reason to believe that the new numbers
     would be significantly different.

JOINT MOTION FOR CLASS CERTIFICATION                 M:10-cv-02124-SI



### G.      The Regulatory Settlement

Conseco and state insurance regulators from California, Florida, Iowa, Indiana and Texas (the "Lead Regulators") began negotiating in late 2008.  Their negotiations culminated in the Regulatory Settlement, which they announced on May 25, 2010.  As of July 2, at least thirty-seven states (including the Lead Regulators) had signed onto it, with the result that it is now effective.

#### 1.      The Limited Scope of the Regulatory Investigation

The Lead Regulators and the Plaintiffs in this case shared many of the same concerns. But Plaintiffs' claims go much further than the subjects of the Lead Regulators' investigation. The Regulatory Settlement includes no allegations about how Conseco improperly uses the Policy's Table of Guaranteed Cash Values when applying the OPP formula, how Conseco improperly raised expense charges to cover investment losses and other costs beyond the cost of administering the policies, or how Conseco improperly increased cost-of-insurance deductions to circumvent the Policy limits on expense charges and to cover such losses and costs when mortality rates had actually declined.  One of Plaintiffs' main contentions is that Conseco is trying to foist its investment and other losses onto its policyholders in contravention of the Policy's "Non-Participating" clause.  Plaintiffs also contend that Conseco's actions will have the effect of undermining the Policies' guaranteed 4.5 percent interest rate.  There is no indication in the Regulatory Settlement that the Lead Regulators investigated, considered, or intended to resolve disputes over those subjects.  In fact, the use of the Table of Guaranteed Cash Values in

16

JOINT MOTION FOR CLASS CERTIFICATION                        M:10-cv-02124-SI

conjunction with the OPP formula, the Non-Participating clause, and the guaranteed interest rate are not even mentioned in the Regulatory Settlement.

As explained in the Regulatory Settlement, the Lead Regulators investigated "allegations related to the sale, administration and management of Conseco Life Insurance Company's LifeTrend life insurance policies" and the "processes" the Conseco and its affiliates "use to identify, manage, and correct policy administration issues." Regulatory Settlement at 1. Following their investigation, they entered into an agreement with Conseco "to address the manner in which the Conseco Companies identify, manage and correct policy administration issues." As the Regulatory Settlement explained in paragraph 26,

> [t]he Lead Regulators' review of the Lifetrend policies included the following issues:
>
> a.      Whether any marketing or advertising materials used by Conseco Life or its predecessors for the Lifetrend policies contained any false or misleading information;
>
> b.      Whether Conseco Life or its predecessors engaged in sales practices that misrepresented the benefits, advantages, or terms of the Lifetrend policies;
>
> c.      Whether any communication by Conseco Life or its predecessors was misleading to Lifetrend Policyowners;
>
> d.      Whether the Company had failed to properly manage or administer the Lifetrend policies; and
>
> e.      Whether Conseco Life and its predecessors properly determined NGE changes made to the Lifetrend policies.

Regulatory Settlement at 17-18, ¶ 26.

### 2.      The "Corrective Action Plan"

The Regulatory Settlement includes long-term monitoring requirements as well as several remedial features referred to collectively as the "Corrective Action Plan" or "CAP." The CAP includes several components. Some apply to "all Lifetrend" policies. Others apply only to policies whose holders "opt in" by submitting election forms and executing releases. The optional components of the CAP do not depend on any particular number of policyholders opting in.

JOINT MOTION FOR CLASS CERTIFICATION                          M:10-cv-02124-SI

The CAP imposes certain obligations on Conseco to extend benefits to policyholders, but the CAP does not confer any rights on the policyholders themselves.  The Regulatory Settlement states that "[n]othing herein shall confer any rights upon any persons or entities other than the Signatory Regulators and the Conseco Companies."  *Id.* ¶ 113.

### a.    Required Benefits

The first component of the CAP is a pair of so-called "Required Additional Policy Benefits," which are policy amendments that Conseco is required to include in "all" Lifetrend policies.  The "Required Additional Policy Benefits" are essentially, the above-referenced modifications to the existing Policy provisions that govern the winding down of Policies after the policyholder has failed to make an annual premium payment demanded by Conseco.  Unlike several other CAP provisions, these amendments apply whether or not a policyholder releases private claims against Conseco.  *Id.* at 19-20, ¶¶ 33-35 & Ex. B.

The second of the "Required Additional Policy Benefits" is a provision that bars Conseco from terminating a LifeTrend policy until after the policyholder has been given an opportunity to modify the policy pursuant to the CAP's provisions providing for "Optional Additional Policy Benefits."  *Id.* at 20, ¶ 36.

### b.    Optional Benefits

The CAP also requires Conseco to give Lifetrend policyholders a choice of two "Optional Additional Policy Benefits."  *Id.* at 21, ¶ 37.  If Conseco determines that the policyholder's account is underfunded but the policyholder does not wish to make any more premium payments, then the policyholder may elect a "Reduced Paid-Up Policy."  *Id.* at 21, ¶ 37(ii).  Under this option, the death benefit is reduced to a level that Conseco calculates as commensurate with the funding level of the account.  Instead of increasing the funding of the account through collection of additional premiums, Conseco decreases the amount insured.  A similar option is available to LifeTrend policyholders whose accounts are allegedly underfunded but who are willing to pay some additional premiums.  *Id.* at 21, ¶ 37(i).  A new but reduced face amount is established, as is a new premium payment schedule.

JOINT MOTION FOR CLASS CERTIFICATION                              M:10-cv-02124-SI

1        To take advantage of either of these benefits, a policyholder must execute a release in a

2   form appended to the Regulatory Settlement as Exhibits F.1 & F.2.

