RAOUL D. KENNEDY (STATE BAR NO. 40892)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Embarcadero Center, Suite 3800
San Francisco, California 94111
Telephone: (415) 984-6400
Facsimile: (415) 984-2698
Email: Raoul.Kennedy@skadden.com

JAMES R. CARROLL (*PRO HAC VICE*)
DAVID S. CLANCY (*PRO HAC VICE*)
CHRISTOPHER A. LISY (*PRO HAC VICE*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Beacon Street, 31st Floor
Boston, Massachusetts 02108
Telephone: (617) 573-4800
Facsimile: (617) 573-4822
Email: James.Carroll@skadden.com
Email: David.Clancy@skadden.com

Attorneys for Defendant
Conseco Life Insurance Company

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE CONSECO LIFE INSURANCE COMPANY LIFETREND INSURANCE SALES AND MARKETING LITIGATION | ) CASE NO.: 3:10-MD-2124-SI ) ) ALL CASES ) ) ) ) **CONSECO LIFE'S OPPOSITION** ) **TO PLAINTIFFS' AMENDED JOINT** ) **MOTION FOR CLASS** ) **CERTIFICATION AND** ) **MEMORANDUM OF POINTS** ) **AND AUTHORITIES IN SUPPORT** ) **THEREOF** ) ) ) Date: August 6, 2010 ) Time: 3:00 p.m. ) Place: Courtroom 10 ) Judge: The Honorable Susan Illston ) ) ) ) |

**OPPOSITION OF**
**DEFENDANT CONSECO LIFE INSURANCE COMPANY**

Defendant Conseco Life Insurance Company ("Conseco Life" or the "Company") respectfully submits this opposition to plaintiffs' amended joint motion for class certification filed on July 7, 2010.  This opposition is based on the accompanying Memorandum of Points and Authorities, the Declaration of Frank S. Scuglik, the Declaration of James R. Carroll, the Declaration and Supplemental Declaration of Michael C. Keeley, Ph.D., all exhibits and attachments thereto and all documents incorporated by reference.

DATED:  July 21, 2010                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


                                        By:  _____/s/ James R. Carroll_____
                                                        James R. Carroll

                                                      Attorneys for
                                        DEFENDANT CONSECO LIFE INSURANCE
                                                        COMPANY

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

STATEMENT OF ISSUES TO BE DECIDED ............................................................. 1

PRELIMINARY STATEMENT ................................................................................ 1

BRIEF STATEMENT OF FACTS ........................................................................... 6

CURRENT STATUS AND PLAINTIFFS' THEORIES ..........................................10

RESPONSE TO PLAINTIFFS' ASSERTIONS ON THE MERITS ...........................11

ARGUMENT ......................................................................................................18

I.     CERTIFICATION OF A CLASS ON PLAINTIFFS' "GCV THEORY" IS
INAPPROPRIATE ...........................................................................................18

    A.    This Theory Is Not Pled In The Complaint .................................................18

    B.    Plaintiffs' Assertion Of This Theory Results In Inappropriate Claim-Splitting ....18

    C.    Plaintiffs' GCV Theory Would Require Adjudication Of Individual Issues .........22

        1.    Individual Issues Exist As To Liability ...............................................22

        2.    Individual Issues Exist As To Statutes Of Limitation .............................24

    D.    The Regulatory Settlement Provides "Substantial" Benefits,
Which Is An Additional Reason To Deny Class Certification ...........................26

        1.    In Similar Situations, Courts Have Recognized That  Parallel
Regulatory Actions Should Preclude Class Certification ........................26

        2.    Certification Is Particularly Inappropriate When -- As Here -- It
Would Threaten The Regulatory Settlement ............................................30

        3.    Plaintiffs' Arguments Against The Regulatory Settlement Are
Unavailing ...............................................................................31

            (a)    Contrary To Plaintiffs' Assertions,
The Regulatory Settlement Covers
The Same Subject Matter As Plaintiffs' GCV Theory .................31

            (b)    The Regulators Have Authority To Order Appropriate Relief ......33

            (c)    Plaintiffs' Case Law Is Unpersuasive ...........................................34

            (d)    The Regulatory Settlement Is Anything But "Irrelevant" ............35

    E.    Plaintiffs' Suggestion That Substantial Economic Damage
Will Result From Conseco Life's Underfunding
Method Does Not Change The Analysis .................................................36

i

1.    Policyholders Under Plaintiffs' Original Class Definition Benefit From Conseco Life's Underfunding Method............................................36

2.    Policyholders Under Plaintiffs' Revised Class Definition Benefit From Conseco Life's Underfunding Method In The Same Way...............39

II.    CERTIFICATION OF A CLASS ON PLAINTIFFS' "FEES THEORY" IS INAPPROPRIATE ..........................................................................................40

III.    CERTIFICATION OF PLAINTIFFS' CALIFORNIA-ONLY CLASS IS ALSO INAPPROPRIATE ..........................................................................................41

CONCLUSION..........................................................................................................44

ii

**TABLE OF AUTHORITIES**

**CASES**                                                             **Page(s)**

Abbott Labs., Inc. v. Gen. Elec. Capital,
    765 So. 2d 737 (Fla. App. S. Dist. 2000) ........................................................... 25

Adams v. Kansas City Life Ins. Co.,
    192 F.R.D. 274 (W.D Mo. 2000) ...................................................................... 23

Apr. Enters., Inc. v. KTTV,
    147 Cal.App.3d 805 (1983) .............................................................................. 24

Brown v. Blue Cross & Blue Shield,
    167 F.R.D. 40 (E.D. Mich. 1996) ...............................................................passim

Caro v. Proctor & Gamble Co.,
    18 Cal. App. 4th 644 (4th Dist. 1993) ............................................................. 32

Cartwright v. Viking Indus. Inc.,
    No. 2:07-CV-02159-FCD-EFB,
    2009 WL 2982887 (E.D. Cal. Sept. 14, 2009) .................................................. 34

Castano v. American Tobacco Co.,
    84 F.3d 734 (5th Cir. 1996) ............................................................................. 35

City of San Jose v. Superior Court,
    12 Cal. 3d 447 (1974) ..................................................................................... 21

County of Stanislaus v. Pacific Gas & Elec. Co.,
    No. CV-F-93-5866-OWW, 1994 WL 706711 (E.D. Cal. Aug. 25, 1994) ........................ 33

Doninger v. Pacific Nw. Bell, Inc.,
    564 F.2d 1304 (9th Cir. 1977) ........................................................................ 33

Drimmer v. WD-40 Co.,
    No. 06-CV-900 W(AJB), 2007 WL 2456003 (S.D. Cal. Aug. 24, 2007) ........................ 20

Dukes v. Wal-Mart Stores, Inc.,
    603 F.3d 571 (9th Cir. 2010) .....................................................................11, 12

Eisen v. Carlisle & Jacquelin,
    417 U.S. 156 (1974) ........................................................................................ 11

Feinstein v. Firestone Tire & Rubber Co.,
    535 F. Supp. 595 (S.D.N.Y. 1982) ................................................................... 21

Gartin v. S&M Nutec, LLC,
    245 F.R.D. 429 (C.D. Cal. 2007) ..................................................................... 20

Gregurek v. United of Omaha Life Ins. Co.,
    Civ. No. 05-6067-GHK (FMOX), 2009 WL 4723137 (C.D. Cal. Nov. 10, 2009) ........24, 25

Howard v. Gap, Inc.,
    No. C 06-06773 WHA, 2009 WL 3571984 (N.D. Cal. Oct. 29, 2009) .............................. 39

Kamm v. Cal. City Devel. Co.,
509 F.2d 905 (9th Cir. 1975)...................................................................................passim

Kennedy v. Jackson Nat'l Life Ins. Co.,
No. C 07-0371, 2010 WL 2524360 (N.D. Cal. June 23, 2010)......................................... 22

Krueger v. Wyeth, Inc.,
No. 03-CV-2496 JLS (AJB), 2008 WL 481956 (S.D. Cal. Feb. 19, 2008)......................... 20

Legge v. Nextel Commc'ns, Inc.,
Civ. No. 02-8676 DSF (VNKX), 2004 WL 5235587 (C.D. Cal. June 25, 2004) ..........20, 40

Mass. Mutual Life Ins. Co. v. Super. Ct. of San Diego County,
97 Cal. App. 4th 1282, 1293 (2002) ............................................................................. 42

Occidental Land, Inc. v. Super. Ct. of Orange County,
556 P.2d 750 (Cal. 1976) ............................................................................................ 42

Ostrof v. State Farm Mut. Auto Ins. Co.,
200 F.R.D. 521 (D. Md. 2001) ..................................................................................... 29

Pattillo v. Schlesinger,
625 F.2d 262 (9th Cir. 1980) ....................................................................................... 30

In re Lorazepam & Clorazepate Antitrust Litig.,
202 F.R.D. 12 (D.D.C. 2001) ...................................................................................... 33

In re Paxil Litig.,
212 F.R.D. 539 (C.D. Cal. 2003) .................................................................................. 17

Pearl v. Allied Corp.,
102 F.R.D. 921 (E.D. Pa. 1984) ................................................................................... 20

Quezada v. Loan Center of California, Inc.,
Civ. No. 2:08-00177 WBS KJM, 2009 WL 5113506 (E.D. Cal. Dec. 18, 2009) ............... 42

Rodriguez v. Gates,
Civ. No. 99-13190-GAF (AJWX), 2002 WL 1162675 (C.D. Cal. May 30, 2002)........20, 36

Servicios de Almacen Fiscal Zona Franca Y Mandatos S.A. v. Ryder Int'l, Inc.,
Civ. No. 06-22774-HUCK/SIMONTON,
2007 WL 628133 (S.D. Fla. Feb. 26, 2007)..................................................................... 25

Southern States Police Benev. Ass'n, Inc. v. First Choice Armor & Equip., Inc.,
241 F.R.D. 85 (D. Mass. 2007) .................................................................................... 24

Szabo v. Bridgeport Machines, Inc.,
249 F.3d 672 (7th Cir. 2001).......................................................................................... 11

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
551 U.S. 308 (2007).................................................................................................... 33

Thompson v. American Tobacco Co., Inc.,
189 F.R.D. 544 (D. Minn. 1999) ................................................................................... 21

iv

Thornton v. State Farm Mut. Auto Ins. Co., Inc.,
    No. 1:06-cv-00018, 2006 WL 3359482 (N.D. Ohio Nov. 17, 2006) ................................ 29

Vasquez v. Super. Ct. of San Joaquin County,
    484 P.2d 964 (Cal. 1971) ...................................................................... 42

White v. E-Loan, Inc.,
    No. C 05-02080, 2006 WL 2411420 (N.D. Cal. Aug. 18, 2006) ...................................... 33

Yue v. Conseco Life Ins. Co.,
    No. 2:08-CV-1506 (C.D. Cal. Dec. 7, 2009) ........................................................ 34

Zinser v. Accufix Research Inst., Inc.,
    253 F.3d 1180, 1190 (9th Cir. 2001) ...........................................................17, 35

**STATUTES**

Cal. Civ. Proc. Code § 337(1) .............................................................. 23

Cal. Civ. Proc. Code § 339(1) .............................................................. 23

Fla. Stat. Ann. § 95.031(1) ................................................................ 23

Fla. Stat. Ann. § 95.11(2) ................................................................. 23

Ky. Rev. Stat. Ann. § 413.090(2) .......................................................... 23

Ohio Rev. Code Ann. § 2305.06) ............................................................ 23

OPPOSITION TO MOTION FOR CLASS CERTIFICATION                    CASE NO.: 3:10-MD-2124-SI

**STATEMENT OF ISSUES TO BE DECIDED**

Plaintiffs in the Brady and McFarland actions[1] ("Plaintiffs"), which have been consolidated in this MDL, have jointly filed an amended motion for certification of a nationwide class and a California-only subclass ("Motion"). The issue before the Court is whether certification of those two separate classes -- one of which, the proposed nationwide class, has been broadened substantially from Plaintiffs' previous proposal -- should be granted.

For the reasons set forth herein, in addition to those set forth in Conseco Life's previous class certification briefing,[2] Conseco Life respectfully submits that certification is not appropriate, and that Plaintiffs' Motion, and class certification, should be denied.

**PRELIMINARY STATEMENT**

In December 2008, Conseco Life suspended its October 2008 letter to policyholders, and announced that it was in discussion with state insurance regulators about the multiple administrative issues addressed in that letter, including "underfunding" of policies, premiums and fees. Shortly thereafter, these Plaintiffs filed suit, complaining about that suspended letter.

During the litigation, Conseco Life repeatedly suggested to Plaintiffs that their suit was premature and that it should await resolution of the regulatory proceedings. Plaintiffs ignored this reasonable suggestion, and pressed forward with theories that were imprecise and inherently speculative. Plaintiffs did not know -- nobody knew -- how the administrative issues would ultimately be resolved, and so Plaintiffs were in effect pursuing a placeholder lawsuit.

---

[1]     Brady v. Conseco Life Ins. Co., No. 3:08-CV-05746-SI (N.D. Cal.) and McFarland v. Conseco Life Ins. Co., No. 3:09-CV-00598 (M.D. Fla.).

[2]     Conseco Life incorporates by reference all of its previous filings in connection with Plaintiffs' requests for class certification, including its opposition to the Brady plaintiffs' motion for class certification (Brady Docket No. 102), its opposition to Plaintiffs' first joint motion for class certification (Docket No. 25), its Settlement Agreement Submission (Docket No. 58), its Agent Testimony Submission (Docket No. 59), its Reply in further support of its Settlement Agreement and Agent Testimony Submissions (Docket No. 65) and all declarations and exhibits in connection with the foregoing.

