IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE CONSECO LIFE INSURANCE CO.
LIFE TREND INSURANCE MARKETING
AND SALES PRACTICE LITIGATION
                                                          /

No. C 10-02124 SI

**ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

Presently before the court is plaintiffs' motion for a preliminary injunction in this class action insurance case, which seeks to enjoin defendant Conseco Life Insurance Company ("Conseco") from imposing cost of insurance charges on approximately 157 members of the class. Having considered the arguments of the parties, and for good cause shown, the Court GRANTS IN PART and DENIES IN PART plaintiffs' motion.

**BACKGROUND**

**1.     The Policies**

Plaintiffs in this class action are holders of life insurance policies known as the "LifeTrend 3" and "LifeTrend 4" policies. The policies were issued in the 1980s and 1990s by Massachusetts General Life Insurance Company and Philadelphia Life Insurance Company, and are now administered by Conseco. The policies provided for a stated annual premium to be paid by the policyholder. See Brady Policy, Weisbrod Decl. Ex. 5, at 3 (the "Brady Policy"). Policyholders paid into an "accumulation account" which would accrue a minimum guaranteed interest rate. Policyholders were permitted to take

out loans against the balance of their accumulation accounts. A policyholder could choose at any time to surrender his policy and receive the balance of the accumulation account, minus a set "surrender charge." Additionally, monthly "costs of insurance" ("COI") charges and "expense charges" were deducted from the accumulation accounts. The expense charge could never exceed $5 per month. The COI charge was capped by a "Guaranteed Maximum Monthly Mortality Charge" set forth in the policies. *Id.* at 10.[1] The combined effect of the above provisions was that the balance of a policyholder's accumulation account would change over time as a result of any loans taken out, monthly deductions, and the accumulation of interest.

The policies contain a Non-Participating Provision, which states that the policies "will not share in any of the Company's profits or surplus earnings. Any premium or factor changes are determined and redetermined prospectively. The Company will not recoup prior losses, if any, by means of premium or factor changes." *Id.* at 13.

In addition, each policy contained an Optional Premium Payment Provision ("OPP Provision"), which provided that the policyholder could choose to reduce or stop paying annual premiums after five years, so long as the amount of money in his accumulation account met or exceeded the guaranteed cash value (the "GCV") of the policy plus the applicable surrender charge and any indebtedness. *Id.* at 9.[2] If the policy became "underfunded," meaning that the account balance failed to meet the GCV threshold, the policyholder would need to resume making premium payments in order to retain his benefits. A policyholder could also choose to continue paying premiums regularly even after the fifth year in order to benefit from the interest that would accrue on his increased accumulation account balance.

---

[1] In prior orders in this case, the Court stated that, "[t]he cost of insurance charge was based on Conseco's expectations as to its future mortality experience (in other words, the number of death claims it expects to have to pay out)." (*citing* Brady FAC ¶¶ 55-57.) In fact, as discussed below, the issue at the heart of this case is what the cost of insurance is actually based on, and what it may permissibly be based on.

[2] As regulators later found, this was in line with Lifetrend marketing materials used at the time of sale, which described the policies as having a "vanish" option. Hopkins Decl., Ex. 5, ¶ 4 (Regulatory Settlement). For example, one marketing brochure for Lifetrend 3 and 4 policies stated that, "Premiums are fixed and may be paid continuously, however, the insured has the option after the payment of 5 year's premiums of 'vanishing' or limiting premium payments, thereby creating a 'paid-up' policy based on current interest, mortality and expenses assumptions." *Id.;* see also Hopkins Decl., Ex. 3 (Conseco's Response to AG 2-1) ("[Conseco's predecessor's] marketing materials . . . addressed then current company practices: suspending [COIs and expense charges] in policy years 9 and beyond . . .")

2

For many years, Conseco charged COIs only for the first eight years a policy was in effect. Browne Decl. ¶ 6; Hopkins Decl., Ex. 3 (Conseco's "marketing materials . . . addressed then current company practices: suspending [COIs and expense charges] in policy years 9 and beyond . . ."). After the eighth year, the COI charge dropped to $0. *Id.* Because there were no cost of insurance deductions, the insureds' accumulation account values would continue to exceed the GCV. Therefore, due to the OPP provision, no premium payments were necessary. Plaintiff's theory in this case is that the COI charges assessed in the first eight years of the policies were sufficient to pay the anticipated real costs of insurance for the life of the policy. Pl.'s Mot. at 12.

### 2. The October 2008 Letter

Plaintiffs allege that, from the time they purchased their policies until 2008, Conseco sent yearly notices stating that the policies were adequately funded and that no additional monthly fees were owed. Brady FAC ¶¶ 71, 76-77. In October 2008, however, Conseco sent a letter (the "October 2008 Letter") to policyholders announcing that their policies had become underfunded. *See* October 2008 Letter to Hovden, Weisbrod Decl. Ex. 1, at 3. The letter informed policyholders that Conseco planned to begin collecting increased COI and expense charges, and stated that the charges had risen because Conseco's "experience factors" had changed since the policies were originally sold. *Id.* at 1. The letter did not explain what "experience factors" are. The letter did inform the affected policyholders that they had three options for making up the shortfalls in their accumulation accounts. First, a policyholder could make an up-front payment to make up the shortfall, then resume paying premiums to ensure that his policy remained in full force. *Id.* at 3. Alternatively, a policyholder could refrain from paying off the shortfall, in which case his policy would go into "Continuation of Insurance." *Id.* at 2-3. After entering Continuation of Insurance, the policyholder could either choose to do nothing and let his policy terminate when its balance became insufficient to cover monthly deductions, or could make flexible premium payments until the balance exceeded the cash value of the policy, in which case the policy would go back into full force and could be maintained with additional premiums in the future. *Id.*

