IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CONSECO LIFE INSURANCE CO. LIFE TREND INSURANCE MARKETING AND SALES PRACTICE LITIGATION / | No. C 10-md-02124 SI<br><br>**ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| This document relates to:<br>WILLLIAM JEFFREY BURNETT and JOE H. CAMP,<br>   Plaintiffs,<br>   v.<br>CONSECO LIFE INSURANCE COMPANY, CNO FINANCIAL GROUP, INC., CDOC, INC. and CNO SERVICES, LLC,<br>   Defendants. / | Individual Case<br>No. C 12-5906 SI |

Defendants Conseco Life, CNO Financial Group, Inc., CDOC, Inc.,and CNO Services, LLC (collectively "Conseco") have moved dismiss the complaint in this putative class action for lack of personal jurisdiction and for failure to state a claim. Plaintiffs William Burnett and Joe Camp have filed an opposition, to which Conseco has replied. Pursuant to Civil Local Rule 7-1(b), the Court determines that this matter is appropriate for resolution without oral argument. Having carefully considered the parties' arguments, the Court GRANTS IN PART and DENIES IN PART defendants' motion to dismiss, WITH LEAVE TO AMEND, for the reasons set forth below.

**BACKGROUND**

This is a multi-district ligation involving Conseco's administration of "LifeTrend 3" and "LifeTrend 4" life insurance policies. Plaintiffs in this action, former policy holders William Burnett

and Joe Camp, allege that Conseco breached the insurance policies by announcing and implementing increases in premiums, cost-of-insurance deductions, and expense charges. They seek declaratory relief and compensatory damages.

The parties and the Court are quite familiar with facts and allegations in this litigation. *See In re Conseco Life Insurance Company Life Trend Insurance Marketing and Sales Practices Litigation*, Case No. 3:10-md-02124-SI (N.D. Cal.) ("MDL"). Burnett and Camp were members of the class certified under Fed. R. Civ. P. 23(b)(2) in the first action filed in the MDL, *Brady, et al. v. Conseco, Inc., et al.*, 3:08-cv-05746-SI (N.D. Cal.) ("*Brady* action"), until December 20, 2011, when the Court redefined the class in light of the Supreme Court's ruling in *Walmart v. Dukes*, 131 S.Ct. 2541 (2011). The Court held that former policyholders, such as the Burnett plaintiffs, could no longer be included in the class because the monetary relief they sought was not incidental to declaratory judgment of injunctive relief, and was therefore barred by *Dukes*. *See* MDL Dkt. 253.

Having been excluded from the *Brady* action, on October 5, 2012, Burnett and Camp filed this action in the Central District of California. The complaint seeks class certification under Rule 23(b)(3) or alternatively under 23(c)(4). On November 9, 2012, the MDL Panel transferred the Burnett/Camp action to this Court. As in the other cases in this MDL, the Burnett plaintiffs named Conseco Life as a defendant. They also have named CNO Financial Group, Inc. ("CNO"), CDOC, Inc. ("CDOC") and CNO Services, LLC ("CNO Services") as defendants. CNO and CDOC are parent entities of Conseco Life. Compl. ¶ 19-20. CNO Services is a related entity to Conseco Life and a subsidiary of CNO and CDOC. *Id.* ¶ 21. Plaintiffs allege that the Court has personal jurisdiction over all defendants because of defendants' specific contacts with California and because CNO, CDOC and CNO Services "are alter egos of Conseco Life." *Id.* ¶ 12.

The policies were issued in the 1980s and 1990s by Massachusetts General Life Insurance Company and Philadelphia Life Insurance Company, and are now administered by Conseco. Each policy provided investment income to the insured during his or her lifetime as well as a death benefit to be paid upon the death of the insured. The policies provided for a stated annual premium to be paid by the policyholder. Conseco deposited the policyholder's premium into an investment "accumulation account," which would accrue a minimum guaranteed interest rate (either 3.5% or 4.5% depending on

1 the kind of policy). The policy permitted Conseco to deduct a monthly "cost of insurance charge"
2 ("COI charge") and a monthly "expense charge" from the accumulation accounts. Policyholders were
3 permitted to take out loans against the balance of their accumulation accounts. A policyholder could
4 choose at any time to surrender his policy and receive the balance of the accumulation account, minus
5 a set "surrender charge." The combined effect of the above provisions was that the balance of a
6 policyholder's accumulation account would change over time as a result of any loans taken out, monthly
7 deductions, and the accumulation of interest at the guaranteed rate.

