UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM BURNETT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CONSECO, INC., et al., <br><br> Defendants. | Case No. 10-md-02124-SI <br><br> **ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND DENYING PLAINTIFFS' MOTION FOR SANCTIONS** <br><br> Individual Case <br> No. C 12-5906 SI <br><br> Re: Dkt. Nos. 639, 642, 657 |

Defendants Conseco Life, CNO Financial Group, Inc., CDOC, Inc., and CNO Services, LLC have moved to dismiss the amended complaint in this putative class action, based on failure to state a claim and lack of personal jurisdiction. Docket Nos. 639, 642. Plaintiffs William Burnett and Joe Camp have filed oppositions, to which defendants have replied. Plaintiffs have also moved for sanctions. Docket No. 657. These motions came on for hearing on March 20, 2015. Having carefully considered the parties' arguments, the Court GRANTS the motions to dismiss and DENIES the motion for sanctions for the reasons set forth below.

## BACKGROUND

This is a multi-district ligation involving "LifeTrend 3" and "LifeTrend 4" life insurance policies. Plaintiffs in this action, former policy holders William Burnett and Joe Camp, seek the following on behalf of themselves and the members of the proposed class of former LifeTrend policy holders: declarations that Conseco breached their insurance policies and money damages

1  that the class members incurred as a result of the policy breaches. FAC ¶ 12.

2  The parties and the Court are quite familiar with facts and allegations in this litigation. *See In re Conseco Life Insurance Company Life Trend Insurance Marketing and Sales Practices Litigation*, Case No. 3:10-md-02124-SI (N.D. Cal.) ("MDL"). Burnett and Camp were members of the class certified under Fed. R. Civ. P. 23(b)(2) in the first action filed in the MDL, *Brady, et al. v. Conseco, Inc., et al.*, 3:08-cv-05746-SI (N.D. Cal.) ("Brady Action"), until December 20, 2011, when the Court redefined the class in light of the Supreme Court's ruling in *Walmart v. Dukes*, 131 S.Ct. 2541 (2011). The Court held that pursuant to *Dukes*, policyholders who surrendered their policies, like the Burnett plaintiffs, could no longer be included in the class because the monetary relief they sought was not incidental to the declaratory or injunctive relief sought by the *Brady* plaintiffs. *See* MDL Docket No. 253.

Having been excluded from the Brady Action, on October 5, 2012, Burnett and Camp filed this action in the Central District of California. The complaint seeks class certification under Rule 23(b)(3) or alternatively under 23(c)(4). FAC ¶ 11. On November 9, 2012, the MDL Panel transferred the Burnett/Camp case as a tag-along case to this Court.[1] As in the other cases in this MDL, the Burnett plaintiffs named Conseco Life as a defendant. They also have named CNO Financial Group, Inc. and CNO Services, LLC as defendants. CNO Financial was an indirect corporate parent of Conseco Life and CNO Services is a subsidiary of CNO Financial. *Id*. ¶ 2.

Burnett and Camp are former owners of LifeTrend 3 and LifeTrend 4 life insurance policies. *Id*. ¶ 1. For most of the time relevant to this action the LifeTrend policies were administered by Conseco's then-indirect corporate parent, defendant CNO Financial Group, Inc. and defendant CNO Services, LLC, a subsidiary of CNO Financial Group. *Id*. ¶ 2.

The LifeTrend policies were sold in the 1980s and 1990s and were originally issued by Massachusetts General Life Insurance Company and Philadelphia Life Insurance Company. *Id*. ¶¶ 3, 52. Under the terms of the LifeTrend policies, each policy was to provide investment income to the insured during his or her lifetime as well as a death benefit to be paid upon the death

---

[1] As of November, 2013, the *Conseco Life* MDL case was settled and judgment was entered. *See* Docket Nos. 526, 527.

of the insured. *Id*. ¶ 55. Each policy was linked to an investment account known as an "accumulation account." *Id*. ¶ 56. Policyholders initially funded their accumulation accounts by making annual premium payments. *Id*. Conseco would deduct cost-of-insurance and expense charges from the accumulation accounts and pay interest on the amounts remaining in the accounts. *Id*. Each accumulation account accrued interest at a guaranteed minimum interest rate; the guaranteed rate on most policies' accumulation accounts was 4.5%. *Id*. ¶ 57. Two of Burnett's policies had a guaranteed minimum interest rate of 4.5%. *Id*. For his third policy, the guaranteed minimum interest rate was the greater of 4% or 75% of the 90-day time certificate of deposit interest rate of the Chemical Bank of New York (now JP Morgan Chase). *Id*. Camp's policy had a guaranteed minimum interest rate of 4.0%. *Id*.