3                    **c.      Optional Recoveries from Settlement Pool**

4        The Regulatory Settlement also establishes a settlement pool in the amount of

5   $10,000,000 for eligible LifeTrend policyholders (the "Settlement Pool").  This number is small,

6   the pool will be shared among potential class members and non-potential class members, and it is

7   not clear how many potential class members will be eligible to participate.  (Again, to take

8   advantage of this benefit, a policyholder must execute a release in a form appended to the

9   Regulatory Settlement as Exhibit F.1.)

10        To put this number in perspective, almost 10,000 LifeTrend 3 and 4 policyholders

11   received underfunding notices in October 2008.  The underfunding amounts for the *Brady*

12   Plaintiffs range from $23,339.66 to $346,132.77.  Am. Compl. ¶ 87.  A policyholder deemed to

13   have an underfunded account must pay an annual premium or, if the premium goes unpaid, must

14   go on "Continuation of Insurance."  The Plaintiffs' annual premiums range from $1,015.20 to

15   $39,760.  Ex. 4, Kreps Policy at BRD 0109; Class Action Compl. Ex. A at 3, *McFarland v.*

16   *Conseco Life Ins. Co.*, No. 3:09-cv-598 (M.D. Fla. July 2, 2009).  These figures do not count

17   expense charges or cost-of-insurance deductions.  The cost of insurance charges policyholders

18   will incur annually, assuming that Conseco intends to charge the amounts it indicated it would

19   charge in the October 2008 Letters, range from $2,951.40 to $29,112.72.  Am. Compl. ¶ 98.

20   While Plaintiffs have not yet prepared damages calculations based on Conseco's newly

21   announced plans, it seems likely that, if Plaintiffs' numbers are typical and their theories of

22   contractual liability are correct, then the total damages that have been and/or will be suffered by

23   the proposed class could be in the hundreds of millions of dollars.[9]  These damages would be

---

[9] For the *Brady* Plaintiffs, the average annual premium is $19,584.78; the average announced cost of insurance deduction is $1,098.77; and the average amount of underfunding is $118,423.45.  Plaintiffs would retain a damages expert to estimate total damages for the class, but, given that the class includes approximately 10,000 people, the numbers likely would get high very quickly.  Because Conseco has and will continue to administer the Policies the same way for all policyholders, the damages suffered by the proposed class members could be, in Conseco's own words, "mechanically-calculable."  Conseco Opp. to Joint M. for Class Certification at 35 n.26 (citing *In re Conseco Life Ins. Co. Cost of Ins. Litig.*, 2005 WL 5678842 (C.D. Cal. Apr. 26, 2005)).

JOINT MOTION FOR CLASS CERTIFICATION                    M:10-cv-02124-SI

based purely on the dollars lost by the class due to the standardized charges, deductions, and policy modifications implemented by Conseco.

All "Eligible Lifetrend Policyowners" potentially may collect from the pool. As defined in the Regulatory Settlement, this group includes the proposed class here as well as individuals who purchased LifeTrend policies other than the LifeTrend 3 and 4 policies at issue in this case. According to a table appended as Exhibit A to the Regulatory Settlement, a total of 12,427 LifeTrend policies were issued. Of those, 79 percent (9,761) were LifeTrend 3 or 4 policies and 21 percent (2,666) were LifeTrend 1, 2, 5, or 7 Policies. Regulatory Settlement at Ex. A.

The Regulatory Settlement defines "Eligible Lifetrend Policyowner" to mean:

> a Lifetrend Policyowner who has not either (i) missed no more than one Schedule Premium Payment as of September 1, 2008, provided the number of annual premiums paid exceeds the number of years set by the policy form's illustration software to show the limited pay or vanish option; or (ii) been sent a letter by Conseco Life or a predecessor company specifically stating the Lifetrend Policyowner had been placed on the Continuation of Insurance Provision of his/her policy prior to September 1, 2008.

*Id.* at 5.

We have not been able to decipher this definition, let alone determine how many potential class members it is likely to include or exclude.

**d.   Restrictions on Expense Charges and Cost of Insurance**

The CAP also imposes timing restrictions on Conseco's imposition of expense charges and deductions for cost of insurance. *Id.* at 27-30, ¶¶ 56-61. However, it appears that, fundamentally, Conseco still will be allowed to impose the charges and deductions that were announced in October 2008, as long as Conseco does not do better than "break even." (The rule that the cost-of-insurance increases must cease once Conseco reaches the "break-even result" may apply only to certain subsets of the LifeTrend Policies.) The bottom line is that the CAP will not preclude Conseco from imposing charges and deductions that Plaintiffs contend are improper.

In Plaintiffs' view, Conseco is not necessarily entitled to "break even." By design, the LifeTrend program front-loaded its profits. Conseco earned large profits during the first few years after it sold the policies, when their middle-aged policyholders were paying large annual

20

premiums and few of their policyholders were dying.  Now that the policyholders are older and no longer required to pay premiums, and now that Conseco is required to pay death benefits more often, Conseco may lose money on the LifeTrend program, particularly if Conseco realizes lower than expected returns on its investments, or if fewer people surrender their policies than previously anticipated.  But those are risks that Conseco took when it underwrote the Policies. The insurance contracts include a variety of restrictions on the imposition of expense charges and deductions, including provisions clearly stating that Conseco cannot make up past losses from policyholders.

### 3.   Conseco's Planned Solicitation of Releases.

Conseco intends to send notices of the Regulatory Settlement to policyholders later this month.  Ex. 3, Tr. at 36.  The notices will include release forms that policyholders must execute if they wish to take advantage of the Regulatory Settlement's optional benefits.