1

1   When Conseco Life did reach a regulatory settlement, in late May, it had a significant

2   impact on this lawsuit.  Though it took time for Plaintiffs to acknowledge it, the settlement took

3   away the thrust of Plaintiffs' suit -- their long-time, vociferous complaint that Conseco Life was

4   demanding significant underfunding amounts from policyholders.  Under the Regulatory

5   Settlement, it is crystal clear that no policyholder needs to pay the underfunded amount.

6

7   Plaintiffs then tried another theory:  that underfunded policyholders would still need to pay

8   premium on an annual basis.  Conseco Life explained that this too is wrong, and Plaintiffs now

9   appear to concede it.  (Now, premium will be required solely to the extent necessary to cover

10  periodic fees that are clearly permitted under the policy.)

11  Plaintiffs are now again engaged in an exercise in theory-modification.  They are trying

12  their hardest to articulate a theory of the case that allows them to claim that they are thinking

13  differently, and pursuing more, than the 42 state insurance regulators.  Their July 7, 2010 brief is

14  the product of that effort, and it does not justify certification of a class.

15

16  Though that 37-page brief is not precise about the particular case upon which Plaintiffs seek

17  class certification (it reads as yet another generalized critique of Conseco Life, and fails to disclaim

18  any of Plaintiffs' prior theories), Conseco Life interprets it to press two basic theories:

19  First, that Conseco Life's method of determining whether a policyholder is underfunded is

20  wrong; and

21

22  Second, that the fees Conseco Life intends to charge in the future are not permitted by the

23  contract.

24  As to the first theory (that Conseco Life continues to determine underfunding incorrectly),

25  which is not pled in any complaint in this action, it does not satisfy the criteria required for

26  certification of a nationwide class for multiple reasons:

27

28

2

1.      Plaintiffs are wrong that Conseco Life is improperly determining underfunding, as explained in the next section.  Also, Plaintiffs struggle to explain why Conseco Life's use of its method of determining underfunding even matters going forward.  Underfunded amounts need not be paid, and an underfunded policyholder need not pay premium each year.  Plaintiffs now claim that upon entry into underfunded status, policyholders' death benefits will decrease, and interest on their accumulation accounts will no longer be paid.  As established herein, and in the accompanying Declaration of Frank Scuglik, this is simply wrong.  Consequently, this first theory is empty, and not worthy of nationwide class certification.

2.      This empty theory is not the complaint articulated by the named plaintiffs themselves, and extensive case law supports denial of class certification where class counsel abandon an important claim or theory in order to obtain class certification on some constructed approach more amenable to counsel's litigation goals.

3.      Even if this theory had merit, it still would not satisfy the requirements for class certification because it would require numerous individualized adjudications.  Nearly 20 years ago, 3 of the 10 named plaintiffs here signed a letter consistent with <u>Conseco Life's</u> method of determining underfunding.  That letter is devastating to those three plaintiffs on the merits, and for purposes of application of the statute of limitations.  It is devastating to class counsel as well, because it shows that it would be impossible to resolve this theory on a class basis.  The letters prove that a court could not properly enter a judgment on this theory, for or against a class, without examining each policyholder's facts and circumstances.

4.      The Regulatory Settlement is an additional, powerful factor undermining Plaintiffs' already-flawed motion for class certification.  Plaintiffs bear the burden on a request for class certification, and denial of a class does not deprive anyone of their litigation rights -- the named plaintiffs may proceed with their suit, and putative class members may sue as well, if they so

3

choose.  As such, when a regulatory settlement covers the subject matter of a proposed class action, and provides substantial relief, courts have exercised their broad discretion to deny class certification, respecting the regulatory settlement and the work and judgments underlying it, while allowing affected individuals to enjoy the regulatory relief, or bring individual suits if they do desire.  (Here, Plaintiffs do not contend that the damages are too low to warrant individual suits; they assert "hundreds of millions of dollars" in damages, in a suit involving approximately 10,000 people.[3])

5. The reasoning of this line of cases -- which includes the Ninth Circuit case <u>Kamm</u> -- applies with particular strength here, because certification of a class would affirmatively threaten the Regulatory Settlement.  Under that Settlement, if a class is certified, Conseco Life has the discretion to exclude absent class members from the Settlement's benefits.  If this were to occur, Plaintiffs' demand for certification of a class would operate, ultimately, to harm thousands of policyholders who have asserted no grievance with Conseco Life.  It would deprive them of concrete, currently-available settlement benefits, including a cash payment, in favor of absent participation in an action that may result in no relief at all.

6. Plaintiffs efforts to negate the Regulatory Settlement as "irrelevant" lack merit:

a. Plaintiffs <u>say</u> they seek more relief than is afforded by the Regulatory Settlement.  But Courts do not compare the relief obtained by regulators with a private plaintiff's bold statement of what he or she <u>seeks</u>.  The prospects of private litigation are always uncertain; the private suit could obtain nothing, or -- at trial or by settlement -- it could obtain less than was obtained by the regulators.  The Ninth Circuit's decision in <u>Kamm</u> addresses Plaintiffs' very argument on this point, and rejects it -- in a case where the regulatory settlement obtained much

---

[3] <u>See</u> Motion at 4.  Assuming, <u>arguendo</u>, that Plaintiffs claim $200,000,000 in damage for a universe of roughly 10,000 policyholders, each individual policyholder's suit could seek average damages of $20,000.

4

1  less than Plaintiffs demanded, did not cover all putative class members, and involved fewer

2  potential defendants.

3        b.      Nor do courts ignore a regulatory settlement just because the private plaintiff

4  claims that the regulators should have pursued, or should have pursued more vigorously, a

5  particular claim or theory.  Courts instead look to the overall subject matter of the regulatory

6  settlement.  This makes sense.  A plaintiff can always articulate a new or different theory,

7  particularly when -- as here -- they have a regulatory settlement in hand to review and criticize.

8  And, again, the question is not whether the Regulatory Settlement should <u>negate</u> the possibility of

9  private litigation.  The question is whether the Court should <u>certify a class</u>, unnecessarily

10  transforming into litigants thousands of individuals who have no asserted claim or grievance, who

11  have access to the Regulatory Settlement's substantial benefits, and who have the right, if they so

12  choose, to bring their own suits.

13        c.      Plaintiffs contend that the insurance regulators did not have authority to sue

14  for damages, and Plaintiffs claim that <u>they</u> seek "hundreds of millions" in damages.  Plaintiffs offer

15  no basis for this overblown claim.  As the Court can readily see, Plaintiffs' new theories seek

16  alteration of <u>future</u> Conseco Life conduct; Plaintiffs do not even claim that state insurance

17  regulators did not have power to do so.

18        As to Plaintiffs' second theory (their challenge to Conseco Life's regulator-approved fees),

19  Conseco Life remains at a loss to understand this aspect of Plaintiffs' case.  As developed further

20  herein, the challenged fees are explicitly provided for in the contracts, up to stated maximums.

21  There is no claim, nor could there be, that Conseco Life plans to exceed those maximums.

22        In any event, for all the reasons set forth already, class certification in this matter is

23  inappropriate, and Plaintiffs have never requested that the Court certify a class on this theory alone.

Consequently, further consideration of this theory's suitability for class certification is not necessary.

In addition, the Court should also consider, in its overall, discretionary analysis, that the insurance regulators reviewed Conseco Life's plans with respect to its fees. That review, and the resultant required fee limitations (ceilings on the fees that Conseco Life can charge, and a schedule for them to be phased in over time), which are a substantial settlement benefit to policyholders, support the application of such cases as <u>Kamm</u>, and also underscore the lack of merit of this theory.

In addition, absent certification of a class, the named policyholders here may continue to seek an order declaring that the fees are barred by the contract. There is no harm to them in denial of class certification, nor is there any broader "injustice," given the existence of the Regulatory Settlement, and given the continuing availability of private litigation to any aggrieved policyholder.

For all of these reasons, class certification should be denied.

## BRIEF STATEMENT OF FACTS

### *The Issues In This Case*

This lawsuit relates to certain "Lifetrend" life insurance policies originally issued by Massachusetts General Life Insurance Company and Philadelphia Life Insurance Company, and now administered by Conseco Life. The policies at issue are Lifetrend 3 and Lifetrend 4 policies, which were offered for sale in the 1980s and into the 1990s. They were sold by independent agents, not by employees of Conseco Life or its predecessors. (Declaration of Frank S. Scuglik ("Scuglik Decl.") at ¶ 2-3.[4]  For further discussion of the factual background, also see the Declaration and

---

[4]     Lifetrend 3 and Lifetrend 4 policies were issued in "series": the 1987 series, the 1993 series, and the 1995 series. There were different policy forms for Massachusetts General and Philadelphia Life, and for each of the three series. All of the <u>Brady</u> plaintiffs had Lifetrend 4 1987 series policies issued by Massachusetts General. (Scuglik Decl. at ¶ 4.)  Additionally, Plaintiff McFarland had two Lifetrend 4 policies:  a 1987 series policy and a 1993 series policy issued by Philadelphia Life.  (<u>Id.</u>)

1   Supplemental Declaration of Michael C. Keeley, Ph.D., Senior Vice-President of Cornerstone

2   Research in Menlo Park, California ("Keeley Decl." and "Suppl. Keeley Decl."), Ex. 1.[5])

3          The Lifetrend policies at issue contain an "accumulation account," which is increased by

4   the payment of premium, and is decreased by the withdrawal of contractually-specified fees.  (See,

5   e.g., Life Insurance Policy for Cedric Brady ("Brady Policy"), Ex. 2, at 8.)  Generally stated, these

6   fees were charged initially, but they were suspended for many years as a concession to

7   policyholders.

8          A set annual premium must be paid once a year, and if the policyholder failed to pay

9   required premium he or she would ultimately enter into a policy-prescribed "continuation of

10  insurance" status under which the policy would persist for as long as it could on its then-current

11  cash value.  (Brady Policy at 3.)

12         But there is an exception:  under the policy's Optional Premium Payment provision ("OPP"),

13  the policyholder may choose to cease paying premium after the fifth year of ownership, as long as

14  then, and thereafter, the value of the fluctuating accumulation account is greater than the sum of

15  three stated values.  (Brady Policy at 9.)  Those values are (1) the Guaranteed Cash Value, which

16  increases over time and is shown in the policy (Brady Policy at 4, 9); (2) the surrender charge,

17  which decreases over time and is also shown in the policy (Brady Policy at 5, 9); and (3) the

18  amount of any outstanding loan.  (Brady Policy at 7-8.)  Where the accumulation account value is

19  below the sum of these values, the policy is informally referred to as "underfunded," or "in

20  shortfall."  (Scuglik Decl. at ¶ 7.)

21         Putting aside factors 2 and 3 -- the ultimately-disappearing surrender charge and the loan,

22  which is optional -- the essential idea of OPP is that it allows the policyholder to remain in a non-

23  premium paying status as long as he or she remains above the policy's stated guaranteed cash value;

24

25

26

27

28         [5]      Unless otherwise indicated, exhibits are attached to the Declaration of James R.
         Carroll, filed herewith.

7

1  i.e., as long as the policy is not "underfunded."  That said, a policyholder in that situation may pay

2  additional premium, in order to benefit from the interest that accrues on the accumulation account.[6]

3       Many policyholders chose the OPP option, and, over time, many policyholders'

4  accumulation account values dropped below the policy-specified benchmark.  Due to an

5  administrative error, Conseco Life did not contemporaneously send a special notice of this

6  "underfunding."

7       In late 2008, Conseco Life notified policyholders of the situation (in, among other

8  correspondence, an "October 2008 letter"), and informed policyholders that it was engaged in

9  communication with regulators about how to address the situation: state insurance departments had

10  commenced an investigation as a result of these late 2008 notifications with policyholders.  (See

11  Scuglik Decl. at ¶ 10.)

12  *The Regulatory Settlement, Which Provides Significant Benefits To Policyholders*

13       The regulatory investigations proceeded for many months, and, after extensive negotiation,

14  Conseco Life recently reached a settlement agreement with (to date) 42 state regulators -- including

15  the Insurance Commissioner of the State of California, which was one of the five lead regulators.

16  (See Ex. 3, Regulatory Settlement Agreement ("Regulatory Settlement Agreement" or

17  "Agreement").)

18       The scope of the regulatory review was broad.  Paragraphs 21 through 30 of the Regulatory

19  Settlement Agreement recite the history of the regulators' involvement following the October 2008

20  letter, and paragraph 26 identifies that the regulators' review included (but was not limited to) the

21  following issues:

22       "a.     Whether any marketing or advertising materials used by
Conseco Life or its predecessors for the Lifetrend policies contained

23  any false or misleading information;

24       b.     Whether Conseco Life or its predecessors engaged in sales
practices that misrepresented the benefits, advantages, or terms of the

25  Lifetrend policies;

26

27       [6]     See, e.g., Brady Policy at 9:  after the fifth policy anniversary the policyholder

28  "may elect . . . to pay: an amount which is less than the premium then due on the policy."
(emphasis added.)

      c.     Whether any communications by Conseco Life or its predecessors was misleading to Lifetrend Policyowners;

      d.     Whether the Company had failed to properly manage or administer the Lifetrend policies; and

      e.     Whether Conseco Life and its predecessors properly determined NGE changes made to the Lifetrend policies."

(Regulatory Settlement Agreement at ¶ 26.)

The Regulatory Settlement provides multiple "substantial benefits" to policyholders. (Agreement at ¶ 125.) Those benefits include:

1.     The _automatic_ extension to all proposed class members of the "Enhanced Continuation of Insurance" feature. Under the Regulatory Settlement's "Enhanced Continuation of Insurance" feature, an underfunded policyholder need not pay the underfunded amount -- i.e., the difference between the accumulation account value and the policy-specified benchmark. Nor must that policyholder resume paying annual premium. Instead, his or her coverage will continue as long as the accumulation account value is sufficient to cover the periodic charges, and if at any point the accumulation account value becomes insufficient to cover those charges, the policyholder can make an additional premium payment at that time. (Agreement at ¶¶ 33-35, and Ex. B.) This arrangement is extended to all affected policyholders automatically; it is not conditioned upon submitting a claim form, or signing a release (although, as discussed further below, Conseco Life has the discretion to exclude policyholders from this relief if a class action is certified). (Agreement at ¶¶ 36, 53-54.)