3

### 3. The Regulatory Settlement

Several months after sending the October 2008 Letter, Conseco sent its policyholders a follow-up letter (the "December 2008 Letter") stating that they should disregard the October 2008 Letter because Conseco had begun working with state insurance regulators to review Conseco's actions. See December 2008 Letter to Brady, Scuglik Decl. Ex. 20. On May 28, 2010, Conseco reached a settlement with the state regulators. Pursuant to the settlement, Conseco is required to follow a specific set of procedures in administering the policies. Furthermore, Conseco Life agreed not to demand that policyholders pay one-time shortfall payments. Ex. 4, Regulatory Settlement Agreement ("RSA") at CLIC 07604-88. The Regulatory Settlement allowed Conseco to begin "phasing in" COI charges on September 1, 2010.

Plaintiffs allege that the terms of the Regulatory Settlement still allow Conseco to violate the policy agreement by charging increased expense charges and "radically increased" COI charges. Pl.'s Mot. at 4. As a result, plaintiffs sought certification to pursue a class action suit against Conseco. Plaintiffs contend that Conseco's policy changes amount to breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, and negligent misrepresentation.

On October 6, 2010, the Court certified a nationwide class pursuant to Fed. R. Civ. P. Rule 23(b)(2). *See* Dkt. 111. On December 20, 2011, in light of the Supreme Court's decision in *Wal-mart v. Dukes*, 131 S. Ct. 2541 (2011), the Court granted in part Conseco's motion to decertify the class. The Court decertified former policyholders from the class because the relief they sought was not incidental to declaratory or injunctive relief, as required by *Dukes*. Dec. 20, 2011 Order at 9, Dkt. 253.

### 4. Motion for Preliminary Injunction

On March 5, 2012, plaintiffs moved for a preliminary injunction to enjoin Conseco from continuing to deduct COI charges from the accumulation accounts of approximately 157 members of the class prior to the resolution of this case, which plaintiffs believe will occur near the end of 2013.[3] Specifically, plaintiffs seek to enjoin Conseco from imposing COI charges on (1) approximately 100

---

[3]Trial is currently set for March 25, 2013.

4

policyholders who are sixty years old or older and have accumulation account values that have been exhausted or will be exhausted by COI and expense charges before the end of 2013; and on (2) approximately 77 policyholders who are sixty years old or older and are currently being charged monthly cost of insurance charges in excess of $400.00. Twenty policyholders are in both groups. Plaintiffs argue that policyholders in the second subgroup are "effectively being coerced to surrender their policies to avoid the rapid loss of cash values and eventual lapse of their policies." Pl.'s Mot. at 5.

Plaintiffs offer support for the preliminary injunction via declarations from five of the 157 members for whom the injunction is sought.

### A. Leo Sroka

Leo Sroka is 91 years old, and purchased his Lifetrend 3 policy in 1993. Sroka Decl., ¶¶ 7, 11. His policy provides a death benefit of $500,000. *Id.* at ¶ 10. Plaintiffs' insurance expert Mark Browne analyzed the data applicable to Sroka's policy from Conseco's database, known as the CK-4 data. Browne Decl. ¶ 15. Sroka paid a total of $270,000 in premiums for the first six years after the inception of his policy, and then stopped paying premiums pursuant to the OPP Provision. Sroka Decl. ¶ 3; Browne Decl. ¶ 15. In the first eight years of the policy, Conseco deducted COI and expense charges totaling $265,000. Browne Decl. ¶ 15. After the eighth year, the COI charges dropped to $0. Browne Decl. ¶ 16. The charges remained $0 until October 2010. *Id.* Then, in October 2010, Conseco begain imposing COI charges of approximately $5,000 per month. *Id.* Conseco's deductions eventually exhausted Sroka's accumulation account. *Id.* Sroka received a letter on September 27, 2011 stating that he was required to pay $35,113.73 or his policy would lapse on November 28, 2011. Sroka Decl. ¶ 6, Ex. A. Sroka made the payment in order to avoid losing insurance coverage. *Id.* He then received a letter on January 17, 2012 informing him that his policy would lapse on February 21, 2012, unless he paid $26,562.04. *Id.* Sroka again made the payment. *Id.* Browne states that Conseco is now charging Sroka more than $7,500 per month with another increase looming, and that Sroka would need to pay a minimum of $129,000 per year to maintain his insurance coverage going forward. Browne Decl. ¶ 16.

1 Sroka testifies that he lives on a fixed income and cannot afford to continue to make the premium
2 payments, and is very worried that his policy will soon lapse because he cannot afford the payments.
3 Sroka Decl. ¶ 9. In a supplemental declaration, Sroka provides information regarding his total monthly
4 income, including his social security and pension, demonstrating that he cannot afford continued
5 payments. Sroka Supp. Decl. ¶¶ 3-6.