8 The policies also contained an Optional Premium Payment Provision ("OPP"), which provided
9 that the policyholder could choose to reduce or stop paying annual premiums after five years. This so-
10 called "vanishing premium" typically required large initial annual premiums. Each policy contained
11 a "Guaranteed Cash Value" table ("GCV table") that listed the minimum amount that Conseco promised
12 to pay the policyholder upon surrender of the policy. The amounts listed in the GCV Table depended
13 on the number of years for which the policy was in force. In order to take advantage of the OPP
14 provision and stop paying annual premiums, the policyholder's accumulation account value had to
15 exceed the GCV plus the applicable surrender charge and any indebtedness. If a policy became
16 "underfunded," meaning that the accumulation account balance fell below the GCV threshold, then
17 Conseco was authorized to resume charging premiums. Upon death, a policyholder's beneficiary was
18 entitled to the greater of (1) the "sum insured," as defined in a policy schedule, or (2) the amount in the
19 accumulation account, multiplied by a factor that corresponded to the insured's age at death, less any
20 indebtedness and unpaid premiums.

21 Plaintiff Camp purchased a LifeTrend 4 policy in 1993, and elected the OPP provision in 1998.
22 Compl. ¶ 110, 112. Plaintiff Burnett purchased three Life Trend Policies – two in 1990 and one in 1993.
23 *Id.* ¶ 119-120, 122. Burnett elected the OPP provision for the first two policies in 1997, and the third
24 in 1999. *Id.* ¶ 121, 123. They allege that by 2008, LifeTrend policyholders were becoming elderly and
25 dying in increasing numbers, with the result that the Conseco defendants were obliged to pay death
26 benefits in increasing numbers. *Id.* ¶ 2. At the same time, revenue from premiums on the policies had
27 shrunk because large numbers of policyholders had elected the OPP provision, thereby leaving fewer
28 policyholders to pay new premiums for their insurance coverage. *Id.* Thus, plaintiffs allege that in

1 October 2008, to stop the financial bleeding, Conseco sent a letter to nearly all LifeTrend policyholders
2 outlining increases in premiums, cost-of-insurance deductions and expense charges that the policy-
3 holders would be required to pay if they wanted to maintain their coverage going forward.

4 The October 2008 letter told Camp, Burnett and other policyholders that their policies had
5 become underfunded and that they owed and would continue to owe substantial premium amounts. In
6 addition to the annual premium payments that would be required in the future, Conseco announced that
7 it would require "shortfall payments," equal to several years' worth of annual premiums. According
8 to Conseco, those annual premiums should have been paid by policyholders in prior years but had not
9 been charged previously due to an alleged "administrative error." *Id.* ¶ 36.

10 According to plaintiffs, the new premiums were based on Conseco's new misreading of the GCV
11 variable. The GCV Table stated, "[t]his table presumes that the insured pays the full annual premium
12 shown on the preceding page each year." ¶ 56. In plaintiff's view, the GCV provision applied to a
13 policyholder on OPP status *only* for the initial year in which a policyholder opted for OPP status. The
14 GCV Table applied for that year, but not subsequent years, because that was both the first and last year
15 in which the policyholder (a) had paid the annual premium "each year" but (b) the policyholder was not
16 required to pay future annual premiums. *Id.* By the second year of a policyholder's OPP status, the
17 policyholder had not paid the annual premium "each year" and therefore the GCV no longer should have
18 figured into the calculation of whether the policy had become underfunded such that premiums properly
19 could be charged again. In other words, once a policyholder had taken advantage of the OPP Provision
20 and stopped paying premiums, the values set forth in the GCV Table no longer applied, and the GCV
21 was $0 – presumably because upon surrender, the policyholder would be entitled to the accumulation
22 account value, which had by then met or exceeded the GCV.

23 Plaintiffs contend that for many years, Conseco respected this reading of the provision and
24 correctly used $0 for the GCV element of the OPP eligibility formula. Prior to 2008, Conseco routinely
25 sent notices to OPP participants, including Burnett and Camp, stating that the GCV of their policies was
26 $0, with no mention of any premium obligations. The effect of quantifying the GCV as $0 was that
27 most policies satisfied the OPP eligibility requirements because the value of the accumulation account
28 had to exceed only the surrender charge plus any indebtedness. By contrast, the effect of using the

4

values from the GCV Table, as Conseco proposed to do in 2008, was that most LifeTrend policyholders had underfunded accumulation accounts, owed enormous "shortfall amounts," and would have to pay substantial annual premiums going forward.

Plaintiffs allege that, in addition to generating more revenue, Conseco proposed the October 2008 changes in order to induce thousands of policyholders to give up their insurance policies before they died – and before Conseco had to pay out death benefits to their survivors. *Id*. ¶ 4, 5. The so-called "shock loss" strategy would save Conseco tens of millions of dollars on a money-losing product line if they could induce a few thousand policyholders to quit their policies. *Id*. ¶ 5. Plaintiffs allege that the strategy worked and thousands of policyholders, including Burnett and Camp, surrendered their policies when they concluded that the proposed new charges would make the policies "impractical" to maintain. Id.