The policies also gave Conseco the right to impose monthly cost-of-insurance deductions and expense charges, subject to certain limitations stated in the policies. *Id*. ¶ 60. The policies did not define "cost of insurance" but provided the monthly deduction would be calculated using a cost-of-insurance rate. *Id*. ¶ 61. Plaintiffs allege that according to the plain meaning of the policies, the cost-of-insurance deductions were to be determined by a formula based on mortality rates. *Id*. Each policy included a table listing the maximum cost-of-insurance rates that Conseco could charge. *Id*. ¶ 62.

The policies also contained an Optional Premium Payment Provision ("OPP"), which provided that the policyholder could choose to reduce or stop paying annual premiums after five years. *Id*. ¶¶ 58. This so-called "vanishing premium" typically required large initial annual premiums. *Id*. Each policy contained a "Guaranteed Cash Value" table ("GCV table") that listed the minimum amount that Conseco promised to pay the policyholder upon surrender of the policy. *Id*. ¶ 67. The amounts listed in the GCV Table depended on the number of years for which the policy was in force. *Id*. In order to take advantage of the OPP provision and stop paying annual premiums, the policyholder's accumulation account value had to exceed the GCV plus the applicable surrender charge and any indebtedness.[2] *Id*. ¶ 68. If a policy became "underfunded,"

---

[2] The policies referred to any amount a policyholder borrowed as a loan against the balance of their accumulation account as "indebtedness." *Id*. ¶ 63. Conseco was permitted to charge interest

3

meaning that the accumulation account balance fell below the GCV threshold, then Conseco was authorized to resume charging premiums. *Id.* Upon death, a policyholder's beneficiary was entitled to the greater of (1) the "sum insured," as defined in a policy schedule, or (2) the amount in the accumulation account, multiplied by a factor that corresponded to the insured's age at death, less any indebtedness and unpaid premiums. *Id.* ¶ 70.

Plaintiffs allege that by the early 2000s, Conseco was losing money on the LifeTrend policies. *Id.* ¶ 79. In October 2008, Conseco issued a letter demanding "shortfall payments" amounting to several years' worth of retroactively imposed annual premiums. *Id.* ¶ 84. The letter announced a new method for calculating cost-of-insurance deductions which considered factors other than mortality, like policy duration. *Id.* ¶ 86. The October 2008 letter also announced changes to the method used to calculate OPP eligibility under the policies. *Id.* ¶ 89.

According to plaintiffs, the new premiums were based on Conseco's misapplication of the GCV variable. *Id.* ¶ 90. In plaintiff's view, the GCV was zero once a policy had been on OPP status for more than one year. *Id.* Thus, by the time Conseco sent the 2008 letter the GCV table no longer applied to OPP/vanishing premium eligibility calculations. *Id.* Plaintiffs contend that prior to 2008, Conseco correctly used $0 for the GCV element of the formula; the result of this application was that most policies satisfied the OPP/vanishing premium eligibility requirements because the value of the accumulation account only had to exceed the surrender charge (which was generally $0 for policies in force for twenty years or more) plus any indebtedness. *Id.* In other words, once a policyholder had taken advantage of the OPP Provision and stopped paying premiums, the values set forth in the GCV Table no longer applied, and the GCV was $0 – presumably because upon surrender, the policyholder would be entitled to the accumulation account value, which had by then met or exceeded the GCV. Additionally, the October 2008 letter announced substantial increases in cost-of-insurance deductions. *Id.* ¶ 96. Plaintiffs allege the announced cost-of-insurance increases violated the policies because the increases were driven by factors other than mortality, including but not limited to policy duration. *Id.*

---

on those loans. *Id.*

4

1    Plaintiffs allege that Conseco's provision of inaccurate information in the October 2008 letter breached the policies irrespective of whether Conseco ultimately paid (or intended to pay) correctly calculated death benefits and account surrender values. *Id*. ¶ 99. According to plaintiffs, Conseco expected and intended thousands of LifeTrend policyholders to respond to the shock of the massive increases by surrendering their policies or letting them lapse. *Id*. ¶ 5. The so-called "shock lapse" strategy would save Conseco tens of millions of dollars on a money-losing product line if they could induce a few thousand policyholders to quit their policies. *Id*. Plaintiffs allege that the strategy worked and more than four thousand policyholders, including Burnett and Camp, surrendered their policies when they concluded that maintaining the policies under the new charges would be neither feasible nor worthwhile. *Id*. ¶ 7-8. Rendering the policies uneconomical was an essential part of Conseco's scheme to shed its obligations to LifeTrend policyholders. *Id*. ¶ 106.