The release form provides:

> In consideration of the Relief ("Relief") provided to (Name), (hereinafter "Claimant"), as described herein, Claimant, on behalf of himself or herself, and on behalf of his or her heirs, personal representatives, successors and assigns, does hereby release, acquit and forever discharge Conseco Life Insurance Company (hereinafter referred to as "Company") and its affiliates, subsidiaries, parents, agents, officers, directors, employees, insurers, successors and assigns (hereinafter referred to as "Released Parties"), from any and all claims of any kind whatsoever, whether known or unknown, which Claimant now has or which may hereafter accrue, arising out of or in any way related to any current and/or future litigation that Claimant could bring regarding the allegations in the Agreement, for Policy Number XXXX issued to Claimant by the Company (hereinafter the "Policy"), for the period covering the solicitation and eventual issue date of the Policy to the date hereof (hereinafter the "Released Claims").

Regulatory Settlement at Ex. F.1.

The release language refers to the "allegations" of the Regulatory Settlement.  The allegations are outlined in paragraph 27 of the Regulatory Settlement, which states:  "For Lifetrend Policy Forms I, II, III, IV, V and VI, the Lead Regulators allege that violations have occurred related to the issues under review identified in Paragraph 25."  *Id.* at 18, ¶ 27.

JOINT MOTION FOR CLASS CERTIFICATION                    M:10-cv-02124-SI

Paragraph 25 states:

> In January 2009, the Insurance Commissioner of the State of Florida and the Insurance Commissioner of the State of Iowa joined with the Insurance Commissioner of Indiana and the Insurance Commissioner of the State of Texas to call a multistate market conduct examination of Conseco Life to review the NGE adjustments announced in the October and November of 2008 letters as well as the sales, administration and management of the Lifetrend policies ("Multistate Examination"). The Insurance Commissioner of the State of California joined the Multistate Examination in August 2009.

*Id.* at 17-18, ¶ 25.

It is possible that paragraph 27 was supposed to cross-reference paragraph 26 rather than paragraph 25, as paragraph 25 seems not to include anything that could be described as an "allegation." Paragraph 26 is quoted above at page 21. In any event, while determining the scope of the "allegations" of the Regulatory Settlement is not a straightforward task, those "allegations" clearly did not include all of the Plaintiffs' allegations in this case.

### 4.      Preservation of Private Actions, Including Class Actions.

The Regulatory Settlement states that, "[e]xcept as explicitly provided herein, nothing in this Agreement or any of its terms and conditions shall be interpreted to alter in any way the contractual terms of any insurance policy issued or acquired by Conseco Life or by the parties to such contract." Regulatory Settlement at 51, ¶ 132.[10] While Conseco has suggested that certifying Plaintiffs' breach-of-contract claim would undermine the CAP, the CAP itself acknowledges that class actions against Conseco may go forward: "[n]o Lifetrend Policyowner shall be excluded from the CAP on the basis of membership in a purported class in any class action lawsuit pending against the Company." *Id.* at 26, ¶ 54. At the hearing on July 2, Counsel for Conseco confirmed that this provision would protect absent class members if a class were certified in this case. Ex. 3, Tr. at 22:4-9. Furthermore, the "Agreement neither imposes any obligations upon, nor takes away any rights of any Lifetrend Policyholder who chooses not to

---

[10] While the Regulatory Agreement was designed to allow class actions to go forward, it nevertheless appears that Conseco hopes to undermine many of the protections normally associated with the class action process. For example, having negotiated the Regulatory Agreement with no input from policyholders or their counsel, Conseco hopes to use the Regulatory Agreement as a device for soliciting releases of personal claims from the entire proposed class without giving class members adequate information about consequences of such releases. *See infra* p. 31.

22

JOINT MOTION FOR CLASS CERTIFICATION                                      M:10-cv-02124-SI

1   participate in the CAP."  Regulatory Settlement at 26, ¶ 54.  The Regulatory Settlement also bars

2   Conseco from seeking to introduce it as evidence in any case other than a case seeking to enforce

3   the Regulatory Settlement.  *Id.* at 49, ¶ 122.

4               **5.        Conseco's Rights to Deal Separately with Individuals Who Sue it.**

5          Under Paragraph 53 of the Regulatory Settlement, "Conseco Life may elect to exclude a

6   Lifetrend Policyowner from the CAP" – in its entirety – if the policyholder settles his or her claim

7   with Conseco independently or if the policyholder "has a pending litigation against the

8   Company."  *Id.* at 26, ¶ 53.  While some provisions of the CAP apply to "all" Lifetrend policies,

9   it appears that, under Paragraph 53, a Lifetrend policyholder who sues Conseco (whether

10  individually or as a purported class representative) may lose all benefits afforded by the CAP,

11  including those that otherwise would have applied automatically.

12         During the hearing held on July 2, counsel for Conseco indicated that this provision

13  applies solely to policyholders who individually sue Conseco, such as the named plaintiffs.  Ex. 3,

14  Tr. 21:7 – 22:3 (stating that paragraph 53 applied only to "individually named persons").  He

15  further explained that paragraph 53 is designed to give Conseco the ability to engage in flexible

16  negotiations with any plaintiffs who personally file suit against Conseco.  *Id.*  Paragraph 53 is not

17  designed to give Conseco the ability to withhold CAP benefits from absent members of a certified

18  class.

19         **H.        Plaintiffs' Allegations**

20         Plaintiffs' claims remain viable, notwithstanding the Regulatory Settlement.  They allege

21  that Conseco is breaching its contracts in several ways:

22              •        Conseco still intends to charge annual premiums that should not be charged

23                       to most policyholders because the premiums are improper under the

24                       Policies' Optional Premium Payment Provision (which is also sometimes

25                       referred to as the "vanish" provision).

26              •        Conseco still intends to impose monthly expense charges that do not

27                       correspond to Conseco's actual expenses, in violation of several Policy

28                       provisions.

23

JOINT MOTION FOR CLASS CERTIFICATION                              M:10-cv-02124-SI

- Conseco still intends to impose higher cost-of-insurance deductions even though the factor that governs cost of insurance – mortality – has actually gone down, in violation of several Policy provisions.

- Conseco's various administrative changes will improperly dilute the 4.5 % interest rate guaranteed under the Policies.