This represents a substantial benefit to policyholders -- even Plaintiffs recognize it as "significant" and "inur[ing] to the benefit of policyholders." (Motion at 11.) Initially, if a policy became underfunded, the policyholder had to pay the underfunded amount to return to OPP status, or he or she again entered into a premium-paying mode (i.e., the annual premium was again due each year). Here, Policyholders were underfunded for years, and Conseco Life is making no effort to collect unpaid premium (which ranges from $23,000 to more than $340,000 in the case of the named plaintiffs), nor, going forward, is Conseco Life placing policies into the default premium-paying mode. For example, named plaintiff Cedric Brady alleges that Conseco Life initially

9

1   informed him that, "to keep [his policy] active," he was required to make a payment of $93,619.56.

2   Am. Compl. at ¶¶ 5, 87(f).  That allegation was always inaccurate, but in any event, a demand for

3   that money is not being made under the Regulatory Settlement.  Under this arrangement, a

4   policyholder may never need to pay any additional premium -- or may only need to do so years

5   from now.  (Scuglik Decl. ¶ 14.)

6        2.   For those who execute a release of claims against Conseco Life, the option to select

7   additional settlement benefits:

8             a.   The opportunity to participate in a $10 million settlement pool.  (Agreement

9   at ¶¶ 38-39);

10            b.   The option to reduce the face amount of the policy (in order to

11  proportionally reduce fee and premium obligations going forward).  (Agreement at ¶ 37i); and

12            c.   The option to elect to convert the policy into a "reduced paid-up" policy (i.e.,

13  through an appropriate reduction in face value, converting the policy into one where no additional

14  premium and charges will ever be due).  (Agreement at ¶ 37ii.)

15       As discussed further below, these substantial benefits, among other reasons, are an

16  independent reason to deny class certification.

17              **CURRENT STATUS AND PLAINTIFFS' THEORIES**

18       Plaintiffs first filed a joint motion for class certification on March 11, 2010, which Conseco

19  Life opposed on April 22, 2010.  (Docket Nos. 15, 25.)  The parties thereafter submitted

20  subsequent briefing on certain issues, and at the hearing on Plaintiffs' motion on July 2, 2010, the

21  Court directed that Plaintiffs file an amended motion for class certification to address, in particular,

22  the effects of the recent Regulatory Settlement.

23       Plaintiffs filed their amended motion for class certification on July 7, 2010.  (Docket No.

24  76.)  Plaintiffs were directed to clearly articulate the class they seek, and also the theories on which

25  they seek class certification.[7]  Plaintiffs did the former -- though they inappropriately broadened

26  _____

27       [7]     At that hearing, the Court directed Plaintiffs to "refile a class motion in light of the
       settlement which is now in effect, and in light of whatever your most current pleading is, and in
28     light of whatever the facts are you want to assert for me, and tell me what class you want me to
       certify, and how I can do it. . . . But I need to know exactly what class claims you want to proceed

                                          10

1  their requested class to include <u>all</u> Lifetrend 3 and 4 policyholders at the time of the October 2008

2  Letter (not just those who were underfunded).  They failed, however, to do the latter:  their 37-page

3  brief reads as a generalized critique of Conseco Life's policy administration, and fails to sharply

4  identify the particular theory or theories which Plaintiffs intend to pursue.  In addition, their brief

5  fails to disclaim the theories already proffered, including the plainly uncertifiable "vanish" theory

6  articulated by the named representatives themselves, <u>i.e.</u>, that they were promised an obligation to

7  pay only five annual premiums.

8      Conseco Life's best understanding, however, is that, departing from their Complaints in

9  these actions, and without seeking leave to amend them, Plaintiffs' counsel currently focus on these

10  essential theories:

11      1.      That Conseco Life is incorrectly determining whether a policyholder is underfunded
    ("GCV Theory").  (Motion at 7-9.)
12
    2.      That Conseco Life plans to impose improper expense charges and cost of insurance
13  fees ("Fees Theory").  (Motion at 10, 14-16.)

14      A class should not be certified on either theory.

15  <u>**RESPONSE TO PLAINTIFFS' ASSERTIONS ON THE MERITS**</u>

16      Before addressing class certification issues, Conseco Life rebuts Plaintiffs' merits assertions

17  about each theory.  (Plaintiffs so prominently argue the merits of each theory that Conseco Life

18  believes that it is appropriate to respond in kind.  In addition, Conseco Life submits that the

19  Regulatory Settlement weighs heavily against class certification, <u>particularly</u> given the hollowness

20  of Plaintiffs' theories.) [8]

21  _____

22  with and how they do or don't relate to anything that's been sort of preempted by the settlement."
    (Ex. 5, Tr. of July 2, 2010 Hearing at 34.)

23      [8]      In <u>Dukes v. Wal-Mart Stores, Inc.</u>, 603 F.3d 571, 581-95 (9th Cir. 2010), the Ninth
    Circuit recently considered the extent to which a district court may consider the merits on class
24  certification.  The court observed that a number of courts have read <u>Eisen v. Carlisle & Jacquelin</u>,
    417 U.S. 156 (1974), too narrowly in holding that a district court is precluded from considering the
25  merits on class certification.  <u>Id.</u> at 582.  The rule in the Ninth Circuit is that "when considering
    class certification under Rule 23, district courts are not only at liberty to, but must, perform a
26  rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied, and this analysis
    will often, though not always, require looking behind the pleadings to issues overlapping with the
27  merits of the underlying claims."  <u>Id.</u> at 594.  The court noted its approval of the approaches taken
    by the Second and Seventh Circuits, which require a district court to resolve "factual and legal
28  disputes that strongly influence the wisdom of class treatment."  <u>Id.</u> at 582-83 (quoting <u>Szabo v.</u>
    <u>Bridgeport Machines, Inc.</u>, 249 F.3d 672, 675 (7th Cir. 2001).  The Ninth Circuit's holding in

1

***Plaintiffs' GCV Theory***

2    Plaintiffs argue that the policies are not underfunded at all, and that Conseco Life is

3  misapplying the OPP formula described above.  (See, e.g., Motion at 8-10.)  Again, that formula

4  checks whether the accumulation account value is greater than a benchmark which is the sum of

5  guaranteed cash value, surrender charge, and any indebtedness.  Usually the most significant

6  portion of that benchmark is the guaranteed cash value, which, as shown on an initial page of each

7  Lifetrend 3 and 4 policy, increases each year; e.g., in Mr. Brady's 20th year (2007), it was $135,879.

8  (Brady Policy at 4.)

9    Plaintiffs incorrectly contend that, once a policyholder is in OPP status, the benchmark

10  should not involve guaranteed cash value.  Consequently, Plaintiffs contend, Conseco Life is using

11  an inflated benchmark, and deeming policyholders to be underfunded long before they actually are

12  underfunded.

13    Plaintiffs' reading of the contract makes no sense:

14    **First**, as the text of the OPP provision makes clear (see, e.g., Brady Policy at 9), the

15  obvious point of OPP is that a policyholder may pay no premium as long as his or her

16  accumulation account remains above, inter alia, the policy's stated guaranteed cash value.  (As

17  shown in Section I of this brief, three of the named plaintiffs sent letters to Conseco Life

18  acknowledging this.)  Plaintiffs' interpretation rewrites the provision, excising its crucial reference

19  to "guaranteed cash value."

20    **Second**, if the contract is read Plaintiffs' way, an entire, crucial aspect of the contract -- its

21  "continuation of insurance" feature -- would be surplusage.  Under the contract, upon underfunding,

22  a policyholder has the right to go into the "continuation of insurance" mode, under which, stated

23  generally, the contract persists as long as it can on the then-current policy value.  (Brady Policy at

24  9.)  (Under the Regulatory Settlement's "Enhanced Continuation of Insurance" feature, the

25  policyholder can extend this phase indefinitely, by adding premium at will.)

26
27
28  Dukes is in accord with the majority of circuits to have considered the issue.  Id. at 583 (noting rapid consensus emerging among the First, Second, Third, Fourth, Fifth, Seventh, Eighth, Tenth and Eleventh Circuits requiring "rigorous factual review and preliminary factual and legal determinations with respect to the requirements of Rule 23 even if those determinations overlap with the merits.").

12

1    Under Plaintiffs' proposed method for determining underfunding, no policy would ever

2 benefit from the "continuation of insurance" feature.  As soon as a policy became underfunded, it

3 would inherently have insufficient value to do so.  By way of illustration, consider a hypothetical

4 policyholder on OPP who has no policy loan (i.e., no debt) and whose policy has a surrender

5 charge of $5,000.  Under Plaintiffs' theory, that policyholder does not become underfunded until

6 his accumulation account falls below $5,000 (the only other two elements of the benchmark are

7 guaranteed cash value (which Plaintiffs contend is $0 for a policyholder on OPP) and indebtedness

8 (which in this hypothetical is $0)).  But the policy provides that, upon entering "continuation of

9 insurance" (i.e., falling below $5,000 in this example) the policy will continue until the "net cash

10 value" is exhausted -- and "net cash value" is defined as the value of the accumulation account <u>less</u>

11 <u>surrender charge and indebtedness</u>.  (See, e.g., Brady Policy at 9.)  This means that under Plaintiffs'

12 approach, the policyholder would never enter "continuation of insurance" because the surrender

13 charge would be automatically deducted.  That would effectively zero the account balance,

14 terminate the policy and render the continuation of insurance provision moot.[9]  Plainly then,

15 Plaintiffs' theory is incorrect.  (This point is made in the Declarations of Conseco Life's expert

16 Michael Keeley.  Plaintiffs have had those declarations for months, and have offered no rebuttal.)[10]

17    The lack of merit of this theory is further underscored by the fact that the regulators' focus

18 during the regulatory proceedings included the "administration" issues that led to the October 2008

19 ─────────────────────────

20    [9]    Plaintiffs' method of determining underfunding leads to the same absurd result if the
policyholder has debt.  Imagine this same hypothetical person with the same surrender charge
21 ($5,000) and debt of $20,000.  He becomes underfunded when his accumulation account value
sinks to $24,999.  But -- again -- he does not enter continuation of insurance, because net cash
22 value excludes surrender charge and debt, and is therefore -- at the very moment of underfunding --
less than $0.  The policy terminates.  As these two examples show, under plaintiffs' method of
23 determining underfunding, the continuation of insurance aspect of the policy is moot.  It makes no
sense to read the policy this way.

24    [10]    Plaintiffs' attempt to support their argument by pointing to a statement on the
25 guaranteed cash value page of the policy that "THIS TABLE PRESUMES THAT THE INSURED
PAYS THE FULL ANNUAL PREMIUM SHOWN ON THE PRECEDING PAGE EACH YEAR"
26 (Brady Policy at 4), and to a statement in certain annual benefit statements that "The surrender
value of your policy on [date] is the greater of the cash value of [amount] or the guaranteed cash
27 value of $0.00."  (See, e.g., Ex. 6 at CLIC 0004784.)  Plaintiffs misconstrue both statements, which
convey that if a policyholder on OPP were to <u>surrender</u> his or her coverage, he or she would not be
28 entitled to receive the guaranteed cash value shown in the policy's table of guaranteed cash values
-- <u>not</u> that the figure shown there is irrelevant to the periodic determination of underfunding.

13

1  Letter and notice of underfunding.  (Agreement ¶ 25.)  Nowhere does the Regulatory Settlement
2  Agreement fault Conseco Life's method of determining underfunding.

3      Consequently, Plaintiffs are simply wrong that Conseco Life is incorrectly determining
4  underfunding.

5      Equally important for present purposes, Plaintiffs' theory that Conseco Life is improperly
6  determining underfunding is academic, because their assertions about the adverse consequences of
7  being underfunded are incorrect.

8      As explained already, under the originally-issued contract itself, once a policyholder
9  became underfunded, he or she needed to either pay the underfunded amount (to return to "OPP"
10 status), or exit OPP status and return to a default mode of paying annual premium (or, failing that,
11 enter "continuation of insurance").  This was the "detriment" to being underfunded, and it has now
12 been removed.  Under the Regulatory Settlement, an underfunded policyholder need not pay the
13 underfunded amount, nor need an underfunded return to an annual premium-paying status.

14     Plaintiffs appear to concede this crucial point, and their July 7 brief asserts two <u>other</u>
15 purported detriments to being underfunded (neither of which have previously been asserted):
16 Plaintiffs assert that entry into Enhanced Continuation of Insurance automatically decreases
17 policyholders' death benefit, and "freezes" the interest that is paid on their policies' accumulation
18 accounts.  (<u>See</u> Motion at 5-7.)  Plaintiffs never sought discovery, formal or informal, on either
19 point, and Plaintiffs are wrong on both of them.  <u>See</u> Section I.E herein, which is supported by the
20 Declaration of Frank Scuglik.

21     For the Court's convenience, the following chart addresses and rebuts the four purported
22 adverse consequences of being deemed underfunded:

23
24
25
26
27
28

14

CLAIMED "ADVERSE CONSEQUENCES" OF BEING UNDERFUNDED

1)   Demand For Payment Of Underfunded Amount:          →   **PAYMENT NOT REQUIRED** *(PLAINTIFFS APPEAR TO CONCEDE)*

2)   Requirement To Pay Going-Forward Annual Premium:   →   **NOT REQUIRED** *(PLAINTIFFS APPEAR TO CONCEDE)*

3)   Death Benefit Reduced:                             →   **NOT TRUE** Scuglik Decl. ¶ 16.

4)   Interest On Accumulation Account Frozen:           →   **NOT TRUE** Scuglik Decl. ¶ 17.

In sum, the first of Plaintiffs' two current theories -- the GCV Theory -- is wrong on the merits, and also academic. It does not justify certification of a nationwide class in the face of, and to the detriment of, the Regulatory Settlement.