### B.     Myrna Noland

Myrna Noland is 72 years old, and purchased her Lifetrend 4 policy in 1995. Noland Decl. ¶¶ 2, 4. The policy has a death benefit of $169,065.[4] Skuglik Decl. ¶ 1(d). She paid a total of approximately $20,000 in premiums in the first five years, and then elected the OPP Provision and stopped making premium payments. Browne Decl. ¶ 18. Conseco deducted approximately $16,000 in COI and expense charges in the first eight years of the policy. *Id.* at ¶ 19. After the eighth year, the COI charge dropped to $0, and Conseco made no additional deductions for the next six years. *Id.* Beginning in 2010, Conseco began imposing COI charges of $185 per month, which then increased to $260 per month. Browne testifies that Noland will soon be charged $472 per month, and that her account will be depleted by next year. *Id.* She states that she cannot afford to continue to make the premium payments, and is very worried that her policy will lapse. *Id.* ¶ 7.

### C.     Cedric Brady

Cedric Brady, one of the named plaintiffs in this action, is 69 years old and purchased a Lifetrend 4 policy with a death benefit of $385,000 in 1987. Brady Decl. ¶ 2. He paid approximately $50,000 in premiums in the first six years after he purchased the policy. Browne Decl. ¶ 21. Conseco deducted approximately $20,000 in COI charges in the first eight years after he purchased his policy. *Id.* After the eighth year, the COI charge dropped to $0. Conseco began imposing COI charges in 2010. *Id.* His monthly COI charges are currently more than $400. *Id.* Brady states that he "understand[s] that

---

[4] Noland's declaration does not state the value of the death benefit of her policy. Conseco's Legal Interface Department manager, Frank Skuglik, provided a declaration with information about the affiants' policies.

6

1  once [his] accumulation account is depleted [he] will lose [his] insurance coverage unless [he] make[s]
2  additional payments." Brady Decl. ¶ 9. He states that he is very worried about losing the coverage, as
3  it was an important part of his financial planning. *Id.* at ¶ 10.

### D. John McNamara

John McNamara, another named plaintiff, is 61 years old and purchased a Lifetrend 4 policy with a death benefit of $1.5 million in 1991. McNamara Decl. ¶¶ 2, 11, 12. He paid premiums for the first six years after purchasing his policy. Browne Decl. ¶ 23. Conseco deducted COI charges for the first eight years, and then the cost-of-insurance charge dropped to $0. *Id.* Conseco is now deducting more than $1,000 per month in COI charges from McNamara's account. *Id.*

### E. Clark Fowler

Clark Fowler is 86 years old and purchased a Lifetrend 4 policy in 1991. Fowler Decl. ¶ 2. He paid approximately $30,000 in premiums during the first five years of the policy and then stopped making payments. Browne Decl. ¶ 20. Conseco deducted about $25,000 in COI and expense charges in the first eight years after he purchased the policy; the COI charge then dropped to $0. *Id.* Fowler's current monthly charges are more than $400 per month. *Id.* Fowler testifies that he lives on a fixed income, which consists of $1,225.80 per month in social security benefits. Fowler Decl. ¶ 3. Fowler's wife also owns a Lifetrend policy, and is a member of the class. *Id.* at ¶ 3. He testifies that he is very concerned that his policy will lapse soon because he cannot afford the payments, and that he and his wife have considered surrendering her Lifetrend policy for the surrender value in order to be able to afford the cost of insurance charges. *Id.* at ¶ 9.

Sroka, Noland, and Fowler fall in the first subgroup – their accumulation accounts will be depleted by the end of 2013 (Sroka's account is already depleted). Brady and McNamara fall in the second subgroup – they are over 60 years of age and being charged more than $400 a month in COI charges.

Conseco filed an opposition to plaintiffs' motion for preliminary injunction on March 23, 2012. Plaintiffs separately filed a motion to strike the declaration of Keith Turner in support of Conseco's

opposition. A hearing was held on both matters on April 13, 2012.

**LEGAL STANDARD**

A preliminary injunction is appropriate to "preserve the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court for the Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988). Preliminary injunctive relief requires establishment of four factors by a preponderance of the evidence: (I) likelihood of success on the merits; (ii) likelihood the moving party will suffer irreparable harm absent injunctive relief; (iii) that the balance of equities tips in the moving parties' favor; and (iv) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). The Court in *Winter* clarified that plaintiffs must establish that "irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Alliance For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1311 (9th Cir. 2011).

**DISCUSSION**

Plaintiffs argue that an injunction is necessary to prevent members from losing their insurance or being induced to surrender their policies prior to a trial on the merits. Conseco argues that plaintiffs have failed to meet any of the four prongs necessary for a preliminary injunction.

**1.      Likelihood of Success on the Merits**

Plaintiffs argue that Conseco's new COI charges are in breach of contract: their standardized insurance policies with Conseco. Plaintiffs essentially raise two theories of breach. First, they argue that the policies tie the COI charges to mortality rates, that mortality rates have decreased, and that therefore, Conseco is forbidden from raising the COI charges.[5] Second, plaintiffs argue that the COI charges are an effort on Conseco's part to "pass off" investment losses to its insureds in violation of the policy's Non-Participation Provision, which states that "[t]he Company will not recoup prior losses, if any, by means of premium or factor changes." Plaintiffs buttress the latter theory with their argument

---

[5]Conseco does not dispute that mortality rates for at least the majority of the policyholders have decreased.