The October 2008 announcement of forthcoming changes prompted a joint investigation by state regulators from California, Florida, Indiana, Iowa, and Texas. *Id.* ¶ 75. As a result of that investigation, Conseco announced in November 2008 that it would suspend the proposed changes, pending the outcome of the regulator inquiry. *Id.* ¶ 76. On May 25, 2010, Conseco announced that it had entered into a Regulatory Settlement Agreement ("RSA") with thirty-seven state insurance regulators initially, and later forty-five. *Id.* ¶ 77. The RSA allowed Conseco to implement some, but not all, of the changes proposed in October 2008. Pursuant to the RSA, Conseco agreed not to demand that policyholders pay one-time shortfall payments. The RSA allowed Conseco to resume COI charges with specified restrictions and procedures. The RSA included a "Corrective Action Plan" ("CAP"), which provided for a number of changes to the policies, some of which automatically applied to all policyholders, and others of which were contingent on policyholders waiving legal claims against Conseco in exchange for certain benefits. For example, in exchange for eligibility to recover from a $10 million settlement pool, policyholders were required to release Conseco from all claims "arising out of or in any way related to any current and/or future litigation that Claimant could bring regarding <u>allegations in the Agreement</u>..." RSA, Ex. F.1. (emphasis added). RSA ¶¶ 31-66. Conseco resumed implementation of its initial proposed changes, including monthly COI and expense charges, in October 2010.

After receiving letters in October and November 2008 demanding a shortfall payment of

$78,274.97, on December 22, 2008, a "shocked" plaintiff Camp notified Conseco that he intended to surrender his policy. Comp. ¶ 113-117. He received $89,585.57 upon surrender – substantially less than the $500,000 death benefit he had anticipated. *Id.* ¶ 117. Although plaintiff Burnett received similar notices in 2008 and was similarly "shocked," he elected to keep his policies during the regulatory investigation. *Id.* ¶ 125. In September 2010, noticing the value of his policies decreasing precipitously, Burnett elected to surrender his policies and receive a payment from the RSA's settlement pool. Burnett signed the RSA release forms on September 13, 2010.

Burnett and Camp now assert claims similar to those in the *Brady* action, alleging that Conseco breached the insurance policies by, among other things, improperly calculating the premium amounts owed under the OPP provision; calculating cost-of-insurance deductions based on factors other than mortality; calculating expense charges based on factors other than actual expenses; charging a new "per unit" expense charge that was not authorized by the policies; diluting the 4.5% guaranteed interest rate by charging increased premiums, cost-of-insurance deductions and expense charges; and passing along financial losses to the policyholders through increased premiums, cost-of-insurance deductions and expense charges. *Id.* ¶ 202-204. Whereas the *Brady* plaintiffs focus their breach of contract claims on the actual implementation of those changes in 2010, Burnett and Camp – both of whom resigned their policies prior to implementation – focus their breach claims on the announcement of the changes in 2008. Thus, the Burnett plaintiffs further allege that by announcing each of the intended breaches in October 2008, Conseco further breached the policies by intentionally inducing policyholders to surrender their policies or have them lapse. *Id.*

Conseco has now moved to dismiss the Burnett/Camp complaint, contending that plaintiffs have failed to establish that the Court has personal jurisdiction over three of the four defendants – CNO, CDOC, and CNO Services. Conseco has also moved to dismiss the complaint against all defendants for failure to state a claim, on the grounds that plaintiffs cannot allege a breach of contract where they surrendered their policies prior to the implementation of the alleged breach or waived that claim by agreeing to the RSA settlement terms and signing the accompanying release.

**LEGAL STANDARD**

**1. Motion to Dismiss for Lack of Personal Jurisdiction**

Personal jurisdiction over a non-resident defendant may exist if the defendant has either a continuous and systematic presence in the state (general jurisdiction), or minimum contacts with the forum state such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice" (specific jurisdiction). *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). Where there is no federal statute applicable to determine personal jurisdiction, a district court should apply the law of the state where the court sits. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). California law requires only that the exercise of personal jurisdiction comply with federal due process requirements. *See id.* at 800-01.

"A defendant whose contacts with a state are 'substantial' or 'continuous and systematic' can be haled into court in that state in any action, even if the action is unrelated to those contacts." *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984)). "This is known as general jurisdiction. The standard for establishing general jurisdiction is fairly high and requires that the defendant's contacts be of the sort that approximate physical presence." *Id.* (citations omitted). "Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Id.*

In order for a court to exert specific jurisdiction in accordance with due process, a nonresident defendant must have "'minimum contacts' with the forum state such that the assertion of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (quoting *Int'l Shoe*, 326 U.S. at 315). The Ninth Circuit employs a three-part test to determine whether the defendant has such minimum contacts with a forum state. First, the "nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum," thereby invoking the benefits and protections of the forum state. *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997) (quoting *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th

1 Cir. 1998)). Second, the claim must "arise[] out of or result[] from the defendant's forum-related 2 activities," and third, the exercise of personal jurisdiction over the defendant must be reasonable. 3 *Pebble Beach Co.*, 453 F.3d at 1155. The plaintiff bears the burden of proving the first two conditions. 4 *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). If the plaintiff carries this burden, "the 5 defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be 6 reasonable." *Id.* (citing *Schwarzenegger*, 374 F.3d at 802).