The administrative changes announced in the October 2008 letter prompted a joint investigation by state regulators from California, Florida, Indiana, Iowa, and Texas. *Id*. ¶¶ 100-01. As a result of that investigation, Conseco sent another letter in November 2008 which stated that policyholders "may temporarily disregard all previous notices sent from Conseco" regarding the LifeTrend policies. *Id*. ¶ 101. On May 25, 2010, Conseco announced that it had entered into a Regulatory Settlement Agreement ("RSA") with thirty-seven state insurance regulators initially, and later forty-five. *Id*. ¶ 225. The RSA allowed Conseco to implement some, but not all, of the changes proposed in October 2008. *Id.* ¶ 226. Pursuant to the RSA, Conseco agreed not to demand that policyholders pay one-time shortfall payments, but nothing in the RSA barred Conseco from calculating OPP/vanishing premium eligibility under the policies in the manner announced in the October 2008 letter. *Id.* Regulators also agreed they would not take action to stop Conseco from imposing cost-of-insurance deductions and expense charges similar to those described in the October 2008 letter. *Id.* The administrative changes permitted and prohibited under the RSA were described in the RSA's "Corrective Action Plan" ("CAP"). *Id.* ¶ 242-45.

The October 2008 letter sent to Camp stated that Conseco would be imposing COI deductions of $727.97 per month and that his policy was underfunded by $78,274.97. *Id*. ¶ 267.

1    Camp also received a shortfall notice in November 2008 demanding payment of $78,274.97. *Id.*
2    ¶ 269. At no time after October 2008 did Conseco tell Camp that his policy was not underfunded
3    by $78,274.97 nor did Conseco inform Camp that he did not owe $78,274.94. *Id.* ¶ 270. Conseco
4    also never clarified Camp's OPP/vanishing premium eligibility, the amounts to be deducted as
5    COI, or the interest to be credited to his accumulation account. *Id.* Conseco's shock lapse
6    strategy worked on Camp and he surrendered his policy on February 5, 2009. *Id.* ¶ 272. Conseco
7    informed him the value of his accumulation account was $99,055.57 and he would receive
8    $89,585.57 after the surrender charge. *Id.* This amount was far less than the $500,000 death
9    benefit he planned to have available to his family. *Id.*

10   Similarly, Burnett received the October 2008 letter from Conseco declaring his policies
11   were underfunded and demanding additional premiums. *Id.* ¶ 279. Burnett was shocked by the
12   demands, but did not surrender his policies immediately. *Id.* ¶ 280. At no time after October 2008
13   did Conseco tell Burnett that his policies were not underfunded nor did Conseco inform Burnett
14   that he did not owe massive premiums. *Id.* ¶ 281. Conseco also failed to tell Burnett what his
15   COI obligations would be going forward. *Id.* In the summer of 2010, Burnett learned of the RSA
16   and signed the release forms on September 13, 2010. *Id.* ¶¶ 282-83. After the RSA was
17   implemented and after he received notice of what Conseco contended were the applicable COI
18   deductions and premiums, Burnett surrendered his policies. *Id.* ¶ 283. In December 2010, Burnett
19   obtained the cash value of one policy, which was $13,791. *Id.* ¶ 285. In February 2012, Burnett
20   obtained the cash value of his second policy, which was $10,390.96, and his third policy, which
21   was $11,304.74. *Id.* ¶¶ 286-87. In September 2012, Burnett received an additional $1,748.71
22   under the RSA.

23   Plaintiffs allege the defendants breached the terms of the LifeTrend 3 and 4 policies and
24   plaintiffs and class members are entitled to money damages. *Id.* ¶¶ 323-33. Plaintiffs further seek
25   a declaration that Conseco's actions violated the terms of the policies. *Id.* ¶ 338. Defendants now
26   move to dismiss plaintiffs' first amended complaint for failure to state a claim and for lack of
27   personal jurisdiction. Plaintiffs have also moved for sanctions.