- Conseco intends to pass on to its policyholders financial losses that Conseco has incurred, even though the Policies' "Non-Participating" provisions preclude policyholders from sharing in Conseco's profits and preclude Conseco from seeking to recover its losses from policyholders.

In addition, and in the alternative, the California Plaintiffs allege claims for breach of the duty of good faith and fair dealing, fraud, and negligent misrepresentation based on Conseco's issuance of misleading annual statements as well as its subsequent conduct.

## V. ARGUMENT

In Plaintiffs' view, Conseco's contractual breaches should be enjoined and Conseco should be required to pay damages. Conseco disagrees with Plaintiffs' contract interpretations, and Conseco would have the Court believe that state regulators share Conseco's view, but nothing in the Regulatory Settlement precludes the relief Plaintiffs seek, and nothing in the relief Plaintiffs seek would impair the Regulatory Settlement. The Policies are contracts between Conseco and its policyholders, who have every right to enforce them as they see fit, including via a class action. The Regulatory Settlement explicitly acknowledges this. The Court should certify classes as requested in this Motion under both Rule 23(b)(2) and Rule 23(b)(3).

### A. Despite the Regulatory Settlement, Conseco is Continuing to Breach the LifeTrend 3 and 4 Policies.

The record is not clear on what the state regulators knew or believed regarding Plaintiffs' breach-of-contract allegations when the regulators agreed to the Regulatory Settlement, but the outcome of their investigation is clear. With state insurance regulators getting out of Conseco's way, Conseco now intends to implement, in modified form, many of the changes it announced in October 2008.

JOINT MOTION FOR CLASS CERTIFICATION                    M:10-cv-02124-SI

Plaintiffs and their fellow policyholders will continue to suffer very substantial damages because, although Conseco no longer plans to demand so-called "shortfall payments," Conseco is still going to send out premium notices for annual premiums that are not supposed to be charged at all.  As set forth in the Regulatory Settlement itself, policyholders who receive such premium notices will have to choose between (a) paying the requested premiums or (b) accepting less valuable insurance coverage and, apparently, forfeiting interest on their investment accounts.

The policyholders also will suffer damages because, in breach of several policy provisions – including a "Non-Participating" clause that expressly precludes Conseco from seeking to recover past losses from policyholders, as well as a minimum interest rate clause that guarantees policyholders a 4.5 percent interest rate – Conseco plans to impose very costly new charges and deductions.  Conseco is going to increase monthly "expense charges" to levels that bear little or no relation to actual expenses.  Conseco also is going to impose major new deductions for "cost of insurance," even though mortality, which is the single factor that is supposed to determine cost of insurance, has declined.  These not only breach the clear language of the contracts, but serve to accomplish Conseco's overriding goal:  forcing elderly policyholders to cash in their Policies so Conseco does not have to pay death benefits.  Unfortunately, many elderly plaintiffs will be unable to afford the new charges and eventually will lose the life insurance they are entitled to receive.

Conseco discounts Plaintiffs' contractual interpretations but Conseco does not deny that, to the extent Plaintiffs' contractual interpretations are correct, Plaintiffs will suffer substantial damages once Conseco implements these changes.

**B.      The Regulatory Settlement Can Proceed Alongside a Class Action.**

Conseco's suggestion that certifying a class would jeopardize the Regulatory Settlement is nothing more than a scare tactic.  Conseco would have the Court believe that it must choose between honoring the Regulatory Settlement or allowing Plaintiffs to proceed with their proposed class action, but that is a false choice.  As counsel for Conseco acknowledged, the Regulatory Settlement was "constructed, of course, with the knowledge of pending litigation, some actual litigation and this proposed class action."  Ex. 3, Tr. 21:7-11.

JOINT MOTION FOR CLASS CERTIFICATION                               M:10-cv-02124-SI

1

2

      **1.       The Regulatory Settlement Expressly Preserves Private Claims and
Remedies, Including Class Action Remedies.**

3

      The Lead Regulators made plain that their actions were not intended to preclude private

4

breach-of-contract claims or class action proceedings brought by policyholders.  Paragraph 132

5

protects private contract claims.  Paragraph 54 protects absent class members (and Conseco's

6

counsel has confirmed that, although this protection refers to "a purported class in any class

7

action lawsuit," absent class members would be protected if a class were officially certified.)

8

      When the regulators required Conseco to acknowledge that their settlement would not

9

preclude a class action, they conducted themselves in accordance with standard state and federal

10

regulatory practices.  Courts have long recognized that government enforcement actions and

11

private class actions can and should proceed in parallel.  For example, in a recent ruling

12

addressing securities class actions, the Supreme Court stated that the "Court has long recognized

13

that meritorious private actions to enforce federal antifraud securities laws are an essential

14

supplement to criminal prosecutions and civil enforcement actions."  *Tellabs, Inc. v. Makor Issues
& Rights, Ltd.*, 551 U.S. 308, 313 (2007).

15

16

      Insurance regulators often investigate insurance companies for conduct that is also the

17

subject of class actions.  Indeed, portions of the Regulatory Settlement here also apply to the

18

Conseco policies at issue in *Yue v. Conseco Life Ins. Co.*, No. 2:08-cv-1506, (C.D. Cal. Dec. 7,

19

2009), ECF No. 96, a case that already is proceeding as a certified national class action and

20

involves allegations of improper fees and deductions similar to the allegations here.  Similarly,

21

the SEC routinely investigates securities frauds that are also the subject of class actions.[11]  The

22

FTC and Justice Department routinely investigate anticompetitive schemes and commercial

23

practices that are also the subject of class actions.[12]  The list could go on and on.  Sometimes the

24

25

26

[11] *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 277-78 & 307 (S.D.N.Y. 2003) (certifying a class
action after settlements with the Securities and Exchange Commission that resulted in disgorgement and other
penalties).