### *Plaintiffs' Fees Theory*

Similarly, there is no basis for Plaintiffs' assertions that there is something improper about the contractually-permitted fees permitted by the Regulatory Settlement (the expense fee and the cost of insurance fee).

*Expense Fee*: The policies permit a monthly $5.00 expense fee, and -- though on many relevant policies Conseco Life opted not to charge that fee for many years -- the Regulatory Settlement Agreement permits them at certain approved levels on a going-forward basis. Plaintiffs assert various purported "real" reasons for this decision, e.g., Conseco Life's investments had historically performed poorly, and that Conseco Life had made a poor business decision in relieving policyholders of these fees for many years. (Motion at 20-21.) But Plaintiffs ignore the fundamental point: the policy *explicitly* provides for a monthly $5.00 expense charge. (See, e.g., Brady Policy at 5.)

*Cost of Insurance Fee*: The policies provide for a cost-of-insurance fee, and the maximum "rate" for calculation of this fee is set forth in the policy. (See, e.g., Brady Policy at 9-10.) As with

15

1   the expense fee, Conseco Life chose not to charge this cost of insurance fee for many years, but as

2   reflected in the Regulatory Settlement Agreement, Conseco Life has been permitted by the

3   regulators to re-impose the fee, calculating it using increased rates (which rates would have been

4   different for different classes of policyholders).  (Agreement ¶¶ 56-61.)

5       Plaintiffs appear to contend that this proposal was contractually barred because there had

6   been no decline in mortality experience, and because it was for the improper purpose of

7   "recouping" prior investment losses.  Both contentions are wrong.  As to the first contention, the

8   policy states maximum cost-of-insurance rates that are based on a 1980 mortality table (Brady

9   Policy at 10), but nowhere does the policy state that if Conseco Life exercises its discretion to

10  benefit policyholders by charging a lower rate (or no fee at all), it thereafter cannot alter that

11  decision absent a decline in mortality experience.  Instead it gives Conseco Life broad discretion to

12  adjust this fee, stating, inter alia (in language that Plaintiffs conveniently omit from their brief), that

13  "[t]he company reserves the right to adjust for the monthly cost of insurance being charged on any

14  policy anniversary by increasing or decreasing the rates for the monthly cost of insurance under

15  this plan by giving written notice to all policyholders not less than ninety days prior to the date of

16  such change."  (Brady Policy at 9-10.)

17      As to the contention that Conseco Life intends to use a cost-of-insurance increase to recoup

18  prior investment losses, there is no basis for that claim either.  Conseco actuary Keith Turner has

19  explained that the proposed increase was based on multiple factors, including that Conseco's rate of

20  investment earnings had declined considerably from what was earlier assumed -- meaning that, on

21  a "go-forward" basis, Conseco Life had decided to increase the cost of insurance rate to respond to

22  the now-lower investment rate of return.  (Deposition of Keith Turner, previously filed as Ex. 11 to

23  Plaintiffs' Motion, at 44:3-8, 67:23-70:6, 153:12-154:17, 163:8-165:4, 167:16-172:19).)   Mr.

24  Turner also rejected Plaintiffs' counsel characterization of his testimony in the way that it has been

25  presented in Plaintiffs' briefing, but, unsurprisingly, Plaintiffs' counsel never followed up to probe

26  his position.  (Id. at 242:5-6.)

27      Again, the lack of merit of this theory is further underscored by the fact that the regulators

28  examined the fees to be imposed, and approved them at certain specified levels:

16

1        The Lead Regulators' review of the Lifetrend policies included the
following issues:  . . . [w]hether Conseco Life and its predecessors

2        properly determined NGE changes made to the Lifetrend policies.

3 (Agreement ¶ 26.)  "NGE" is defined in the Regulatory Settlement Agreement as "Cost of

4 Insurance rates and monthly expense charges." (Agreement at 6.)

5        In that regard, the Regulatory Settlement Agreement provides a detailed schedule that

6 regulates how and when Conseco Life may impose the fees.  (Agreement ¶ 56 and Ex. G.)  For

7 example, Conseco Life may increase the monthly cost of insurance charges, beginning on

8 September 1, 2010, at stated time and basis-point intervals, on a going-forward basis.

9        The following chart shows in summary form why Plaintiffs' challenge to the fees is

10 precluded by the contracts themselves:

11 COST OF INSURANCE FEE:

12
13 • Expressly permitted by contract to a stated maximum, and it will be below the maximum. (Scuglik Decl. ¶ 13, 15.)

14
15 • Contract does <u>not</u> state that an increase is permitted <u>only</u> when mortality increase.

The following table shows the maximum rates for the monthly cost of insurance per each $1,000 of net sum insured.  The Company reserves the right to adjust the monthly cost of insurance being charged on any policy anniversary by increasing or decreasing the rates for the monthly cost of insurance under this plan by giving written notice to all insureds not less than ninety days prior to the date of such change.  Any such change shall be subject to approval by the insurance regulatory authority of the state of residence of the owner, if required.  In no event can the rate for the monthly cost of insurance be increased to an amount greater than the rates for the attained age of the insured specified in this table.  (Ex. 2.)

22 EXPENSE CHARGE:

23
24 • Expressly permitted by contract to a stated maximum, and it will be <u>below</u> that maximum. (Scuglik Decl. ¶ 13, 15.)

There is a charge of $2.50 per month per policy.  This charge may be increased by the Company at a policy anniversary but not to exceed $5.00 pre month per policy and only upon the giving of prior notice of increase to the Owner.  (<u>Id.</u> at 9-10.)

25

26

27

28

17

## ARGUMENT

As an initial matter, as referenced earlier, Conseco Life incorporates here all of its prior arguments, briefing, and submissions against class certification.

In addition, Conseco Life notes that even though Plaintiffs now present a revised proposal for class certification, they include no trial plan. Such a plan is required in the Ninth Circuit, as Conseco Life explained in its opposition to the <u>Brady</u> Plaintiffs' motion for class certification (<u>see</u> <u>Brady</u> Docket No. 102 at 9-11) and its opposition to the Plaintiffs' first joint motion for class certification. (<u>See</u> Docket No. 25 at 10-12.)[11] Plaintiffs stubbornly fail to satisfy this requirement, which Conseco Life continues to submit is especially important here: a complex case, in which Plaintiffs' theories are not grounded in their complaints, constantly change, and are subsumed by a regulatory settlement.

## I. CERTIFICATION OF A CLASS ON PLAINTIFFS' "GCV THEORY" IS INAPPROPRIATE

### A. This Theory Is Not Pled In The Complaint

Plaintiffs' GCV Theory is not pled in <u>any</u> complaint in this action. A class should not be certified on a theory that is not articulated in a complaint. Plaintiffs have had months to move for leave to amend to include this theory, but have not done so.

### B. Plaintiffs' Assertion Of This Theory Results In Inappropriate Claim-Splitting

Plaintiffs' counsel assert the GCV Theory at the expense of a different theory that, until recently, was the focus of this lawsuit. Under that theory -- espoused by the named plaintiffs themselves at their depositions, in sworn testimony that has not been disavowed -- the complaint against Conseco Life was that it breached a purported promise to policyholders that only five premium payments would be due on their Lifetrend policies. For example:

- The Amended Complaint in <u>Brady</u> alleges that "Plaintiffs were told that their policies would buy them even more security in the future than most life insurance

---

[11] <u>See, e.g.</u>, <u>In re Paxil Litig.</u>, 212 F.R.D. 539, 548 (C.D. Cal. 2003) (denying nationwide class certification in product liability suit where -- on reply -- plaintiffs submitted a trial plan insufficiently addressing how to resolve individualized factual issues, and variances in state law), citing <u>Zinser v. Accufix Research Inst., Inc.</u>, 253 F.3d 1180, 1190 (9th Cir. 2001) (upholding denial of class certification where "there was no manageable trial plan adequate to deal with individualized issues and variances in state law.")

policies because the large front-loaded premiums and other associated costs would quickly 'vanish,' and the policies would become self-funded after a short number of years (approximately five years in most cases)." (<u>Brady</u> Docket No. 51 at ¶ 2 (in section titled "Summary of Action").)  Similarly, the Brady plaintiffs allege that "[t]he policies at issue in this lawsuit were marketed as having 'vanishing premiums.'  With a 'vanishing premium' policy, if the policyholder makes a series of initial premium payments, then the policy becomes self-funded and the policyholder no longer needs to make premium payments; i.e., the premiums 'vanish.'"  (<u>Id.</u> at ¶ 47.)[12]

- In the first joint written report to the Court, the Brady plaintiffs explained their position that "[t]he policies were marketed as having 'vanishing premiums.'  The policyholders were told to first make large initial premium payments . . . . The policyholders were told that their policies would provide them security in the future because the large initial premium payments plus the accrued interest would be more than enough to cover the policies' operating expenses, and the policies would then be self-funded and the premiums would vanish."  (<u>Brady</u> Docket No. 48 at 2.)  Later, they contended that "[e]very purported Class Member purchased a vanishing premium life insurance policy from Conseco that allowed them to cease making premium payments provided that the value in their accumulation accounts was sufficient to cover the policy's operating expenses."  (<u>Id.</u> at 5.)

The proposed class representatives prominently advanced this claim in their sworn testimony.  They testified that they were led to believe that no more than five premium payments were required -- even though the policy itself contains no support for any such arrangement.  For example:

- Mr. Brady testified that Conseco Life violated his understanding that his policy would be fully paid up after five annual premium payments.  (Brady Dep. at 68:1-69:3 (Ex. 7).)

- Dr. Sakai testified that Conseco Life "demanded payment beyond what was promised in the contract."  (H. Sakai Dep. at 13:2-8 (Ex. 8.).)

- Dr. Marion Hovden testified that Conseco Life broke a "deal" in which "I had life insurance, that I had paid it up and it was there," and that "once we paid and paid up everything, it was paid in full."  (M. Hovden Dep. at 13:14-14:7; 17:3-15 (Ex. 9.).)[13]

---

[12]     In their first joint class certification motion, Plaintiffs made much of the alleged facts that "Conseco promised its policyholders that the premiums would become 'optional' or 'vanish' if the policyholder so desired and that no additional contributions would be necessary to maintain the death benefit," but that a subsequent letter from Conseco Life "made the vanished premiums reappear."  (Docket No. 15 at 1, 2.)

[13]     <u>See also</u> J. Sakai Dep., Ex. 10, at 15:24-16:5; C. Hovden Dep., Ex. 11, at 25:22-26:8; McNamara Dep., Ex. 12, at 31:22-32:4; Kreps Dep., Ex. 13, at 43:10-17; McFarland Dep., Ex. 14, at 43:22-44:9.

19

1    But now, Plaintiffs' counsel have attempted to <u>abandon</u> the vanish theory.  Plaintiffs'

2    Motion says nothing about it, and focuses on the un-pled GCV Theory and the Fees Theory.

3    Moreover, Plaintiffs' recent submissions distance themselves from their earlier allegations.  For

4    example, Plaintiffs state that they "are not asserting claims based on point-of-sale fraud, nor are

5    they seeking class certification on such claims" and that "the point-of-sale evidence is largely a side

6    show because Plaintiffs seek a national class on breach-of-contract claims, not fraudulent sales

7    practices claims (and Plaintiffs seek a California class based on fraudulent omissions in documents

8    disseminated long after the Policies were sold)."  (Docket No. 61 at 1, 4.)

9    Plaintiffs' counsel understandably want to focus on the claims that they feel present the best

10   chance of success for a nationwide class, including their GCV claim, but they cannot jettison their

11   own representatives' claims for this purpose.  In similar circumstances, courts have denied class

12   certification on typicality and adequacy grounds.  <u>See, e.g.</u>, <u>Gartin v. S&M Nutec, LLC</u>, 245 F.R.D.

13   429 (C.D. Cal. 2007) (denying class certification; variance in proposed class representative's claim

14   from other class members' claims caused insurmountable typicality deficiency); <u>Legge v. Nextel</u>

15   <u>Communic'ns, Inc.</u>, Civ. No. 02-8676 DSF (VNKX), 2004 WL 5235587, at *6 (C.D. Cal. June 25,

16   2004) (addressing multiple concerns, including adequacy, occasioned by Plaintiffs' counsel's

17   efforts to narrow their case in order to obtain class certification, for example the possibility that a

18   favorable class judgment would unfairly limit the relief that individual class members could have

19   pursued); <u>Rodriguez v. Gates</u>, Civ. No. 99-13190-GAF (AJWX), 2002 WL 1162675 (C.D. Cal.

20   May 30, 2002) (named plaintiff was atypical where his theory of liability was narrower than the

21   theory or theories that could be presented by the class).

22   When presented in other cases with this kind of so-called "claim-splitting," Courts have

23   reached a similar conclusion, often addressing the inappropriateness of a class representative's

24   willingness to narrow his or her claim in order to obtain class certification and the unfairness of

25   that approach to potential class members.  In <u>Krueger v. Wyeth, Inc.</u>, No. 03-CV-2496 JLS (AJB),

26   2008 WL 481956, at *2 (S.D. Cal. Feb. 19, 2008), for example, the court denied certification of a

27   proposed state-wide class because the named plaintiff disclaimed recovery of damages for personal

28   injury despite the fact that the class definition included plaintiffs who were injured.  The court

1    explained that "[c]laim splitting is generally prohibited by the doctrine of res judicata, which bars

2    parties to a prior action, or those in privity with them, from raising in a subsequent proceeding any

3    claim they could have raised in the prior action." <u>Id.</u>  The court noted that "[o]ther courts agree that

4    the existence of claim splitting constitutes a compelling reason to deny class certification." <u>Id.</u> at

5    *3.  The court denied certification of the class action on the basis that, because of this, the named

6    representatives inadequately represented the interests of the entire class. <u>Id.</u> at *4.  On similar

7    grounds, the court in <u>Drimmer v. WD-40 Co.</u>, No. 06-CV-900 W(AJB), 2007 WL 2456003 (S.D.