8

that the COI charges assessed by Conseco in the first eight years of the policy before ceasing the charges were sufficient to pay the anticipated real costs for insurance for the life of the policy. Pl.'s Mot. at 12. Because the policies were effectively "paid off," the recently implemented COI charges evidence an attempt to recoup recent investment losses.[6]

Conseco responds that nothing in the policy language limits its ability to increase COI charges besides the guaranteed maximum rate table, the requirement that it provide written notice, and, if necessary, approval by regulators.[7] It disagrees that mortality rates control the COI charges. Conseco also disputes that it is attempting to pass off historical losses, and argues that it is only "resuming" charges in an effort to produce a prospective (post-2008) break-even result. Def.'s Opp. at 6; Turner Decl. ¶ 13.[8] Conseco argues that it "suspended" COI charges after eight years of payment at its discretion. *Id.*; Turner Decl. ¶ 7. As a policy matter, Conseco argues that to bar it from increasing its charges now "would mean that an insurance company would never be motivated to voluntarily charge less than the permitted rates set forth in the policy." *Id.* at 12. Conseco also raises a third argument: that the regulators' approval of the fees is determinative, pursuant to the filed rate doctrine.

The parties' arguments will be addressed in turn.

### A.     COIs and Mortality Rates

The central dispute between the parties is whether the contract requires that changes to the COI charges be tied to changes in mortality rates. In other words, may Conseco increase COI rates in the face of declining mortality rates? Plaintiffs recognize that the policies "do not explicitly define the basis

---

[6] Plaintiffs add a third theory in their Reply: that Conseco is attempting to circumvent the $5 cap on expense charges by instead charging expenses through increased COI charges. Pls.' Reply at 2. Because the Court finds in favor of plaintiffs on other grounds, it does not address that theory here.

[7] Plaintiffs do not argue that Conseco is attempting to charge amounts greater than the maximum allowed by the "Guaranteed Maximum Monthly Mortality Charge" table. See *infra*.

[8] Plaintiffs have moved to strike the Declaration of Keith Turner. Dkt. 305. Plaintiffs argue that his declaration is not based on personal knowledge, and that it is "conclusory with no supporting facts." *Id.* In opposition, Conseco provided a Supplement Declaration, setting forth Turner's basis of knowledge for the facts set forth in his declaration. To the extent the Court relies on Turner's declaration, he has provided sufficient basis of knowledge under Fed. R. Civ. P. 56(e). Plaintiffs' motion to strike is DENIED.

for determining the monthly cost of insurance rates."[9] Pl.'s Mot. at 11. Plaintiffs argue that nonetheless, changes to Conseco's COI charges are contractually tethered to changes in mortality rates for three reasons. First, mortality rates "are the only reference provided for calculation of cost of insurance under the policies." Pl.s' Mot. at 11. They point out that the COI rate table included in the policy is entitled "Guaranteed Maximum *Monthly Mortality Charges*: Table of (Monthly) Cost of Insurance Rates." *Id.* (citing Brady Policy at 10) (emphasis plaintiffs'). Second, they argue that interpreting the COI rates as based upon mortality comports with the expectations of the reasonable insured. *Id.* Third, they point to deposition testimony from Conseco officials which suggests Conseco acknowledges that cost of insurance rates are connected to mortality rates. Pl.'s Mot. at 12; *citing, e.g.* Turner Dep. 26:19-24 (Conseco's Senior Managing Actuary stating that "[I]n some circles, the idea of mortality rates and cost of insurance rates are one and the same.") Conseco argues that the only limiting principles on its ability to charge COI rates is a table setting forth the maximum rates, the notice requirement, and approval of regulators when necessary. Def.'s Opp. at 10 (table reproduced below).

Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 647 (2003). When interpreting an insurance policy, courts must "consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation." *London Market Insurers v. Superior Court*, 146 Cal. App. 4th 648, 656 (Cal. App. 2nd Dist. 2007); *see* Cal. Civ. Code § 1641.[10] The mutual intention of the

---

[9]Recently, Judge Matz of the Central District of California certified a class and issued a preliminary injunction in a similar suit brought against Conseco due to Conseco's recently implemented COI charges in a different set of policies. *See Yue v. Conseco Life,* CV 11-9506 AHM (C.D. Cal. Apr. 2, 2012). Those policies explicitly stated "Current monthly cost of insurance rates will be determined by the Company based on its expectation as to future mortality experience." Judge Matz focused on that language in determining that plaintiffs were likely to prevail on the merits of their claim that the newly implemented COI charges, in the face of decreased mortality rates, were in breach of contract. Because the policies before this Court do not contain that explicit language, the merits portion of Judge Matz's opinion provides little guidance here. However, as discussed *infra*, the Court agrees with Judge Matz's reasoning as to irreparable harm for the first of plaintiffs' two injunction-seeking subgroups.

[10]Conseco points out that the 157 policies at issue here were signed in 23 states, not just California. It nonetheless assumes *arguendo* that the application of California contract interpretation law applies. In any event, a district court sitting in diversity applies the forum state's contractual interpretation rules. *See Dean v. United of Omaha Life Ins. Co.*, 2007 7079558, *3 (N.D. Cal. Aug. 20, 2007) (*citing Schwarzer, et al., California Practice Guide, Federal Civil Procedure Before Trial* ¶ 1:48 (2006)). The pre-consolidated cases were all brought on the basis of diversity.

10

contracting parties at the time of contract formation governs interpretation. Cal. Civ. Code § 1636. Such intent is to be inferred, if possible, solely from the written provisions of the contract. *Adler v. Western Home Ins. Co.*, 878 F. Supp. 1329, 1332 (C.D. Cal. 1995) (*citing AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990)). That language is to be given its "plain meaning or the meaning a layperson would ordinarily attach to it." *Waller v. Truck Ins. Exchange, Inc.* 11 Cal. 4th 1, 18 (1995). If contractual language is clear and explicit, it governs. Cal. Civ. Code. § 1638. However, if the policy language is in any sense unclear or ambiguous, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it. Cal Civ.Code § 1649. If application of this rule does not eliminate the ambiguity, the ambiguous language is construed against the party who caused the uncertainty to exist – in the insurance context, generally the insurer. *Dean v. United of Omaha Life Ins. Co.*, 2007 WL 7079558, at *3 (C.D.Cal. Aug. 27, 2007) (*citing AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990)).