7 The plaintiff bears the burden of establishing the district court's personal jurisdiction over the 8 defendant. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128-29 (9th 9 Cir. 2003). If a district court acts on the defendant's motion to dismiss without holding an evidentiary 10 hearing, the plaintiff "need only demonstrate facts that if true would support jurisdiction over the 11 defendant." *Id.* at 1129 (citation omitted). Unless directly contravened, the plaintiff's version of the 12 facts is taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved 13 in the plaintiff's favor for purposes of deciding whether a prima facie case for personal jurisdiction 14 exists. *Id.* (citation omitted); *see also Bancroft*, 223 F.3d at 1087.

### 2. Motion to Dismiss for Failure to State a Claim

17 Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it 18 fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, 19 the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.* 20 *Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility " standard requires the plaintiff 21 to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." 22 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although courts do not require "heightened fact pleading 23 of specifics," *Twombly*, 550 U.S. at 544, a plaintiff must provide "more than labels and conclusions, and 24 a formulaic recitation of the elements of a cause of action will not do," *id.* at 555. The plaintiff must 25 allege facts sufficient to "raise a right to relief above the speculative level." *Id.*

26 In deciding whether the plaintiff has stated a claim, the Court must assume that the plaintiff's 27 allegations are true and must draw all reasonable inferences in his or her favor. *Usher v. City of Los* 28 *Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true

8

1 "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."
2 *St. Clare v. Gilead Scis., Inc.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Moreover, "the tenet that a court
3 must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."
4 *Iqbal*, 556 U.S. at 678. In considering a motion to dismiss, the court may take judicial notice of matters
5 of public record outside the pleadings. *See MGIC Indemn. Corp. v. Weisman*, 803 F.2d 500, 504 (9th
6 Cir. 1986).

7 If the Court dismisses a complaint, it must decide whether to grant leave to amend. The Ninth
8 Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend
9 the pleading was made, unless it determines that the pleading could not possibly be cured by the
10 allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal
11 quotation marks omitted).

## DISCUSSION

### 1. Personal Jurisdiction

Defendants contend that plaintiffs' claims against three defendants– CNO, CDOC, and CNO Services – must be dismissed because this Court cannot exert personal jurisdiction over them. Plaintiffs respond that this Court has both general and specific jurisdiction over all defendants because of their independent contacts with this forum and because CNO, CDOC, and CNO Services are alter egos of defendant Conseco Life.

#### A. General or Specific Jurisdiction.

Having reviewed the complaint, the Court concludes that plaintiffs have not alleged sufficient facts to establish personal jurisdiction over defendants CNO, CDOC and CNO Services. Plaintiffs' personal jurisdiction theory rests on the notion that defendant Conseco Life exists only as a shell company for the benefit of CNO, CDOC and CDOC. There are no specific allegations that these defendants had contacts with California *other than* those as an agent or alter ego of Conseco Life. Rather, there are only conclusory allegations that CNO, CDOC, and CNO Services transacted business in the State of California on behalf of Conseco Life. Such conclusory allegations are insufficient to

9

establish a continuous and systematic presence in the state (general jurisdiction), or minimum contacts with the forum state such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice" (specific jurisdiction). *Pebble Beach Co,* 453 F.3d at 1155.

The complaint alleges that CDOC is a Delaware corporation which is the direct corporate parent and owner of 100% of the stock of defendant Conseco Life. Through "CDOC's ownership of and control over Conseco Life, it transacts business in the State of California...by selling and administering life insurance policies and other financial products." Compl. ¶ 19. CNO is also alleged to be a Delaware corporation, and is the direct corporate parent and owner of 100% of the stock of CDOC. Similarly, plaintiffs' allege, "[t]hrough CNO's ownership of and control over Conseco Life and other Conseco Defendants, CNO transacts business in the State of California...by selling and administering life insurance policies and other financial products." *Id.* ¶ 20. CNO Services is a limited liability company incorporated in Indiana, owned collectively by CNO and CDOC. Plaintiffs allege that CNO Services "actually performs most of the day-to-day operations and actions of Conseco Life." *Id.* ¶ 21. As with CNO and CDOC, plaintiffs further allege, "[t]hrough CNO Services' ownership of and control over Conseco Life and other Conseco Defendants, CNO Services transacts business in the State of California...by administering life insurance policies and other financial products." *Id*. These allegations fail to establish general or specific jurisdiction because they contain no facts demonstrating that these three corporate entities – CDOC, CNO and CNO Services – had a presence in California independent of their investment relationship with their subsidiary, Conseco Life.