**LEGAL STANDARD**

**I.     Motion to Dismiss for Failure to State a Claim**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*

In reviewing a Rule 12(b)(6) motion, a district court must accept as true all facts alleged in the complaint, and draw all reasonable inferences in favor of the plaintiff. *See al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009). However, a district court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). As a general rule, the Court may not consider any materials beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001). However, pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of "matters of public record," such as prior court proceedings, without thereby transforming the motion into a motion for summary judgment. *Id.* at 688-89. If the Court dismisses a complaint, it must decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## II. Motion for Sanctions

Discovery misconduct is sanctionable under Rule 37 of the Federal Rules of Civil Procedure. *Sneller v. City of Bainbridge Island*, 606 F.3d 636, 640 n.4 (9th Cir. 2010). A Court may sanction a party who fails to obey an order to provide or permit discovery, or fails to timely supplement initial disclosures or discovery responses. Fed. R. Civ. P. 37(b)(2)(A), (c)(1). Sanctions may include ordering a party to pay reasonable expenses including attorneys' fees caused by the failure to comply with the discovery order. Fed. R. Civ. P. 37(b)(2)(C), (c)(1)(A). A court may also direct that designated facts be taken as established for purposes of the action, prohibit the disobedient party from supporting or opposing designated claims or defenses or from introducing designated matters in evidence, or strike the pleadings in whole or in part. Fed. R. Civ. P. 37(b)(2)(A)(i)-(iii).

# DISCUSSION

## I. Motion to Dismiss for Failure to State a Claim

Conseco contends that plaintiffs' breach of contact claim is legally insufficient and must be dismissed. First, Conseco argues that under California law, once a policyholder exercises his right to surrender permanent life insurance coverage, all rights derived from the policy terminate. Docket No. 639 at 9. Conseco contends that the terms of plaintiffs' surrender contracts bar them from now seeking or recovering consequential damages under the policies. *Id*. at 14; Reply at 4-5. Plaintiffs argue that they do not seek an order compelling Conseco to pay death or other benefits on policies that have been surrendered, but instead seek consequential damages for Conseco's breaches of contract that occurred while their policies were still in effect. Docket No. 647 at 15. Plaintiffs point specifically to the October 2008 letter as the act that breached Conseco's contractual duty to provide accurate information to policyholders about the status of their policies. *Id*. at 6. Plaintiffs contend that a policyholder may recover damages for breach of an insurance policy even if the policy is surrendered after the breach.

The parties here have not provided the Court with arguments regarding choice of law. Defendant states in its motion that Burnett's policies are governed by California law because

8

California is the state where the policies were issued to him. Docket No. 639 at 9.

Plaintiffs rely upon the "common law" to argue that they are entitled to consequential damages for Conseco Life's breaches of contract which occurred while their policies were still in effect, even though the policies were later surrendered. Docket No. 647 at 12-15; Docket No. 700 at 3. Plaintiffs point to only one case, a case from Colorado, *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59 (Colo. 2005), which they contend supports their position. However, this case does not provide plaintiffs with the legal support they require.

In *Coors*, the plaintiff Mr. Coors entered into contract for a life insurance policy with Security Life in 1994. The specific written terms on the declarations page of the contract provided the monthly expense charges were $7.00 per policy per month and $.131 per $1,000 of basic death benefit per month during the first five years of the policy. *Id*. at 62. However, a disclosure statement sent by Security Life after the contract was signed stated the monthly expense charges were $7.00 per policy per month and $.90 per $1,000 of basic death benefit per month during the first five policy years. The disclosure statement "was designated as an illustration, not a contract, and referred policyholders to their written policy to the extent that the disclosure statement was in conflict." *Id*. at 62. In fact, Security Life charged Coors the higher, $.90/$1000 expense charge for approximately three and one-half years, depleting Coors' cash surrender value accordingly.[3] *Id*.

In 1997, Security Life learned a "computer truncation error" had mistakenly printed the $.131 expense charge on 227 policies, including Coors'. However, Security Life had always intended to charge $.90 per $1,000, and "concluded that the misprint was a scrivener's error, which could be reformed." *Id*. In 1998, Security Life notified Coors of the discrepancy by letter. *Id*. at 63. After receiving the letter, Coors requested a surrender of his policy and demanded payment. Security Life issued Coors a check for $667,025.03 — the surrender value of his policy less a termination penalty of $111,966.93. *Id*. Coors then filed suit against Security Life for breach of

---

[3] Coors was charged $2,340 per month at the $.90/$1000 rate, on policy benefits of $2,600,000. Payments at the stated contract rate, $.131/$1000, would have been considerably lower ($340.60 per month). The higher amount was deducted from Coors' cash surrender value monthly.