27

[12] *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486, 2006 WL 1530166 *1-2 (N.D.
Cal. June 5, 2006) (certifying a class action while noting an investigation by the Department of Justice into the same
allegedly improper actions of defendants)

28

26

1    regulators settle first.  Sometimes the private litigants settle first.  Neither type of settlement

2    precludes the other proceedings from going forward.

3              **2.    Certifying a Class Will Not Prevent Absent Class Members from
                        Taking Advantage of the Regulatory Settlement If They Wish to Do
4                       So.**

5              The Regulatory Settlement's "Corrective Action Plan" (or "CAP") includes various

6    mandatory features and various optional features.  Policyholders who want to do so can take full

7    advantage of the CAP whether or not this Court certifies this case as a class action.

8              To begin, there is no reason why Conseco cannot implement the "Required Additional

9    Policy Benefits" while litigating a certified class action on Plaintiffs' breach-of-contract claims.

10   (By contrast, however, under paragraph 53 of the Regulatory Settlement, if a class is not certified

11   and each policyholder is forced to sue Conseco individually in order to vindicate his or her

12   contractual rights, then every policyholder who sues Conseco theoretically would be vulnerable to

13   potential exclusion from all CAP benefits, including the so-called "required" ones; paragraph 53

14   is discussed in more detail below.)

15             The same holds for the Regulatory Settlement's "optional" benefits.  A policyholder who

16   wants to take advantage of them may do so regardless of whether there is a certified class in this

17   case.  If the Court certifies a class, then some policyholders may be more inclined to decline the

18   optional benefits, but that should be their choice.  The availability of optional benefits under the

19   CAP does not depend on the acceptance of those benefits by any particular number or percentage

20   of policyholders.  The optional benefits will be available whether the vast majority of putative

21   class members accept them or turn them down.

22             **C.    The Regulatory Settlement Is Irrelevant to the Certification Analysis Under
                        Rule 23(b)(2).**
23
               Plaintiffs seek injunctive relief to stop Conseco from breaching the Policies.  Plaintiffs
24
     also seek compensation for damages that Plaintiffs have incurred and will incur in the future as a
25
     consequence of Conseco's past and future conduct.  Both forms of relief sought by Plaintiffs are
26
     important, but Conseco is simply wrong when it suggests that the monetary relief sought by
27
     Plaintiffs predominates over the injunctive relief they seek.
28

JOINT MOTION FOR CLASS CERTIFICATION                              M:10-cv-02124-SI

1          With the Regulatory Settlement now in place, it is quite clear that most of the damages at

2    issue in this case have not yet been suffered and would be prevented if Conseco's conduct were

3    enjoined.  Furthermore, the damages elements of Plaintiffs' case will flow largely from the

4    resolution of the parties' contract interpretation disputes.  For example, if the Court enters a

5    judgment declaring that certain cost-of-insurance deductions are improper, then the primary

6    damages sought in connection with that contract breach will be the amounts improperly deducted.

7    The dollars at stake are significant but that does not mean that Plaintiffs' request for damages

8    predominates over its request for injunctive relief.  *See Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d

9    571, 618 (9th Cir. 2010) (holding that class could be certified under Rule 23(b)(2) even though

10   Plaintiffs sought substantial damages because the damages claim did not predominate over the

11   claim for injunctive relief).

12         Conseco contends that the Regulatory Settlement offers a "superior" method for resolving

13   Plaintiffs claims.  However, the applicability of Rule 23(b)(2) does not depend on whether the

14   proposed class action would be "superior to other available methods for fairly and efficiently

15   adjudicating the controversy," which is language found in Rule 23(b)(3).  The test under Rule

16   23(b)(2) is whether "the party opposing the class has acted or refused to act on grounds that apply

17   generally to the class, so that final injunctive relief or corresponding declaratory relief is

18   appropriate respecting the class as a whole."  As the Ninth Circuit stated in *Kamm v. California*

19   *City Development Co.*, 509 F.2d 205, 211 (9th Cir. 1975), a case on which Conseco relies heavily,

20   "[t]he superiority requirement is unique to those class actions maintained under Rule 23(b)(3)."

21   Conseco cites no authority for the proposition that the superiority requirement also applies under

22   Rule 23(b)(2).

23         **D.      The Regulatory Settlement Does Not Materially Alter the Certification**
              **Analysis Under Rule 23(b)(3).**

24         If the prerequisites of Rule 23(a) are met, then, under Rule 23(b)(3), a class may be

25   certified if:

26              (3) the court finds that the questions of law or fact common to class
27              members predominate over any questions affecting only individual
                members, and that a class action is superior to other available

28

JOINT MOTION FOR CLASS CERTIFICATION                          M:10-cv-02124-SI

methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Conseco argues that the class action would not be "superior to other available methods for fairly and efficiently adjudicating the controversy" because the Regulatory Settlement is superior to a class action remedy. Conseco is wrong for several reasons.

### 1.    The Regulatory Settlement Does Not Adjudicate the Controversies at Issue Here.

Conseco cannot establish that the regulators have adjudicated the controversies at issue here. As an initial matter, the Regulatory Settlement made plain that it was not a substitute for private breach-of-contract actions. It expressly preserves the contractual rights of parties to the contracts. Regulatory Settlement at 51, ¶ 132. It also stated that "[n]othing herein shall confer any rights upon any persons or entities other than the Signatory Regulators and the Conseco Companies." *Id.* ¶ 113. It cannot be that the Regulatory Settlement fully adjudicated the rights of potential class members when those class members have no rights that they can enforce under the Regulatory Settlements.

Furthermore, the Regulatory Settlement is not an adjudication of anything. There is no judgment. The Regulatory Settlement is a negotiated agreement that enabled Conseco and the regulators to avoid going to court. Indeed, it states that Conseco cannot use it "as evidence in any regulatory or judicial proceeding" other than a proceeding to enforce its terms. *Id.* ¶ 122.