8    Cal. Aug. 24, 2007), denied certification of a proposed class because, "[i]n an apparent attempt to

9    limit unique questions of fact," the named representative waived personal injury damages, yet

10   sought to represent both injured and uninjured class members.

11        The California Supreme Court has reversed certification of a class action in part because the

12   plaintiffs failed to raise available claims on behalf of the class.  The court held that

13            "[t]he plaintiffs here inadequately represent the alleged class because
             they fail to raise claims reasonably expected to be raised by the
14            members of the class and thus pursue a course which, even should
             the litigation be resolved in favor of the class, would deprive class
15            members of many elements of damage."

16                            *        *        *

17            "This court has long been concerned with requiring the representative
             party to protect the interests of the absent class members, even
18            imposing a fiduciary duty to do so on the representative class
             member.  To fulfill this fiduciary duty the representative plaintiff
19            must raise those claims reasonably expected to be raised by the
             members of the class."
20

21   <u>City of San Jose v. Superior Court</u>, 12 Cal. 3d 447, 464 (1974) (internal citation and quotation

22   marks omitted).  By failing to raise available, substantial claims on behalf of the entire class, the

23   court held that the plaintiffs effectively waived any possible recovery under those claims on behalf

24   of "hundreds of class members." <u>Id.</u>  This, the court held, the plaintiffs "may not do." <u>Id.</u>

25        Elsewhere, courts reach the same conclusion.  In <u>Pearl v. Allied Corp.</u>, 102 F.R.D. 921 (E.D.

26   Pa. 1984), for example, the court denied plaintiffs' motion for class certification in part because "it

27   appear[ed] that the plaintiffs' efforts to certify a class by abandoning some of the claims of their

28   fellow class members have rendered them inadequate class representatives."  The court explained:

21

> It is apparent that [plaintiffs] have modified the proposed classes alleged in their complaint in an effort to exclude claims necessitating individualized proofs. By abandoning their claims of present physical injuries, diminution in the property value of their residences, and breach of express warranty they have eliminated many issues peculiar to individual class members.

102 F.R.D. at 923. See also Thompson v. American Tobacco Co., Inc., 189 F.R.D. 544 (D. Minn. 1999) (denying certification of class seeking medical monitoring from manufacturers of cigarettes in part because the named "Plaintiffs' efforts to reserve personal injury and damage claims may, in fact, jeopardize the class members' rights to bring such claims in a subsequent case" and so rendered their interests different than those of the class at large); Feinstein v. Firestone Tire & Rubber Co., 535 F. Supp. 595 (S.D.N.Y. 1982) (denying certification of nationwide class, in part, because "a serious question of adequacy of representation arises" where "plaintiffs so tailored the class claims in an effort to improve the possibility of demonstrating commonality . . . at the price of presenting proposed class members with significant risks of being told later that they had impermissibly split a single cause of action").

The rationale and holding of these cases apply here. Plaintiffs' counsel are not dispensing with some peripheral potential claim or theory. Instead, they are dispensing with the chief complaint of their own clients, even though they are bound to represent the interests of all proposed class members. Independently, and even more clearly in combination with all of the other identified flaws in Plaintiffs' class certification motion, this inappropriate attempted claim-splitting is a powerful reason for denial of class certification.[14]

### C. Plaintiffs' GCV Theory Would Require Adjudication Of Individual Issues

#### 1. Individual Issues Exist As To Liability

Again, Plaintiffs' GCV theory, in essence, is that the underfunding analysis should ignore the table of guaranteed values in the policy. However, Mr. Brady himself sent a letter articulating the opposite view to the position his lawyers now advocate, suggesting that he understood that, for

---

[14] The Kennedy case submitted by Plaintiffs before the July 2, 2010 hearing is distinguishable: in that case, there was no evidence that the plaintiff's lawyers were affirmatively ignoring her predominant complaint. Instead, the plaintiff and her attorneys proceeded together on a theory that they agreed presented the best chance for success. See Kennedy v. Jackson Nat'l Life Ins. Co., No. C 07-0371, 2010 WL 2524360 (N.D. Cal. June 23, 2010).

22

purposes of determining underfunding, that the Company <u>would</u> consider the guaranteed cash

value shown on the policy data page.  The letter states, in pertinent part:

> "I would like to elect the option of premium payment by the
> vanishing premium method for the above policy, effective
> with the premium due date above.  <u>I understand that if the
> actual cash value drops below the table of guarantee value</u>, a
> special premium due notice will generate to advise that
> additional premium is due."

(Ex. 15) (emphasis added.)

Mr. Brady sent this letter in 199<u>2</u>, meaning that, almost twenty years ago, he was presented

with <u>and signed</u> a document describing OPP calculation in a manner his counsel now claim is

contractually incorrect.  Similarly, Dr. Marion Hovden and Dr. Charles Hovden sent letters in 199<u>4</u>

similar to the one sent by Mr. Brady in 1992.[15]  (Exs. 16 and 17.)  These letters reflect an

understanding consistent with Conseco Life's method of underfunding, in the sense that they

acknowledge that underfunding takes into account "the table of guarantee[d] cash value."  (Scuglik

Decl. ¶ 6.)

Plainly, to adjudicate Plaintiffs' GCV Theory, it would be necessary to litigate each

Plaintiffs' understanding of the OPP provision, and the facts relevant to that question would be

unique to each person.  Here, individual adjudication would be necessary even for the ten named

plaintiffs:  for Mr. Brady and Dr. and Dr. Hovden, the above letters would be important extrinsic

evidence; for the other seven named plaintiffs, the letters would not be important evidence.  <u>See

Adams v. Kansas City Life Ins. Co.</u>, 192 F.R.D 274, 281 (W.D Mo. 2000) (denying class

certification because, in part, extrinsic evidence of the parties' understandings of an important, but

ambiguous, contract provision rendered plaintiffs' contract claim unsusceptible to class treatment).

Making matters even more unmanageable is the fact that there is significant state-by-state

variation with respect to the proper use of extrinsic evidence in a breach of contract case.  Plaintiffs

contend that there will never be any need to reach extrinsic evidence, because each side asserts that

---

[15]    All Plaintiffs assert in rebuttal is that these letters are unimportant because, at
deposition, there was testimony elicited that the named plaintiffs did not actually write them.  (<u>See</u>
Docket No. 37 at 9.)  But again, the named plaintiffs <u>signed</u> them.  And the very fact that Plaintiffs
are responding to the existence of the letters by pointing to individual plaintiffs' deposition
testimony proves the point:  the letters create individualized issues.

23

1  the policy is unambiguous.  But while each side asserts that the policy is unambiguous, each side

2  asserts a different policy interpretation.  The Court must therefore determine whether the policy is

3  unambiguous, and if so in which side's favor.   If the Court cannot make such a ruling as a matter

4  of law, then the jury will be tasked with determining which interpretation is correct through the use

5  of extrinsic evidence -- yet, state law varies considerably on what kinds of extrinsic evidence can

6  be admitted at trial.[16]

7  ### 2.    Individual Issues Exist As To Statutes Of Limitation

8      Conseco Life's statute of limitations defenses to Plaintiffs' GCV Theory will also require

9  individualized inquiry.  For example, as just discussed, Mr. Brady and Dr. and Dr. Hovden

10  acknowledged in writing in the early 1990s their understanding of Conseco Life's method of

11  calculating guaranteed cash value.  That is a powerful fact that Conseco Life would be entitled to

12  assert in its defense, and it weighs against certification of a nationwide class.

13      In Gregurek v. United of Omaha Life Ins. Co., Civ. No. 05-6067-GHK (FMOX), 2009 WL

14  4723137 (C.D. Cal. Nov. 10, 2009), for example, plaintiff alleged (as here) that the insurance

15  company's calculation of a "cost of insurance" charge was contractually incorrect.  After class

16  certification, the company introduced evidence that, in some instances, agents explained the

17  insurance company's calculation method to policyholders -- meaning that, upon such explanation, a

18  policyholder would be on notice of the alleged breach.  Id. at *6-7.  The Court noted that "[i]n

19  California, the discovery rule postpones the accrual of a breach of contract claim until the plaintiff

20

21      [16]      In its opposition to Plaintiffs' first joint motion for class certification, Conseco Life
22  provided an appendix detailing the state-by-state differences in this area.  (See Docket No. 25 at
   Appendix A.)  For example, some states permit extrinsic evidence contemporaneous with the
23  execution of the contract; others permit extrinsic evidence from throughout the life of the contract.
   (Id. at A-3, A-4.)  In some states, extrinsic evidence is important even before a contract is deemed
24  to be ambiguous; for example, some states contemplate use of extrinsic evidence to determine
   whether a contract is ambiguous or unambiguous.  (Id.)  Plaintiffs ignore this heterogeneity, and
25  have asserted opaquely that in all states extrinsic evidence is admissible where there is an
   ambiguous contract.  (See Docket No. 37 at 18.)  This may be true, but what extrinsic evidence is
26  admitted varies considerably.  And although Plaintiffs cite Southern States Police Benev. Ass'n, Inc.
   v. First Choice Armor & Equip., Inc., 241 F.R.D. 85 (D. Mass. 2007) for the proposition that state-
27  law variation can be managed through jury instructions, this is only true if the differences are
   sufficiently small.  In Southern States, only 12 states were at issue, not 48 as here, and the plaintiffs
28  demonstrated through a state-by-state analysis that state-law differences were immaterial.  Id. at
   90-91.  That is simply not the case here.  (See Docket No. 25 at Appendix A.)

1  knew or should have known of the breach," such that sales presentations in which there was

2  explanation of the challenged charge "presented the possibility of an inquiry notice defense against

3  the discovery rule."  Id. at *7 (citing Apr. Enters., Inc. v. KTTV, 147 Cal. App. 3d 805, 832 (1983).)

4  The Court concluded that the statute of limitations issue "will require individualized findings

5  specific to each class member, and is not amenable to collective resolution."  Gregurek, 2009 WL

6  4723137, at *8.  The same analysis is applicable here.

7       These matters are complicated substantially by Plaintiffs' request for a nationwide class.

8  Conseco Life has previously reported that breach-of-contract statute-of-limitations periods vary

9  widely state by state.  (See Docket No. 25.)  For example, in California limitations period for

10  breach of contract is two years (if an oral contract; Cal. Civ. Proc. Code § 339(1)), or four years (if

11  a written contract; Cal. Civ. Proc. Code § 337(1)).  In contrast, the limitations period for breach-of-

12  contract in Florida is five years.  (Fla. Stat. Ann. § 95.11(2)(b).)  (Limitations periods for breach of

13  contract vary widely: from two years (for breach of oral contract in California) to 15 years in

14  Kentucky (Ky. Rev. Stat. Ann. § 413.090(2)) and Ohio (Ohio Rev. Code Ann. § 2305.06).)

15       Similarly, there is variation in the rules concerning the point at which the limitations period

16  is triggered.  For example, in California, the limitations period is triggered by discovery of the

17  alleged breach.  See Gregurek, 2009 WL 4723137, at *8 ("in California the discovery rule

18  postpones the accrual of a breach of contract claim until the plaintiff knew or should have known

19  of the breach") (citation omitted).  In contrast, in Florida, the limitations period "commences once

20  the last element for breach of contract occurs, not when a plaintiff discovers the breach."  Servicios

21  de Almacen Fiscal Zona Franca Y Mandatos S.A. v. Ryder Int'l, Inc., Civ. No. 06-22774-

22  HUCK/SIMONTON, 2007 WL 628133, at *3 (S.D. Fla. Feb. 26, 2007) (emphasis added) (citing

23  Abbott Labs., Inc. v. Gen. Elec. Capital, 765 So. 2d 737, 740 (Fla. App. S. Dist. 2000) ("the

24  legislature did not intend to provide a discovery rule in section 95.11(2)(b), Florida Statutes

25  (1981) . . . [t]o conclude otherwise would require us to write into section 95.11(2)(b), Florida

26  Statutes (1981), a discovery rule when the legislature has not") (emphasis added); see also Fla. Stat.

27  Ann. § 95.031(1) ("A cause of action accrues when the last element constituting the cause of action

28  occurs.").

25

**D.      The Regulatory Settlement Provides "Substantial" Benefits,
Which Is An Additional Reason To Deny Class Certification**

The Regulatory Settlement Agreement provides, in the regulators' own words, "substantial"

benefits for Lifetrend policyholders who are members of the putative class.  (Agreement ¶ 125.)

As explained, the Regulatory Settlement Agreement offers a host of benefits in addition to

eliminating the need to pay an underfunding amount or annual premium payments:  (i) a

$10,000,000 settlement pool; (ii) optional restructuring of the policies, at the policyholder's

discretion; and (iii) limitations on fees and expenses, which include, among other things, ceilings

on the amount of fees that can be charged, and a schedule limiting when they can be charged.

(Agreement at ¶¶ 37-39; 56-61.)  As such, it undercuts Plaintiffs' demand for a nationwide class.

Plaintiffs began this case by complaining about a demand for prompt payment of

substantial underfunding, e.g., $93,619.56 in the case of Mr. Brady.  (Brady Am. Compl. ¶ 87.)

Under the Regulatory Settlement Agreement, there is no such requirement for payment of an

underfunding amount.  (Agreement at ¶¶ 33-35, and Ex. B thereto.)

Plaintiffs recently appeared to acknowledge these facts, and -- searching for new problems

-- complained at the July 2, 2010 hearing that Conseco Life would nonetheless require underfunded

individuals to return to a default status of paying annual premium.  (Ex. 5 at 6-7.[17])  Under the

Regulatory Settlement Agreement, however, this is not the case.  Policyholders will need to pay

premium only to the extent necessary to cover future fees, when those fees become due.

(Agreement at ¶¶ 33-35, and Ex. B thereto.)    Plaintiffs appear now to concede this point as well.