The Brady Policy, which the parties agree is representative of the class' policies, contains the following language with respect to COI charges:

**MONTHLY COST OF INSURANCE RATES**

The following table shows the maximum rates for the monthly cost of insurance per each $1,000 of net sum insured. The Company reserves the right to adjust the monthly cost of insurance being charged on any policy anniversary by increasing or decreasing the rates for the monthly cost of insurance under this plan by giving written notice to all insureds not less than ninety days prior to the date of such change. Any such change shall be subject to approval by the insurance regulatory authority of the state of residence of the owner if required. In no event can the rates for the monthly cost of insurance be increased to an amount greater than the rates for the attained age of the insured specified in this table. The monthly cost of insurance rates, and any change in the monthly cost of insurance as provided herein, are and will be determined on a uniform basis for insureds of the same age, sex and classification for all policies issued with like benefits and provisions. The premium required for any supplemental benefits provided by riders that may be included in this policy are not included in the monthly cost of insurance rates and will be shown on a Policy Data Page. The rates for any supplemental benefits will not be changed by the Company. A change in the monthly cost of insurance will not alter the guaranteed values shown in the Table of Guaranteed Policy Values on a Policy Data Page.

An excerpted portion of the attached table contains the following:

11

**GUARANTEED MAXIMUM MONTHLY MORTALITY CHARGE**
**TABLE OF (MONTHLY) COST OF INSURANCE RATES**

| | Rate per 1,000 | | | Rate per 1,000 | |
|---|---|---|---|---|---|
| **Attained Age** | **Male** | **Female** | **Attained Age** | **Male** | **Female** |
| 0 | .22 | .16 | 63 | 1.86 | 1.06 |
| 1 | .09 | .07 | . . . | . . . | . . . |
| 2 | .08 | .07 | 70 | 3.51 | 1.95 |
| 3 | .08 | .07 | 71 | 3.87 | 2.15 |
| . . . | . . . | . . . | . . . | . . . | . . . |
| 40 | .26 | .21 | 80 | 9.01 | 6.00 |
| 41 | .29 | .23 | 81 | 9.86 | 6.73 |
| 42 | .31 | .25 | 82 | 10.82 | 7.58 |
| 43 | .34 | .27 | 83 | 11.90 | 8.55 |
| . . . | . . . | . . . | . . . | . . . | . . . |
| 60 | 1.41 | .82 | 90 | 21.38 | 18.31 |
| 61 | 1.54 | .88 | 91 | 23.05 | 20.25 |
| 62 | 1.69 | .96 | 99 | 83.33 | 83.33 |

As the initial step of contract interpretation, the Court finds that the term "cost of insurance" is ambiguous. The policy nowhere explicitly defines the term; it merely sets a few parameters as to changes, maximums, and uniformity across age, sex and "classification." The policy elsewhere describes "expense charges." Brady Policy at 5. As another court noted when also finding ambiguous the term "cost of insurance" in a substantially similar policy, "[c]learly, the 'cost of insurance charge' is not the amount charged for the insurance product, because the Policy also states that the insured will pay separate expense charges." *Dean v. United of Omaha Life Insurance*, 2007 WL 7079558, *4 (C.D. Cal. 2007) (King, J.). In *Dean*, Judge King found the term "cost of insurance" ambiguous despite the clarifying language that the COI charges are "based on the Insured's issue age, sex, rate and risk classes,

1 the current specified amount, and the length of time the policy has been in force." *Id.*[11] The policies
2 at issue here do not contain even that clarifying language, rendering the term more ambiguous than it
3 appeared in *Dean*. *Id.*

4       Next, "the whole of a contract is to be taken together, so as to give effect to every part, if
5 reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. The table
6 that sets forth the COI charges – the table that is subheaded "Cost of Insurance Rates" – is entitled
7 "Guaranteed Maximum Monthly Mortality Charge." By its own terms, the contract uses
8 interchangeably "cost of insurance rates" and "mortality charge." This indicates that Conseco
9 considered the terms at least connected, if not interchangeable. Moreover, the only indication given in
10 the contract as to the basis of the COI charges is that they "will be determined on a uniform basis for
11 insureds of the same age, sex and classification for all policies issued with like benefits and provisions."
12 Because age and sex are the guiding factors in the lifespan of a person, a layperson would ordinarily
13 attach the rates to mortality. *See Dean*, 2007 WL 7079558, at *6-7. The contract terms support
14 plaintiffs' interpretation.

15       The remaining ambiguity in the term "is resolved by interpreting the ambiguous provisions in
16 the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of
17 formation." *AIU*, 51 Cal. 3d at 822 (citing Cal. Civ. Code § 1649). There is no extrinsic evidence
18 contemporaneous to formation that might pertain to the sense Conseco believed plaintiffs to have
19 understood the term. Plaintiffs point to later-produced evidence that suggests Conseco recognized the
20 tie between COI charges and mortality rates. Keith Turner, a Senior Managing Actuary at Conseco,
21 stated at deposition that "[I]n some circles the idea of mortality rates and cost of insurance rates are one
22 and the same, even though cost of insurance rates could be derived or made up of other things other than
23 just pure mortality." Turner Dep. 36:18-24, Hopkins Decl., Ex. 2. While this statement does not fully
24 support plaintiffs' position, it does suggest that Conseco recognizes mortality as one factor upon which
25 COI charges are based. A second piece of evidence plaintiffs provide is a spreadsheet entitled

---

27 [11]The plaintiffs in *Dean* argued that the COI charges had to be calculated exclusively on the factors listed, and could not include considerations of expenses and profits. Judge King denied
28 defendant insurance company's motion for summary judgment on the issue. *Dean*, 2007 WL 7079558 at *7.