The complaint also contains two allegations intended to demonstrate specific contacts with California: (1) that all defendants interacted with California policyholders by communicating with them about the October 2008 letter announcing changes (Compl. ¶ 34-39); and (2) that CNO and CNO Services "negotiated the terms of the RSA on behalf of...Conseco Life." *Id*. ¶ 138. As with the general allegations discussed above, neither of these generic allegations contains enough detail to show that any of these entities had contacts with California besides those as agents or alter egos of Conseco Life. On the second allegation, plaintiffs further contend that CNO's Executive Vice President of Government Relations testified that he participated in nearly all meetings of state regulators – including California regulators – leading up to the RSA. Opp. at 25 (Dkt. 440 at 31). Plaintiffs were able to obtain this

10

deposition testimony from the Court's public docket in the *Brady* action. *Id.* However, taken together with the complaint, this allegation simply furthers the point – that CNO's contacts with California were on behalf of Conseco Life, not independent. As discussed below, while such allegations may establish personal jurisdiction by way of an alter ego or agent theory, both specific and general jurisdiction require that each defendant have its own contacts with the forum state. Having not met this burden, plaintiffs have not demonstrated that the Court can exercise general or specific jurisdiction over these defendants, absent a showing that they are the agent of alter ego of defendant Conseco Life.

### B. Attribution of Conseco Life's contacts to CDOC, CNO and CNO Services

Defendants do not deny that this Court has jurisdiction over defendant Conseco Life. Instead, defendants argue that plaintiffs have not sufficiently alleged alter ego or agent liability. Plaintiffs respond that CDOC, CNO and CNO Services' actions in California are attributable to Conseco Life.

"It is well-established that a parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes. Two exceptions to that general rule exist, however – a subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent." *Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003) (citations omitted).

#### i. Alter ego

"To satisfy the alter ego exception to the general rule that a subsidiary and the parent are separate entities, the plaintiff must make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice. The plaintiff must show that the parent exercises such control over the subsidiary so as to render the latter the mere instrumentality of the former." *Id.* at 1134. (citations omitted). Whether a unity of interest exists is a fact-specific inquiry which requires that courts "look at all the circumstances to determine whether the doctrine should be applied." *Sonora Diamond Corp. v. Superior Court*, 99 Cal. Rptr.2d 824, 836 (2000).

Here, plaintiffs allege that Conseco Life is a subsidiary of CDOC, which in turn is a subsidiary

11

of CNO. CNO Services, being directly owned by CNO and CDOC, is also a parent of Conseco Life. This web of relationships, plaintiffs allege, creates a situation in which Conseco Life "exists only as a shell company for the benefit of" CNO, CDOC and CNO Services. Compl. ¶ 134. As a result of non-arms length transactions and failure to observe corporate formalities, plaintiffs contend that CNO, CDOC, and CNO Services "must be held liable for the shell company's contractual breaches." *Id.* In support of these otherwise conclusory allegations, plaintiffs allege the following facts:

- CNO and CDOC have the power to appoint officers and directors of Conseco Life;

- CNO and CDOC have intentionally caused numerous officers and directors to overlap among the various entities for the purpose of enriching CNO and CDOC; in particular, CNO and CDOC instructed Conseco Life to pay dividends that have depleted Conseco Life's capital;

- CNO requires that Conseco Life contract with affiliates to provide personnel and infrastructure;

- CNO and its affiliates set the prices and rate at which CNO Services and other affiliates provided services to Conseco Life without regard to the trust market value for such services, instead charging for services based on Conseco Life's ability to pay;

- CNO and CNO Services negotiated the terms of the RSA with state regulators, including California regulators, on behalf of Conseco Life.

Compl. ¶¶ 133-138. Although these allegations are generally directed at the claim that defendants have failed to observe corporate formalities and engaged in non-arms length transactions, they include few specific facts demonstrating such. To the extent plaintiffs' allegations do include specific facts, such as the overlap of officers and directors, the required payment of dividends, setting prices and rates for services, and the negotiation of the RSA, these facts, without more, are unremarkable. A parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is "consistent with the parent's investor status." *United States v. Bestfoods*, 524 U.S. 51, 72 (1998). "Appropriate parental involvement includes: monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures." *Id.* Plaintiffs have made no allegations that defendants' behavior regarding officers and directors, dividends, pricing, and negotiation of the RSA is inconsistent with the parties' various investor relationships. *See Harris Rutsky*, 328 F.3d at 1134. Accordingly, the Court

12

1 finds that plaintiffs have not alleged facts sufficient to support a claim that CNO, CDOC, and CNO
2 Services are alter egos of Conseco Life such that the formers' contacts with California are attributable
3 to the latter.