1   contract, bad faith breach of contract, fraud, violation of the Colorado Consumer Protection Act,
2   and punitive damages. *Id*.

3   The trial court found that Security Life's use of the $.90 expense charge constituted a
4   material breach and "the expense overcharge had a material impact on the performance and
5   surrender value of Coors' policy in the amount of $89,973.00 with interest in the amount of
6   $44,880.00." *Id*. at 64. Ultimately, the Colorado Supreme Court agreed with that analysis, and
7   further held that Security Life was not entitled to charge Coors with the $111,966.93 termination
8   penalty. *Id*. at 62, 64.

9   Conseco argues, and the Court agrees, that *Coors* supports only the proposition that a
10  surrendering policyholder may sue for the proper amount of cash surrender value on a breach of
11  contract claim. Docket No. 654 at 7. *Coors* does not support plaintiffs' broad contention that a
12  surrendering policyholder may sue for consequential damages "based on a breach of contract that
13  occurred prior to a policy surrender." Docket No. 647 at 16. In *Coors*, Security Life's
14  overcharges amounted to a breach of contract and gave rise to Coors' right to surrender his policy
15  without penalty and to receive a correct, recomputed surrender value— but not to the kind of
16  consequential damages being sought by Burnett and Camp.

17  The Court notes that defendants do not argue that the plaintiffs' surrender of their policies
18  would bar them from bringing misrepresentation claims or seeking damages under consumer
19  protection statutes. Docket No. 654 at 3. Conseco also concedes that the surrender contracts do
20  not release claims for fraud. *Id*. at 5. Such claims, however, are not made in the amended
21  complaint. Accordingly, the Court must GRANT Conseco's motion to dismiss plaintiffs' claims
22  for breach of contract as plaintiffs have failed to state a legally cognizable claim.

23  The CNO defendants argue that plaintiffs' claims against them are derivative of their
24  claims against Conseco and therefore should be dismissed pursuant to Rule 12(b)(6). Docket No.
25  642 at 2. As plaintiffs have failed to allege a breach of contract against Conseco, their claims
26  against the CNO defendants similarly fail and the Court must also GRANT the CNO defendants'

motion to dismiss.[4]

## II.     Motion for Sanctions

Plaintiffs seek sanctions against defendants under Federal Rules of Civil Procedure 37(b) and 37(c). Docket No. 657. Plaintiffs allege that defendants have obstructed plaintiffs' discovery efforts and refused to fulfill their discovery obligations by withholding certain information related to plaintiffs' jurisdictional discovery. *Id*. at 2-3. Plaintiffs move the Court to sanction defendants by treating certain facts as true, and by striking defendants' assertions to the contrary. Motion at 2. Plaintiffs also seek attorneys' fees.

### A.     Sanctions Under Rule 37(b)

Rule 37(b) provides that a court may impose sanctions on a party which fails to comply with a discovery order. Fed. R. Civ. P. 37(b)(2)(A). Plaintiffs contend that defendants are subject to sanctions because they violated an order requiring production of documents related to the Transaction Services Agreement ("TSA") between the CNO defendants and non-party Wilton Reinsurance. Docket No. 657 at 18.

The order upon which plaintiffs rely was issued by Magistrate Judge Laporte on October 21, 2014. *See* Docket No. 634. The order was the result of plaintiffs' motion to compel Wilson Re to produce, among other things, documents related to the TSA that were located both inside and outside the data room[5] set up for the sale of Conseco to Wilton Re. *See* Docket No. 611. Judge Laporte held a hearing on the motion on September 9, 2014, at which counsel for plaintiffs and Wilton Re argued. Docket No. 630. Though the motion concerned only plaintiffs and Wilton Re, an attorney for Conseco observed the first portion of the hearing. *See* Docket No. 657-1 at 3.

---

[4] The CNO defendants also move to dismiss plaintiffs' claims against them for lack of personal jurisdiction pursuant to Rule 12(b)(2). Docket No. 642 at 10. The Court need not reach this issue as plaintiffs have failed to state a claim against Conseco and thus also against the CNO defendants.