The regulators did make some findings but those findings did not address the contract interpretation questions raised here. In this proposed class action, Plaintiffs raise the following questions:

JOINT MOTION FOR CLASS CERTIFICATION                    M:10-cv-02124-SI

- Is Conseco breaching the Policies by charging annual premiums based on a misapplication of the Policies' Optional Premium Payment Provision?

- Is Conseco breaching the Policies by imposing monthly expense charges that do not correspond to Conseco's actual expenses?

- Is Conseco breaching the Policies by imposing higher cost-of-insurance deductions, notwithstanding the fact that the factor that governs cost of insurance – mortality – has actually gone down?

- Is Conseco breaching the Policies by imposing administrative changes that dilute the guaranteed 4.5 percent interest rate?

- Is Conseco breaching the Policies' Non-Participating clause by passing on to its policyholders financial losses that Conseco has incurred as a result of bad business decisions?

Conseco's position seems to be that the regulators must have interpreted the Policies the same way Conseco does because the regulators are allowing Conseco to go forward with its administrative changes.[13] But nothing in the Regulatory Settlement permits this inference, and its provisions, particularly those disavowing any preclusive effect, belie Conseco's position. The regulators looked into the following questions, which overlap only partially with the issues raised by Plaintiffs:

a.    Whether any marketing or advertising materials used by Conseco Life or its predecessors for the Lifetrend policies contained any false or misleading information;

b.    Whether Conseco Life or its predecessors engaged in sales practices that misrepresented the benefits, advantages, or terms of the Lifetrend policies;

c.    Whether any communication by Conseco Life or its predecessors was misleading to Lifetrend Policyowners;

d.    Whether the Company had failed to properly manage or administer the Lifetrend policies; and

e.    Whether Conseco Life and its predecessors properly determined NGE changes made to the Lifetrend policies.

---

[13] *See, e.g.*, Tr. at 31:6 – 32:25; Tr. at 33:13-17.

30

1   Regulatory Settlement ¶ 26.

2        The Regulatory Settlement does not even mention the interplay between the Table of

3   Guaranteed Cash Value and the OPP formula, the guaranteed interest rate, or the Non-

4   Participating clause.  The regulators did discuss Conseco's so-called "administrative error" and,

5   in connection with their review of "Non-Guaranteed Element" (or "NGE") changes, they did

6   review some aspects of Conseco's expense charges and cost-of-insurance deductions.

7   Nevertheless, the regulators made no findings on Plaintiffs breach-of-contract allegations, and it

8   is not clear whether Plaintiffs' contractual interpretations were ever discussed.  They certainly are

9   not mentioned in the Regulatory Settlement itself.  (Conseco refused to share any information

10  about the regulatory investigation with Plaintiffs and Conseco objected on confidentiality grounds

11  when Plaintiffs proposed to share with the regulators information discovered in this case.)

12   **2.      The Insurance Commissioners Lacked Authority to Bring the Same
             Type of Claims that Plaintiffs Are Asserting.**

13        While the state insurance regulators and the Plaintiffs here were focused on some of the

14  same conduct, Conseco cannot establish that the regulators and the Plaintiffs were ever pursuing

15  the same type of claims.  Breach-of-contract claims are private claims with private remedies.

16        Many or most of the state regulators did not have authority to seek the same relief

17  available to policyholders through private litigation.  While state enforcement remedies vary from

18  state to state, they typically are injunctive in nature.  Tellingly, neither the Florida nor the Iowa

19  Orders to show cause demanded individual damages.  *See* Exhibits 17, 18.  The monetary

20  penalties that are available to state regulators often are limited in the dollar value of remedies that

21  can be sought.  In California, for example, unfair and deceptive acts or practices in the business of

22  insurance are punishable by a cease and desist order and a civil penalty not to exceed $5,000 or

23  $10,000 if the conduct was intentional.  Cal. Ins. Code §§ 790.035, 790.03, attached as Ex. 19.

24  Similarly, Iowa's statute authorizes a cease and desist order and a civil penalty of $1,000 per

25  violation with a $10,000 aggregate limit, or $5,000 per violation with a $50,000 aggregate limit if

26  the conduct was intentional.  Iowa Code § 507.b7 attached as Ex. 20.  Given the number of

27  policyholders affected by Conseco's conduct, even if the state regulators found Conseco's

28

31

conduct to be intentional, the limited civil penalties available simply are not comparable to the remedies available to policyholders through the litigation process.

Conseco may point out that the Regulatory Settlement includes a Settlement Pool.  That is certainly true, but the size of the Pool may well have been affected by the nature of the claims that the states were asserting as well as the size and type of recovery that the states could have obtained had they initiated enforcement actions and litigated them to judgment.  As noted above, the size of the Pool is very small relative to the dollars at issue in this case, and it is not clear how much of the pool actually will go to the LifeTrend 3 and 4 policyholders who constitute the putative class.

Numerous cases have rejected arguments like Conseco's when, as here, the regulator lacked the same ability that a private litigant would have to obtain remedies for the alleged wrongs.  This Court's decision in *White v. E-Loan, Inc.* is a good example.  *See White v. E-Loan, Inc.*, No. C 05-02080, 2006 WL 2411420, at *9 (N.D. Cal. Aug. 18, 2006) (rejecting defendant's argument that the FTC's administrative enforcement capabilities are superior to a class action because the statute expressly authorizes private consumer actions and because individual rights may not be vindicated by regulatory action).  *See also County of Stanislaus v. Pacific Gas & Elec. Co.*, No. CV-F-93-5866-OWW, 1994 WL 706711, at *5-6 (E.D. Cal. Aug. 25, 1994) (rejecting argument that a regulatory adjudication was superior to a class action because the regulator had limited authority).