**1.      In Similar Situations, Courts Have Recognized That
Parallel Regulatory Actions Should Preclude Class Certification**

In similar situations -- where regulators have obtained substantial relief for would-be class

members -- courts have exercised their discretion to deny class certification, especially when, as

here, the denial does not deprive anyone of litigation rights.  (Even in the absence of a class action,

any aggrieved person can still sue.)  For example, in Kamm v. Cal. City Dev. Co., 509 F.2d 905

---

[17]      Conseco Life previously explained this to Plaintiffs on more than one occasion, for
example in its Regulatory Settlement Submission (Docket No. 58) and in correspondence from its
counsel to Plaintiffs' counsel prior to the recent hearing.  (Ex. 18, Letter from James R. Carroll to
Stephen A. Weisbrod dated June 30, 2010.)

26

(9th Cir. 1975), the plaintiffs sought certification of a class in connection with an allegedly

fraudulent land sale scheme for a planned city in the Mojave desert.  509 F.2d at 210.  The district

court, on a motion from defendants arguing that the alleged class action was not the superior

method for resolving the controversy, struck the class allegations from the amended complaint, and

the plaintiffs took an interlocutory appeal.  Id. at 207.  The Ninth Circuit affirmed the decision

based on a parallel proceeding and concurrent settlement agreement between certain defendants

and the California Attorney General and the Real Estate Commissioner.  Id. at 208, 211.  The court

characterized this as not just "possible administrative relief," but rather as a "remedy which has

already been instituted" -- the settlement provided for offers of restitution of principal payments to

certain purchasers, about $3.3 million in the aggregate, as well as a promise to institute "a program

to settle future disputes."  Id.  As here, there was nothing in the settlement agreement that

precluded a potential class member from declining to release the defendants and instituting an

individual action.  Id.

      The court in Kamm considered a number of factors to determine that a class was not

appropriate.  (Id. at 212-13.)  Those same factors are present here and inform the class certification

analysis:

| Factors Considered By The Court In Kamm: (509 F.2d at 212-13) | Similarly, In This Matter: |
| --- | --- |
| (1) A class action would require a substantial expenditure of judicial time which would largely duplicate and possible to some extent negate the work on the state level. | Here too, proceeding with this case on a class basis would require extensive judicial time, and it would largely duplicate the regulatory work -- and could even negate it (e.g., if Conseco Life opts to exclude class members from the settlement, and/or if the Court issues a judgment barring the fees contrary to the regulators' approval of them within prescribed limits). |
| (2) The class action would involve 59,000 buyers in separate transactions over a 14-year period. | The essential point in Kamm is that the class action would be sprawling and burdensome, and would involve difficult management issues. The same is true here. |
| (3) Significant relief had been realized the state action. | As explained, the Regulatory Settlement provides "substantial benefits." |

| (4) The state court retained continuing jurisdiction. | In Kamm, the regulators filed a lawsuit and filed the settlement agreement the same day; the court retained continuing jurisdiction under the terms of the agreement  509 F.2d 208. Here, the situation is substantively the same:  under the terms of the 42-regulator settlement, the regulators maintain continuing jurisdiction over the dispute and Conseco Life.  (Agreement ¶¶ 92-104.) |
|---|---|
| (5) No member of the class is barred from initiating a suit on his own behalf. | The same is true here. |
| (6) Although the class action aspects of the case have been dismissed, appellants' action is still viable. | The same would be true here, if -- as in Kamm -- this Court were to deny class certification. |
| (7) Defending a class action would prove costly to the defendants and duplicate in part the work expended over a considerable period of time in the state action. | The same is true here.  See also factor (1), above. |

Similarly, in Brown v. Blue Cross & Blue Shield of Mich., Inc., 167 F.R.D. 40 (E.D. Mich. 1996), the plaintiff, a participant in and administrator of an employee welfare benefit plan, challenged a health insurer's practice of computing coinsurance obligations and sought, in part, restitution for excess coinsurance paid and an injunction requiring the insurer to properly pay all plan benefits.  Id. at 42.  The insurer, however, was regulated by the State of Michigan, had been investigated by the state's insurance department and Attorney General, and, while the litigation was pending, had entered into a settlement agreement with the Insurance Commissioner and Attorney General concerning the same matters at issue in the lawsuit.  Id.  The settlement agreement, which provided for refunds of over $24 million in connection with possible overpayments of coinsurance, required the insurer to provide notice of the settlement and of the available relief.  Id.  Only individuals who submitted a claim form would be bound by the settlement.  Id.  Based on that settlement agreement, the insurer argued that no purpose would be served by class certification because a class would be wasteful, unnecessary and duplicative.  Id. at 43.

The court agreed with the insurer, explaining:  "[T]he interests of the class would be adequately served by the agreement between defendant and the State of Michigan rendering a class action unnecessary."  Id. at 44.  It did not matter that "the State agreement may not be perfect or

28

1   may not be how plaintiffs' counsel would have advocated a settlement in the present case" --

2   "where the State agreement is providing monetary relief to the subscribers anyway, a class action

3   seeking those same monies is unnecessary." Id. at 47, 45 n.18.  As in Kamm, the court also noted

4   that nothing in the settlement agreement precluded a putative class member who did not join the

5   settlement from instituting an individual claim for relief against the insurer.  Id. at 46 n.22.

6        Here, as in Kamm and Brown, Conseco Life is regulated by various states' insurance

7   departments and has agreed to a settlement agreement with those entities concerning the matters at

8   issue in this lawsuit.  Potential class members will be notified of the regulatory settlement (which

9   will provide monetary relief just as requested by the plaintiffs) and will have an opportunity to

10  institute individual actions should they decline to join the regulatory settlement.  As recognized by

11  the court in Brown, a class action under these circumstances would be duplicative and unnecessary,

12  and confusing to class members.  And, as explained by the court in Kamm, many factors make this

13  class action a less superior method for resolving the controversy:  the significant relief realized in

14  the regulatory settlement, the ability of individuals to institute their own proceeding (and the

15  continued viability of plaintiffs' proceeding), and the cost to Conseco Life of duplicative work

16  already undertaken over a considerable period of time.

17       Brown and Kamm apply with particular force in the present case.  Here, a fundamental

18  aspect of the relief afforded by the Regulatory Settlement -- the Enhanced Continuation of

19  Insurance benefit -- extends to all proposed class members, regardless of whether they release their

20  claims.  The automatic extension of this benefit to all proposed class members sharply undercuts

21  the ostensible rationale for this proceeding -- i.e., to prevent Conseco Life from requiring

22  policyholders to pay the underfunding amounts -- and considerably weakens the argument for

23  certification of a nationwide class.

24       Also, as explained in Conseco Life's previous submissions, there are also sound policy

25  reasons for not certifying a private class action when a regulatory resolution has already been

26  achieved.  For example, in Thornton v. State Farm Mut. Auto Ins. Co., Inc., No. 1:06-cv-00018,

27  2006 WL 3359482 (N.D. Ohio Nov. 17, 2006), the court struck the plaintiff's class allegations

28  concerning improperly titled motor vehicles as a result of a parallel agreement between defendant

State Farm and 49 state attorneys general.  Id. at *3.  The court emphasized the potential, adverse impact that permitting a class action to proceed could have on the ability of regulators to settle claims on behalf of their citizenry:  "[i]f courts consistently allow parallel or subsequent class actions in spite of state action, the state's ability to obtain the best settlement for its residents may be impacted, since the accused may not wish to settle with the state only to have the state settlement operate as a floor on liability or otherwise be used against it."  Id.; see also Ostrof v. State Farm Mut. Auto Ins. Co., 200 F.R.D. 521 (D. Md. 2001) (denying motion for class certification and concluding that overlapping investigation by Maryland insurance department and availability of individual actions (as a "supplement to administrative proceedings") would render class action duplicative); Pattillo v. Schlesinger, 625 F.2d 262, 265 (9th Cir. 1980) (in an action seeking to compel United States to locate and pay service personnel entitled to back pay, "the use of a class action procedure is not superior to the ongoing administrative proceedings for the notification and payment of former service personnel").

### 2.   Certification Is Particularly Inappropriate When -- As Here -- It Would Threaten The Regulatory Settlement

Certifying a nationwide class action is particularly inappropriate where, as here, it could threaten the Regulatory Settlement.

If the Court certifies a class, Conseco Life will have the option to exclude the members of the certified class from the Regulatory Settlement:

> Conseco Life may elect to exclude a Lifetrend Policyowner from the CAP if . . . the Lifetrend Policyowner has a pending litigation against the Company.

(Agreement ¶ 53.)  This provision encompasses members of a certified class, and, if a class is certified, it could result in the effective dissolution of the Regulatory Settlement and its substantial, concrete, currently available benefits -- in favor of a lawsuit with, at best, uncertain prospects.  In other words, if a class is certified, absent class members may find themselves denied the opportunity to participate in the substantial benefits afforded by the Regulatory Settlement, and instead entirely dependent on Plaintiffs' counsel to someday deliver a better arrangement than they could have otherwise obtained today.

30

1    Plaintiffs attempt to distinguish <u>Brown</u> on a similar basis, <u>i.e.</u>, by noting that the settlement

2  there was conditional on the court <u>not</u> certifying a class.  (<u>See</u> Motion at 35.)  But that is not far

3  from the situation here, where certification of a class will give Conseco Life the discretion to

4  exclude its members from the Regulatory Settlement's benefits -- effectively making the

5  Regulatory Settlement conditional on certification.[18]

6              3.      **Plaintiffs' Arguments Against The**
                       **<u>Regulatory Settlement Are Unavailing</u>**
7

8                      (a)     **Contrary To Plaintiffs' Assertions,**
                               **The Regulatory Settlement Covers The**
9                              **<u>Same Subject Matter As Plaintiffs' GCV Theory</u>**

10    Plaintiffs complain that Conseco Life is improperly determining whether policyholders are

11  underfunded, and that its calculations in this regard -- including the October 2008 Letter, which

12  informed thousands of policyholders that they were underfunded -- are wrong.  (<u>See, e.g.</u>, Motion

13  at 10-12.)  In turn, the regulatory review was commenced promptly after the mailing of the October

14  2008 letter, it investigated, <u>inter alia</u>, "[w]hether the Company had failed to properly manage or

15  administer the Lifetrend policies" (Agreement ¶ 26), and it ordered substantial relief with respect to

16  the underfunding issues in particular.[19]

17    Plaintiffs claim that they are seeking <u>more</u> relief than was provided in the Regulatory

18  Settlement, and that "Conseco did not cite a single case in which class members contended that

19  they had a prospect for a substantial recovery above and beyond the recovery offered by the

20  regulatory settlement but the court nevertheless denied class certification . . . ."  (Motion at 36.)

21    But the court in <u>Kamm</u> directly addressed this argument.  There, the court rejected the

22  argument that the relief (or the parties) in the parallel action and the private litigation had to be

23  ─────────────────────────────

24      [18]     Paragraph 54 of the Agreement provides that Conseco Life may not exclude
       policyholders "on the basis of membership in a <u>purported</u> class in any class action lawsuit pending
25     against the Company," but, by its terms, that provision is inapplicable once a class is certified and
       is no longer "purported."  (Regulatory Settlement Agreement ¶ 54 (emphasis added).)  (This again
26     clarifies the discussion on this issue at the July 2, 2010 hearing, when paragraphs 53 and 54 of the
       Regulatory Settlement Agreement were raised by the Court.  <u>See also</u> Docket No. 85 at 5, n.3)

27      [19]     Viewed in this context, Plaintiffs miss the forest for the trees in questioning whether
28     the regulators considered Plaintiffs' <u>particular</u> theory of  improper administration, which is any
       event is meritless.

                                            31

1   identical; indeed, it recognized that "not all members of the class appellants seek to represent will

2   be protected by the California settlement; nor will the class recover an amount that is even close to

3   that sought in the class action." Id. at 211-12.  The Court explained:

> Finally, appellants contend that the district court erred in considering
> the [parallel proceeding] as an alternative to the class action, arguing
> that the [parallel proceeding] did not involve the same controversy,
> did not include five of the defendants named in this action, and did
> not provide the class-wide restitution sought in this case.
>
> We cannot agree that these differences render the state action so
> different a controversy that it should not have been considered by the
> district court in determining whether the class action was superior to
> alternative methods.  The state action was based on a charge of
> misleading advertising and deceptive sales practices.  While
> appellants have charge false registration under the Interstate Land
> Sales Act, a violation of the Securities Exchange Act of 1934, and
> false registration under the California Subdivided Land Act, both
> actions involve the same fraudulent conduct of the defendants and
> both seek to provide relief for those injured thereby.

509 F.2d at 213.

So too, here.  As in Kamm, both the Regulatory Settlement and this action concern the

same underlying conduct and seek to provide relief for allegedly affected policyholders.  It does

not matter that Plaintiffs assert that they seek relief greater than that afforded by the Regulatory

Settlement.  Courts do not ignore a regulatory settlement just because a civil plaintiff represents

that he or she seeks substantially more in relief.  Plaintiffs might lose, or they might win or settle

and receive far less than they seek.

Similarly, Plaintiffs attempt to distinguish Brown because, in their words, "the plaintiffs

were going to recover through the regulatory settlement virtually everything they had demanded."

(Motion at 35-36.)  In Brown, though, the court declined to certify a class action despite

recognizing that the parallel regulatory action "may not be perfect or may not be how plaintiffs'

counsel would have advocated a settlement in the present case."  167 F.R.D. at 47. [20]

---

[20]   Plaintiffs purport to distinguish Caro v. Proctor & Gamble Co., 18 Cal. App. 4th
644 (4th Dist. 1993), but Conseco Life did not cite that case.  In any event, Caro turned on the fact
that the class action was not likely to produce any "substantial benefit" for the class (because
damages were so nominal -- less than $2 per person).  18 Cal. App. 4th at 660.  The court was not
concerned with how those damages compared to the relief provided in the regulatory settlement
agreement, because in fact consumers recovered nothing under the terms of the regulatory

32

**(b)    The Regulators Have Authority To Order Appropriate Relief**

Plaintiffs assert that the 42 regulators that have endorsed the Regulatory Settlement Agreement "lacked authority" to bring the same types of claims that Plaintiffs are asserting because, for example, state enforcement remedies are "typically [ ] injunctive in nature," and here Plaintiffs are seeking a substantial <u>monetary</u> recovery.  (Motion at 31.)