1 "Comparison of Sources of Profits with NGE Changes," produced by Conseco in discovery, which 2 simply refers to the COI charge as the "mortality charge." Hopkins Decl., Ex. 7. However, neither 3 piece of evidence directly relates to how Conseco believed its insured understood COI charges at the 4 time of formation.

5 The Court therefore turns to the final step in interpretation: "In cases of uncertainty not removed 6 by the preceding rules, the language of a contract should be interpreted most strongly against the party 7 who caused the uncertainty to exist." Cal Civ. Code § 1654; *see also Dean*, 2007 WL 7079558 at \*7 8 ("With nothing further to support a finding in favor of [the insurer] on this point, we need not consider 9 the evidence that might support Dean here, because we resolve the ambiguity against the insurer.") 10 Resolving the ambiguity against the insurer in this case means finding that changes to the COI rates are 11 tied to changes in mortality rates. The contract, taken as a whole, supports this interpretation. The 12 Court agrees with plaintiffs that a reasonable insured would not read the terms and believe that Conseco 13 could amend the COI charges at its discretion, regardless of changes to mortality rates. Resolving the 14 ambiguity against the insurer seals the question. The Court finds that plaintiffs have established by a 15 preponderance of the evidence that they are likely to succeed on the merits that the contract considers 16 that changes to COI charges will be directly tied to changes in mortality rates.

17 Having found in plaintiffs favor on that issue, it follows that plaintiffs are likely to succeed on 18 the merits that Conseco is in breach of contract. Conseco has vastly increased the COI rates - from $0 19 to hundreds or even thousands per month - in the face of declining mortality rates. Because the Court 20 finds that changes to the COI rates are contractually bound to changes in mortality rates, raising the 21 rates represents a breach of contract. The Court finds that plaintiffs have established by a preponderance 22 of the evidence that they are likely to succeed on the merits on this issue. Because the Court so finds, 23 it need not address plaintiff's second theory of breach: that the current COI charges are in violation of 24 the Non-Participation Provision's prohibition on recouping prior losses.[12]

25

---

26 [12]While the Court does not fully address the issue, the Court notes that the high COI charges in the first eight years of the policies, followed by a cessation of those charges, strongly implies that the 27 policies were "paid up" by those COI charges. *See* Browne Decl. ¶ 16 (in first eight years of Sroka's $500,000 policy, Conseco deducted $265,000); Brown Decl. ¶ 18 (in first eight years of Noland's 28 policy, Conseco deducted $16,000). The policy marketing materials support this assumption. Hopkins

14

**B.     The Filed Rate Doctrine**

Conseco argues that plaintiffs are unlikely to succeed on the merits because their challenge to the regulator-approved fees is barred by the filed rate doctrine. Def.'s Opp. at 15. The filed rate doctrine provides that "rates duly adopted by a regulatory agency are not subject to collateral attack in court." *MacKay v. Superior Court*, 188 Cal. App. 4th 1427, 1448, (2010). Conseco points to the Regulatory Settlement Agreement, which was "duly adopted" by 45 insurance regulators. Conseco also states, however, that the Court need not reach the issue because it intends to present it fully at summary judgment.

Plaintiffs argue that the filed rate doctrine is inapplicable for a number of reasons. First, plaintiffs state that the Ninth Circuit has held that the doctrine has no application in a case involving rates approved by *state* regulators, citing *E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1033-34 (9th Cir. 2007). ("The filed rate doctrine . . . bar[s] challenges under state law and federal antitrust laws to rates set by *federal agencies*"); *see also Miletak v. Allstate Ins. Co.*, 2010 WL 809579, at *4 (N.D. Cal. Mar. 5, 2010) ("The doctrine does not directly apply to a situation, as here, involving potential interference with rates set by a state agency rather than a federal agency."). Second, plaintiffs argue that to the extent Conseco attempts to analogize the filed rate doctrine to California's "prior approval system" (which requires prior approval of insurance rates), that argument has been rejected. *See Fogel v. Farmers Group, Inc.*, 160 Cal. App. 4th 1403, 1418 (2008). Third, plaintiffs argue that the filed rate doctrine only applies to specific challenges to an approved rate, citing *MacKay v. Superior Court*, 188 Cal. App. 4th 1427, 1449-50 (2010). They contend that this is not a challenge to an

---

Decl., Ex. 5, ¶ 4 (Regulatory Settlement) (stating policies were sold with the use of "certain marketing materials, presentations, and policy illustrations" that contained references to "vanishing premiums" and "paid-up policies."). It is further buttressed by Conseco's response to a policyholder inquiring whether Conseco would resume COI charges after ceasing them: "According to your policy contract you will not incur any further costs to your policy." Hopkins Decl., Ex. 3 (Nov. 14, 2002 Letter).