### ii. General agent

"To satisfy the agency test, the plaintiff must make a prima facie showing that the subsidiary represents the parent corporation by performing services sufficiently important to the parent corporation that if it did not have a representative to perform them, the parent corporation would undertake to perform substantially similar services." *See Harris Rutsky*, 328 F.3d at 1135 (citations and ellipses omitted).

Here, it is alleged that Conseco Life is wholly owned by CDOC, which is in turn wholly owned by CNO. CNO Services, being directly owned by CNO and CDOC, also exercises control over Conseco Life. Plaintiffs allege generally that all defendants caused the sending of the October 2008 letter announcing policy changes (Compl. ¶ 36), and that CNO and CNO Services negotiated the RSA on behalf of Conseco Life with state regulators, including California (*Id.* ¶ 138). These allegations are not sufficient to show the degree of control CDOC, CNO, and CNO Services exert over Conseco Life. Plaintiffs do not show that Conseco Life's presence in California substitutes for that of CDOC, CNO, and CNO Services or that CDOC, CNO, and CNO Services are in the business of issuing insurance rather than the business of investing. *See Bellomo v. Penn. Life Co.*, 488 F. Supp. 744, 746 (C.D. N.Y. 1980), cited in *Harris Rutsky*, 328 F.3d at 1135 (9th Cir. 2003) (agency relationship exists if there is no basis "for distinguishing between the business of the parent and the business of the subsidiaries."). Accordingly, the Court finds that plaintiffs have not alleged sufficient factual support for the claim that Conseco Life is the general agent of CDOC, CNO, or CNO Services in California and dismisses these defendants from this action.

### iii. Leave to Amend

Should the Court dismiss CDOC, CNO, and CNO Services, plaintiffs request that they be

1 permitted to conduct jurisdictional and amend their complaint. Defendants oppose that request on the
2 grounds that plaintiffs have twice before suffered adverse jurisdictional rulings in the MDL.

3 Defendants first point to this Court's July 29, 2009 Order in the *Brady* action, in which the Court
4 found that there was no personal jurisdiction over proposed defendant Conseco, Inc. (now known as
5 CNO – a defendant in the Burnett action). There the Court granted plaintiffs leave to amend their
6 jurisdictional allegations within two months, which plaintiffs did not do. Defendants also note that the
7 attorneys involved in the *Brady* action then are the same attorneys representing the Burnett plaintiffs
8 now. Plaintiffs respond that the July 29, 2009 Order has no preclusive effect, because the parties were
9 different and the pre-certification plaintiff there (Brady) could not bind plaintiffs Burnett and Camp
10 prior to certification. They also note that attorney overlap plays no role in any issue preclusion analysis.
11 The Court agrees with plaintiffs. The Burnett plaintiffs are not precluded by the prior ruling because
12 the parties were different and the issues now – with three additional defendants – are different than when
13 the parties in the *Brady* action disputed the Court's jurisdiction over Conseco, Inc. (CNO) only.

14 Defendants next point to the Court's January 25, 2012 Order in the MDL in which the Court
15 denied leave to the *Brady* plaintiffs to amend their complaint to add CNO and CDOC as defendants.
16 That Order, too, has no preclusive effect here. Most importantly, a month prior to that Order the Court
17 had issued an order (December 20, 2011), in which it decertified the class as to surrenderees – including
18 Burnett and Camp. Thus, Burnett and Camp were not actually in the case a month later when the Court
19 denied leave to amend. Therefore, they are not bound by that adverse ruling. Moreover, the Court did
20 not rule on the merits of the request to amend the complaint to add the alter ego theory, and instead
21 focused on the fact that plaintiffs had abandoned their pursuit of that theory for nearly two years. MDL
22 Dkt. 277 at 6.

23 The Burnett plaintiffs have filed a new putative class action and the parties in that action have
24 raised jurisdictional issues that have not been precisely litigated before in the MDL. Therefore, the Court
25 finds in its discretion that plaintiffs should be permitted to conduct jurisdictional discovery and to amend

14

their complaint accordingly.[1]

## 2. Failure to State a Claim

Burnett and Camp purport to represent a nationwide class of people:

> who (1) have owned a Conseco LifeTrend III or IV Policy; (2) have received, since October 2008, any of the following: (a) notice that an annual premium or shortfall payment was due, notwithstanding such person's prior invocation of the Policy's Optional Premium Payment Provision; (b) notice of increased cost-of-insurance deductions; or (c) notice of increased expense charges; and (3) since October 2008, have surrendered their Policies or had them lapse.