[5] A data room is a physical or virtual space used for housing data, in this case information related to Wilton Re's purchase of Conseco.

11

1    Judge Laporte remarked during the hearing that the documents related to the TSA were relevant to
2    plaintiffs' alter ego theory, and that it was fair for plaintiffs to seek discovery of these documents
3    as long as their requests were not overbroad. *Id*. at 14-15. The resulting order directed plaintiffs
4    to seek TSA documents inside the data room from Conseco first. *See* Docket No. 624 at 3. In the
5    event that Conseco failed produce the requested documents, the order directed plaintiffs and
6    Wilton Re to work together to search for the documents, with the understanding that plaintiffs
7    would bear some of the cost of this search. *Id.* As to the TSA documents outside the data room,
8    the order did not mention the defendants at all, but instead directed plaintiffs and Wilton Re to
9    work together toward agreeing on an electronic search for responsive documents. *Id.* at 3-4.
10   Production of TSA documents was subject to claims of privilege. *Id.* at 4.

11   The Ninth Circuit has explained that sanctions "may be imposed even for violation of a
12   court's oral order, as long as a party has 'unequivocal notice that a court has asked that certain
13   documents be produced.'" *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787 (9th Cir. 2011) (quoting
14   *Unigard Sec. Ins. Co. v. Lakewood Eng'g. & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992)).
15   Plaintiffs contend that Judge Laporte ordered the TSA documents to be produced, and that
16   defendants violated this order by not turning over these documents. Docket No. 657 at 18. The
17   Court does not share this view. First, the order did not involve any of the defendants. *See*
18   *generally* Docket No. 634. Plaintiffs noted this at the hearing, Docket No. 630 at 11 ("[W]e did
19   not feel comfortable moving to compel on Conseco . . . at this juncture."), and the fact that Judge
20   Laporte required Wilton Re to produce responsive documents only if Conseco did not indicates
21   that the order was not binding on Conseco. Docket No. 634 at 3. Further, even if the order did
22   apply to defendants, it did not provide "unequivocal notice that a court has asked that certain
23   documents be produced." *See Dreith*, 648 F.3d at 787. The cases plaintiffs cite in support of
24   their view fail to support their position, because each case involves situations in which the
25   sanctioned party had a discovery order issued against it directly. *See Dreith,* 648 F.3d 779
26   (affirming sanctions against defendants who failed to comply with a discovery order against them
27   even though the order was not formally noticed, opposed, or heard); *United States v. Westinghouse*
28   *Elec. Corp.*, 648 F.2d 642 (9th Cir. 1981) (rejecting defendants' argument that they could not be

United States District Court
Northern District of California

1   sanctioned under Rule 37 on the basis of a magistrate's order issued against them before that order

2   was adopted by the district court); *Henry v. Sneiders*, 490 F.2d 315 (9th Cir. 1974) (affirming

3   entry of default against defendant who refused to comply with a discovery order issued against her

4   orally rather than in writing). The Court declines to enforce sanctions here where defendants had

5   no discovery order issued against them at all. *See Unigard*, 982 F.2d at 368.[6]

### B. Sanctions under Rule 37(c)

Next, plaintiffs argue for sanctions under Rule 37(c), which states "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Plaintiffs argue that the defendants have violated Rule 26(a) by failing to disclose communications with regulators about payments between Conseco and CNO Services, which were mentioned in the CNO defendants' 12(b)(2) motion to dismiss. Docket No. 657 at 19.

Defendants point out, and plaintiffs do not dispute, that plaintiffs and the CNO defendants have not yet conferred as required by Rule 26(f), and are thus not under an obligation to make initial disclosures under 26(a). Docket No. 685 at 17; Fed. R. Civ. P. 26(a)(2)(C) ("A party must make the initial disclosures at or within 14 days after the parties' Rule 26(f) conference . . . ."). As to Conseco, the defendants argue (and plaintiffs do not dispute), that the communications with regulators were not relevant to the claims or defenses of Conseco, only to those of the CNO defendants. Docket No. 685 at 18. Conseco was therefore under no obligation to disclose the information. *See id*. Given that the CNO defendants were not yet required to provide initial disclosures, and the disclosures were not relevant to Conseco's claims or defenses, the failure of defendants to provide plaintiffs with communications with regulators was not a violation of Rule 26(a). Accordingly, Rule 37(c) provides no basis for sanctions against defendants.