The District of Columbia District Court's discussion of similar issues in *In re Lorazepam & Clorazepate Antitrust Litigation*, 202 F.R.D. 12 (D.D.C. 2001), is instructive.  In that case, the court certified a class of plaintiffs, direct purchasers of generic drugs, alleging that the defendants' anticompetitive behavior caused plaintiffs to pay enormously high prices for medications.  *Id.* at 14.  The defendants moved to dismiss arguing that the plaintiffs lack standing because the FTC already had successfully petitioned for disgorgement under the Federal Trade Commission Act ("FTC Act").  *Id.* at 17.  The court rejected the defendant's argument, noting that section 13(b) of the FTC Act, which gives the FTC the power to seek disgorgement, is distinct from the ability of direct purchasers to maintain a private right of action seeking treble

32

damages pursuant to section 4 of the Clayton Act.  *Id.* at 20.  The court noted that the statutory language of the FTC Act makes clear that the statute does not prevent private causes of action under antitrust statutes.  *Id.* at 20-21.

### 3.   The Regulatory Settlement Is Not a Superior Method of Resolving Individual Claims.

Rule 23(b)(3) lists factors to be considered when determining the superiority of competing methods for adjudicating a controversy.  While these factors may not be exhaustive, they also should not be ignored, and in this case they strongly favor Plaintiffs' position.  The Regulatory Settlement does not bear on any of the listed factors to any significant extent.

Section 23(b)(3)(A) favors certification because, as compared with a class action, the Regulatory Settlement gives class members less control over the prosecution of actions on their behalf.  The Regulatory Settlement confers no direct rights on third parties, and it has been conducted in secret, with little or no input from policyholders.

Section 23(b)(3)(B) favors certification because very little actual litigation occurred prior to the Regulatory Settlement.  Indeed, there were no noteworthy rulings in either of the two cases that were filed, and no major pleadings were filed other than charging documents in two cases that were not pursued.

Section 23(b)(3)(C) favors certification because, unless the litigation is concentrated in one forum, individual policyholders may be forced to engage in duplicative litigation, wasting their own resources as well as judicial resources.  Inconsistent rulings may result.  And, unfortunately, some policyholders may be deterred from pursuing meritorious claims due to the expense and effort required.  (In addition, Paragraph 53 of the Regulatory Settlement would appear to give Conseco the ability to withhold CAP benefits from any policyholder who sued individually.)

Section 23(b)(3)(D) favors certification because a class action in this case would not be particularly difficult to manage, and no more difficult to manage than individual litigations would be.

### 4.   *Kamm* and *Brown* are Easily Distinguished.

JOINT MOTION FOR CLASS CERTIFICATION                    M:10-cv-02124-SI

This case is easily distinguished from *Kamm v. California City Development Co.*, 509 F.2d 205, 207 (9th Cir. 1975), *Brown v. Blue Cross & Blue Shield of Michigan, Inc.*, 167 F.R.D. 40 (E.D. Mich. 1996), and the other cases in which courts denied class certification when presented with regulatory settlements.

In *Kamm*, the court concluded, based on the successful settlement negotiated by state officials, that allowing the class action to go forward would merely result in duplication of effort. 509 F.2d at 212.  *Kamm* was decided thirty-five years ago and has rarely been followed since then with respect to its holding that a regulatory settlement should trump a class action proceeding.

*Kamm* is also different from this case in numerous respects.  The *Kamm* court noted that "Appellants in their briefs appear to assume that the district court held that the state action was superior," but as the Ninth Circuit explained, "the [district] court held that the class action was not superior to 'other alternative methods', especially in the light of the state action," and those "alternative methods" included "individual suits as well as participation in the state settlement plan." *Id.* at 212 n.17.  Conseco makes the same incorrect assumption about *Kamm* that the Ninth Circuit expressly warned against.  *Kamm* was *not* simply a holding that a government proceeding could be superior to a class action.  The *Kamm* court relied on several factors, including several unusual circumstances bearing on the ability of individual claimants to prosecute and resolve their claims in other fora.  Those factors were:

> (1) A class action would require a substantial expenditure of judicial time which would largely duplicate and possibly to some extent negate the work on the state level. (2) The class action would involve 59,000 buyers in separate transactions over a 14 year period, with part of the buyers desiring to retain their land. (3) Significant relief had been realized in the state action through (a) restitution to many members of the class; (b) Western Cities' agreement to establish a program to settle future disputes; (c) a permanent injunction; and (d) a letter of credit in the amount of approximately $5,000,000 to guarantee funds for off-site improvements. (4) The state court retained continuing jurisdiction. (5) No member of the class is barred from initiating a suit on his own behalf. (6) Although the class action aspects of the case have been dismissed, appellants' action is still viable. (7) Defending a class action would prove costly to the defendants and duplicate in part the work expended over a considerable period of time in the state action.

*Id.* at 212.

34

Here there is no chance that judicial time expended by state courts will go to waste because state courts played almost no role in the Regulatory Settlement. In addition, the transactions at issue here are almost completely identical – every potential class member received materially identical Policies, and Conseco has treated all of the policyholders the same way. Here the Settlement Pool is very small relative to the potential damages. Eligibility to recover from the Pool is far from clear, but it already is apparent that the fund will be diluted substantially by claims from non-class members and that, even under the best of circumstances, no policyholder could receive full restitution or anything close to it from the Pool. The Regulatory Settlement does not establish an alternative dispute resolution procedure to resolve disputes over outstanding issues. No state court retains jurisdiction over the Regulatory Settlement and, even if one did, individual policyholders would have no standing to appear in such state proceedings because the Regulatory Settlement explicitly states that there are no non-party beneficiaries. As in *Kamm*, no member of the proposed class is barred from initiating individual proceedings, but this case differs from *Kamm* insofar as any policyholder who does initiate such proceedings may be subject to loss of CAP benefits – including the CAP benefits that otherwise would apply automatically. Finally, there is nothing in the record to suggest that Defendant's work would be duplicated if a class were certified, as the state regulators appeared to be focused on different issues and, in any case, the individual Plaintiffs were excluded from the process at Conseco's insistence. It also is worth noting that the record in *Kamm* included a 26 page affidavit and 100 pages of exhibits detailing the negotiations and settlement between the defendants and the government.