That ignores the $10,000,000 settlement pool that the regulators ordered Conseco Life to establish.  (Agreement ¶ 38.)  Plaintiffs claim that that multi-million dollar pool is "very small" relative to the potential damages in this case, but, as described in their brief, Plaintiffs seek an order regulating Conseco Life's <u>future</u> administration of the policies.  And Plaintiffs continue to invoke the prospect of massive monetary damages, without providing any basis for that at all.  Until they do so, this argument (<u>i.e.</u>, that they are seeking something that the regulators could not have provided) should be accorded no weight, particularly where the regulators <u>in fact</u> obtained a $10,000,000 settlement pool.

The cases cited by Plaintiffs on this point, <u>White v. E-Loan, Inc.</u>, No. C 05-02080, 2006 WL 2411420 (N.D. Cal. Aug. 18, 2006), <u>County of Stanislaus v. Pacific Gas & Elec. Co.</u>, No. CV-F-93-5866-OWW, 1994 WL 706711 (E.D. Cal. Aug. 25, 1994), and <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, 202 F.R.D. 12 (D.D.C. 2001), are distinguishable.  In <u>White</u>, no parallel proceeding had been commenced, as opposed to here, where a proceeding has not only commenced, but resulted in concrete, substantial benefits.  2006 WL 2411420, at *9.  In <u>County of Stanislaus</u>, the administrative body -- the California Public Utilities Commission -- was principally an oversight body with only "limited" enforcement abilities and no jurisdiction over one of the defendants.  1994 WL at 706711, *5-6.  And in <u>Lorazepam</u>, the court, on a motion to dismiss, considered but rejected a ("colorable") standing challenge concerning whether the defendants could be sued at all in light of a Federal Trade Commission action on "wholly separate causes of action."  <u>Id.</u> at 20.  In this context, Conseco Life does not dispute that policyholders may have standing to

settlement.  <u>Id.</u>  The regulatory settlement simply required the defendant to remove the allegedly deceptive labeling from its products.  <u>Id.</u>

33

1   bring underline{individual} claims -- indeed, this is contemplated by the Regulatory Settlement -- but disputes

2   instead that those claims may be brought on a underline{class} basis.

### (c)   Plaintiffs' Case Law Is Unpersuasive

4           Plaintiffs claim that "courts have long recognized that government enforcement actions and

5   private class actions can and should proceed in parallel."  (Motion at 26.)  For that crucial

6   proposition, Plaintiffs cite one case:  the Supreme Court's 2007 decision in Tellabs, Inc. v. Makor

7   Issues & Rights, Ltd., 551 U.S. 308 (2007).  In that decision, the Supreme Court did not address

8   the impact of a regulatory settlement on a proposed private class action.  Instead, the court -- in a

9   lead-in to analysis of a pleading-standard issue -- merely reaffirmed the general importance of

10  "meritorious" private federal securities actions as a "supplement" to government enforcement,

11  while explaining that they need to be "adequately contained" to avoid "abuse" and undue costs.  Id.

12  at 313.  Turning to the issue under review, the Court announced a new, strict pleading standard for

13  the element of scienter.  Id. at 329.  This decision is unsupportive of the proposition for which

14  Plaintiffs cite it, and is otherwise unhelpful to Plaintiffs.[21]

15          Plaintiffs otherwise fail to cite to any cases where courts were asked to, and did, address the

16  significance of those actions -- they only cite cases in which courts noted the existence of parallel

17  actions.  (See Motion at 26, n.11 and 12.)  Conseco Life made this same point about these same

18  cases in the submission it filed on June 29, 2010 (See Docket No. 65).  It is telling that Plaintiffs

19  have been unable to improve their legal showing.[22]

---

21          [21]     Also, the Court's prefatory observation that private securities class actions are an
22  important (but potentially abusive and unduly costly) supplement to government enforcement is by
    its terms -- and by its context -- limited to "actions to enforce federal anti-securities laws."  551 U.S.
23  at 313.  That is what the Court says, that is what the case is about, the two cases the Court cites on
    this point are federal securities law cases in which there was no issue about the effect of the
    regulatory settlement, and the Court merely adverted to the general importance of private securities
24  law enforcement before turning to a potential limitation on it.  This case asserts violations of
    common law.  Plaintiffs are wrong to invoke in this context the Supreme Court's policy observation
25  about an entirely different field of law.  (Conseco Life does not, of course, dispute that common
    law actions can parallel regulatory actions.  The issue here, though, is different:  should this
26  common law action proceed on a nationwide class basis, notwithstanding its many flaws and the
    impact of the regulatory settlement?)

27          [22]     Plaintiffs vaguely contend that "portions" of the Regulatory Settlement Agreement
28  apply to the Conseco policies at issue in Yue v. Conseco Life Ins. Co., No. 2:08-CV-1506 (C.D.
    Cal. Dec. 7, 2009) (which is proceeding as a certified national class action) seemingly to suggest

34

**(d)**    <u>The Regulatory Settlement Is Anything But "Irrelevant"</u>

Plaintiffs state that the Regulatory Settlement is "irrelevant" to the certification analysis under Rule 23(b)(2), which has no superiority requirement. (<u>See</u> Motion at 27.) Conseco Life first addressed this issue in a brief filed in June. (<u>See</u> Docket No. 58.) As explained, district courts have wide discretion with respect to whether a class should be certified "because the district court is in the best position to consider the most fair and efficient procedure for conducting any given litigation." <u>Cartwright v. Viking Indus. Inc.</u>, No. 2:07-CV-02159-FCD-EFB, 2009 WL 2982887, at *3 (E.D. Cal. Sept. 14, 2009) (quoting <u>Doninger v. Pacific Nw. Bell, Inc.</u>, 564 F.2d 1304, 1309 (9th Cir. 1977)).

Courts use that discretion in varying ways, in order to reach the right result on a class certification motion. In <u>Castano v. American Tobacco Co.</u>, 84 F.3d 734, 744 (5th Cir. 1996), for example, the Court reversed certification of a class in part because the tort claim asserted was "immature" -- that is, the nature and elements of the claim had not been tested and developed in multiple cases. As a result, the court found the necessary predominance analysis "abstract," and recognized that the class "risk[ed] decertification after considerable resources [were] expended." <u>Id.</u> at 749. The situation here is analogous. Plaintiffs' cause of action is not immature, but their theories of relief are conflicting and unclear, such that -- just as in <u>Castano</u> -- pressing forward on a class basis would be difficult and risky. Further, doing so is not necessary in light of the Regulatory Settlement, and would in fact frustrate that settlement. In these circumstances, it is well within this Court's discretion to deny certification of any class here.

Another instructive case is <u>Brown</u>, 167 F.R.D. at 40. There, the court noted that its decision to decline to certify a class as a result of a parallel regulatory settlement was not limited to a strict application of Rule 23's superiority requirement -- instead, the court "exercise[ed] its discretion" and determined that "the interests of the class would be adequately served by the agreement between defendant and the State of Michigan rendering a class action unnecessary." <u>Id.</u> at 44. As

---

that the Regulatory Settlement should not affect the decision to certify a class. But <u>Yue</u> was <u>already</u> certified as a class when the Regulatory Settlement became effective; here, the Court is considering the effect of the settlement on a <u>putative</u> class.

35

1   in <u>Brown</u>, this Court should use its discretion to decline to certify Plaintiffs' proposed Rule 23(b)(2)

2   class.

3       **E.    Plaintiffs' Suggestion That Substantial**
            **Economic Damage Will Result From Conseco Life's**
4           **Underfunding Method Does Not Change The Analysis**

5       Even if Plaintiffs were correct that Conseco Life's going-forward method of calculating

6   underfunding would cause substantial economic damage to Plaintiffs (<u>see</u> Motion at 4), the class

7   certification analysis does not differ.  Plaintiffs' claims cannot proceed on a class basis for all the

8   reasons discussed herein.[23]

9       But Plaintiffs are <u>not</u> correct.  Their claims of damage on their GCV Theory are wildly

10  exaggerated.

11      **1.    Policyholders Under Plaintiffs' Original Class**
            **Definition Benefit From Conseco Life's Underfunding Method**
12

13      Policyholders within Plaintiffs' original class definition are individuals who were already

14  underfunded.[24]  Conseco Life's method of determining underfunding does not matter as to them,

15  because, under the Regulatory Settlement Agreement, they are not required to pay any "shortfall"

16  amount, nor are they required to pay future annual premium (they must pay premium only to the

17  extent necessary to ensure that the policy remains solvent to pay the associated fees, which was

18  always the case).  (Agreement ¶¶ 33-35 and Ex. B.)  These individuals have a <u>better</u> arrangement

19  under the Regulatory Settlement than they previously did -- even Plaintiffs admit it is a

20  [23]    Further, Plaintiffs' suggestion of "hundreds of millions of dollars" of damage sharply
21  undermines their request for class treatment.  <u>See</u> <u>Zinser v. Accufix Inst. Ltd.</u>, 253 F.3d 1180, 1190
    n.7 (9th Cir. 2001) (denying class certification and noting that the fact that each class member
22  individually claimed $50,000 in damages, exclusive of punitive damages, suggesting that
    individual claims might "economically and reasonably" be pursued individually); <u>Rodriguez v.</u>
23  <u>Gates</u>, Civ. No. 99-13190-GAF (AJWX), 2002 WL 1162675 (C.D. Cal. May 30, 2002) (settlement
    of lawsuits for "substantial sums" suggests sufficient incentive for putative class members to file
24  their own lawsuits).
    [24]    Plaintiffs' original class definition was "[A]ll persons in the United States who (1) own or
25  owned a Conseco Lifetrend 3 or 4 policy; (2) designated their policies to operate under the OPP
    Provision of those policies; and (3) received or were sent an October 2008 Letter from Conseco
26  concerning the under-funding of accounts, shortfall payments, premium payments, insurance
    expense charges, and/or cost of insurance charges." (Docket No. 15, at 5.)  That proposed class
27  definition was summarized in Conseco Life's brief (which summary Plaintiffs never challenged):
    "Plaintiffs' putative nationwide class consists of 9,550 policyholders who received the October
28  2008 letter and were underfunded at the time." (Docket No. 25, at 6 n.9.)  Plaintiffs subsequently
    affirmed that the potential class consisted of "9,550 class members." (Docket No. 37 at 1.)

                                    36

1   "significant" modification that will "inure to the benefit of policyholders." (Motion at 11.) They

2   have no damages flowing from Conseco Life's use of its own (correct) definition of underfunding.

3       To try to get around this problem, Plaintiffs assert that entry into Enhanced Continuation of

4   Insurance decreases an policyholder's death benefit, and "freezes" the interest that is paid on their

5   policies' accumulation accounts. (See Motion at 5-7.) Plaintiffs are incorrect on each assertion.

6       ***Purported reduction of death benefit.*** Plaintiffs argue that under the policy terms (as

7   modified by the new "Enhanced Continuation of Insurance" endorsement), entry into Enhanced

8   Continuation of Insurance results in automatic reduction of the death benefit. They state that "the

9   Policy's 'proceeds' are reduced by the amount of the missed premium." (Motion at 12.) They point

10  to this portion of the policy, and, in particular, the underlined text:

11          PROCEEDS

12          Upon receipt of due proof that the insured died
      while this policy was in force, the Company will
13          pay the death benefit to the beneficiary. The death
      benefit payable will be the greater of:
14

15          (a) the sum insured on the date of death, shown on a
      Policy Data Page, or

16          (b) the accumulation account on the date of death
      multiplied by the applicable percentage at the
17          insured's attained age as shown in the Table of
      Minimum Death Benefits on a Policy Data page
18
              less:
19

20              (1)    any indebtedness; and

21              (2)    any premium due and unpaid if the
      insured dies during the grace period.
22                    Indebtedness consists of any unpaid
      loans plus accrued interest.

23  (Brady Policy at 7) (emphasis added.)

24      This text provides for a reduction in death benefit, by the amount of premium then due and

25  unpaid, if the policyholder dies during the grace period (i.e., in the approximately 61 days after a

26  notice of premium due, but before entry into Enhanced Continuation of Insurance).

27      Consequently, what Plaintiffs portray as a sweeping, classwide issue -- a purported across-

28  the-board death benefit reduction -- is nothing of the sort. If in the future a policyholder receives a

37

1  notice of premium due, and <u>then</u> passes away during the grace period, that policyholder's death

2  benefit will be reduced by the amount of that single premium.[25]

3          Even if there were something wrong with this arrangement (and there is not), it should not

4  form the basis for a nationwide class action.  Plaintiffs identify nobody to whom this ever

5  happened, and it may never happen to anybody in the future.  This strained theory of potential

6  damage does not warrant certification of a class, particularly in the face of, and to the detriment of,

7  a substantial regulatory settlement.

8          For elimination of any doubt on this point, Conseco Life refers the Court to the Declaration

9  of Frank Scuglik.  It states as follows:  "I understand that Plaintiffs have contended that, upon a

10 policyholder entering the enhanced continuation of insurance status set forth in the Endorsement

11 ("ECOI"), the death benefit will be reduced by the amount of unpaid annual premium.  In fact,

12 upon a policyholder's entry into ECOI, the policy's proceeds are not reduced by the amount of any

13 unpaid premium.  Under the policy provision that Plaintiffs cite (the "Proceeds" section), Conseco

14 Life reduces proceeds only in the narrow circumstance described in the policy provision itself:  if a

15 policyholder receives a premium-due notice, then passes away during the grace period without

16 paying it, the policy proceeds are reduced by the amount of that unpaid premium."  (Scuglik Decl.