That the policies were paid up in turn suggests the resumption of charges is an effort to recoup losses. Conseco's statements to regulators further support this interpretation. *See* Hopkins Decl., Ex. 3, at CLIC 32106-107 (Response to AG 2-1) (the "decline in investment rates and credited rates has led to the inability of [Conseco] to earn the overall base pricing spread [and] accumulation accounts that have not grown to the levels and at the rate originally anticipated in pricing due to the lower interest rate environment."). While Conseco provides a declaration from an actuary that Conseco ceased charging COIs as "a matter of discretion," and is simply resuming them to produce a *future* break-even result, the evidence suggests that Conseco may be attempting to recoup prior losses. Turner Decl., ¶¶ 7, 13.

15

approved rate; it is a challenge the cost of insurance charges Conseco is imposing in breach of their contracts. Pl.'s Reply at 8. Finally, plaintiffs contend that the filed rate doctrine is inapplicable here because it is based on the premise that the insurance commission regulates rates only "after an extensive hearing process in which consumers and interested parties are encouraged to participate," and here, consumers were never given the opportunity to participate and challenge the rates. *Id.* (*citing Walker v. Allstate Indem. Co.*, 77 Cal. App. 4th, 750, 754-46 (2000)).

At this stage, the Court finds it likely that plaintiffs will succeed on the filed rate doctrine dispute. Conseco gives its filed rate argument only cursory attention in its brief, and has not had the opportunity to respond to plaintiffs' reply arguments. More importantly, Conseco does not address relevant language from the Regulatory Settlement itself, which states that the agreement does not alter the contractual terms, and that "this Agreement nor any related negotiations, statements or court proceedings shall be offered by the Conseco Companies or the Signatory Regulators as evidence in any regulatory or judicial proceeding." Regulatory Settlement ¶¶ 122, 132. The Court has already found that "plaintiffs credibly allege here that benefits provided under the regulatory settlement are insufficient to protect their contractual rights." Oct. 10, 2010 Class Certification Order, at 17, n. 11. The Court agrees with plaintiffs that they are likely to show the filed rate doctrine is inapplicable. The Court will consider the merits of Conseco's argument on summary judgment if argued.

In sum, the Court finds that plaintiffs have established by a preponderance of the evidence that they are likely to succeed on the merits of their claims for breach of contract.

**2.    Irreparable Harm**

Plaintiffs must also establish a likelihood that they will suffer irreparable harm absent injunctive relief. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008). Plaintiffs seek to enjoin the imposition of COI charges on two subgroups of classmembers: (1) approximately 100 policyholders who are sixty years old or older and have accumulation account values that have been exhausted or will be exhausted by cost of insurance and expense charges before the end of 2013, and (2) approximately 77 policyholders who are sixty years old or older and are currently being charged monthly COI charges in excess of $400.00. Twenty policyholders are in both groups. Plaintiffs argue that policyholders in

16

the second group are "effectively being coerced to surrender their policies to avoid the rapid loss of cash values and eventual lapse of their policies." Pl.'s Mot. at 5.

For both groups, plaintiffs focus on the anxiety and loss of peace of mind the subgroups face in losing their life insurance, and argue that they cannot be compensated for that harm by money damages after the fact. Pls.' Reply at 9 (*citing Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1268 (W.D. Mich. 1990) (finding increased costs in health insurance for retirees constituted irreparable harm)). Conseco focuses on the beneficiaries, and argues that since life insurance simply awards beneficiaries a sum of money, failure to receive that money due to a policy lapse is remediable in a suit for damages. Def.'s Opp. at 17 (*citing Breen v. Mineta*, 2005 WL 3276163 (D.D.C. Sept. 30, 2005) (denying preliminary injunction and finding that lost jobs, lost retirement contributions or increased costs of health or life insurance to be compensable by money damages and therefore not irreparable harm).

In a recent order granting a preliminary injunction to other plaintiffs seeking to prevent Conseco from imposing increased COI charges on a similar set of policies, Judge Matz addressed the precise question at issue -- that is, whether increased costs of life insurance constitute irreparable harm. *Yue v. Conseco*, CV 11-9506 AHM, *22 (April 2, 2012). Judge Matz stated**:**

> The Court finds that without a preliminary injunction, policyholders are likely to suffer imminent irreparable harm. It is common knowledge that people purchase insurance policies for "security" and "peace of mind." *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 642 (1975) (comparing social security benefits to insurance because they provide "security" and "peace of mind"). In the context of life insurance, the "security" being purchased is the knowledge that the policies' designated beneficiaries will be left with some degree of financial support when the insured passes away. When policyholders face large, unanticipated increases in charges, the "peace of mind" they paid for is irreparably lost – instead, they are left with stress, anxiety and uncertainty regarding the state of their life insurance.

*Id.*

With respect to the first subgroup – those whose accumulation account values will be exhausted before the end of trial – the Court agrees with this analysis, and adopts it here. For this subgroup, the fact that the policyholders will lose their insurance without substantial payments constitutes irreparable harm. This is particularly true for those plaintiffs who cannot afford the substantially increased COI charges. For example, plaintiff Myrna Noland will soon be charged $472 per month, and her account

17

1 will be depleted by the end of next year. Browne Decl. ¶ 19. According to her supplemental
2 declaration, she is unable to afford these payments. Noland Decl. ¶ 4. She, like others in the subgroup,
3 will lose the peace of mind that comes with life insurance. That loss cannot be remedied by money
4 damages after the fact.