Compl. ¶ 168. Plaintiffs also propose a subclass of policyholders who (1) meet the criteria for the class; (2) accepted optional benefits made available by Conseco Life under the Regulatory Settlement Agreement; and (3) signed the standard release form accompanying the Regulatory Settlement Agreement. In short, plaintiffs and the proposed class are policyholders who surrendered their policies in the face of the October 2008 announcement, some of whom did so in connection with the RSA, under which they accepted benefits in exchange for signing its corresponding release. Conseco argues that (1) surrenderees and (2) policyholders who signed the RSA cannot state a claim for breach of contract. The Court addresses each in turn.

### A. Joe Camp

Plaintiff Joe Camp alleges that he surrendered his policy in December 2008 after receiving letters in October and November 2008 demanding additional payments. Upon surrender he contends that he received substantially less than the $500,000 death benefit he had anticipated. He surrendered his policy well in advance of when Conseco actually implemented the changes in 2010. Accordingly, Conseco now contends that Camp and others like him cannot state a claim for breach of contract because at the time they surrendered, the policy changes about which they complain had not gone into effect. In essence, having surrendered their policies, Conseco posits that there could be no breach because there was no contract in existence in 2010. The Court disagrees.

---

[1] Defendants have also filed a motion to stay proceedings, including discovery, pending resolution of this motion to dismiss. That motion is DENIED as MOOT, except to the extent that the Court now permits plaintiffs to conduct jurisdictional discovery. MDL Dkt. 423.

It is a well-established principle of contract law that a promisor's renunciation of a contractual duty before the time fixed in the contract for performance is a repudiation. *See Taylor v. Johnston*, 15 Cal.3d 130, 137 (1975). Repudiation of a contractual duty ripens into a breach prior to the time for performance only if the promisee elects to treat it as such. *Id*. 137-38. When a contract is repudiated, the time of accrual of a breach of contract action depends on whether the injured party chooses to treat repudiation as a present breach; if the injured party elects to place the repudiator in breach before the performance date, the accrual date is accelerated from the time of performance to the date of such election, but if the injured party opts to await performance, the claim accrues from the time fixed for performance. *Id.*

Here, plaintiffs allege that Conseco renounced certain terms of the insurance policy prior to full performance. The October 2008 letter, according to plaintiffs, renounced key terms of the contract by changing the way critical numbers were calculated, including: the premium amounts owed under the OPP provision; cost-of-insurance deductions based on factors other than mortality; expense charges based on factors other than actual expenses; charging a new "per unit" expense charge that was not authorized by the policies; diluting the 4.5% guaranteed interest rate by charging increased premiums, cost-of-insurance deductions and expense charges; and passing along financial losses to the policyholders through increased premiums, cost-of-insurance deductions and expense charges. Whether these alleged renouncements are in fact renouncements (i.e., whether they breach the contract) is not the subject of the instant motion. Assuming, *in arguendo*, that they were, by choosing to surrender their contracts, plaintiffs elected to place the repudiator in breach. *Taylor,* 15 Cal.3d at 137-38. Accordingly, the broader repudiation-based breach of contract accrued the moment plaintiffs elected to surrender their policies.

Conseco responds that although they announced the changes in October 2008, they suspended them a month later pending regulatory review. Conseco contends that by surrendering their policies during that review period, Camp and others like him surrendered at a time when the policies were not actually repudiated. In effect, Conseco argues that its subsequent suspension letter nullified its alleged prior repudiation. The Court disagrees. Conseco's November 2008 announcement told policyholders that the forthcoming changes would be *suspended* not *withdrawn.* The November 2008 suspension letter

1  was not a change of heart; instead Conseco pursued the relevant changes with state regulators for the
2  next two years and finally implemented them in 2010 – all the while leaving policyholders like Camp
3  and Burnett faced with the reality of dwindling accumulation accounts. The promisee does not have
4  to wait for years to see whether the announced repudiation comes to pass. *Taylor*, 15 Cal.3d at 137-38.
5  Instead, in the face of what they viewed as an express repudiation of the contract, plaintiffs – the party
6  injured by the repudiation – elected to place the repudiator in breach by surrendering the contract.[2]

Accordingly, the Court finds that plaintiffs have pled allegations sufficient to state a claim for breach of contract based on repudiation.

### B.     William Burnett

Conseco again raises the issue of whether the subclass of releasors – policyholders who signed the CAP release contained in the RSA settlement – are prohibited from asserting breach of contract claims. *See, e.g.,* MDL Dkt. 138 at 8; 451 at 20. Plaintiff Burnett surrendered his policies by signing such a release and received payment from the RSA's settlement pool.

In exchange for certain benefits, like inclusion in a $10 million settlement pool, certain policyholders released Conseco from all claims "arising out of or in any way related to any current and/or future litigation that Claimant could bring regarding <u>allegations in the Agreement</u>..." RSA, Ex. F.1. (emphasis added).[3] The issue is whether plaintiffs' breach of contract claims in this action are within the scope of the "allegations in the agreement." The Court concludes that they are not. The plain language of the RSA shows that it covers an entirely different subject matter than this class action.