---

[6] In their reply, plaintiffs argue that defendants violated a further order of Judge Laporte which stated that the parties "should be candid with each other[.]" Docket No. 689 at 9-10 citing Docket No. 602 at 5. The court will not consider arguments raised for the first time in a reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

### C. Sanctions Under the Court's Inherent Authority

Finally, plaintiffs argue that the Court should sanction defendants pursuant to its own inherent authority. Under its inherent powers, a court may impose sanctions where a party has willfully disobeyed a court order, or where the party has "acted in bad faith, vexatiously, or for oppressive reasons." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 1758 (2014) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1978)). These powers, however, "must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). Accordingly, the bad-faith requirement sets a "high threshold," *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997), which may be met by willful misconduct, or recklessness that is coupled with an improper purpose. *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001).

Plaintiffs argue defendants have acted in bad faith in three ways. First, plaintiffs assert that defendants misled them into believing defendants conducted a thorough search for TSA documents, claimed no such documents existed, but later backtracked on their assertions that the documents did not exist. Docket No. 657 at 22. Plaintiffs further argue that even now defendants appear unwilling to remedy their discovery deficiencies as they continue to object to production of the TSA documents. *Id*. And finally, plaintiffs contend that defendants acted in bad faith when they claimed that regulatory communications were irrelevant, but later relied on those communications in their motion to dismiss. *Id*.

The Court is not convinced that these facts sufficiently demonstrate the bad-faith conduct necessary to invoke the Court's inherent powers. *See Fink*, 239 F.3d at 992. Defendants' statement that they had performed a diligent search for TSA documents outside the data room and found none may have been misleading in light of defendants' later admission that responsive documents existed. *See* Docket No. 657, Sugimura Decl. Ex. 5 at 3. However, to constitute sanctionable conduct the statement must have been reckless and coupled with something more— like an improper purpose. *Fink*, 239 F.3d at 994. As to defendants' continued objections to plaintiffs' requests to produce the TSA documents, the plaintiffs have provided no information that would allow the Court to address whether the objections are illegitimate or otherwise

14

1  unreasonable. *See* Docket No. 657 at 22. The CNO defendants' use of regulatory
2  communications in its motion to dismiss — after previously arguing the communications were
3  irrelevant — does not demonstrate bad faith. Plaintiffs assert that defendants responded to
4  document requests by stating that the regulatory documents were "irrelevant" and reiterated this
5  position at a hearing on plaintiffs' motion to compel; however, this request was served only on
6  Conseco, not the CNO defendants — the defendant party that later relied upon the
7  communications. *Id*. at 16-17; Sugimura Decl. Ex. 15. Moreover, Conseco's objection was not
8  simply that the documents were irrelevant, but that they had already produced relevant documents,
9  and that Plaintiffs' request was overbroad and burdensome. Docket No. 657, Sugimura Decl. Ex.
10 15 at 18-20.[7] Plaintiffs have not demonstrated that defendants acted in bad-faith to mislead the
11 plaintiffs or the Court as to the relevance of these documents.

12 While the Court agrees that certain of defendants' representations may have been
13 misleading in light of later developments, the plaintiffs have not made the requisite showing of
14 bad faith that the Court must explicitly find before invoking its inherent powers to levy sanctions.
15 *See Fink*, 239 F.3d at 993. Because Rules 37(b) and (c) similarly provide insufficient basis for
16 imposing sanctions on defendants, plaintiffs' motion for sanctions is DENIED.

21 ///
22 ///

---

[7] At the hearing on the plaintiffs' motion to compel, Judge Laporte agreed with Conseco that plaintiffs' request was overbroad, stating:
> I think what you're asking is far too amorphous. . . . [I]f you could come up with something much more specific, then I could say yes or no, but it's very unclear to me what you want. I mean, every interaction the parent company has made with California regulators over a certain period[,] and then you're going to try to figure out on whose behalf it was? . . . [T]hat's . . . just too amorphous and over-broad.

Docket No. 594 at 28, Transcript of Hearing Before Judge Laporte on May 7, 2014.

United States District Court
Northern District of California

**CONCLUSION**

For the above stated reasons, the Court GRANTS defendants' motions to dismiss with prejudice and DENIES plaintiffs' motion for sanctions.

**IT IS SO ORDERED.**

Dated: April 9, 2015

_____
SUSAN ILLSTON
United States District Judge