*Brown* is no more helpful to Conseco than *Kamm*. In *Brown*, the regulatory settlement was conditioned on there not being a class action, and the potential class members were going to recover through the regulatory settlement virtually everything they had demanded. 167 F.R.D. at 46. In essence, the plaintiff in *Brown* could not point to anyone, other than perhaps plaintiffs' counsel, who would benefit from the class being certified. Similarly, in *Caro v. Proctor & Gamble Co.*, 18 Cal. App. 4th 644 (4th Dist. 1993), the court held that class action treatment would not serve to benefit the proposed class members any more than the agreements already reached with the Food and Drug Administration and state entities, in part because the potential

JOINT MOTION FOR CLASS CERTIFICATION                    M:10-cv-02124-SI

1    recovery likely was less than $2.00 per person and there was little chance any class members

2    would even come forward to collect.  *Id.* at 659-60 & n.9.

3              In its prior submissions to the Court, Conseco did not cite a single case in which class

4    members contended that they had a prospect for a substantial recovery above and beyond the

5    recovery offered by the regulatory settlement but the court nevertheless denied class certification

6    on the ground that the regulatory settlement should preclude private class litigation.

7              **E.       State Insurance Regulators Are Not the Final Arbiters of Insurance Contract
                          Disputes.**

8              Conseco is using the Regulatory Settlement to make two arguments.  On the one hand,

9    Conseco contends that the proposed class action would interfere with the Regulatory Settlement.

10   But that argument is easily rejected after consulting the terms of Conseco's agreement with the

11   regulators.  The regulators were not trying to restrict the policyholders or this Court.  As shown

12   above, just the opposite is true.

13             Conseco also is arguing that Plaintiffs must be wrong in their contract interpretation

14   because, if Plaintiffs were right, then the state regulators never would have allowed Conseco's

15   administrative changes to go forward.  And since Plaintiffs' theory must be wrong, the absent

16   potential class members would be better off accepting the optional portions of the deal that

17   Conseco is offering than they would be if they reject Conseco's offer and wait for the outcome of

18   Plaintiffs' proposed class action.  Conseco's counsel intimated these points several times during

19   the hearing on July 2.[14]

20             But a class certification hearing is not the proper place to decide the merits.  *See, e.g.*,

21   *Dukes v. Wal-Mart*, 603 F.3d at 581-90.  And even if it were, Conseco's arguments would be

22   completely misplaced.  When regulators settled with Conseco they did not bless Conseco's

23   contract interpretations.  Furthermore, regardless of what a particular state regulator may think

24   about Plaintiffs' breach-of-contract claims, Plaintiffs have every right to assert them, and there is

25   no reason why they should not be permitted to assert them on behalf of other individuals who

26

27   ────────────────

28   [14] *See, e.g.,* Tr. at 28:1-7; 31:18-20; 32:15-25.

                                                      36
     JOINT MOTION FOR CLASS CERTIFICATION                                    M:10-cv-02124-SI

hold virtually identical insurance policies and find themselves in virtually identical straits as a result of Conseco's conduct.

**VI.   CONCLUSION**

For the foregoing reasons, and notwithstanding the Regulatory Settlement, Plaintiffs respectfully request the Court certify a national class and a California class.

JOINT MOTION FOR CLASS CERTIFICATION                                    M:10-cv-02124-SI

1    Dated: July 7, 2010                  Respectfully submitted,

2

3                                       /s/
                                   David J. Millstein (CSB #87878)
                                   dmillstein@millstein-law.com

4

5                                  MILLSTEIN & ASSOCIATES
                                  100 The Embarcadero Suite 200
                                  San Francisco, California 94105
6                                  Telephone:   (415) 348-0348
                                  Facsimile:   (415) 348-0336

7

8                                  Scott D. Gilbert (Admitted *pro hac vice*)
                                   gilberts@gotofirm.com
                                  August J. Matteis, Jr. (Admitted *pro hac vice*)
9                                  matteisa@gotofirm.com
                                  Jonathan M. Cohen (Admitted *pro hac vice*)
10                                cohenj@gotofirm.com
                                  Kathleen Hale (Admitted *pro hac vice*)
11                                halek@gotofirm.com

12                                  GILBERT LLP
                                  1100 New York Avenue, NW
13                                  Suite 700
                                  Washington, DC 20005
14                                  Telephone:   (202) 772-2200
                                  Facsimile:   (202) 772-1924

15

16                                  *Counsel for the Brady Plaintiffs*

17                                    /s/
                                  Joseph J. Tabacco, Jr. (CSB #75484)
18                                Christopher T. Heffelfinger (CSB #118058)
                                Bing W. Ryan (CSB #228641)

19

20                                BERMAN DEVALERIO
                                Once California Street, Suite 900
                                San Francisco, CA 94111
21                                Telephone:   (415) 433-3200
                                Facsimile:   (415) 433-6382

22                                  *Counsel for McFarland*

23

24

25

26

27

28

JOINT MOTION FOR CLASS CERTIFICATION               M:10-cv-02124-SI

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that a true and correct copy of the foregoing was mailed via United States

3    mail, first class postage prepaid, on July 7, 2010, to the following:

4                              James R. Carroll
                               David S. Clancy
5                              Cale P. Keable
                               Skadden, Arps, Slate, Meagher & Flom LLP
6                              One Beacon Street, 31st Floor
                               Boston, MA  02108
7
                               Raoul S. Kennedy
8                              Skadden, Arps, Slate, Meagher & Flom LLP
                               Four Embarcadero Center, Suite 3800
9                              San Francisco, CA  94111

10

11                              By:  _____/s/_____
                                         Stephen A. Weisbrod
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28