17 at ¶ 16.)

18          ***Purported nonpayment of interest.***  Plaintiffs state that, upon entry into Enhanced

19 Continuation of Insurance, Conseco Life will "apparently" stop crediting interest to the

20 policyholder's accumulation account.  (Motion at 12.)  Plaintiffs proffer no basis in the policy for

21 that tentative assertion, and it is wrong.  The policy contains a provision explaining the interest that

22 is applied to an accumulation account.  (<u>See</u> Brady Policy at 8, section titled "Accumulation

23

24

25

---

26          [25]      Totally ignoring the "if the insured dies during the grace period" qualifier, Plaintiffs
        describe this provision as follows:  "In other words, if Conseco Life notifies a policyholder that he

27 or she owes an annual premium and the policyholders fails to pay it, then the 'Proceeds' are reduced
        by the amount of the unpaid premium."  (Motion at 6.)  This characterization is not only wrong, it

28 is improper -- it is belied by the plain text of the very provision that Plaintiffs rely upon.

38

1  Account.")   Neither there nor anywhere else does the policy call for that interest to cease upon

2  entry into enhanced continuation of insurance, and it will not.  (Scuglik Decl. at ¶ 17.)[26]

3          In sum, the regulator-approved "enhanced continuation of insurance" provides an

4  underfunded policyholder with an extraordinarily beneficial arrangement.  He or she need not pay

5  back the underfunded amount.  Nor is he or she placed into a default annual premium-paying mode.

6  Plaintiffs' strained efforts to identify "damage" to policyholders from this new status fail; it causes

7  no damage to policyholders, and only benefits them.

8              **2.    Policyholders Under Plaintiffs' Revised Class Definition**
                      **Benefit From Conseco Life's Underfunding Method In The Same Way**
9

10         Plaintiffs' revised class definition now includes individuals who <u>might</u> become underfunded

11  in the future.[27]

12         As an initial matter, Plaintiffs should not be permitted to seek a class as to these individuals.

13  They have never sought to represent them, even though class certification briefing in this case

14  began in December 2009.  Moreover, they have no class representative from this additional group -

15  - that is, a policyholder who is not now, but may become, underfunded -- much less a

16  representative who Conseco Life has deposed.  <u>See</u> <u>Howard v. Gap, Inc.</u>, No. C 06-06773 WHA,

17  2009 WL 3571984, at *7 n.3 (N.D. Cal. Oct. 29, 2009) (finding that typicality was not satisfied

18  where the named plaintiffs were managers, but were attempting to represent all non-exempt

19  employees).  This is a <u>new class</u>, as to which Conseco Life has been afforded no discovery, no

20  meaningful time for analysis, and two weeks for briefing.

21         In any event, if a policyholder in this group becomes underfunded in the future, he or she

22  can either (i) pay sufficient premium to become fully funded (and return to OPP status), or (ii) be

23         [26]     Plaintiffs did not get this incorrect idea from the October 2008 letter.  That letter
24  announced an enhanced continuation of insurance feature that Plaintiffs have described as similar
   to the current Enhanced Continuation of Insurance feature.  (Motion at 14.)  It attached illustrations
25  showing future policy performance on stated assumptions, and those illustrations clearly showed
   interest being applied during the enhanced continuation of insurance phase.  (See Ex. 4 (illustration
26  attached to Brady's October 2008 letter), the last two columns of which show projected future
   values at "assumed interest rate (4.5%).")

27         [27]     Plaintiffs' revised class definition now includes policyholders who "in the future
28  may receive . . . notice that an annual premium is due, notwithstanding such person's prior
   invocation of the [OPP provision]."  (Docket No. 76 at 3.)

39

1    automatically afforded the regulator-approved Enhanced Continuation of Insurance status.  Under

2    that status, just like policyholders in the first group, the policyholder would need to pay premium

3    only to the extent necessary, and when necessary, to cover the contractually-permitted fees.

4           With this group, just as with the currently-underfunded group, Conseco Life's method of

5    determining underfunding does not cause economic damage -- much less damage so great that the

6    Court should disregard the many reasons for denial of class certification, including the effect on the

7    concrete and currently-available benefits of the Regulatory Settlement.

8    II.    **CERTIFICATION OF A CLASS ON**
             **PLAINTIFFS' "FEES THEORY" IS INAPPROPRIATE**
9

10          Class certification on Plaintiffs' "fees theory" should be denied for all of the reasons set

11   forth above.  This theory is part of a broader case that cannot be certified, for all of the reasons

12   shown.  Plaintiffs have not proposed that this theory be certified independently, and Conseco Life

13   submits that it is far too late for any such proposal, and that such a proposal would be otherwise

14   inappropriate.  The Court should not permit a case to be sliced so thinly solely to justify

15   certification of a class.

16          Other factors weigh against certification of this theory.

17          (1)    The theory is simply wrong, as explained above, and its lack of merit is underscored

18   by the fact that the policy permits the fees, the regulators examined the fees, and approved them at

19   specified levels.  The Court may weigh that fact on a motion for class certification.  See <u>Legge v.</u>

20   <u>Nextel Communic'ns, Inc.</u>, Civ. No. 02-8676 DSF (VNKX), 2004 WL 5235587 (C.D. Cal. June 25,

21   2004) (denying class certification; "admitted disadvantage" to class members of a class

22   certification denial "should be balanced against Nextel's credible argument that the Class Members

23   have not actually been damaged, and . . . Class Action treatment would lead to an inequitable and

24   absurd result").

25          (2)    The Court should defer to the Regulatory Settlement Agreement, which provides

26   tangible benefits to policyholders, in the form of going-forward limitations on the fees.

27   (Agreement ¶¶ 56-61.)  In addition to the contractual propriety of the fees, the regulators also

28   considered, after undertaking a comprehensive financial review, the effect that <u>not</u> charging the

1  fees would have on the ongoing solvency of Conseco Life, and the corresponding effect that would

2  have on Conseco Life's over 500,000 policyholders.  Further, certification here would threaten the

3  settlement by, among other reasons, triggering Conseco Life's option to exclude policyholders from

4  its benefits.  The principles of <u>Kamm</u> and <u>Brown</u> apply with full force here.

5        (3)     Absent class certification, any policyholder who chooses to challenge the fees will

6  be able to do so, and will be free to seek across-the-board injunctive relief.  As noted, Plaintiffs

7  definitively do not argue that this is the kind of case where individual litigation is unrealistic (given,

8  for example, their contention that damages may be "hundreds of millions of dollars" (Motion at 4)).

9  **III.  CERTIFICATION OF PLAINTIFFS'**
10         **CALIFORNIA-ONLY CLASS IS ALSO INAPPROPRIATE**

      Plaintiffs continue to propose a California-only class on claims of fraud, breach of good

11  faith and fair dealing and negligent misrepresentation, on an abstruse theory (plainly not amenable

12  to classwide certification) that Conseco Life's annual benefit statements were misleading.

13  According to Plaintiffs, those annual statements represented that the guaranteed cash value was

14  "$0," even though Conseco Life believes that the guaranteed cash value was the greater amount

15  shown on the policy data page.  (<u>See</u> Motion at 14-15.)

16        Yet none of the proposed class representatives who have been deposed relied upon the

17  allegedly incorrect portion of the annual benefit statements:

18
19  •   Dr. Charles Hovden could not remember whether he ever received or read annual
     statements about his policy, so he cannot claim to have relied to his detriment on
20       them.  (C. Hovden Dep. at 26-27:11.)

21  •   Similarly, Mrs. Sakai simply never read any of her annual statements, (J. Sakai Dep.
     at 18:18-18:23) and so she too cannot claim to have relied to her detriment on them.

22
23  •   Dr. Sakai testified that, generally, he claims an entitlement to his policy's guaranteed
     cash values.  (H. Sakai Dep. at 70.)  But when presented with the challenged aspect
24       of his 2000 annual statement -- the reference to guaranteed cash value as $0 -- Dr.
     Sakai testified that he "probably" read it, but that he does not "remember" if he had
     any reaction to it.  (<u>Id.</u> at 66:19-67:4.)

25  •   Unlike Dr. Sakai, Mr. Brady did not rely upon or expect his policy's guaranteed cash
26       values; he testified:  "I've never looked at these values.  I've never thought about
     these values."  (Brady Dep. at 134:9.)  Not surprisingly, therefore, he simply did not
27       notice the challenged aspect of his annual statements.  (<u>Id.</u> at 115:10.)

28

41

- Dr. McNamara testified that even though he generally reviewed his annual statements when he received them, he did not have any recollection of reading the challenged statement about guaranteed cash value.  (McNamara Dep. at 81:1-82:20.)

- Dr. Kreps claimed to have read the allegedly incorrect portion of his annual benefit statement numerous times, but "cannot figure out what it says" and didn't recall asking anyone about the meaning of the statement.  (Kreps Dep. at 112:23-115:5)  When asked if he ever understood what it meant, he acknowledged "not really."  (Id. at 114:3.)

- Dr. Marion Hovden testified that she reviewed her annual statements when she received them.  (M. Hovden Dep. at 52:4-52:8.)  Yet, when asked whether she saw the challenged statement about guaranteed cash value, she responded "I doubt it."  (Id. at 83:8.)

The putative California class therefore fails on typicality grounds because the class representatives challenge an alleged misrepresentation upon which they did not themselves rely. See Quezada v. Loan Center of California, Inc., Civ. No. 2:08-00177 WBS KJM, 2009 WL 5113506 (E.D. Cal. Dec. 18, 2009) (denying class certification on typicality grounds where the class representative did not read the challenged loan documents at issue but instead had them explained to her).

Additionally, Plaintiffs' California-only theory would require adjudication of issues that are unique to each class member, centering on such matters as:

- Did the policyholder receive and read an annual benefit statement that contained one of the $0 references?  (Not all annual statements did.)

- If the policyholder received and read one of those annual statements, did the policyholder notice the $0 reference itself?

- Did the policyholder rely to his or her detriment on that reference?  (How a plaintiff would do so is not spelled out in the class certification brief, even hypothetically.)

The rule that class certification is inappropriate where liability depends on whether each proposed class member was exposed to non-uniform representations applies with special force where the theory is based upon a claim of fraud (as here), because then the inherently-individualized issue of reliance is an integral part of the claim.  In Quezada, 2009 WL 5113506, at *8-9, for example, the court denied class certification in a fraud case alleging that the lender did not disclose that the original "teaser" rate was unlikely to persist, because, although "the loan documents . . . were similar," "whether class members relied upon the loan documents in question will be a critical issue in this action," and "[t]he class members likely had different conversations

42

1   with their mortgage brokers," and "read the loan documents to different degrees."  Similarly here,

2   there is no way to know whether a policyholder even received and read an annual statement

3   containing the challenged text, much less relied upon it to his or her detriment, without

4   individualized adjudication.

5       In an attempt to salvage a California class, Plaintiffs have previously cited Mass. Mutual

6   Life Ins. Co. v. Super. Ct. of San Diego County, 97 Cal. App. 4th 1282, 1293 (2002), Occidental

7   Land, Inc. v. Super. Ct. of Orange County, 556 P.2d 750, 753 (Cal. 1976) and Vasquez v. Super. Ct.

8   of San Joaquin County, 484 P.2d 964 (Cal. 1971) for the proposition that reliance may be inferred

9   on a classwide basis.  (See Docket No. 25 at 25; Docket No. 37 at 23.)  Those cases bear no

10  similarity to this one.  In Vasquez, "salesmen . . . memorized a standard statement containing the

11  representations (which in turn were based on a printed narrative and sales manual) and [] this

12  statement was recited by rote to every member of the class."  Id. at 971.  Vasquez was a demurrer

13  decision, and so the alleged representation was taken as true.  Id. at 966-67.  Mass. Mutual

14  involved a common "failure to disclose" (id. at 1293-94), and there was "nothing in the record"

15  indicating that the allegedly undisclosed information was communicated to anyone at all.  Id. at

16  1295.  Here, Plaintiffs rely upon an alleged affirmative representation which -- as shown -- they

17  themselves did not even read and/or rely on.  And in Occidental, the misrepresentation was in a

18  written report that was undisputedly provided to potential home purchasers, and that the purchasers

19  were required to certify that they had read.  Id. at 753.  The case alleged that the report was false

20  and had misled buyers, and in that circumstance the court thought it sensible to assume reliance.  Id.

21      For these reasons, the proposed California-only class fails not just on typicality grounds,

22  but also on commonality, predominance and superiority grounds.

23

24

25

26

27

28

43

1

**<u>CONCLUSION</u>**

2

For all the foregoing reasons, and for those set forth in Conseco Life's previous submissions

3

on class certification, Conseco Life respectfully requests that the Court deny Plaintiffs' joint motion

4

for class certification in its entirety.

5

Dated:  July 21, 2010                                   Respectfully submitted,

6

7

        <u>      /s/ James R. Carroll       </u>
RAOUL D. KENNEDY (State Bar No. 40892)

8

Skadden, Arps, Slate, Meagher & Flom LLP
Four Embarcadero Center, Suite 3800

9

San Francisco, California 94111
Telephone: (415) 984-6400

10

Facsimile: (415) 984-2698
Email: Raoul.Kennedy@skadden.com

11

12

JAMES R. CARROLL (*Pro Hac Vice*)
DAVID S. CLANCY (*Pro Hac Vice*)

13

CHRISTOPHER A. LISY (*Pro Hac Vice*)
Skadden, Arps, Slate, Meagher & Flom LLP

14

One Beacon Street, 31st Floor
Boston, Massachusetts 02108

15

Telephone: (617) 573-4800
Facsimile: (617) 573-4822

16

Email: James.Carroll@skadden.com
Email: David.Clancy@skadden.com

17

Email: Christopher.Lisy@skadden.com

18

19

Attorneys for Defendant
Conseco Life Insurance Company

20

21

22

23

24

25

26

27

28

44