5      Conseco argues that plaintiffs have not provided evidence that all of the one hundred members
6 in the first subgroup will find the payments unaffordable, or otherwise provide evidence that all of them
7 will face irreparable harm. Def.'s Opp. at 19. That is not necessary. Plaintiffs have provided three
8 declarations from the first subgroup, all of whom have stated that they cannot afford the payments now.
9 Noland Supp. Decl. ¶ 3; Sroka Decl. ¶ 9; Fowler Decl. ¶ 7. Between this evidence and plaintiffs
10 targeted subgroup, they have sufficiently demonstrated the affiants are representative of the subgroup.
11 *See LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 57 (2nd Cir. 2004) (affirming district
12 court's acceptance of six affidavits on behalf of six hundred classmembers). The Court does not find
13 it necessary that the plaintiffs declare that all one hundred are unable to afford the increased payments.
14 Even if some could technically afford the payments, many may be unwilling to do so for fear of
15 diverting funds from other, more pressing expenses. They will still lose their life insurance before trial.
16 Indeed, Judge Matz issued a preliminary injunction covering the entire class - not, as here, a small,
17 targeted group of policyholders who will face complete depletion of their accounts before the end of
18 trial.

19      For the second subgroup – those who are facing COI charges in excess of $400 per month but
20 whose accounts will not be depleted before trial – the Court finds that plaintiffs have not established a
21 likelihood of irreparable harm. This group will not be required to make additional payments in order
22 to keep their insurance. That they face a difficult decision as to whether to surrender now and retrieve
23 the guaranteed cash value of their accumulation accounts or continue to incur high COI charges is a type
24 of harm, but it does not rise to the level of those who will lose their insurance without affirmative
25 payment. The members in this group, like Brady and McNamara, still have a choice to remain insured;
26 and, if they so choose and plaintiffs prevail at trial, they will likely receive monetary damages that can
27 remedy the harm. Nobody in the second subgroup will lose their insurance due to inability to pay, nor
28 have to divert funds from other of life's necessities to keep their insurance. *See Los Angeles Mem'l*

1 *Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("It is well established 2 . . . that such monetary injury is not normally considered irreparable."). The Court therefore finds that 3 preliminary injunctive relief is inappropriate for this subgroup.

4 The Court finds that plaintiffs whose accumulation accounts will be depleted by the new COI 5 charges prior to the end of 2013 are likely to suffer irreparable harm in the absence of an injunction. 6 Plaintiffs not in that subgroup are not likely to face irreparable harm.

### 3. Balance of Hardships

Before issuing a preliminary injunction, the Court has a duty "to balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1138 (9th Cir. 2009).

The Court finds that the balance of hardships falls in favor of the first subgroup seeking an injunction. They are the most vulnerable to the rapidly increasing COI charges, as they will lose their life insurance before the end of next year in the absence of an injunction. They face lost peace of mind, one of the primary reasons they purchased life insurance in the first place. Conseco argues that if the injunction is issued, Conseco will be required "to insure over a hundred individuals for free between now and trial, which is more than one year away as a result of Plaintiffs' efforts to postpone trial." Conseco also argues that to the extent one or more of the insureds passes away in that time period, "presumably Plaintiffs will demand that Conseco Life pay the death benefit, adding to Conseco Life's expense of providing free pre-trial insurance." Def.'s Opp. at 24. Conseco provides no evidence that this would cause it hardship, other than some monetary loss and the fact that if it wins at trial, "it will need to attempt to collect the unpaid fees, from individuals who Plaintiffs' counsel claim are of limited means." Def.'s Opp. at 24. However, the lapsing of life insurance coverage - and the concomitant anxiety and loss of peace of mind - outweighs the budgetary considerations of Conseco. *See Yue v. Conseco*, CV 11-9506 AHM (C.D.Cal. Apr. 2, 2012) (finding balance of hardships falls in favor of the class where class faced higher COI rates on Conseco's policies)*; Lopez v. Heckler*, 713 F.2d 1432, 1436 (balance of hardships "strongly favors plaintiffs" because loss of benefits was "far more compelling than possibility of some administrative inconvenience of monetary loss" to defendant).

**4.     Public Interest**

"When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction." *Yue v. Conseco*, 11-9506 at *24 (*citing Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009)). As Judge Matz found, this case revolves around a contractual dispute between private parties, and thus its effect on the public interest is minimal. *Id.* That is particularly true here, where the injunction is narrowly limited to approximately 100 class members.

Nonetheless, "courts have recognized that the public has an interest in regulating insurance companies and enforcing contractual obligations." *Id.* (*citing Egan V. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 820 (1979) ("The insurers' obligations are rooted in their status as purveyors of a vital service labeled quasi-public in nature.")). To the extent the public interest is implicated here, it falls in favor of plaintiffs. *See Green v. State Farm Fire & Casualty Co.*, 667 F.2d 22, 25 (9th Cir. 1982) (public has an interest in "motivating insurers to deal fairly.") As there are other Conseco policies with substantially similar language, the public has an interest in seeing that Conseco's obligations are enforced. *See Yue*, CV 11-9506, at *24.

## CONCLUSION

Plaintiffs have established the four prongs required by *Winter* for entitlement to preliminary injunctive relief with respect to those classmembers who face depletion of their accumulation accounts before the end of 2013. The Court GRANTS plaintiffs' motion for a preliminary injunction with respect to those members of the class. The Court DENIES plaintiffs' motion for a preliminary injunction with respect to the rest of the class. Conseco is hereby ENJOINED from deducting cost of insurance charges from the accumulation accounts of the classmembers identified in exhibit E to the Browne Declaration.

**IT IS SO ORDERED.**

Dated: July 17, 2012

SUSAN ILLSTON
United States District Judge