Paragraph 54 of the RSA confirms that "No Lifetrend Policy owner shall be excluded from the CAP on the basis of membership in a purported class action lawsuit pending against the Company."

---

[2] Although they no longer held policies, plaintiffs also argue that the breach of contract was ongoing and actually occurred in 2010 when the changes were implemented. This argument is incorrect. The law on repudiation is clear: the breach occurs when the injured party chooses to treat repudiation as a breach. *Taylor*, 15 Cal.3d at 137-38. Here, plaintiffs and the other policyholders they purport to represent chose to do so prior to the 2010 implementation of the changes at issue.

[3] The Burnett complaint discusses and incorporates the substance of the RSA, which was introduced into evidence in the MDL in the parties' summary judgment briefing. *See* MDL Dkt. 387, Hopkins Decl., Ex. 12, Regulatory Settlement Agreement. Accordingly, the Court takes judicial notice of the undisputed contents of this Agreement.

17

RSA ¶ 54. Presumably, if a policyholder cannot be prevented from participating in the CAP on the basis of membership in a class action, then the same policyholder should not be excluded from this particular class action on the basis of having signed a CAP release. Other portions of the RSA confirm this understanding.

Paragraph 27 of the RSA states, "the Lead Regulators allege that violations have occurred related to the issues under review identified in Paragraph 25." *Id.* Paragraph 25 outlines a broad "multistate market conduct examination of [Conseco] to review the [COI and expense charges] announced in the October and November 2008 letters as well as the sales, administration and management of the Lifetrend policies," conducted by state regulators. *Id.* Paragraph 26 provides more detail of the issues reviewed during the multistate examination:

a. Whether any marketing or advertising materials used by [Conseco] for the Lifetrend policies contained any false or misleading information;
b. Whether [Conseco] engaged in sales practices that misrepresented the benefits, advantages, or terms of the Lifetrend policies;
c. Whether any communication by [Conseco] was misleading to Lifetrend Policyholders;
d. Whether [Conseco] had failed to properly manage or administer the Lifetrend policies; and
e. Whether [Conseco] properly determined [COI and expense charges] made to the Lifetrend policies.

Paragraph 30 also lists the "concerns" that the CAP, which contains the release, was structured to address, including "concerns regarding the [COI and expense charges]; [Conseco]'s attempt to collect additional premiums for under-funded policies; the sale, administration and management of the Lifetrend policies..." *Id.*

Under Indiana law, claims not within the subject matter of a release are not discharged, and courts strictly enforce release language limiting the scope of the release. *Wright Motors, Inc. v. Marathon Oil Co.*, 631 N.E.2d 923, 925-26 (Ind. Ct. App. 1994).[4] From the plain language of the RSA, it is apparent that the multistate examination was premised on a very different theory of potential liability than this putative class action. Four of the five issues listed reflect general concerns about fraudulent behavior, including terms such as "false or misleading information," "misrepresentations," and management failures. These terms evidence a concern on the part of regulators that Conseco COI

---

[4] Paragraph 111 of the RSA provides that "[w]hen an issue pertaining to this Agreement applies to multiple jurisdictions, the [parties] agree that Indiana law shall apply."

1 charges were misleading, but not necessarily inflated. To the extent the RSA contains general 2 statements, such as "Whether [Conseco] properly determined [COI and expense charges] made to the 3 Lifetrend policies," the RSA narrows these general terms with the inclusion of the enumerated preceding 4 list of specific concerns that all sound in fraud. In any event, nowhere does the RSA evidence an 5 awareness or concern for the specific breach of contract claims asserted in this action – that Conseco's 6 announcement of inflated fees and changes in certain policy calculations repudiated the contract. The 7 crux of the multistate examination appeared to be a response to consumer concerns that there was some 8 falsehood behind Conseco's 2008 attempt to restructure charges. Thus, the RSA release covers an 9 entirely different subject matter and therefore does not bar releasors from participating in this action.

Again, whether the announcement and subsequent implementation of changes were in fact repudiations of the contract remains to be seen. On a motion to dismiss for failure to state a claim the Court is only concerned with whether the allegations as plead are sufficient. Having concluded that the RSA does not bar releasors from participating in this action, and that surrendering prior to full implementation does not extinguish plaintiffs breach of contract claim, the Court finds that plaintiffs have stated a claim for breach of contract.

## CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion to dismiss for lack of personal jurisdiction and DENIES defendants' motion to dismiss for failure to state a claim. The Court further directs that the parties engage in jurisdictional discovery and that plaintiffs may amend their complaint only as to the jurisdictional issues discussed herein **within forty-five (45) days of this Order**.

**IT IS SO ORDERED.**

Dated: November 18, 2013

SUSAN ILLSTON
United States District Judge

19